1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3                           ---

4               THE HONORABLE MARVIN J. GARBIS

5           UNITED STATES DISTRICT JUDGE PRESIDING

6

7    Amphastar Pharmaceuticals, Inc.,    )

8                    Plaintiff,          )

9                                        )

10   vs.                                 )   Case No.

11                                       )   ED CV 09-00023-MJG(Opx)

12   Aventis Pharma SA, et al.,          )

13                    Defendants.        )

14   _____    )

15

16

17           REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

18                   Day 1- A.M. Session

19                 Los Angeles, California

20                 Monday , July 7, 2014

21

22   Pamela A. Batalo, CSR, FCRR, RMR
     Official Reporter
23   Roybal Federal Building
     255 East Temple Street
24   Room 181-I
     Los Angeles, California  90012
25   (213) 687-0446

```
 1   APPEARANCES:

 2     FOR PLAINTIFF:          JAN P. WEIR

 3                             TAYLOR C. FOSS

 4                             JOSEPH J. MELLEMA

 5                             K&L GATES LLP

 6                             1 PARK PLAZA, 12TH FLOOR

 7                             IRVINE, CA 92614

 8

 9     FOR DEFENDANTS          WILLIAM B. DAWSON

10     AVENTIS PHARMA SA,      BETTY YANG

11     AVENTIS                 TRACEY B. DAVIES

12     PHARMACEUTICALS,        GIBSON DUNN & CRUTCHER LLP

13     INC., AND               2100 MCKINLEY AVENUE, SUITE 1100

14     SANOFI-AVENTIS SA:      DALLAS, TX 75201-6912

15

16                             RICHARD H. CUNNINGHAM

17                             GIBSON DUNN & CRUTCHER LLP

18                             1801 CALIFORNIA STREET

19                             DENVER, CO 80202-2642

20

21                             STEPHEN C. PAYNE

22                             GIBSON DUNN & CRUTCHER LLP

23                             1050 CONNECTICUT AVENUE NW

24                             WASHINGTON, DC 20036-5306

25
```

| | |
|---|---|
| 1 | INDEX FOR JULY 7, 2014 |
| 2 | |
| 3 | INDEX OF WITNESSES |
| 4 | |
| | WITNESSES:                                                    PAGE |
| 5 | |
| | JERRY L. ATWOOD |
| 6 |   DIRECT EXAMINATION BY MR. WEIR                     51 |
| |   CROSS-EXAMINATION BY MS. DAVIES                    83 |
| 7 | |
| 8 | |
| 9 | EXHIBITS |
| 10 | |
| 11 | PLAINTIFFS' EXHIBITS:                      MARKED      RECEIVED |
| 12 | |
| 13 | |
| 14 | |
| 15 | DEFENSE EXHIBITS:                          MARKED      RECEIVED |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

```
 1              Los Angeles, California, Monday, July 7, 2014

 2                              9:01 a.m.

 3                               -oOo-

 4         THE COURT:  Good morning.  The powers that be told me

 5    that they promise that the air conditioning in the courtroom is

 6    working and that it will be comfortable in due course.

 7         Okay.  Let us, I guess, begin, first of all, if just

 8    counsel would identify themselves, and then we can proceed,

 9    please.

10         MR. WEIR:  Good morning, your Honor.  Jan Weir for the

11    relator, Amphastar Pharmaceuticals.  At counsel table with me is

12    Taylor Foss and Joseph Mellema.  Also Jennifer Mauri is back at

13    the computer.

14         THE COURT:  Okay.

15         MR. DAWSON:  Your Honor, Bill Dawson for the defendant

16    Aventis, and with me at counsel table is Tracey Davies, Betty

17    Yang, and Rich Cunningham.  We're ready, your Honor.

18         THE COURT:  Thank you.  We shall -- we shall proceed

19    and -- as we have discussed the schedule -- we'll just see how

20    things are going.  Right now we have a request for 45 minutes of

21    opening statements, and I am happy to honor that.  And I

22    therefore call on Mr. Weir and please proceed.

23                    Plaintiff's Opening Statement

24         MR. WEIR:  Thank you, your Honor.  We do have some

25    slides that will appear.  I hope they will appear on your
```

1    monitor as we're proceeding.  I see the first line on mine, on

2    the main monitor.  Do you see it on yours?

3              THE COURT:  No.  This is not going to be any delay,

4    but if the monitor can work, it would be fine.

5              Now you are going to show me which button to touch.

6              We're fine, Mr. Weir.  I'm looking at that screen.

7              MR. WEIR:  Okay.  I would like to start off,

8    your Honor, by framing the issue that is currently before the

9    Court and the evidence that Amphastar will present to address

10   that issue.

11             As you know, the issue here is whether or not

12   Amphastar is an original source for the FCA claims asserted in

13   the Complaint.  And we have focused our discussions prior to

14   this date on Amphastar's experimentations that they did prior to

15   the filing of the ANDA litigation between Amphastar and Aventis

16   back in 2003.

17             In that ANDA litigation, Amphastar established that

18   Aventis submitted false information to the Patent Office in

19   order to support the patentability of the DeBrie patent that was

20   at issue in that case.

21             And I have up on the board some quotes from the ANDA

22   court litigation, the ANDA litigation courts, in which they

23   state that the central issue for the patentability of the DeBrie

24   patent was the longer plasma half-life.  So they represented to

25   the Patent Office that the claimed invention exhibited an

1    improved half-life over the prior art Mardiguian patent.

2         And so it is Amphastar's contention that we did

3    experimentation that shows that that statement sufficient for --

4    to establish ourselves as original source was untrue.

5         So the -- the key issue then in this case focuses

6    around the half-life study that was reported in the DeBrie

7    patent.

8         The next slide is a slide of the DeBrie patent, and

9    Example 6 is the key example that was at issue in the ANDA

10   litigation.

11        Example 6 compares the mixtures of the invention to

12   the prior art European Patent EP 40,144.  And it describes that

13   it has a greater -- the claimed -- the invention has a greater

14   half-life than the EP 40,144, and in particular in

15   subparagraph 1, it says the mixtures produced in Examples 3 and

16   4 at a 40-milligram dose, 75 percent of the cases had a

17   half-life longer than four hours and 45 percent more than four

18   and a half hours, where in subparagraph 3 they said for the EP

19   Patent, it had a half-life at four and a half hours of only 17

20   percent.

21        So this was a big difference which they argued was --

22   made it patentable.

23        The reference to Examples 3 and 4 in Example 6, if we

24   go back to the specification to Example 6 to the reference to 3

25   and 4, so Example 3 begins *this example illustrates the*

1   *preparation and properties of the mixtures according to the*

2   *invention.*

3           And this is key language because when it's

4   incorporated into Example 6, they are saying that the invention

5   here in 3 and 4 -- 3 and 4 is what gives you the superior

6   half-life properties.

7           So as your Honor knows, you claim the invention at the

8   end of the patent, and if we go to the claim, Claim 1, Claim 1

9   defines the invention in terms of its molecular weight

10  properties.  And you'll see that it says, for example, in the

11  first element from 9 to 20 percent of the polysaccharide chains

12  having a molecular weight less than 2,000.  Then it has 5 to 20

13  percent greater than 8,000.  And 60 to 86 percent between the

14  two, and then it has a -- was called a polydispersity range of

15  1.3 to 6.1 and then finally an average molecular weight of 3500

16  to 5500 daltons.

17          The reason why I bring this up, your Honor, is this is

18  the definition of the invention which, according to the

19  teachings in the DeBrie patent, had the superior half-life

20  properties.  And what we will show you is Amphastar's

21  experiments using the Mardiguian teachings resulted in a

22  composition that fell within the scope of that molecular weight

23  distribution.

24          And therefore based on the teachings of the patent if

25  it had those properties of the invention, it had to have the

1    same half-life properties because that's the whole logical

2    basis, structure for the patent.

3            The other allegation that we have raised which came --

4    was the subject of discussion just a couple days ago was the

5    citizen's patent that Aventis filed with the FDA.  And in

6    particular, what we are challenging there is the statement by

7    Aventis that -- where they say here at page 10 and 11, *as*

8    *discussed above, Aventis utilizes a process of beta elimination*

9    *of uronic benzyl esters to manufacture enoxaparin.*  And here is

10   the key language.  *This process creates a distinct drug product*

11   *with unique chemical structure that is sensitive to specified,*

12   *specified temperature, base concentration and duration of --*

13   *factors in the reaction.*

14           Then they have a footnote that follows that where they

15   say *since the initial development of enoxaparin in 1981, the*

16   *steps of the manufacturing process have remained unchanged.*

17   Okay.

18           We believe that Amphastar's experimentation shows that

19   the statement that enoxaparin is limited to specified

20   temperature-based concentration and duration factors in the

21   reaction is not true.  That those conditions can be varied and

22   you can still result in enoxaparin.

23           So our evidence will show the reproductions of the

24   40,144 patent that is referred to in Example 6 of the patent.

25           And let me set the background for that just briefly.

1           Amphastar in the early 2000s decided to make a generic

2     version of the drug enoxaparin.  And as typical in a research

3     company, they began a research project where they took the

4     teachings of the Mardiguian patent and they ran experiments and

5     they conducted experiments up to the ANDA litigation, the filing

6     of the ANDA litigation and beyond.

7           Not all of the experiments we're relying on.  There's

8     a great many experiments where they were testing the limits of

9     the reaction, whether they could get a greater yield, whether

10    they could effectively destroy the reaction, what were the

11    limits?  How far could you go?  How little could you use?

12          And so we're not going to go through two to three

13    years of experimentation here to show you exactly what they did,

14    but what we are going to do, if the Court will indulge us, is to

15    show you what Amphastar did by illustrative examples and then

16    the key experiments that we are going to rely on.

17          Generally the evidence will show that when Amphastar

18    first started its experiments, it did the easiest experiment

19    they could come up with that was conducted at room temperature.

20    And that experiment failed.

21          They then moved to another example, Example 17 in the

22    Mardiguian patent, and that patent did generate a low molecular

23    weight heparin that fell within the scope of the claims of the

24    '618 patent.  So this is the second -- essentially the second

25    experimental method that they tried.

1    However, the enoxaparin is -- and you'll hear the

2    testimony on this -- is a product of a benzyl ester.  Example 17

3    is a for chloral benzyl ester so Example 17 was not acceptable

4    for a generic drug product.

5         They switched back to Example 3 and then a combination

6    of Examples 2 and 3.

7         The Example 3 was successful and Example 2 and 3 was

8    successful.

9         Now, here's what's interesting about Examples 2 and 3.

10   Example -- these examples in the Mardiguian patent have

11   basically described two steps.  Go back one slide to just the --

12   so they basically describe two steps.  The first step is the

13   esterification step and the second step is the depolymerization

14   step, and what we will show you is what Mr. Mardiguian did in

15   his patent was -- I liken it to like a problem matrix where you

16   have maybe three or four variables and then you say, *Well, I'm*

17   *going to do A with B, A with C, A with D and then C with D, C*

18   *with A,* where you try to mix all the variables and come up with

19   each kind of example.  And so Mardiguian concludes with 20

20   examples at the end of his patent, which is a rather large

21   number for -- even for a patent.

22        But what we will show you is that he mix and matches

23   these steps so the esterification step in 2 appears in any

24   number of his examples matched with a different depolymerization

25   step.  And in the case of Examples 2 and 3, if you look to

1    Example 9, which we will show you, you can take the step from

2    Example 2, and if you combine 2 with the depolymerization of 3,

3    you get 9.  The only difference is if you look at, say, 10 grams

4    on the bottom and then 2 grams, that is a proportionate

5    increase.  So the ratio of the reactants will still be the same.

6    It's just that one uses 10, the other one uses 2, but when you

7    divide it all out, the ratios are the same.

8             So this is going to be one of the areas of contention

9    in the litigation here.  Amphastar took the teaching of this

10   combination and did effectively Example 9, which is really 2 and

11   3.  Example 9 uses bovine heparin from cattle and Examples 2 and

12   3 use porcine heparin, and enoxaparin is made from porcine

13   heparin.  So if you substitute porcine heparin for bovine

14   heparin in No. 9, which we say is taught in the Mardiguian

15   patent, you get this reaction that Amphastar will be talking

16   about.

17            This ultimately became the method with some scale-up

18   manufacturing additions that Amphastar submitted to the FDA.

19   This ultimately became the product that the FDA approved as the

20   same as enoxaparin.  And we will show you the data and raw data

21   that will demonstrate how this product results in a low

22   molecular weight heparin that falls within the scope of the

23   enoxaparin claims.

24            Next slide.

25            We are going to show you contemporaneously -- sorry

1    for the mispronunciation of that -- notebooks that were done by

2    Mr. Robert Fei.  He was the scientist at enoxaparin who did the

3    synthesis work.  I have the originals of the notebooks with us.

4    We have produced in the case copies and the copies are all

5    marked.  I've provided the originals to counsel for inspection,

6    and they'll be here throughout the case for inspection, but the

7    original notebook -- they're all bound notebooks.  The original

8    notebook is old, more than 10 years old, and it's falling apart,

9    but they're all here in their original form.

10          And we will go through these experiments and show you

11   with Mr. Fei's contemporaneous notes exactly what he did in his

12   experiments.

13          We suspect that that will probably -- we will finish

14   that examination today, including cross-examination.  We think

15   we will get through the basic experiments today.

16          Then I will put on the testimonies of two Amphastar

17   scientists who conducted the molecular weight studies, and with

18   respect to the key experiments that we are relying on, we will

19   show you the raw data from the experiments that were done that

20   establish that the -- we generated a low molecular weight

21   heparin that fell within the claimed ranges.  That and in

22   addition to the expert testimony that we will offer will be our

23   case.

24          I'd like to take just a little bit of time now to talk

25   about what I expect is the rebuttal case.

```
 1          THE COURT:  Your rebuttal?
 2          MR. WEIR:  Yes.  Their response to our case.  And what
 3   I would like to do is refer you just briefly to the -- their
 4   opening -- their pre-hearing brief at page 4.
 5          So as your Honor knows, we've had some discussion,
 6   quite a bit, leading up to this hearing, about whether the
 7   findings of the ANDA court are controlling and whether they are
 8   not.  And I expressed in a number of those conversations that
 9   were off the record a concern that there was going to be an
10   approach by the defendants in this case to get around those
11   findings and there was going to be disputes regarding that.
12          In the very beginning of their brief, this is the
13   predominant theme that they have now placed before the Court.
14   At lines 11 and 12, they say *because EP '144 insufficiently*
15   *discloses how to practice the claimed invention, it is not prior*
16   *art to the '618 patent.*  So the theme now that they are going to
17   tell you is that this Mardiguian patent is not prior art.  That
18   argument never surfaced, ever, in the prior litigation, in the
19   Patent Office, in the '618 patent.
20          On the side next to the statement on the slide up
21   there, I have a quote from the '618 patent, and under the
22   description of the prior art, the '618 patent says, in the
23   second box -- I'll cut to it -- *in particular, the processes*
24   *described in the prior art and especially EP 40,144.*  So in the
25   DeBrie patent, they admitted that it was prior art.  Throughout
```

```
 1   the ANDA litigation, we litigated it as if it was prior art.

 2   And now for the first time in this case, we now have a

 3   contention, which is the central theme, that it's not prior art

 4   and therefore apparently no fraud, no misrepresentations.

 5             Turn to slide 12.

 6             They base this argument that it's not prior art on

 7   this statement at page 12.  In 1985 a competitor challenged EP

 8   '144 arguing that it did not sufficiently describe how to

 9   reproduce low molecular weight heparin with the patent's claims,

10   i.e., it did not enable a scientist to make and use the

11   invention.  In 1989 the EPO Opposition Division agreed and

12   revoked the '144 patent.

13             So their relying on the non-prior art argument is now

14   based on a decision by the EPO that Amphastar was not a party to

15   nor were any of the U.S. governments, and while we have

16   struggled in this case on the issue of whether or not the actual

17   findings of the District Court in the ANDA litigation where

18   Aventis was a party is binding, they now want you to accept as a

19   fundamental premise in their case that the EPO division findings

20   are binding, and therefore it's not prior art.  That's the --

21   that's the essential theme.

22             The -- turn to -- so earlier in this case, we noticed

23   and we referred to this in our opening brief -- we noticed the

24   contention discovery.  We asked them to identify for us the

25   bases for which they contended we were not an original source,
```

1    and this argument never appeared.

2            And, in fact, in spite of -- and that was the subject

3    of a motion to compel, and the magistrate judge ruled that they

4    had to give us all the facts, and that never showed up.

5            In addition to that -- slide 14 -- we asked them

6    during discovery in this case to produce all documents relating

7    to the opposition proceeding before the European Patent Office

8    involving the EP 4 -- the '144 patent, and you can see their

9    response was they objected, among other grounds.  It seeks

10   information about a European patent proceeding that is not at

11   issue in this litigation.  And they did not provide any

12   documents which -- by the way, the entire proceeding was in

13   French.  Defendants -- and then at the end, they stand on their

14   objections.  They do not agree to produce documents in response

15   to this request.

16           So I don't know where counsel is going to go, but this

17   was the central theme in their -- in their brief, and this set

18   up the entire argument that why we can't be an original source,

19   and if it comes up during the course of the hearing, we

20   obviously will have objections to it, but hopefully the Court

21   will indulge us and -- in putting forth our rebuttal.

22           The other important thing that's going to come up --

23   we touched on it a little bit in the pre-hearing conference.

24   There are going to be documents that are brought into this

25   proceeding that are not going to be offered -- proffered by a

1    witness.  This EPO proceeding, for example, there is no witness

2    that is going to testify about it.  They're going to bring it

3    in, I think, through argument of counsel.

4            What is essential when we deal with those -- these

5    documents that are not the subject of witness testimony is to

6    look at exactly what the document says.  And the Court has been

7    extremely diligent, I would say, in that regard with whatever

8    counsel has said and characterized in the past and even in our

9    motion for -- that certain findings of the district courts were

10   binding, your Honor instructed us to quote verbatim what was

11   being said, the point being is your Honor wanted to see exactly

12   what was being said and so exactly does that mean or support the

13   proposition that it's being offered for.

14           So as we go through these exhibits, I don't care how

15   your Honor wants to handle it, whether I deal with it on

16   rebuttal or when it's being offered, we should focus in exactly

17   on the language that they are relying on or that they contend

18   has supported it because I think you will find it does not

19   support it.

20           Lastly, they are going to show you pleadings from the

21   ANDA litigation, the contention being that Amphastar did not

22   originally allege inequitable conduct in the ANDA proceeding and

23   that that somehow evidences that Amphastar lacked information to

24   be an original source.

25           The pleadings and documents refer actually back to

1   Amphastar's experimentation.  You will find that Amphastar has

2   consistently maintained that its experiments show that you can

3   generate the claimed invention from Mardiguian.

4           In the very first hearing we had with your Honor, we

5   discussed this issue, and it's going to be dressed up in another

6   way from counsel.  We cannot possibly know what their state of

7   mind is, and so you need discovery for that, and your Honor

8   addressed that in your decision, and not all -- we don't need to

9   have all the information from our direct and independent source.

10  We can rely on discovery.

11          But importantly, the FCA claim does not require a

12  specific intent to deceive, and I suspect they will ask

13  Mr. Zhang what evidence he had of a specific intent to deceive.

14  *Mr. Zhang, what knowledge did you have of their state of mind?*

15  And the answer is well, he doesn't.

16          But there's also something that we would ask the Court

17  when this evidence is coming in to consider.

18          Last slide.

19          There is a case from the federal circuit, *Burlington*

20  *Industries vs. Dayco*.  This case is cited over and over again.

21  It's been cited recently in the *Therasense* case.  This is the

22  case that originated the language of the habit of charging

23  inequitable conduct in almost every major patent case has become

24  an absolute plague.

25          And then the Court, the federal circuit goes on to

1    criticize counsel for making premature allegations of

2    inequitable conduct.

3            What I would suggest is that when this evidence is

4    coming in, that without waiving privilege and work product, that

5    the practice at the time was not to make inequitable conduct

6    arguments prematurely.  The practice was to gather your facts

7    and then file an Amended Complaint.  And this includes evidence

8    of an intent to deceive.

9            So the fact that Amphastar did not plead inequitable

10   conduct originally or Teva did not plead inequitable conduct

11   originally is not probative of anything.

12           What is probative is that Amphastar consistently

13   referred to the very same experiments that are going to be the

14   issue in this case.

15           Thank you.

16           THE COURT:  Okay.  Well, before I hear from the other

17   side, as you can imagine, in many cases -- and certainly this

18   one is typical -- there is a contention by one side and then

19   there is a relation of what that side perceives or hopes the

20   other side is arguing and then attacks that.

21           It may well be that counsel for Aventis stands up and

22   says *yeah, that is exactly what we're contending* and then meets

23   it head on.  But they may say something else, and to some

24   degree, I'm trying to avoid having ships passing in the night

25   here, as has happened.

```
 1              So independent of what it is that they're going to
 2   say -- because I assume, counsel, you will make some argument
 3   for your side; correct?
 4              MR. DAWSON:  Yes, your Honor.
 5              THE COURT:  And it probably won't be exactly the way
 6   it was expressed here so far.
 7              MR. DAWSON:  Yes, your Honor.  That's true.
 8              THE COURT:  So let's get the essence, Mr. Weir, of
 9   your contention.
10              Independent of whatever they wish to say, can we -- I
11   don't say we can keep it in a nutshell, but is it, in a
12   nutshell, that we were original source, we have the independent
13   knowledge, etc., because we ran certain experiments and from
14   these experiments, we obtained information with regard to the
15   false statements -- everything is alleged but the false
16   statements on the application, the false statements in the
17   patent, the false statements to the FDA?  Is that the essence of
18   it, and then somehow they are going to oppose that?
19              MR. WEIR:  Yes.  That is absolutely correct.
20              THE COURT:  Okay.  Fine.  So now I've got that.
21              And unless counsel for Aventis wants to just concede
22   and we can end early, I suppose you may have something to say.
23              MR. DAWSON:  Thank you, your Honor.
24              THE COURT:  All right.  This is an exhibit.  Of course
25   I may have a copy of it.
```

1    Counsel, as you refer to it, please walk slowly.

2    Okay?  Please state on the record what these things are that are

3    up.  I'm going to get a copy.  I think I have a copy.

4         MR. DAWSON:  Your Honor, we are going to give the

5    Court, the clerk, the other side copies of all of our graphics.

6    These are just two of the graphics that we're going to use that

7    attempt to summarize the evidence that we think will be

8    presented in this case.  And this is just two of them we put up

9    on the board, but all of them that I show and talk about we will

10   provide to the clerk and the Court and of course to our

11   opponent's.

12        The one on the left here is a summary graphic of what

13   the evidence we believe will show with respect to the

14   experiments in issue and what they really reveal.

15        THE COURT:  Let me interrupt you just.  I understand

16   that the first witness is going to provide a very helpful

17   tutorial on chemical principles that are relevant.

18        Is that correct, Mr. Weir?

19        MR. WEIR:  Yes, your Honor.

20        THE COURT:  All right.  I mean, I guess to the extent

21   that you think you need to add in your statements some

22   clarification, you can do it.  I assume there will be some

23   definition of what a *dalton* is, etc.

24        MR. DAWSON:  Not from me, your Honor, but from the

25   expert.

```
 1              THE COURT:  From the expert.  So that we don't have to
 2    get into the --
 3              MR. DAWSON:  It's a weight, yes, your Honor, of some
 4    sort.
 5              THE COURT:  Yes.  I understand.
 6              Go ahead, counsel.
 7              MR. DAWSON:  May I proceed, your Honor?
 8                         Defense Opening Statement
 9              MR. DAWSON:  May it please the Court.  Bill Dawson for
10    Aventis.
11              Can I have the first slide up, please, to start with.
12              I think we agree on the question.  The question before
13    the Court is did Amphastar -- and this is the question.  This is
14    the hearing where this question will have to be answered.
15              Did Amphastar have direct and independent knowledge
16    from its experiments of errors in Example 6 to the '618 patent.
17    And to prove that it had this direct and independent knowledge
18    from these experiments, Amphastar will need to prove that
19    Amphastar's experiments show that the '618 composition was
20    reproducible by following the process described in -- that's the
21    key phrase, process described in EP '144.
22              This is the way Dr. Zhang expresses it in his
23    deposition, Defendants' Exhibit 142, page 73, lines 15 to 23.
24    He says the product produced by Mardiguian, who is the inventor
25    of EP '144, the prior art patent.
```

```
 1              THE COURT:  Mr. Dawson, could you go back to the last
 2    slide?
 3              MR. DAWSON:  Yes, your Honor.
 4              THE COURT:  Let me take a look at it a little more
 5    slowly.
 6              MR. DAWSON:  Yes, your Honor.
 7              THE COURT:  Okay.
 8              MR. DAWSON:  And again we will provide all these to
 9    the Court.
10              THE COURT:  Okay.  Thank you.  Go ahead.
11              MR. DAWSON:  This is how Dr. Zhang says it.  He says
12    this EP '144, the prior art patent and the current marketed by
13    Aventis, which is the '618 composition, have the same molecular
14    structure.  So the behavior, whatever, in vitro, in vivo, for
15    in vivo including half-life, must be the same.
16              This Example 6 for Patent '618 says it's different and
17    it's better.  They even cite European Patent '144, EP '144, in
18    the first two lines, that's of Example 6, paragraph 3, so we
19    believe it is impossible.  Here's the language --
20              THE COURT:  Counsel, could you ask him to move the
21    chart over about half a foot.  I can't see the screen.  Just a
22    little bit.  The other one.  Just a little bit.  All right.
23              Go ahead.
24              MR. DAWSON:  So he says it's chemically impossible.
25    They have to have the same half-life.  That's what his story is.
```

1   And here is the language he's referring to from the Example 6 of

2   paragraph 3 of Example 6 of the '618 patent.  It says, *When the*

3   *product was prepared according to the process* -- and here is the

4   language -- *described in European Patent EP '144, the half-life*

5   *was longer than four and a half hours in 17 percent of the*

6   *cases.*

7           What Dr. Zhang now says is that Amphastar made the

8   '618 composition not by doing what was in the '618 composition,

9   but rather by following and doing only the process, quote,

10  *described in EP '144,* and therefore because the two compositions

11  are the same, they must have the same half-life.  And thus this

12  paragraph 3 of Example 6 was proven wrong by his expert's

13  experiments and gives him the necessary direct and independent

14  knowledge.

15          So the issue is did Amphastar's experiments show that

16  the '618 composition was reproducible by following the, quote,

17  *process described in EP '144.*

18          The summary of the evidence that we're going to bring

19  out in the hearing as best we can is these five -- first five

20  things that deal with this Example 6 of '618 issue.  The last,

21  if I have time, I'll address the evidence on the two FDA

22  allegations.

23          First with respect to the '618, the evidence will show

24  that doing the process described in EP '144 will not reproduce

25  the '618 composition because EP '144 is not reproducible, even

1    had Amphastar done only what was described in EP '144.

2          And second the evidence will show that Amphastar did

3    not do what was described in EP '144.

4          And third, Amphastar has repeatedly admitted that its

5    experiments do not show what Zhang, Dr. Zhang, now claims.  In

6    actual fact, Amphastar admits it learned of errors in Example 6

7    of the '618 patent from public information and in litigation

8    that came along after the experiments in issue.

9          Fourth, the evidence will show that Zhang's *I knew it

10   all along,* in 2002 at least, hypothesis is at odds with other

11   Amphastar witnesses and statements.  It's not shared by, for

12   example -- by those who actually did the experiments at

13   Amphastar:  Robert Fei, who you have heard referred to;

14   Dr. Chao; Dr. Zeng; and was reviewed by Dr. Ding.

15         And fifth, that Zhang's hypothesis was not confirmed

16   by government actions.  That has been repeatedly said by the

17   court in hearings.  That he had this hypothesis; it was

18   confirmed by government actions.  And we're going to demonstrate

19   through the evidence we do not believe that is true.

20         So going to the evidence on the first point, that

21   doing what was described in EP '144 will not reproduce the '618

22   composition because it's simply not reproducible, a point on

23   which both the European Patent Office, the EPO, and the PTO

24   agree.

25         Defendants' Exhibit 4 and Defendants' Exhibit 180 are

the issuance of EP '144, the patent, in August of 1984, and as

noted in plaintiff's trial brief or relator's trial brief, it

was revoked in '89, but what the -- the key here is why was it

revoked?  It was revoked for insufficiency of disclosure and

lack of reproducibility.  And this is part of Defendants'

Exhibit 180.  This is part of the statement by the European

Patent Office, the EPO, as to why it revoked the EP '144.

It says, *The granted patent discloses the stages in

*the process by which the claimed mixture must be obtained.  It*

*also discloses a detailed example for preparing the mixture and*

*it identifies the starting heparin,* which incidentally Amphastar

never did this.  Never used the starting heparin that was

identified in EP '144.  But it identifies the starting heparin.

*Nonetheless, this information is not sufficient to establish the*

*reproducibility of the invention.*

Why did it revoke it?  It said in paragraph 9 of

Defendants' Exhibit 180 -- it said *Heparin is a very complex*

*molecule and its structure has not been completely worked out.*

*It is also well-known that heparin is a highly variable*

*substance; that is, its characteristics depend not only on the*

*source but also on the treatment or extraction conditions.  It*

*is precisely this variability that contributes to the*

*non-reproducibility of the invention.*

But the evidence will show that it's not just the

European Patent Office that found that the '618 composition

 1    cannot be reproduced as counsel said, even had Amphastar done

 2    only what was described in EP '144.  The USPTO has found that as

 3    well, the U.S. Patent and Trademark Office, the PTO when

 4    re-issuing the '618 determining that EP '144 did not invalidate

 5    the '618 patent.  This is a timeline that shows -- of course on

 6    the left I've covered about the revocation.

 7            The '618 patent was issued in 1995.  In May of '03 a

 8    reissue proceeding was started by us, by Aventis, where we

 9    disclosed problems in Example 6 of the '618 patent, so whatever

10    original source knowledge they are going to claim to have has

11    got to predate that date.

12            And during these proceedings up through December of

13    '04 -- they went on for some time -- Aventis also made

14    disclosures to the PTO of Amphastar's claims that the '618 was

15    invalid for indefiniteness and invalid over a combination of

16    these examples that you've heard about this morning, 2 and 3.

17    That's Defendants' Exhibit 147.

18            And then in November of 2004, *the PTO determined that*

19    *faithful reproductions of EP '144 appear to result in occasional*

20    *rather than inevitable anticipation*, finding that the '618 was

21    not anticipate, is not invalidated by the EP '144.  In effect, a

22    broken clock is right twice a day.

23            Now, we know that the Court found all these things

24    after reviewing all of the allegations that Amphastar now makes.

25    In this period from January of '05 to June of '05, it expressly

considers the reissue in view of Amphastar's litigation claims

that the '618 is invalid for indefiniteness and invalid over a

combination, as counsel has told you about, of these two

examples in EP '144.

So how do we know that the PTO did in fact review all

of those thing and enter -- and take this action?

Well, we know here, Defendants' Exhibit 180, that the

EPO revoked EP '144 for insufficiency of disclosure to establish

reproducibility and we know from Defendants' Exhibit 147 that

the PTO reissued '618 aware of EP '144 and we know from the PTO

records that it took this action after reviewing Amphastar's

invalidity allegations and its expert reports that included the

inequitable conduct claims.  For example, this is part of

Defendants' Exhibit 147.  This is part of the PTO documents.  I

think they call it file wrapper.  I'm not sure.

But you see examiner's initials on the left showing

that the examiner reviewed the expert report, for example, of

John K. Goolgasian, which was Amphastar's expert right here.

What does that report say?  At paragraph 35 of that

report, part of Defendants' Exhibit 147, the PTO record, it

says, *The process described in the prior art and especially in*

*EP '144 is said to be in the '618 patent to not permit*

*production of mixtures with a sufficiently long plasma*

*half-life.  It is my understanding that this statement is false*

*and misleading because the product covered by EP '144 is*

1    *essentially the same product claimed in the '618 patent and has*

2    *essentially the same bioavailability characteristics.*

3            But that's just one of the things the Patent Office

4    reviewed before it reissued the '618.  This is additional parts

5    of 147 depicted here.  This includes declarations by Robert Fei,

6    Amphastar's Robert Fei, and Chao, and its Vice-President of

7    Regulatory Affairs, Campbell.

8            Here it notes -- I've blown it up -- *that reviewed*

9    *Amphastar's Memorandum of Points of Authority on Invalidity and*

10   *its Findings of Fact and Conclusions of Law.*

11           We know after doing that from the exhibits here, the

12   examiner confirmed that all documents and submissions have been

13   considered and we know that the patent was reissued.

14           So reviewing where we are to this point -- and it was

15   reissued here in June of '05.  So reviewing where we are to this

16   point, we know that doing the process described in the EP '144

17   will not reproduce the '618 composition.

18           The EPO said it, the PTO says it and they agree.

19           But we also are going to put on evidence that

20   Amphastar did not even do --

21           THE COURT:  Let me stop you, Mr. Dawson.

22           MR. DAWSON:  Yes, your Honor.

23           THE COURT:  Because I really want to try and help us

24   all focus, and if I should say something that, number one,

25   reflects something you don't contend, you'll tell me.  If I say

1    something that is wrong or even wrong in your view, you'll tell

2    me.  Okay?

3              I want to -- one of the things that is helpful to

4    avoid are purely semantic differences that in substance don't

5    make any difference, and one of the things we talk about is the

6    '144 patent and it was revoked, etc.

7              It seems to me possible that the status of the

8    writing, that is, the '144 patent, is irrelevant; that is, we

9    would be having the same discussion in substance if instead of

10   having a '144 patent, we had a published article at the time

11   that said everything that's in the patent.

12             First of all, am I correct on that?  The fact that

13   it's -- that this statement was an issued patent for purposes of

14   what we're talking about isn't any different than if it had been

15   a published article in terms of prior art, the anticipation,

16   what have you; is that correct?

17             MR. DAWSON:  If I understand what your Honor is

18   saying, I think that is exactly correct.  And let me make sure I

19   do.

20             The reason EP '144 is important here and that it is

21   the EP '144 that is important is because it is what is

22   referenced in Example 6 and that's what they say they proved had

23   the same half-life.

24             THE COURT:  Yes.  But if it wasn't '144, the same

25   words, but it was an article published in an accepted

1    publication, we'd have the same discussion.

2         MR. DAWSON:  We would be substituting that article for

3    EP '144 or it would be Patent No. 111 or something else.  That's

4    what we would be talking about.  We're talking about it because

5    it's in Example 6.

6         THE COURT:  Because it is a published statement that

7    existed.

8         The only point I want to make is we can get ourself

9    all wrapped around the axle about the formal legal action of a

10   revocation of '144 which can be viewed as the equivalent of, let

11   us say, a later article or a fact that '144 isn't correct.

12        I mean, the key thing is not that we get involved with

13   what the EPO did, but that at least, from your side's point of

14   view, '144 does not describe a process that can -- that can be

15   reproduced to yield the same product.

16        MR. DAWSON:  I think you're right, your Honor.  They

17   say in their pleadings that EP '144 was revoked.  We're not in

18   disagreement on that.  Both sides plead and rely on that.

19        But what our point is is it's the reason it was

20   revoked that is important.  And that is because it's not

21   reproducible.  That has been found not just by the EPO but PTO

22   as well.

23        Furthermore, we're going to show it's pretty much

24   proven by Dr. Fei's experiments that it's not reproducible.  I

25   think the evidence will show that just from his own experiments

1    as well.

2            The significance is EP '144 is not reproducible, even

3    if you do what it says.

4            THE COURT:  Okay.  What is done in what's his name's

5    writing -- how do you pronounce his name?  The inventor?

6            MR. DAWSON:  Mardiguian is the way I was saying it.

7    I'm not sure if that is right.

8            THE COURT:  If you do what he said, you will not be

9    able to reproduce the result.

10           MR. DAWSON:  Correct.  You will not produce the '618

11   composition.

12           THE COURT:  And if we threw out as not ever happening

13   all of this stuff with the USPTO and the European Patent Office

14   and all that and say look, we've got a time machine, none of

15   that ever happened, but you were able to present an expert

16   witness that I believed who said, *In my opinion, for which I*

17   *have been duly compensated, you can't use what this guy said to*

18   *produce -- or to produce a reproducible product,* and I said,

19   *absolutely believe it,* we're in the same position.

20           MR. DAWSON:  That's true, your Honor.  Here we just

21   have EPO and PTO both saying that.

22           THE COURT:  All that supports this -- I just wanted to

23   make clear that we can go all around the axle about the fact

24   that what -- what you are relying on or what happened as

25   factually happened are certain legal actions by tribunals.  We

```
 1    can cut through all that and say look, what's really at issue,

 2    one thing that is really at issue is if you follow this process,

 3    you can't get this result.

 4           MR. DAWSON:  Correct.

 5           THE COURT:  And apparently the other side says they

 6    followed this process and they got this result.

 7           MR. DAWSON:  They do say that, your Honor, and that's

 8    the question.

 9           THE COURT:  Okay.

10           And I hope that from time to time I can interrupt

11    things, which I think helps to clarify where we're going.  But

12    all right.  That's fine.

13           MR. DAWSON:  It does, your Honor, and that's exactly

14    where we're going here.  Amphastar did not do what was described

15    in EP '144.

16           THE COURT:  Now we have a second thing.

17           MR. DAWSON:  It's the second thing.  So they didn't do

18    it.  This is this chart that is up here.

19           I acknowledge here the evidence is going to be

20    scientific and detailed and Ms. Davies is going to take Robert

21    Fei through it all.  And based on the testimony of those who

22    actually did these experiments, Robert Fei in particular, but

23    Chao and Zeng as well, who they say they're going to call, in

24    summary, as this chart shows, in the early part of the

25    experiments for the first 18, 20 months or so, right in this
```

```
 1    time frame, they were generally trying to, it appears, do what
 2    was described in EP '144 and they failed and they failed and
 3    they failed.
 4            THE COURT:  Mr. Dawson, you are moving fast in an area
 5    where I want to be very careful, and I want to go back and make
 6    another point.
 7            You are using the term that the '144 is not prior art.
 8    Let me put an understanding of *prior art*.  It doesn't have to be
 9    a valid patent to be prior art in the sense that a disclosure in
10    an invalid patent, but a disclosure can be prior art in the
11    sense that it combined with this combined with that might make
12    an invention obvious.
13            MR. DAWSON:  Actually it's a legal proposition.  Since
14    it was revoked, it's not prior art.  But that's a legal point.
15    I'm just focusing on the facts.  I'm not up here arguing about
16    whether -- we can brief that.  Actually, it does have to be, is
17    my understanding, but I'm not the patent expert.
18            But on factual basis --
19            THE COURT:  Well, a magazine article doesn't have to
20    be valid.  A magazine article still could be prior art, even --
21    and it could disclose something but some piece of it might be
22    usable in an obvious --
23            MR. DAWSON:  Absolutely.
24            THE COURT:  Anyway, that is what I'm trying to
25    express.
```

```
1            MR. DAWSON:  All right --

2            THE COURT:  Okay.  They didn't do -- whatever it is,

3    they didn't do it.  Go ahead, Mr. Dawson.

4            MR. DAWSON:  Well, they didn't do what is in EP '144.

5    They tried and tried here.  They may have reached over and

6    gotten some things out of '618.  But in here they're generally

7    trying to follow EP '144.  They're not quite doing it.  They're

8    failing, repeatedly failing, failing, failing.

9            And then long about October of 2001, they started

10   reaching over and pulling things out of the '618.  And from that

11   point forward through the time when they made at the end of 2001

12   the composition that they put in their ANDA filing right here,

13   these are the pre-2003 experiments that Dr. Zhang formed his

14   hypothesis on, during this period of time from October of '01 to

15   the end of '01, they were reaching over the line, not for the

16   EP '144 information, but for the '618 information, and that's

17   what the evidence is going to show.

18           They added a purification procedure from the '618

19   that's not in the '144.  They controlled for the degree of

20   esterification as taught in the '618 patent but not EP '144.

21   They added a critical pre-heating procedure described in the

22   '618 patent to the depolymerization step, and it's not in the EP

23   '144.

24           And how do we know?  What will the evidence show that

25   they actually lifted this out of the '618 rather than doing what
```

```
1    they say now they did, they just produced this '618 substance by
2    doing what is described in EP '144.  How do we know that they
3    lifted it out?
4            The evidence is going to be the laboratory notebooks
5    show it.  Here EP '144 does not describe purification, but the
6    '618 patent does.  It talks about treatment of the heparin
7    sodium.  You got to get the impurities reduced to get the degree
8    of purity of the heparin sodium thereby obtained.  You have got
9    to add methanol and you have to precipitate it.
10           What does the notebook say on that date I told you
11   about, October of '01?  Purification of heparin sodium.  Heparin
12   sodium.  Right out of the patent.  '618; not 144.  Heparin
13   sodium.  Methanol added.  Precipitate.  Precipitate.
14           But that's not all.  Here's -- the EP '144 does not
15   degree of esterification, but the '618 patent does.  In fact,
16   that is something '618 added that makes it reproducible.  You
17   have got to control the degree of esterification ranging from
18   this 9.5 to 14.  Did they lift that out of the '618 rather than
19   do what they're telling your Honor, they get it from the '144?
20           It says test the esterification degree.  Degree of
21   esterification.  Here are the percentages they were shooting for
22   right out of that patent.
23           But that's not all.  EP '144 does not describe
24   pre-heating, but the '618 certainly does.  It says to this
25   solution, you add something.  What is it you add?  Heated to
```

1   62 degrees centigrade, sodium hydroxide is added.  So you heat

2   it and then you add it to the solution.  Pre-heating.

3         The temperature then is maintained for 1 hour 30

4   minutes at 62 degrees centigrade.  Right out of the '618; not in

5   EP '144.

6         What does phase lab notebook say?  Pre-heat on water

7   bath at 62 degrees centigrade.  62 degrees centigrade.

8   Pre-heat.  Heat before you add.

9         NaOH.  That's sodium hydroxide right out of the

10  patent.  Sodium hydroxide.  Depolymerization for 1.5 hours.  One

11  hour 30 minutes at 62 degrees.  One and a half.  62 degrees.

12  62 degrees.  Directly out of the '618.

13        What the evidence is going to show is you're being

14  told one thing but, in fact, they did another.  They said they

15  were trying to follow EP '144, and maybe they were.  We know

16  it's non-reproducible.  We know from the EPO and PTO and we know

17  it from their own experience, they could not do it.  They

18  failed, failed, failed.

19        And then he when they started pulling things out of

20  the '618, they started getting different results.  You will

21  notice on this chart and the evidence will show that in this

22  October 2001, they actually did three samples that were -- where

23  they purified the heparin, which is right out of '618, and three

24  that they didn't.  They did a control set.  They got better

25  results on the purified than the non and then they purified

1    thereafter.

2          So what about these notebooks?  What about these

3    notebooks?

4          Well, we had the original notebooks that are depicted

5    down here, and they produced a bunch this morning but not in

6    this time period where I think -- Ms. Davies, correct -- not in

7    that time period.

8          But at the very time they started reaching over the

9    line and doing the '618 stuff rather than the EP '144 stuff,

10   they came up with a second set of notebooks, the ones they call

11   and are depicted in blue on this as *the neat notebooks*.

12         What will the experts say about this?  You have been

13   told that Dr. Atwood is going to give us a very helpful

14   tutorial, and hopefully he does.  But what he says is that the

15   experiments pre-2003 -- and keep in mind, it's these experiments

16   from October of 2001 to December of 2001 on which Fei relies.

17   He formed his hypothesis in 2002.

18         And it was in this substance it was formed at the end

19   of 2001 that makes up the ANDA proceeding, ANDA filing, that's

20   in issue in this case.

21         But Dr. Atwood says the pre-2000 experiments are

22   beside the point, and he said two sets of lab notebooks are

23   appropriate in this case.  And he is an expert at testifying, no

24   doubt about it.  And he is a crystallographer, but of course

25   heparin does not form crystals.

1           The defense expert is Dr. Edgar.  He has never

2    testified previously, at least in court.  This will be his

3    maiden voyage.  So he's not an expert at it.  But he's an expert

4    in polysaccharides, and that's what heparin is.

5           And he says there is simply no legitimate purpose for

6    keeping these two sets of books.  And he closely reviewed all of

7    Fei's notebooks, at least the ones that were produced, and

8    concluded that Fei made material changes to what was described

9    in EP '144.

10          So reviewing what the evidence will show is first EP

11   '144 is not reproducible.

12          THE COURT:  Let me interrupt you, Mr. Dawson.

13          Looking at the chart that is closer, I think this is

14   obvious, that whatever they did, that at least through June 1st

15   of 2000, they were not infringing the '618; right?

16          MR. DAWSON:  Well, they claimed early on they weren't

17   infringing.  We don't know exactly why, and there has never been

18   a finding of infringement or non-infringement.

19          THE COURT:  Now, you've seen through -- again, this

20   may not be important here, but it just leaps at me, that until

21   June of 2000 -- the gray stuff there discloses that they did a

22   bunch of things to try and produce a pharmaceutical.

23          MR. DAWSON:  Yes.

24          THE COURT:  And they didn't, at least you're not

25   contending and it may not be important, that anything they did

1    there infringed '618 because you have them doing things in '618

2    in the next block where you have the yellow bottom.

3              MR. DAWSON:  Yes.

4              THE COURT:  All right.  Go ahead.

5              MR. DAWSON:  Right.  What they're telling you is they

6    made this composition that was similar to the '618 over here in

7    their ANDA filing --

8              THE COURT:  At that point --

9              MR. DAWSON:  -- but using EP '144, but in fact that is

10   not so.  That's our point.

11             THE COURT:  At that point you are saying they were

12   infringing.

13             MR. DAWSON:  Well, the question is, is the Example 6

14   wrong, and the Example 6 says if you do what is in EP '144, you

15   get a lesser half-life than you do if '618.  They say they made

16   '618 by doing what is in EP '144 out here.

17             The fact is they didn't.  They never made anything

18   similar to the '618 and -- until they started doing '618.  In

19   making a '618 composition using '618 does not make them original

20   source.  They have to make the '618 composition using the EP

21   '144 methods.

22             THE COURT:  Mr. Dawson, I probably asked a question

23   that is not what's at issue here.  It was just an observation.

24   But until they used what was in the '618, they didn't infringe

25   it.

40

1          MR. DAWSON:  Correct.  If they didn't do it, they

2     didn't infringe it.

3          THE COURT:  I understand that's not the issue here.

4     It's just maybe it will be helpful someday.

5          Go ahead.

6          MR. DAWSON:  All right.  So now what do we know?  We

7     know you can't make '618 using '144.  It's just not

8     reproducible.  We know that they didn't using EP '144.

9          What they did, whatever they came up with, the

10    question is how did they make this composition if it wasn't EP

11    '144?  The answer is they used '618, and then the evidence is

12    going to show that they have repeatedly admitted in the ANDA

13    court and other places, in letters, in letters to the U.S.

14    Attorney's Office and others, that the experiments did not show

15    what Dr. Zhang now claims.

16         This is the timeline chart that is on the poster board

17    over here, and above the line that goes through the various

18    issuances and disclosures to the PTO and public disclosures and

19    them first claiming inequitable conduct in their FCA claim in

20    '09 and their experiments, as they say, which went along all

21    during this period of time, these are their admissions, the

22    admissions that they filed in this very court and also with the

23    FDA and the U.S. Attorney's Office.

24         Here in March of '03 they tell the FDA that their

25    generic Lovenox® will not infringe the '618 patent.  No mention

1    of invalidity, no mention that they made it using EP '144, no

2    mention of experiments.

3                In June of that year they wrote a letter to Aventis

4    that does not mention its experiments and does not mention

5    inequitable conduct.

6                Then in August of '03 they filed an Answer to the

7    patent infringement claim.  No mention of experiments.  No

8    mention of inequitable conduct.

9                And then in June of '04, they claim inequitable

10   conduct for the first time, and they tell the Court here, this

11   ANDA court, in a motion that its claim is based on facts

12   recently developed in litigation, litigation that all post dates

13   the experiments.  No mention of experiments.

14               Then they say -- Amphastar tells the ANDA court in a

15   motion that all of the facts in evidence on which its new and

16   equitable conduct are based are in the possession and control of

17   Aventis.  No mention of Fei, Chao, Ding.  No mention of Zhang.

18   No mention of the experiments.

19               Then in August of '04, Amphastar tells the ANDA court

20   in a motion that its inequitable conduct claim relating to

21   Example 6 is premised entirely, entirely on evidence obtained

22   from Aventis during the discovery.  Totally inconsistent with

23   what they're saying now, that it's based at least in part on

24   these experiments.

25               In November of '04, Amphastar represented that none of

1    its employees have knowledge relating to inequitable conduct

2    with respect to Example 6.  The very opposite of what they're

3    saying today.

4            And in December of '08 when they gave the letter to

5    the government for the False Claims Act, they said that this

6    information about its inequitable conduct claim was obtained

7    during litigation, litigation that all occurred after, after the

8    experiments that involved -- and I want to focus on that one a

9    minute because that's a letter by counsel here to the U.S.

10   Attorney's Office in December of '08 saying during Amphastar's

11   litigation against Aventis, Amphastar discovered that Aventis

12   has committed frauds against the USPTO and the United States

13   Patent Office.  If they knew more than that, they should have

14   said it.

15           Now, fourth, the evidence is going to show that

16   Zhang's *I knew it all* hypothesis is at odds with Amphastar's

17   other witnesses and other statements.  Dr. Zhang's hypothesis --

18   he's the fellow on the very end in the whisper-down-the-lane or

19   telephone game here.

20           He did no experiments, he reviewed no lab notebooks,

21   neither set of books.  He got his information primarily from

22   Zeng, and from that he claims he knew it all along, that is, by

23   2002, that '618 patent was wrong.  Example 6 was wrong.

24           Well, his information probably comes from Ding, who

25   they're not going to call.  He supervised the experiments.  He

1    reviewed certain lab notebooks.  He reviewed the '618 patent.

2    He doesn't reach any conclusion about its accuracy.

3           Fei they'll call.  He does most of the experiments.

4    He has the two sets of books.  He reviewed the '618 patent.  He

5    forms no conclusions.  These other two people do not either.

6           Amphastar's current litigation position leaves us

7    asking ourselves the question if Amphastar's experiments gave it

8    this direct knowledge, independent knowledge of problems in the

9    '618 patent, why did they tell the FDA -- this is in their

10   ANDA -- that its -- only that its enoxaparin would not infringe

11   the '618 and not say that the '618 was invalid if they now say

12   they made it using EP '144 that would invalidate it.  Or

13   unenforceable due to inequitable conduct, either one, when the

14   FDA rules require disclosure of all basis for your claim, not

15   just a basis for your claim.

16          Why did they tell the ANDA court in May of 2004 that

17   its newly-pled inequitable conduct claim was based on facts

18   recently developed in this litigation, litigation that predates

19   the experiments rather than the experiments themselves?  Why did

20   it tell the ANDA court that its inequitable conduct defense was

21   based entirely on evidence obtained from Aventis during

22   discovery rather than at least in part on experiments by Fei or

23   Zeng or Ding?  Why did it do that?

24          Why did it tell Aventis in an interrogatory response

25   in November of 2004 that none of its employees have knowledge

1   relating to inequitable conduct?  Why did it tell the

2   government, this is the U.S. Attorney, in December 2008, that

3   information about its inequitable conduct claim was obtained

4   during litigation?

5           And lastly, we live in an age of text and e-mail and

6   memos to the file by all of us.  Why did it fail to create a

7   single e-mail from Dr. Zhang or memo to the file or anything to

8   document what he now says was his conclusion?

9           And the last point with respect to this '618 point and

10  the accuracy of the Example 6 and '618 and whether these

11  experiments reveal some problem with it before they were

12  self-reported by Aventis in May of 2003, Zhang's hypothesis,

13  contrary to what has been told to the Court, was not confirmed

14  by government actions.  And you're right, these may not be

15  binding or -- I don't know whether they are or not.

16          But we know that the EPO revoked EP '144, and they say

17  it.  They just say because over prior art, but it's actually for

18  insufficiency of disclosure and lack of reproducibility, and the

19  PTO reissued the '618 finding that EP '144 did not invalidate

20  it, and that certainly does not confirm their hypothesis.

21          But perhaps the thing that best illustrates that

22  government actions do not confirm Zhang's hypothesis is how

23  Amphastar disagrees with various government actions it now

24  claims confirm that hypothesis.

25          Here is one.  Judge Pfaelzer noted, admittedly in a

footnote, that *the question of compositional differences between
two low molecular weight heparins -- LMWHs -- is a question of
law for the PTO.*  Amphastar just disagrees.  Disagrees that the
PTO is the one that decides that question of compositional
difference, and they want to relitigate it right here.

          The PTO found that it fully considered and rejected
Amphastar's invalidity arguments and inequitable conduct expert
reports.  But they just disagree with the PTO and they seek to
relitigate that here.

          The EPO revoked it for non-reproducibility.  They
acknowledge it was revoked, but the key is the reason,
non-reproducibility, and Judge Pfaelzer stated in one of her
opinions that EP '144 claimed undefined LMWH mixtures, whereas
the '618 patent claims defined LMWH mixtures.  Amphastar just
disagrees that EP '144 is not reproducible and wants to
relitigate that issue here.

          And the PTO found that '618 patent is valid by
reissuing it because it found faithful reproductions of this EP
'144 result in occasional rather than inevitable anticipation.
It did not anticipate '618.  It reissued it as valid.  Even a
broken clock is right twice a day.

          Amphastar simply disagrees.  The issue is did
Amphastar's experiments show that '618 composition was
reproducible by following the process in EP '144?  And the
answer to that is no.

1              Quickly on the FDA, they cannot be and admit they're

2    not a source, an original source.  The first one is they admit

3    that they're not an original source of Aventis's manufacturing

4    changes.

5              We took the deposition of their VP of Regulatory

6    Affairs.  He says what is the basis of Amphastar's conclusion

7    that Aventis's representation in its citizen petition -- that's

8    the one of the FDA that they cited in their opening -- that it

9    had never changed.  Its manufacturing process was false.  He

10   says it was taken from information on the FDA website.  Public

11   information.

12             Dr. Zhang says we don't know their manufacturing

13   process.  So you have no information about whether or not

14   Aventis changed it its process based on your experimentation?

15   He said no.  They admit they are not.  Did not have DIK.  They

16   are not an original source with direct and independent

17   knowledge, DIK, of that.

18             The second one -- this is from the thing they sent us

19   last week.  *Amphastar is able to show* -- and this is through

20   their experiments -- *that Aventis's representation in its*

21   *citizen's petition that the reaction was sensitive to time and*

22   *temperature of reaction was untrue.*  But Amphastar admits that

23   the different times and temperatures will have an impact on the

24   molecular weight.  Precisely.  That's Fei.

25             Dr. Ding, *Based on your role of supervising the*

*enoxaparin project, does the temperature at which the*

*depolymerization step is performed affect the molecular weight?*

   *Yes.*

   They cannot be original source of a misstatement that

the process is sensitive because they themselves say it is.

   Where does this leave us with the Court as a

fact-finder on the issue of whether these experiments showed

problems with the '618?  The Court is left with a very clear

choice.  Will it believe what Amphastar said then before it had

its False Claims Act litigation agenda or what it says now?

Then Ding, no conclusion.  Fei, no conclusion.  Zeng, no

conclusion.  And we could add Chao, no conclusion.  These are

people who did experiments and did not conclude that they showed

any problem with the '618 patent.  No contemporaneous document

confirming that Zhang had that opinion at the time.

   They've admitted in litigation that its inequitable

conduct claim was based on facts recently developed in ANDA

litigation that all post dates the experiments in question.

They admitted in litigation that all supporting facts were in

the possession and control of Aventis, not from experiments, not

from Fei.

   They admitted in litigation that none of its employees

had knowledge relating to inequitable conduct:  Not Fei, not

Chao, not Ding.  They admitted in a government disclosure letter

that fraud was discovered during the litigation, all of it post

1    dating.

2            Or the Court can accept the unsupported hypothesis of

3    Dr. Zhang now for which there is no contemporaneous writing,

4    that he knew it all along.

5            That's the evidence, your Honor.

6            THE COURT:  Okay.  Thank you.

7            Just one thing to be -- to be clear.  As with

8    Mr. Weir, there was a portion of this presentation in which you

9    presented what you contend are Amphastar's positions with regard

10   to certain government actions, court statements, etc.

11           And as with the other side, I merely say that I'm not

12   paying attention to that part yet because until I hear what

13   Amphastar's actually contending, I don't think I should consider

14   what -- the response to it.  But other than that, I understand

15   what you said and we can proceed.

16           MR. DAWSON:  Thank you, your Honor.

17           THE COURT:  All right.  I think I'm -- let me -- I

18   guess the most important person is the court reporter.

19           How are you doing?  You tell me whenever you want a

20   recess.

21           THE COURT REPORTER:  Now would be nice.

22           THE COURT:  If it would be nice, then it will be nice.

23   We will take a recess.

24                      (Recess taken)

25           THE CLERK:  Please come to order.  This Court is again

```
 1    in session.

 2              THE COURT:  Thank you.  All right.  We are on time.

 3              Mr. Weir, please.

 4              MR. WEIR:  At this time, your Honor, relator would

 5    like to call Dr. Jerry Atwood.

 6              THE COURT:  Thank you.

 7              Dr. Atwood, the ruling is with -- with due regard for

 8    your eminence, you can talk about yourself for 60 minutes -- 60

 9    seconds and you are fully embraced and then we can get to the

10    merits.

11              MR. DAWSON:  Your Honor, defendant would like to

12    invoke the rule with respect to fact witnesses, not experts, who

13    will be testifying about these things here, but fact witnesses

14    we ask to be excluded.

15              THE COURT:  You can accept that the other side is

16    entitled to have a corporate representative.  They can choose

17    whoever that is.

18              MR. DAWSON:  Thank you, your Honor.

19              THE COURT:  And the same goes for you.

20              MR. DAWSON:  Thank you, your Honor.

21              THE COURT:  All right.  To avoid any misunderstanding,

22    a person who is excluded cannot be told what happened in the

23    courtroom, except for scheduling matters, as to what other

24    witnesses said, the arguments made, etc.  All right.

25              MR. DAWSON:  And it would apply to fact witnesses but
```

```
 1   not experts.

 2            THE COURT:  That's correct.

 3            MR. DAWSON:  Thank you, your Honor.

 4            THE COURT:  Very well.

 5            Yes, Mr. Weir.

 6            MR. WEIR:  Nothing further.  I think we are going to

 7   swear the witness in.

 8                      Jerry L. Atwood was sworn

 9            THE CLERK:  Thank you.  Please be seated.

10            MR. WEIR:  Your Honor, may I approach?

11            THE COURT:  Yes, please.

12            THE CLERK:  For the record, please state your full

13   name and spell your last name.

14            THE WITNESS:  Jerry L. Atwood, A-T-W-O-O-D.

15            MR. DAWSON:  Your Honor, if I may interrupt one more

16   time, there are fact witnesses for Amphastar in the courtroom

17   that have not left, in light of your instruction.  I think

18   Robert Fei is here.  There may be others.  I don't know.

19            THE COURT:  Well, Mr. Weir, do you want to address

20   that?

21            MR. WEIR:  Well, this is expert testimony about the

22   Mardiguian patent.  I don't know that this is fact testimony

23   that would be -- that would affect the fact testimony that the

24   experts -- that the witnesses are going to give.

25            THE COURT:  Mr. Dawson's point is that fact witnesses
```

```
 1   should be excluded.  Frankly, they could have been excluded

 2   during opening statement, but I gather they weren't.  Okay.

 3   That's not a waiver.

 4            I think he has got a point.  We have to do that.

 5            MR. WEIR:  Okay.  So you want the fact witnesses

 6   removed?  I can't hear you because of the speaker.

 7            THE COURT:  Yes.  Except that you have -- each side

 8   has a corporate representative that you can have present.

 9            MR. WEIR:  Okay.  So we will designate Dr. Zhang as

10   the corporate representative.

11            THE COURT:  That's fine.  I regret this, but the rule

12   is a rule and applies to both sides, and I assume, Mr. Dawson,

13   that there is no fact witness for you here?

14            MR. DAWSON:  Correct, your Honor.

15            THE COURT:  All right.

16            MR. WEIR:  We've handed up to your Honor a three-ring

17   binder, I hope.  There you go.  These are the hard copies of the

18   exhibits that we are going to use with Dr. Atwood so you don't

19   have to go digging through the file.  Dr. Atwood has a copy and

20   we've given a copy to opposing counsel.

21                        DIRECT EXAMINATION

22   BY MR. WEIR:

23   Q.   So in 60 seconds, Dr. Atwood, what degrees do you hold?

24   A.   I have a BS degree in chemistry and mathematics from

25   Southwest Missouri State University and a Ph.D. in chemistry
```

1    from the University of Illinois.

2    Q.    What is your current employment?

3    A.    I am Curators' Professor and Chair of the Department of

4    Chemistry at the University of Missouri, Columbia.

5    Q.    Do you conduct laboratory work as part of your employment?

6    A.    I do.  I have a research group with two post-doctoral

7    fellows, seven grad students and four undergraduate, and I also

8    do chemistry with my own hands still.

9    Q.    Have you published any scientific articles?

10   A.    Yes.  I have published right at 700 scientific papers and

11   peer-reviewed journals.

12   Q.    And have you served as the editor of any peer-reviewed

13   publications?

14   A.    Yes.  I've founded three journals in various areas and I

15   have edited four others over the years.

16   Q.    Have you ever worked in the pharmaceutical industry in the

17   context of a chemist?

18   A.    I have never been employed directly as my sole employment

19   in the pharmaceutical industry, but I have spent the last 30

20   years consulting with pharmaceutical companies on matters

21   related to organic synthesis, drug development, and

22   formulations.

23   Q.    The first tab in your three-ring binder is a copy of your

24   curriculum vitae; is that correct?

25   A.    Yes, that's correct.

53

1    Q.    This includes a list of your publications and employment

2    history?

3    A.    It does.

4    Q.    And your degrees?

5    A.    Yes, it does.

6          MR. WEIR:   Your Honor, at this time I would like to

7    move Dr. Atwood as an expert in chemistry.

8          THE COURT:   Yes, of course.  Of course he is.  I will

9    spare you my humor for another time.   Totally qualified to give

10   the opinions that he is going to give.

11         MR. WEIR:   Thank you.

12   Q.    Let's turn to Exhibit 46 in your three-ring binder.

13   A.    Yes.  I have that.

14   Q.    Okay.  And do you recognize Exhibit 46?

15   A.    This is the Irish version of the Mardiguian patent to which

16   we've referred to earlier this morning.

17   Q.    This is the English translation of the French 40,144

18   patent?

19   A.    Correct.

20   Q.    And have you reviewed that in preparing for your testimony

21   here today?

22   A.    Yes, I have.

23   Q.    What does the -- generally, what does the Mardiguian patent

24   disclose?

25   A.    The Mardiguian patent discloses a method of producing low

1   molecular weight heparins, and the method is broken down into

2   basic chemistry, which allows one to follow the teachings of

3   patent and produce low molecular weight heparins.

4   Q.    What is the process that Mardiguian discloses for making

5   the low molecular weight heparins, the basic process?

6   A.    The basic process involves three separate steps.  One is

7   what we call salification, formation of a salt.

8           The second is an esterification, which is a

9   modification of the heparin molecule in this case.

10          And the third is depolymerization, which is a step

11  that breaks the original heparin molecules down into smaller low

12  molecular weight heparins.

13  Q.    If you turn to page 19 of the Exhibit 46 -- at the bottom,

14  your Honor, it will have 0046-0019.

15  A.    Yes.  I have page 19.

16  Q.    And if I can direct your attention to lines 11 and 12,

17  could you explain to the Court what is described there.

18  A.    Yes.  Starting in line 11 of page 19, quote, *the neutral*

19  *benzethonium salt of heparin or benzethonium heparinate used as*

20  *the starting substance in Examples 1 to 3, 10, and 12 to 15*

21  *comes from a heparin from pig intestines,* so on and so forth.

22  Q.    And there is a similar statement at line 20; correct?

23  A.    Yes.  Line 20 states essentially the same information

24  through lines 23.

25  Q.    Could you explain to the Court what a neutral benzethonium

```
 1   salt is?  What is a neutral salt?
 2   A.   Yes.  A salt generally is composed of two different kinds
 3   of ions, one that has a positive charge and one that has a
 4   negative charge.  A neutral salt is one in which the number of
 5   positive ions matches the number of negative ions, leading to a
 6   salt that is overall neutral.
 7   Q.   Okay.  Now, the starting material for the low molecular
 8   weight heparins that are discussed in the Mardiguian patent is
 9   what?
10   A.   It's heparin sodium, sodium salt of heparin.
11   Q.   And just describe briefly what heparin sodium is.
12   A.   Heparin sodium is composed of large heparin ions that carry
13   a negative charge.  Several negative charges.  And these are
14   counterbalanced by small sodium ions that are ionically bound
15   into the salt, which is heparin sodium.
16   Q.   And what happens when you put heparin sodium in water?
17   A.   Ionic compounds normally dissolve in water, and in the case
18   of heparin sodium, the small sodium ions are easily -- it's easy
19   for them to interact with water.  Water does not carry a charge,
20   but it has a positive end to it and a negative end to it and
21   this allows the sodium ions to basically be lifted out of the
22   structure and put into solution.
23          This carries the heparin, negatively-charged heparin
24   ions into solution as well, into water solution.
25   Q.   So the Mardiguian patent says there is a neutral
```

1    benzethonium salt.  How would you generate a neutral

2    benzethonium salt from sodium heparin?

3    A.    Sodium heparin, as I was just describing, is soluble in

4    water.  One dissolves it completely in water.

5              There is an ionic compound, benzethonium chloride,

6    which is also completely soluble in water.  If we mix these two

7    together, heparin sodium and benzethonium chloride, then the

8    benzethonium kat ion or positively charged ion, binds strongly,

9    tightly to the heparin negatively charged.

10             THE COURT:  Slow down.  I want to follow this.

11             Looking at the patent, at the page that was

12   highlighted, where does it say that -- let me go back to what

13   the transcript said here.

14             Neutral benzethonium salt.  Where does it say that?

15             THE WITNESS:  That's found, your Honor, first on line

16   11 at page 19.  And then that statement is repeated at line 20

17   of page 19.

18             THE COURT:  Let me find page 19.  So this is -- the

19   invention is illustrated.

20             The neutral benzethonium salt of heparin -- okay.

21   Let's -- the neutral benzethonium salt of heparin -- now would

22   you just state exactly what that is again so I don't miss it?

23             THE WITNESS:  Yes.  That's the heparin

24   negatively-charged ion binding tightly to the benzethonium

25   positively-charged ion.

1          THE COURT:  Okay.  Go ahead and proceed.

2          THE WITNESS:  Perhaps I can clarify that a little bit.

3          THE COURT:  Anything that you could do to help would

4     be beneficial.

5          THE WITNESS:  The heparin negatively-charged ion is

6     quite a large entity.  As molecules or ions go, it's very large.

7     The sodium ion that balances it in heparin sodium is quite

8     small, so there is a mismatch of a large negatively-charged ion,

9     which is heparin, and small sodium ions.

10          This mismatch means that sodium heparin doesn't bind

11    so strongly together, and when we put this in water, it will

12    dissolve, the ions will separate heparin containing negative

13    charged and sodium positively-charged ions.

14          Now, benzethonium chloride, the benzethonium is a

15    large positively-charged ion and chloride is a small

16    negatively-charged ion.  This mismatch in size for these two

17    ions makes benzethonium chloride soluble in water.

18          If we mix heparin sodium with benzethonium chloride,

19    we form the, as we say here in line 11 and 20 of page 19, the

20    neutral benzethonium salt of heparin, and also the other species

21    that are left in solution are just sodium ion and chloride ion

22    so it's just essentially table salt left in solution.

23          So what we now have with the neutral benzethonium salt

24    of heparin is a large positively-charged ion, the benzethonium,

25    and a large negatively-charged ion, which is the heparin

```
 1   species.  These fit together nicely, but they're not water

 2   soluble.

 3              So what one has in carrying out the salification step,

 4   which is the first step described here on page 19, is a changing

 5   from a large ion and a small ion to two large ions and the

 6   sodium chloride.

 7    BY MR. WEIR:

 8   Q.   How can you determine how much benzethonium chloride you

 9   would add in order to get a neutral salt?

10   A.   Yes.  Yes.  This is a simple matter of chemistry.

11              We know how much heparin sodium we have and we know,

12   therefore, how much benzethonium chloride we must add.  For

13   every sodium ion that is in the sodium heparin or the heparin

14   sodium -- for every sodium ion that is there, we must add a

15   benzethonium ion.

16              And what -- what we do in chemistry in that situation

17   is we just weigh the right amount of material out on a balance.

18   That tells us how much we must add.

19              THE COURT:  These two ions bound together produced a

20   neutral molecule?

21              THE WITNESS:  Yes.  It's still a salt.  It's still

22   made of positive and negative ions, but the positive and

23   negative ions for the benzethonium heparin compound are tightly

24   bound together, and water has no way of removing these ions, one

25   from the other.
```

1     So if we -- if we have a solution of heparin sodium,

2  which would just be a clear solution, like a cup of water, and

3  if we have a solution of the benzethonium chloride, which again

4  will be a clear solution, in the right amount, so we have

5  measured out the amount of benzethonium chloride, and if we just

6  pour these together, one into the other with stirring, we will

7  get a precipitate.  A solid will form almost immediately, which

8  is the benzethonium heparin compound.

9     And the sodium chloride, the remainder of the two

10  initial materials, the heparin sodium and the benzethonium

11  chloride, the sodium chloride that remains will just stay in

12  water because salt is completely soluble in water.

13     THE COURT:  Okay.  So what I call a molecule is two

14  ions bound together because of the difference in charge.  It's

15  not precisely a separate molecule or is it?

16     THE WITNESS:  No.  It's not a separate molecule, and

17  the heparin negatively-charged ion has several sites of negative

18  charge on it, so there will be more of the benzethonium bound to

19  it, making the neutral benzethonium salt.  It's not a separate

20  molecule.  It's still a salt, but it's a tight binding of a

21  large positively-charged ion or several large positively-charged

22  ions that fit nicely together with a larger negatively-charged

23  ion.

24     THE COURT:  So the benzethonium, that's the larger

25  one; correct?

```
 1              THE WITNESS:  Yes, yes.  That's a large
 2  positively-charged ion.
 3              THE COURT:  And that will have attached to it some
 4  number of, I guess, the negatively-charged -- what is it?
 5  Heparin -- what's the negatively-charged --
 6              THE WITNESS:  Yes.  That's the heparin -- the heparin
 7  part of sodium heparin.
 8              Now, perhaps I could make this a little bit clearer,
 9  your Honor.
10              The largest one of these -- so we have four things.
11  We have sodium ion, chloride ion, benzethonium ion, and heparin
12  ion.
13              THE COURT:  Right.
14              THE WITNESS:  The heparin ion is large.  The heparin
15  ion would be, for example -- is as large as my arms are
16  reaching.  And it has several sites of negative charge on it.
17              The sodium ion would be about the size of the end of
18  my little finger.
19              And the chloride ion would be about the size of my
20  thumb.
21              And the benzethonium ion would be about the size of
22  this array of cups.
23              So we have essentially changed sodium for
24  benzethonium, and in so doing, we've produced some -- a species
25  benzethonium salt of heparin.  It's still a salt because it's
```

1   still made up of positive ions and negative ions, but these are

2   rather tightly bound together and they're not soluble in water.

3   So they form a solid in the bottom of the solution.

4           THE COURT:  So if I have this right, the sodium was --

5   without regard to the benzethonium, the sodium was bound to the

6   heparin but loosely?

7           THE WITNESS:  Yes.

8           THE COURT:  Then when you put it in water, the

9   benzethonium knocks out the sodium?

10          THE WITNESS:  Yes.  Yes.  And when we put the sodium

11  heparin in water, the water molecules are small.  They're of the

12  order of the size of the sodium ions, and sodium has a

13  positively-charge -- a positive charge.  Water has a negative

14  side and a positive side to it.

15          So several of these water molecules come in exposing

16  their negative sides to the positive sodium ion and just lift

17  the sodium ion free from its -- it's binding in the solid state

18  to the heparin ion.

19          And the sodium ions and the heparin ions are then

20  completely disassociated in the water solution initially.

21          THE COURT:  But there has to be a positive that is

22  going to fill -- take its place, and that's the benzethonium?

23          THE WITNESS:  Exactly right, your Honor.  There has to

24  be a balance of positive and negative, which is expressed in the

25  idea of the neutral benzethonium --

1          THE COURT:  So the resulting combination is everything

2    is in water and precipitates out?

3          THE WITNESS:  Exactly right.  Yes.

4    BY MR. WEIR:

5    Q.   So we're at the stage where we get the precipitant, the

6    solid in solution.  How would you isolate the solid benzethonium

7    heparinate from solution?

8    A.   There is two ways to do that.  We have a solid and a

9    solution above it.  One way to do it is to filter -- just take a

10   piece of porous filter paper and pour the mixture of solution

11   and neutral benzethonium heparin and the solid will be retained

12   on the filter paper while the solution will pass on through.

13         It's a little bit like using -- using a fine mesh bag

14   or something like that to filter wet pasta to get the solution

15   away from the pasta itself.  That's one way to do it and that's

16   a way that is taught in Mardiguian in the examples.

17         Another way to separate the positive -- to separate

18   the solid from the liquid is to centrifuge this.  A centrifuge,

19   your Honor, involves taking the material, which is the reaction

20   mixture, the positive -- the sodium chloride solution and the

21   benzethonium heparin solid, and we put that into a large

22   rotating drum and we spin this around at high speed, and what

23   that does is it packs the solid at the bottom, and we then

24   separate the solid from the liquid, either by just pouring the

25   liquid off from the solid or by, in some fashion, removing the

1    liquid from the solid.

2     BY MR. WEIR:

3    Q.    Does Mardiguian mention the centrifugation as a separation

4    method?

5    A.    Yes.  Yes.  Mardiguian mentions -- in Example 17 at two

6    places, your Honor, I am looking at, which is page 33, line 26,

7    quote, *the precipitate formed is collected by centrifuging,* end

8    quote.

9           And then later on in Example 17, on page 34, line 14,

10   *the precipitate formed is collected by centrifuging,* end quote.

11          So Mardiguian teaches filtration and centrifugation as

12   methods of separating the solid from the liquid solution.  Both

13   of these are standard methods used in the chemistry lab.

14   Q.    If performed correctly, is there any practical difference

15   between the two methods?

16   A.    No, there is no practical difference.  This -- these are

17   both physical methods of separating a solid from a liquid.

18   Q.    Could you turn to page 14 of Exhibit 46?

19   A.    Yes.  I have page 14.

20   Q.    And beginning at line 13, could you explain to the judge

21   what step is explained there.

22   A.    Yes.

23          On page 14, beginning at line 13, your Honor,

24   Mardiguian is telling us how to make an ester of the heparin.

25   So we have the benzethonium heparin as a solid, and we've

1    separated that from the sodium chloride solution by

2    centrifugation or filtration, and now on page 14, starting at

3    line 13, Mardiguian begins to talk about the process -- the

4    second process, the process of making the heparin moiety into an

5    ester of heparin.

6    Q.   If you could read out loud the sentence beginning on line

7    24 that says *the heparin esters used*.

8    A.   Yes.  I'm reading from page 14, line 24, quote, *the heparin*

9    *esters used as starting substances in the processes, according*

10   *to the invention, may be derived from heparin of any origin; for*

11   *example, bovine lung heparin, heparin from pig mucous membranes*

12   *or heparin from cattle intestines,* end quote.

13   Q.   What do you understand that to mean?

14   A.   I understand the clear meaning of this to be the initial

15   source of the heparin, before we do the salification, can come

16   from, as it says here, heparin of any origin on lines 16 and 17.

17   Q.   Turn over to page 15, and I would just like to direct your

18   attention to the sentence beginning at line 7.

19   A.   Yes.  I have that.

20   Q.   And could you explain to the judge what is being disclosed

21   here by Mr. Mardiguian?

22   A.   What -- what Mardiguian is doing here, your Honor, is he is

23   beginning to discuss how to make an ester of the heparin, of the

24   benzethonium heparin.

25            If I could quote from line 7, quote, *this reaction is*

1    *affected in solution or in suspension in an inert solvent such*

2    *as, for example, dimethylformamide, methylene chloride,* and a

3    few others are mentioned, and then, quote, *at a temperature from*

4    *minus 20 degrees C to plus 60 degrees C,* end quote.

5    Q.   What do you understand this temperature range, minus

6    20 degrees C to plus 60 degrees C, to mean?

7    A.   I take it to mean just what it says.  One of ordinary skill

8    would apply the same meaning to it.  One is going to carry out

9    the reaction leading to the ester of heparin at temperatures

10   from minus 20 to plus 60.  So within this range, these are all

11   taught by Mardiguian as appropriate temperatures for making the

12   ester of heparin.

13   Q.   You mentioned -- part of the sentence you read there was

14   the phrase *inert solvent*.  Could you explain what an inert

15   solvent is?

16   A.   An inert solvent is a solvent which is not itself going to

17   be a participant in a reaction.  It's just going to be a medium

18   in which the reaction occurs.

19          For example, in the -- in the initial treatment of

20   sodium heparin with benzethonium chloride, the water was an

21   inert solvent.  The water was not itself reacting but, rather,

22   it was a medium in which the reaction occurs.

23          Now, what we're doing -- what we're stating here on

24   page 15 at lines 8 and 9, an insert solvent is going to be

25   chosen, but the benzethonium heparin that we made from the

1    salification is not soluble in water.  So the solvent that one

2    has to choose will be what we call an organic solvent.  It's a

3    solvent which does not have this positive and negative end to it

4    the way water does.

5              The --

6              THE COURT:  Just a second.  Could I trouble you to

7    redefine *ester* the way you're using it here so I don't lose

8    that?

9              THE WITNESS:  Yes.

10             We have in the heparin entity an acid function.  It's

11   a function which has a proton, a hydrogen atom that can be

12   removed, and it functions like an acid, like hydrochloric acid

13   would in the stomach.

14             Now, in the process of removing this hydrogen atom

15   from an acid group in the heparin species, we can place an

16   organic molecule onto it.  We can react an organic molecule onto

17   it.

18             So instead of having an acid at a certain position in

19   heparin, we have now what is called an ester where we have

20   replaced the hydrogen atom of the acid with an organic -- an

21   organic entity.

22             *Organic*, your Honor, I'm referring to something that

23   is composed largely of carbon and hydrogen.

24             THE COURT:  A carbon molecule?

25             THE WITNESS:  Yes.  It would be, for example, the --

1    I'm just looking for the exact cite here.  Where appropriate

2    reactive --

3     BY MR. WEIR:

4    Q.    If you look --

5    A.    Yes.  I'm looking at page 14 at line 17.  Here Mardiguian

6    is telling us what particularly would be good to make an ester,

7    and he has, quote, *particularly the benzyl and substituted*

8    *benzyl,* end quote.

9           A benzyl species, your Honor, has a so-called benzene

10   ring.  It's six carbons bonded in a ring.  And then it has,

11   protruding from that, a group which can be attached to the acid

12   function of heparin.

13          THE COURT:  Okay.  Now, first of all, I want you and

14   counsel to understand that I'm perfect -- it's perfectly fine

15   for you to say, after some question I ask, that that question is

16   not relevant to what we're talking about here.  Instead of

17   feeling like my curiosity has to be satisfied, you may -- I may

18   very well ask a question and you say well, that's very

19   interesting, but that's not what we're talking about, and I

20   won't take it as an insult.  I will take it as being efficient.

21          I just want to get straight that the term *ester*, as

22   we're now using it, is a -- I guess, a molecule in which some

23   existing molecule has been modified by replacing a hydrogen atom

24   with some carbon-based molecule?

25          THE WITNESS:  Exactly right.

 1            And you haven't asked any questions that haven't been

 2    absolutely spot on, your Honor.  This chemistry is rather

 3    complex and --

 4     BY MR. WEIR:

 5    Q.    Maybe you can explain, what is the sort of typical ester

 6    linkage that it's going to be a C hyphen -- could you explain to

 7    the Court what an ester linkage looks like and then --

 8    A.    Yes.  So the typical acid functionality in heparin I'm

 9    showing with my hands here.  My pointer finger is -- my knuckle

10    is a carbon and the tip of my pointer finger is an oxygen.  My

11    thumb is another oxygen with a hydrogen atom on it, and it's

12    this hydrogen atom that is the acid part of this overall group

13    on heparin.

14            So what we're doing is we are replacing the hydrogen

15    atom on this oxygen with a benzyl group which is, as you

16    correctly put it, a large organic entity.

17            So we then have a carbon, an oxygen, and then another

18    carbon of the ester group instead of having a carbon, an oxygen,

19    and a hydrogen, making it an acid functionality.

20            THE COURT:  Okay.  And acid, in the chemical sense,

21    does not mean like hydrochloric acid that is going to eat your

22    body away, but it has another function.  It's --

23            THE WITNESS:  It's a weaker acid.  It's a much weaker

24    acid.  Instead of hydrochloric acid, it would be like citric

25    acid.

```
 1              THE COURT:  The term acid is used to something that
 2   has a range between acids and bases, pH levels?
 3              THE WITNESS:  Yes.  Exactly right.
 4              THE COURT:  I think that suffices for now.
 5              THE WITNESS:  When we're moving into the chemistry
 6   here and beginning to talk about esters and reactions to form
 7   esters, the first year of undergraduate chemistry doesn't touch
 8   this usually.  Usually that's well into the second year of
 9   organic chemistry.
10              So the chemistry that Mardiguian is spelling out here,
11   he is doing a nice job of spelling it out, but it's still
12   complicated chemistry.
13              THE COURT:  All right.
14    BY MR. WEIR:
15   Q.  So you touched on this and I would like to sort of
16   summarize what is happening.
17              We have first the sodium heparin that is soluble in
18   water and then we now go to this benzyl ester.
19              Could you map out, for these first two steps, the
20   solubility of the compositions and how they precipitate?
21   A.  Yes.
22              So we have made initially in water the benzethonium
23   heparin, and that's insoluble.  So it precipitates.  But the
24   benzethonium heparin will now dissolve in one of the solvents
25   which I was just referring to on page 15, your Honor, the one
```

1    that is called dimethylformamide in line 9.

2          Dimethylformamide -- some of these names get a little

3    bit long, so as chemists, we refer to this as just DMF.  Just

4    the levels DMF.  And dimethylformamide is a substance that will

5    dissolve organic materials like the neutral benzethonium

6    heparin.

7          We've now got that into -- the benzethonium heparin

8    into a DMF solution, for example, and we can add our benzyl

9    chloride, for example, the organic, the carbon-containing

10   material that's going to form the ester to this.  And we then

11   produce the -- if we use the benzyl organic material, we produce

12   the benzyl ester of heparin.

13    BY MR. WEIR:

14   Q.    Okay.  So at the end of the salification step, we have

15   benzethonium heparinate.  At the end of the esterification step,

16   we have heparin benzyl ester?

17   A.    Correct, yes.

18   Q.    And you mentioned earlier, there is now a third step which

19   is the depolymerization step.  Could you turn to page 12.

20   A.    Yes.  I have page 12.

21   Q.    Okay.  And beginning at line 1, if I can focus your

22   attention on that, could you explain to the Court what

23   Mardiguian is disclosing here, if anything, about the

24   depolymerization step.

25   A.    Yes.  Yes.  I'll just focus on lines 1 through 3.  Quote,

1    *the mixture according to the invention may be prepared, for*

2    *example, by the action of an inorganic or organic base on a*

3    *heparin ester,* end quote.

4            So the mixture, according to the invention, is going

5    to be the low molecular weight heparin, and it can be prepared

6    by taking the heparin ester, which is now the normal heparin

7    molecule, but it's been made into an ester, and the statement on

8    the second and third line of page 12 says that we can treat this

9    with an inorganic or organic base; in other words, we could use

10   something like sodium hydroxide.

11           In fact, looking on page 12, your Honor, down at line

12   24, line 23, *basis which may be used are those which are water*

13   *soluble and in particular sodium hydroxide,* end quote.

14           So this is the step called depolymerization.  We have

15   got the normal heparin molecule, just like it was in the heparin

16   sodium but we've made it into an ester.  And we're now going to

17   depolymerize it; in other words, chop this large molecule up

18   into smaller segments, which will be the, as Mardiguian puts it,

19   the mixture according to the invention.  Low molecular weight

20   heparins.

21   Q.   Now, if you would look at page 12, line 20, what does

22   Mardiguian say about the temperature range for the

23   depolymerization reaction?

24   A.   Yes.  I'll go -- I'll start just before line 20 with,

25   quote, *the reaction between the ester and the base may be*

*affected in water at a temperature of 20 degrees C to 80*

*degrees C.*

Q.   And if you read on, it says what the concentration of the

base might be.   Could you explain that.

A.   Yes.   It goes ahead to say, quote, *the molar concentration*

*of the base in the medium being preferably between .1 and .2 --*

*and .6.*   That's referring to the concentration of the sodium

hydroxide in the water solution which is going to be added to

the water solution of the heparin ester.

          THE COURT:   What is *molar concentration*?

          THE WITNESS:   Molecules are too small to count,

your Honor, so chemists use what is referred to as Avogadro's

number of molecules after a 16th Century scientist named

Avogadro.

          A mole is a molecular weight of the molecules in a

large enough quantity to work with.   So it's actually 6 times 10

to the 23rd molecules make up one mole.

          Sodium hydroxide, for example -- one mole of sodium

hydroxide weighs about 58.5 grams, and 58.5 grams would be a

convenient amount to put -- it would fill this cup maybe about a

third full.   So it's a convenient amount to work with.

          We can't work on the molecule basis so we work on the

molar basis, but the difference between a molecule and a mole is

just a scale factor of 6 times 10 to the power 23rd.

          So what it's saying here, the molar concentration of

```
 1    the base is .1 mole per liter of solution.  And if this is

 2    sodium hydroxide, one mole of sodium hydroxide weighs about 58.5

 3    grams.  If we put one mole -- if we put 58.5 grams of sodium

 4    hydroxide in a liter of solution, this would be a one-molar

 5    solution.

 6              But what it's calling for here is a .1 molar solution,

 7    which would be 5.85 grams of sodium hydroxide in a one-liter

 8    solution, up to .6 moles, which would be about 30 grams of

 9    sodium hydroxide in a one-liter solution.

10              So the idea of molar is a way of allowing a chemist to

11    make a solution and then to know how much of that solution one's

12    adding to another solution instead of having to continuously

13    weigh the material.

14              THE COURT:  Okay.  That's fine.

15     BY MR. WEIR:

16    Q.   Okay.  So those are the three reactions that you testified

17    to earlier.  There is salification, esterification, and

18    depolymerization.

19              Could you turn to page 19 and in particular lines 9

20    and 10.

21    A.   Yes.  I have page 19, lines 9 and 10.  Should I read these?

22    Q.   Sure.

23    A.   Quote, *the invention is illustrated by the following*

24    *non-limiting examples,* end quote.

25    Q.   What do you understand that to mean?
```

1    A.    I understand that to mean that Mardiguian is going to give

2    us now, as it turns out, 20 examples, specific examples of how

3    one can carry out his invention.  And by *non-limiting*, he means

4    that his invention is not limited to these examples.  His

5    invention is spelled out in the specification of the patent, but

6    the examples are to allow one to -- to have some specific

7    teaching of how the invention could be done.

8              So the -- by non-limiting, Mardiguian is telling us

9    that his invention is not just these 20 examples, but these 20

10   examples will be a subset of what his teaching is.

11   Q.    Have you reviewed the 20 examples that Mr. Mardiguian has

12   in his patent?

13   A.    I have.

14   Q.    And what did you observe?

15   A.    I observed that there were many -- many ways to carry out

16   Mardiguian's invention.  I observed that he, in his own 20

17   examples, mixes and matches -- he's starting in each case with

18   the benzethonium heparin for the salification step, but he's --

19   he then has different ways of doing the esterification and the

20   depolymerization.

21             And in one example, he will do one esterification

22   followed by one method of doing the depolymerization.  In

23   another one, another example, again, different ways, but then

24   he'll mix the two methods together.

25             I realize this is not particularly clear, your Honor,

1    but if -- would it be appropriate to turn to what's labeled as

2    301?

3    Q.    Yes.   That is what I was going to direct you to next.

4    Could you turn to Exhibit 301.

5             MS. DAVIES:  Your Honor, they did not include this on

6    their exhibit list when we were required to put exhibits in a

7    couple weeks ago.  Late last night we received a supplemental

8    exhibit list from them that included this on it.  We had -- I

9    guess I object to them using this, given that they did not

10   include it on their exhibit list.

11            THE COURT:  Yes, Mr. Weir?

12            MR. WEIR:  It's included in his expert report.

13            MS. DAVIES:  His report was also not included in his

14   exhibit list, your Honor.

15            MR. WEIR:  Separately -- we marked his expert report.

16   We didn't separately mark this particular exhibit, so we just

17   gave it its own exhibit number.  That's all we did.  But it's in

18   his expert report.

19            MS. DAVIES:  Your Honor, may I speak that the

20   representation is wrong.  The expert report of Dr. Atwood is

21   also not on their exhibit list from two weeks ago or from late

22   last night.

23            THE COURT:  Okay.  I'm going to overrule the objection

24   because, number one, this is not evidence.  This is an

25   illustration to take -- to help try and make something clear.  I

1    don't think this is a surprise.

2            And if there needs to be some remedy, we can think

3    about it, but I think -- I think it would be helpful to have

4    this to make clear what he was just talking about.  So let's

5    proceed.

6            It's not in evidence as if it were some independent

7    piece of evidence, Mr. Weir.

8            MR. WEIR:  Understood.

9            THE COURT:  All right.  But in as much as it has a

10   chart with colors, maybe it will be helpful.

11           MR. WEIR:  Thank you.

12           THE WITNESS:  It has to be an improvement over me

13   using my fingers to represent --

14           THE COURT:  I didn't see your fingers -- your fingers

15   haven't been attached to your expert report either.  All right.

16           Please proceed.

17    BY MR. WEIR:

18   Q.   Okay.  So what's shown in example -- in Exhibit 301?

19   A.   Yes.  In Exhibit 301, I have listed seven items, and that's

20   on the right-hand column, your Honor.  It says *sequence number*

21   *of mixed processes*, *No. 1*, and what we find in No. 1 is Example

22   2 has the salification, which is listed as neutral, and then it

23   has esterification and depolymerization.

24           And it has the conditions and the chemicals that are

25   used to carry out in Example 2 the esterification and then the

1   chemicals, concentrations, conditions that are used to carry out

2   the depolymerization.

3            And the same for Example 3.

4            Now, what this chart is -- what I'm aiming to show is

5   Example 9 takes the conditions for esterification from Example 2

6   and then it takes the conditions for depolymerization from

7   Example 3.

8            So I'm writing there under *examples with mixed*

9   *processes* on the right-hand side Example 9 equals Example 2 plus

10  Example 3.

11  Q.   What is the significance of, as you go down the

12  esterification column -- of the yellow highlighted examples?

13  A.   The yellow highlighted just means I'm going to use that set

14  of conditions in the -- well, if I go to the next blocks, which

15  is Example 1, 5, 15, and then Example 10, I'm using the

16  esterification from Example 1 in Example 10, but then I'm using

17  for depolymerization not the conditions from Example 1, but

18  rather the conditions from Example 5 or 15.

19           So Example 10 has esterification from Example 1

20  followed by depolymerization from Example 5 or from Example 15.

21  Q.   And then what about the entries in the blue column?

22  A.   The blue column -- so the column to focus on -- I realize,

23  your Honor, that this makes a lot more sense to me after I have

24  made it up than it does at first blush, but what I'm seeking to

25  do is I'm focusing on Example 9, which is that first block,

1    Example 10, which is the second block, and Example 5, which is

2    the third block.

3             So if we focus on Example 10 in the second block, the

4    conditions for Example 10 for esterification and for

5    depolymerization are shown just across the horizontal, and what

6    I point out is that the condition for esterification shown in

7    yellow for Example 10 is, in fact, a condition shown for Example

8    1 for esterification.

9             And then in blue are the conditions for

10   depolymerization for Example 10, and then I'm showing that in

11   blue just above that are the conditions for depolymerization for

12   Example 5 or 15, and they're just the same.

13   Q.   How many times is the depolymerization step used in Example

14   3 used in other examples in the Mardiguian patent?

15   A.   Well, it's used in 3 and it's also used in 9.  So the

16   depolymerization is used in Example 3 and it's also used in

17   Example 9.

18   Q.   And how about Example 5?

19   A.   Example 5 --

20   Q.   Depolymerization step only.

21   A.   The depolymerization step only for Example 5 is the same as

22   that used in Example 10 and the same as that used in Example 15.

23   Q.   Lastly, I'd like to address the chemical theory that

24   involves a relationship between temperature and time in a

25   reaction.

And so what is the relationship between time and temperature in a reaction?

A.   The time and temperature are linked together.  The way in which they're linked was discovered by a 19th Century chemist called Arrhenius, so the relationship is called the Arrhenius Relationship.

And what that says essentially in its simplest form is that if we are carrying out a reaction at 20 degrees C, sort of comfortable room temperature, and then we increase the temperature to 30 degrees C, the amount of time it takes for the reaction to go completely is only half.

So for every 10 degrees centigrade that we increase in temperature, it cuts the time for the reaction to go to completion in half.  In other words, if we did something for 60 minutes at 20 degrees C, we would expect to get the same result, about the same result by doing the reaction at 30 degrees C for 30 minutes.

Q.   Now, how do chemists use this principle in practical application?

A.   We use it every day in reaction chemistry such as we see here in Mardiguian.  And that is Mardiguian has given us, for example, for the -- for the esterification reaction a range of minus 20 to plus 60 degrees.

So if we -- if we're carrying this reaction out at room temperature, it may take several days.  But using the

1    Arrhenius relation, if we move the temperature up to 20, suppose

2    the reaction was going to take four days --

3             THE COURT:  Can I ask an academic question --

4             THE WITNESS:  So chemists just use temperature and

5    time balanced together within a range of temperatures.  We can't

6    just -- if we heat something too high, then it might cause the

7    reaction to take another course.

8             THE COURT:  Well, this just may not be pertinent, but

9    is this a universally applicable rule to all chemical reactions?

10   Whatever the chemical reaction is, it speeds up -- for every

11   10 degrees centigrade, you could expect to have the chemical

12   reaction to take half the time it took at the earlier --

13            THE WITNESS:  Yes.  Yes.  That's a general rule of

14   thumb.

15            Now, the Arrhenius equation itself has a lot more math

16   in it than that so it might be that it only -- that it doesn't

17   proceed to the same amount in half the amount of time.  It might

18   be .45.

19            THE COURT:  Intuitively, it's -- in principle, it

20   seems to make sense.

21            THE WITNESS:  Yes.

22            THE COURT:  I wouldn't suspect that it would be

23   universal, and I would be -- you're phrasing it in terms of

24   degrees centigrade, but I think you're really talking about

25   degrees kelvin, which is the same number of degrees.

1              THE WITNESS:  Yes.  Yes.

2              THE COURT:  It --

3              THE WITNESS:  If you go up 10 degrees kelvin.

4              THE COURT:  It would be the same, except that I would

5    suspect that the timing difference might be considered

6    considerably varied at lower degrees kelvin than it would be at

7    higher degrees kelvin, etc.

8              THE WITNESS:  That's a good point.  I think you're

9    right about that, your Honor.

10             THE COURT:  All right.

11             But in terms of what we seem to be talking about here,

12   it's in a range where it speeds up, and as a rule of thumb,

13   fine.  A hundred percent for every 10 degrees centigrade.  I

14   think that's good enough for government work today.

15             THE WITNESS:  Okay.

16             THE COURT:  All right.  That's fine.

17             THE WITNESS:  The other point in that regard,

18   your Honor, is without Mardiguian, I would not know that the

19   range at which the esterification could be done was from minus

20   20 to 60.  So without Mardiguian, one would have to experiment

21   and see how high one could heat it without something bad

22   happening.

23             THE COURT:  Or put another way, I mean, whether it

24   could be done at 10 or at 70 doesn't matter.  He said 20 to 60,

25   and that's what he taught and that's what we're talking about.

1           THE WITNESS:  Exactly right.

2           THE COURT:  All right.  So let's move on.

3           MR. WEIR:  No further questions, your Honor.

4           THE COURT:  All right.  Okay.

5           Ms. Davies, I'm perfectly happy for you to proceed.

6    If you wanted to have some little time to organize, you can.

7    It's up to you.

8           MS. DAVIES:  I would like a couple minutes to

9    organize.

10          THE COURT:  We will take as brief as we can do it.

11   Let's give you the courtesy of organizing.

12          MS. DAVIES:  Thank you.

13          THE COURT:  Brief recess.

14          MR. WEIR:  Your Honor, we just will assume by the rule

15   when there is a witness on the stand, at a break, nobody will

16   confer with the witness.

17          THE COURT:  Well, I don't know, Ms. Davies --

18          MR. WEIR:  We certainly won't.

19          THE COURT:  The technical rule is when he is under

20   cross-examination.  If you wish to have it apply when he has

21   finished direct, that's fine with me.  If that's the way you

22   want to operate, that's the way we'll do it.

23                       (Recess taken)

24          THE CLERK:  Please come to order.  This court is again

25   in session.

1          THE COURT:  Okay.  Thank you.  Thank you.  Okay.

2          Dr. Atwood is still under oath, and you're up.

3          MS. DAVIES:  Thank you, your Honor.

4          THE COURT:  And anybody who finds that I'm not

5  speaking into the microphone has a perfect license to tell me.

6  Okay.

7          MS. DAVIES:  Thank you, your Honor.

8                      CROSS-EXAMINATION

9  BY MS. DAVIES:

10 Q.   Dr. Atwood, we have not met before.  My name is Tracey

11 Davies, and I am going to ask you some questions based on the

12 answers you have provided.  Okay?

13 A.   Nice to meet you.

14 Q.   It's nice to meet you, too.

15          First of all, I think you mentioned this isn't the

16 first time you provided testimony as an expert witness, is it?

17 A.   I hadn't mentioned it in my testimony today, but I

18 certainly mentioned it at my deposition.

19 Q.   Okay.

20          And I think you -- I understand you've testified as an

21 expert witness over 200 times in the last 25 years?

22 A.   No.  That's -- that's an exaggeration.  I think the 200 was

23 the number of cases in which I had been involved but not

24 necessarily testifying.

25 Q.   Okay.  But what about deposition testimony or testimony in

 1    court?

 2    A.    Deposition testimony since 1989, about 90 to 100 times, and

 3    in court, I would say 25 to 30 times over that 25-year period.

 4    Q.    Okay.  So I've done this a few times, but you've done this

 5    a lot.

 6          Do you -- you currently spend more time providing

 7    testimony as an expert witness or serving as an expert witness

 8    than you do writing and researching and teaching; isn't that

 9    correct?

10    A.    No, no, that's not correct.

11          I do four things, primarily.  I do research, I teach,

12    I run the chemistry department at Missouri, and I consult.  I

13    would say I spend about -- these days I spend about an equal

14    amount of time on the first three as I do on consulting.

15    Q.    I believe you testified in your deposition that you spend

16    about 40 hours a week working as an expert?

17    A.    I think my exact testimony was I spend 40 hours a week

18    consulting, and that breaks down roughly as four hours doing

19    normal consulting for pharmaceutical companies and 36 hours

20    doing work related to litigation these days.

21    Q.    Okay.

22    A.    Now, I also pointed out in my deposition, that I spend 80

23    to 100 hours a week working.  So 40 hours, I don't consider that

24    a full week, but rather it's a good start to a full week.

25    Q.    I fear we all spend more time working than we want to.

```
 1              That time you spend testifying contributes more to
 2    your income than your teaching or your research; correct?
 3    A.    It does, yes.
 4    Q.    I'd like to talk a little bit about your expertise.  I
 5    understand that you have published in the range of 700 papers or
 6    so; is that correct?
 7    A.    That's correct.
 8    Q.    And none of these papers discuss heparin or low molecular
 9    weight heparins; is that correct?
10    A.    That's correct.
11    Q.    In fact, a big chunk of your papers relate to
12    crystallography; correct?
13    A.    A big chunk relate to crystallography.  However, I am a
14    synthetic chemist, both inorganic and organic chemist, and the
15    crystallography is a tool, like nuclear magnetic resonance, for
16    gaining information about that which we've made in the
17    laboratory.
18    Q.    Heparins don't form a crystal structure, do they?
19    A.    They do not.
20    Q.    And enoxaparin don't form a crystal structure, do they?
21    A.    That's correct.  They do not.
22    Q.    You were talking earlier about sodium chloride and it
23    dissolving in water.  And then you proceeded on and you were
24    talking about a base and the importance of the base in the
25    depolymerization process.
```

1    I'm -- I'm curious and -- when you were talking about

2    the base, you mentioned that sodium hydroxide has a molecular

3    weight of 58.5.  Were you confusing that with a crystal

4    structure that you were talking about earlier?

5    A.   No.  No.  Chlorine weighs about 35.5 weight units and

6    sodium weighs 23 weight units.  So a mole of sodium chloride, a

7    molecular weight expressed in grams for sodium chlorides, about

8    58.5 grams.

9         Now, sodium chloride, of course, I'm referring to it

10   as table salt, you know.  I'm weighing it out as a solid and I'm

11   not putting it in solution and weighing it out at that point.

12   Q.   So it's your testimony that the base that's used in many of

13   these reactions, to do a molar calculation of that, you would

14   use a molar calculation of 58.5 grams per milliliter?

15   A.   No.  No.  I have either confused you or you are confusing

16   me.  That's sodium chloride.  We are using sodium hydroxide as

17   the base.

18   Q.   Right.

19   A.   Sodium hydroxide weighs about 40 grams per mole.

20   Q.   Well, I think maybe I was just confused about your

21   testimony earlier then.

22        When you were talking earlier about the disclosures in

23   Mardiguian, you said that Mardiguian describes that one can use

24   a heparin at any starting weight.  But it doesn't -- Mardiguian

25   does not say that you can use a heparin to produce the

1   compositions that are at issue in this case of any molecular

2   weight, does it?

3   A.   I don't believe I testified that one could use heparins of

4   any starting weight.  I testified earlier as Mardiguian leads

5   us, that the source of the heparin is covered by Mardiguian,

6   whether it's pig mucosa or of cattle origin.

7   Q.   And so you don't provide a -- testimony on the importance

8   of the starting molecular weight of the heparin to follow the

9   Mardiguian patent in your opinions, did you?

10  A.   In my opinions, I did not, and I'm taking that primarily

11  from the European Pharmacopeia where a starting molecular weight

12  for enoxaparin sodium -- a starting molecular weight for the

13  heparin which leads to enoxaparin sodium is not given there

14  either.

15  Q.   But we're talking in this case about whether or not

16  Amphastar followed the teachings of the Mardiguian reference and

17  that reference specifically does not say that you can start with

18  any molecular weight-starting material, does it?

19  A.   Well, I agree, it doesn't say that one can start with any

20  starting molecular weight.  But I disagree that it teaches a

21  particular starting molecular weight.

22         Now, in examples, it gives starting molecular weights,

23  but the teaching is that one can use heparin from -- I think

24  that the exact statement was from any source.  And, of course,

25  depending on the source, the molecular weight of the heparin

1   will be different.

2   Q.   So the molecular weight of the heparin will be different.

3   I'm wondering -- can you please pull up Atwood No. 1.  Atwood

4   Exhibit 1, please.

5           When you came to this conclusion that Mardiguian would

6   allow you to start with any molecular weight according to the

7   source, you were not considering the opinion of the European

8   Patent Office Opposition Division when they said there's no

9   suggestion in the disputed patent that there is a range of

10  heparins that can be used as a starting material.  The only

11  heparin disclosed as producing the mixtures of Claim 1 is a

12  specific heparin having exactly an average molecular weight of

13  11,400 daltons, were you?

14          MR. WEIR:  Objection, your Honor.

15          THE COURT:  Before the objection --

16   BY MS. DAVIES:

17  Q.   Dr. Atwood, you were not considering this opinion --

18          THE COURT:  Wait a minute.

19          MS. DAVIES:  I'm sorry.  I couldn't hear you.

20          THE COURT:  I know.  I know.

21          Now give me a definition of a *dalton* because I'm

22  looking at a number 11,400.

23          What is a dalton?

24          THE WITNESS:  A dalton is just a molecular weight

25  unit.  Typically one molecular weight unit is one dalton, but

1   typically one would say that it's -- a large protein might have

2   a weight of 30 kilodaltons.  It's -- I would say it's more a

3   term used in biology rather than chemistry.

4          THE COURT:  Does it have any relationship to a mole?

5          THE WITNESS:  Yes.  Yes.  Exactly.  Thanks,

6   your Honor.

7          I'm just reading now from line 4 on the screen of

8   average molecular weight of 11,400 daltons would be an average

9   molecular weight of 11,400 grams.

10          THE COURT:  11,400 grams?

11          THE WITNESS:  Yes.  Yes.  Because molecular weight we

12   typically express for small compounds like sodium chloride is

13   58.5 grams per mole.  And this is 11,400 grams per mole or

14   daltons.

15          THE COURT:  Well, so a dalton is one gram per mole?

16   That can't be.

17          THE WITNESS:  Yes.

18          THE COURT:  Yes?

19          THE WITNESS:  Yes.  So the molecular weight here is

20   11,400 daltons or 11,400 grams per mole, at least that's my

21   reading of it.

22          THE COURT:  A dalton -- of course the mole is based

23   on -- I know it's basic, but let's make sure that I don't get

24   overly confused here.

25          We talked about 58.5 or grams per mole.  A mole is a

```
 1    number of molecules?

 2              THE WITNESS:  Yes.

 3              THE COURT:  Like 10 to the 23?

 4              THE WITNESS:  Yes.

 5              THE COURT:  And so would the number 58.5 grams per

 6    mole mean 58.5 daltons?

 7              THE WITNESS:  Yes.  That's my reading of it here.

 8              THE COURT:  All right.

 9              THE WITNESS:  Typically the dalton is used for

10    something that is much larger, much higher in molecular weight.

11              THE COURT:  All right.

12              Ms. Davies, do we have an agreement that the word

13    dalton is referring to one gram per mole?  Or is that not

14    agreed?  I just want to make sure, when we're referring to

15    something, that I have the right understanding.

16              MS. DAVIES:  I think in the abstract, we can agree

17    that a dalton is equal to one gram per mole.  How that plays out

18    in solution and in the reactions of this case may be the subject

19    of debate.

20              THE COURT:  Well, we'll see where we go with that.

21              MS. DAVIES:  Yes, sir.

22              THE COURT:  Anyway, the average molecular mole is

23    11,400 daltons.  That's a very, very large number.

24              THE WITNESS:  It is.

25              THE COURT:  Okay.  All right.  I think that suffices
```

1    for now.

2            Now, Ms. Davies, I have gotten you off your question,

3    so why don't you go back and restate what you were asking.

4            MS. DAVIES:  That's okay.  I think the witness

5    testified he was not considering this statement from the

6    European Patent Office when he was commenting earlier.

7    Q.   In fact, you didn't consider these -- the decision by the

8    European Opposition Division in rendering the reports that you

9    have rendered in this case at all, did you?

10   A.   That's correct.  And to clarify my previous statement, in

11   terms of molecular weight of the starting material, I was taking

12   my teaching directly from the specification of Mardiguian, not

13   from specific examples.

14   Q.   So the specification of Mardiguian does not say that you

15   can use any molecular weight material, does it, Dr. Atwood?

16   A.   I'm -- I'm looking for specifically the statement that I

17   was reading.

18   Q.   Are you looking for a statement regarding molecular weight?

19   A.   Well, no.  No.  I'm looking for the -- it's a statement

20   that I read into the record earlier.  And it had to do with --

21   yes.  Yes.  Here.

22            I'm looking at page 14, your Honor, and starting at

23   line 24, quote, *the heparin esters used as starting substances*

24   *in the processes, according to the invention, may be derived*

25   *from heparin of any origin (for example, bovine lung heparin,*

1    *heparin from pig mucosa membranes or heparin from cattle*

2    *intestines),* end quote.

3            This is where I'm getting my teaching from Mardiguian

4    that it's not a specific molecular weight but, rather, it's

5    heparin from any origin.  And, of course, depending on the

6    origin, the starting heparin will have different molecular

7    weight.

8            THE COURT:  Could you go back to the page that you

9    just had --

10           MS. DAVIES:  Please go back to Atwood No. 1.

11           THE COURT:  It has No. 10 on it now.

12           Ms. Davies, you're the cross-examiner, and I think you

13   have a license to tell me not to ask the question because you

14   want to do it some other way, so please use that license, but I

15   just want to ask it this way.

16           Looking at the statement that is on the board, which

17   is No. 10, and we're going to forget -- I'm not paying any

18   attention to who said it, whether it was the European Patent

19   Office or some lawyer or anybody.

20           I take it -- do I correctly take it that except for

21   the last sentence, the *because of* sentence, you would agree that

22   everything else in there, getting down to the *because of*, is

23   true?

24           Or put it another way, regardless of who said it --

25   well, pretty clear -- I'll just do this a different way.  I

 1    haven't cross-examined in a long time, and I don't mean to

 2    cross-examine.

 3            I think you would have to agree the first sentence is

 4    a perfectly true statement as stated?

 5            THE WITNESS:  Yes.

 6            THE COURT:  Okay.  And as to the second sentence as

 7    the starting point, do you agree or disagree with that

 8    statement?

 9            THE WITNESS:  I agree with the statement, your Honor,

10    in that the -- the starting point for -- an example was heparin

11    with a molecular weight of 11,400 daltons.

12            What I was disagreeing with was that the teaching of

13    Mardiguian doesn't say that one has to start with a

14    particular --

15            THE COURT:  I agree.  I'm not -- I understand that.

16    But I think that the -- so would your disagreement be with the

17    third -- the third sentence, you would disagree with that?  Or

18    would you agree with that, *because of*?

19            THE WITNESS:  The third sentence is --

20            THE COURT:  Because --

21            THE WITNESS:  The starting point.

22            THE COURT:  It says *because of the known variability,*

23    etc.

24            THE WITNESS:  Oh, no, I don't agree with this,

25    your Honor.

1          THE COURT:  Okay.  That's fine.

2          THE WITNESS:  Because of the undue experimentation.

3    My --

4          THE COURT:  I just wanted to focus counsel on -- I'm

5    coming from a slightly different -- I'm coming from a slightly

6    different direction from where the attorneys are, and so I think

7    we're on the same wavelength.

8          Regardless of who said this, you disagree with the

9    last sentence, and counsel can ask whatever they want.  All

10   right.

11         MS. DAVIES:  Thank you, your Honor.

12   Q.   Let's look at the sentence right before that since we

13   reverted back here.

14         *As the starting point for obtaining the claimed*

15   *mixture, the person skilled in the art must obtain a heparin*

16   *fraction having this exact combination of parameters.*

17         And the parameters they are talking immediately above

18   it include a very specific molecular weight.

19         In fact, if you could help me out, David, they said a

20   specific heparin having exactly an average molecular weight of

21   11,400 daltons.

22         MR. WEIR:  Your Honor --

23    BY MS. DAVIES:

24   Q.   Do you disagree with that statement?

25         THE COURT:  Just a minute.  All right.

1            Dr. Atwood, you're an experienced witness.  I think

2     you're fine.  I have no problem.  But as soon as Mr. Weir stands

3     up, we have to wait and see what he has to say.

4            THE WITNESS:  I understand, your Honor.

5            THE COURT:  That's fine.

6            Mr. Weir?

7            MR. WEIR:  The question mischaracterizes the sentence

8     that she was reading.

9            THE COURT:  Let me review the question.

10           Well, I don't -- what does it --

11           MS. DAVIES:  I was trying to --

12           THE COURT:  Ms. Davies --

13           MS. DAVIES:  Sorry.

14           THE COURT:  I'm not sure what it mischaracterizes.

15    The --

16           MR. WEIR:  The --

17           THE COURT:  Let me try and get to this because the one

18    thing we want to do is try and stay on track with what's

19    significant.

20           If the -- if the sentence says that *in order to*

21    *produce the mixture of Claim 1,* which is -- to produce that

22    mixture, having that result, is this weight.  I mean, that's --

23    that doesn't mean that you can't produce something perfectly

24    fine using some other weight, but it won't be exactly that

25    mixture.

1          So I'm not sure Ms. Davies has mischaracterized the

2   statement.

3          Now, we've had enough discussion, Ms. Davies, that

4   we've managed to fog up whatever it is you want to ask, so why

5   don't you start over.

6          MS. DAVIES:  Okay.  Thank you.

7   Q.   Let's start over with the first sentence.

8          There is no suggestion in the disputed patent that

9   there is a range of heparin that can be used as a starting

10  material.  Do you see that, Mr. Atwood -- Dr. Atwood?  I believe

11  you testified you don't disagree with that statement; correct?

12  A.   Well, I do disagree with it because the way this is

13  phrased, there is no suggestion in the disputed patent that

14  there is a range of heparin.

15         I -- I don't agree with that because there is not just

16  a suggestion, but there is a statement that it's any heparin is

17  the starting material.

18  Q.   So let's go back to that statement, David.

19         I want you to focus on the statement that you're

20  referring to just now, which I believe is at Example 14, lines

21  24 through, I think you said, 28.  If you think it goes on

22  longer than that, you correct me.

23         And, David, I want you to underline specifically where

24  it says *the heparin esters used as starting substances in the*

25  *process according to the invention may be derived from heparin*

1    *of any origin.*

2           That's what you're relying on; right?

3    A.    Yes, that's what I'm relying on.  Is this Example 14?

4    Q.    This is page 14.

5    A.    Oh, page 14.  I thought you said Example 14.

6    Q.    No.  Page 14.  Okay.

7           And so this is talking about the origin of the

8    heparin?  This is not talking about the molecular weight of the

9    heparin, is it?

10   A.    It's not -- it's silent about the molecular weight of the

11   heparin.  However, depending on the source, the molecular weight

12   will differ, and for a given source, depending on the samples,

13   the molecular weight will differ.

14   Q.    Okay.  And so you disagree -- go back to Atwood Exhibit 1,

15   please -- that as a starting point for obtaining the mixture

16   claimed in this patent, the person skilled in the art must

17   obtain a heparin fraction having the exact combination of

18   parameters that is specified there that includes a specific

19   molecular weight.  You disagree with that?

20   A.    Well, I need to go back just a little bit because I

21   actually haven't studied the European Patent Office documents

22   until you're giving me this point 10.  The Claim 1 I'm seeing on

23   the third line, do I take that to mean that Claim 1 is Claim 1

24   of the Mardiguian patent?

25   Q.    Yes, sir.  I'll just note this is Defense Exhibit 180 from

1    our exhibit list that we're talking about here.

2            If you look -- if you will look -- did we hand you up

3    a notebook, sir?

4    A.    You did.

5    Q.    Will you take a look at Defense Exhibit 180.  It's in your

6    notebook.

7    A.    I just wanted to clarify that Claim 1 doesn't relate to a

8    starting heparin and Claim 1 actually claims a range of optical

9    rotations, the alpha of from plus 25 to plus 55 degrees.  So the

10   Claim 1 I'm looking at is the low molecular weight material.

11   Q.    Which is what enoxaparin is, right, a low molecular weight

12   material; correct?

13   A.    Yes.

14   Q.    If you could, please, sir, turn to Defense Exhibit 180.

15   A.    I have 180.

16   Q.    Okay.  If you could please go to what -- the page that

17   bears -- well, at the top, the European Patent Office Opposition

18   Board has given this Sheet 7, a designation *Sheet* 7.  Do you see

19   that?

20   A.    I have Sheet 7.

21   Q.    Okay.  If you look at 9(c), it says *repetition of Example 8*

22   *leads to the product specified in Claims 1 and 2.*  Do you see

23   that?

24   A.    I see that statement, yes.

25   Q.    Okay.  I'd also like you now to refer back to the

1    Mardiguian patent at --

2    A.    Excuse me.

3    Q.    -- page -- yes, sir?

4    A.    Ms. Davies, is Example 8 -- is Example 8 of the

5    Mardiguian --

6    Q.    Yes, sir.  Yeah.  If you could please return -- refer back

7    to page 19, lines 20 through 25, of Mardiguian.

8    A.    20 through 25.  Yes.  I have that.

9    Q.    Okay.  If you'll see there, this says that *the neutral*

10   *benzethonium salt of heparin or benzethonium heparinate used as*

11   *a starting product in Examples 4 to 9 and 11, which includes*

12   *Example 8, comes from heparin from cattle intestines having the*

13   *following characteristics,* and then it specifies the specific

14   molecular weight, 11,400.

15   A.    Yes.  And it further goes on to specify the optical

16   rotation and the anticoagulant activity.

17   Q.    Correct.  And so the European Patent Office -- go back to

18   Atwood Exhibit 1, please --

19   A.    This is --

20   Q.    -- says with respect to that -- start at the second line:

21   *The only heparin disclosed as producing the mixture of Claim 1*

22   *is a specific heparin having exactly an average molecular weight*

23   *of 11,400 daltons, a specific rotation,* which is what you were

24   referring to a minute ago, *and for which the Codex anticoagulant*

25   *activity within the accuracy limits,* and then it goes on.

1    And then the next sentence says *as the starting point*

2    *for obtaining the claimed mixture, the person skilled in the art*

3    *must obtain a heparin fraction having this exact combination of*

4    *parameters.*

5        Now that you've had a chance to look at the claim and

6    look at the specification that it's referring to, do you still

7    disagree with this statement?

8        THE COURT:  Which statement?

9        MS. DAVIES:  The statement that --

10       THE COURT:  As --

11       MS. DAVIES:  To follow Example 8 and produce Claim 1,

12   the mixture of Claim 1, the starting point for obtaining the

13   claim mixture, the person skilled in the art must obtain a

14   heparin fraction having this exact combination of parameters.

15       THE WITNESS:  All right.  Maybe I'm catching up

16   slowly.  I apologize, your Honor.

17       My understanding -- so Claim 1 is claiming a range for

18   the low molecular weight heparin?

19    BY MS. DAVIES:

20   Q.    Correct.

21   A.    And, indeed, it's claiming optical rotation from plus 25 to

22   plus 55 --

23   Q.    Right.

24   A.    Now, the starting product for Example 8 I agree has the

25   parameters which you have on the screen here.  Now, what I'm

1    missing is tying Example 8 to Claim 1.

2    Q.    So if you refer back to Sheet 7 of DX 180, Part C, where it

3    says *repetition of Example 8 leads to the product specified in*

4    *Claims 1 and 2.*

5            THE COURT:  Ms. Davies, could you just tell me the

6    page on the patent that has Claim 1 so I can find it?

7            MS. DAVIES:  Yes, sir.  The Mardiguian patent at

8    page 40 --

9            THE WITNESS:  42.

10           MS. DAVIES:  Two.  Thank you.

11           THE COURT:  Okay.  Thank you.

12           THE WITNESS:  So could you give me that question

13   again.  It was something to do with Sheet 7.

14    BY MS. DAVIES:

15   Q.    So my question for you is do you see there that the

16   European Patent Office is noting that to follow the process of

17   Claim 8, you would have to follow the specific requirements for

18   the heparin --

19           THE COURT:  You mean Example 8.

20           MS. DAVIES:  Example 8.  Yes, sir.  Thank you.  I'll

21   start over.

22   Q.    To follow the process disclosed in Example 8, the European

23   Patent Office is saying you need to start with a specific

24   heparin that is specified in the Mardiguian patent.

25           And the question is do you agree or disagree with that

1  statement?

2  A.   Well, I don't really want to be disagreeing with the

3  European Patent Office when I haven't studied anything, other

4  than these highlights that you've pointed out to me, Ms. Davies,

5  but I disagree with the general premise that one has to

6  reproduce exactly Example 8 in order to have material which is

7  covered under Claim 1 of Mardiguian.

8  Q.   Okay.

9        So you disagree with the Patent Office, the European

10  Patent Office?

11  A.   Well, I'm not sure I do or don't.

12        MR. WEIR:  Your Honor, first of all, I would like to

13  move to strike that last comment.  But I object to this line of

14  questioning.

15        He hasn't reviewed the document.  As I said in

16  opening, this was a surprise document that was provided to us

17  for the first time after expert reports were filed.  And he --

18  he -- we -- he was just not -- there is no foundation laid for

19  him to actually testify about this document.

20        THE COURT:  Which document is the surprise document?

21        MR. WEIR:  The EP decision, this Exhibit No. 180.

22  This is the -- the document that I mentioned in opening was not

23  produced to us in discovery and surfaced for the first time in

24  their pre-hearing brief.

25        So we didn't have that at the time of his expert

```
 1    report.  It's not mentioned in their expert reports.  So it's

 2    coming out of left field.

 3               THE COURT:  Well, whether it is a document written by

 4    the European Patent Office or whether it is a document written

 5    by counsel who made it up out of whole cloth, it is a statement

 6    on which they can question the witness with regard to his

 7    agreement or disagreement with it.

 8               So for right now, I'm not overly concerned, although

 9    maybe they'll make an argument on it, of the conclusion by the

10    European Patent Office.  I mean, what seems to be a fuss here is

11    perhaps not something we should really have a dispute about,

12    which if we go back -- there's a lot of pages here to follow.

13               But if we go back to the -- what number is that --

14    what's the opinion so I can get to the thing that has

15    paragraph 10 in it, Ms. Davies?

16               MS. DAVIES:  The European Patent Office.

17               THE COURT:  Which -- what number -- what document is

18    that?

19               MS. DAVIES:  It's Defense Exhibit 180.

20               THE COURT:  It's 180.  Okay.  Yes.  I have it marked

21    here.

22               MS. DAVIES:  And, your Honor, if I may --

23               THE COURT:  We do have -- as I say, I don't know the

24    significance of this as we get to the final result, but -- let's

25    see.
```

1          MS. DAVIES:  Your Honor, may I point something out?

2   It may help expedite things.

3          THE COURT:  Okay.

4          MS. DAVIES:  First of all, I feel compelled to respond

5   to Mr. Weir's statement that they haven't had this document.

6   That is simply not true, and I could provide details, but I will

7   do that only if you want me to.

8          What I was going to point out is that the -- I would

9   like to direct the witness's attention to the specific molecular

10  weight requirements in Mardiguian for Examples 2 and 3 which

11  Amphastar claims it is following.  And hopefully that will move

12  us along.

13         THE COURT:  Well, okay.  But let me just see if I

14  can't state where we are without regard to what this -- what

15  Document 180 is and assuming it's something you made up.

16         I mean, it's true that there is no suggestion that

17  there is a range of heparin in terms of literally he says

18  there's a range of heparin.  Fine.  Nobody can disagree with

19  that.

20         On the other hand, what there is is a statement that

21  says you get your heparin from pigs or from cattle and therefore

22  I assume, at least based upon -- in the absence of anything

23  else, that heparin from a Santa Rosa cow would be different from

24  that from a Guernsey, etc.

25         So therefore if it says you can get it from any pig

1    and any cattle, the patent is saying get any heparin as a

2    starting point.  So you have the undeniable two statements, and

3    we can argue what they mean.

4            And I can understand Dr. Atwood said *well, it doesn't*

5    *say range, but it says you could get any*.  Again, I don't think

6    that is a real dispute.

7            The second sentence is *the only heparin disclosed as*

8    *producing the mixture of Claim 1 is specific,* etc., and I assume

9    that's true.  I assume that Claim 1 talks about -- or at least

10   in the example, talks about the 11,400 daltons as the result,

11   but the claim doesn't say that.  The claim sort of says 2,000 to

12   10,000 daltons.

13           So I'm not sure how that follows, and you may have to

14   explore that.  But there's no question that the claim says what

15   it says, the example says what it says.

16           And then as far as the starting point is concerned,

17   the -- I don't find offensive that the witness says *I don't*

18   *agree with that,* whether it was the European Patent Office or

19   something else.  That's his opinion.

20           So I'm not -- I think I've been helpful, Ms. Davies,

21   but go ahead and ask your questions.

22           MS. DAVIES:  I was just going to point the witness

23   back to, as I said, the provision in Mardiguian that talks about

24   the specific requirements for following Example 2 and 3.

25   Q.   Dr. Atwood, will you please turn to page 19 and look at --

```
 1              THE COURT:  We're at 19 of --

 2              MS. DAVIES:  Of DX 46.

 3   Q.   Where Mardiguian says that to follow Examples 2 and 3, you

 4   need to have a heparin or that they used a heparin with a

 5   starting molecular weight of 16,000 daltons.  Do you see that?

 6   A.   Yes.  I see that.

 7   Q.   All right.  We can take a step back.

 8              I think you talked quite a bit about the three steps,

 9   at a high level of the three steps:  salification,

10   esterification and depolymerization; correct?

11   A.   Correct.

12   Q.   And I would like to ask you -- the European patent

13   Mardiguian does not describe any purification step, does it?

14   A.   The Mardiguian patent does not specifically describe as a

15   separate step purification.  However --

16   Q.   That was my question.  Thank you.

17              The -- also the EP '144 does not describe -- excuse

18   me -- DX 46, the Mardiguian patent, also does not describe a

19   specific desired degree of esterification in the esterification

20   step, does it?

21   A.   I agree with that.

22   Q.   Okay.  And the DX 46 also does not describe pre-heating the

23   sodium hydroxide solution before adding heparin benzyl ester in

24   the depolymerization step, does it?

25   A.   Would you take me, Ms. Davies, to particularly what --
```

1    where that pre-heating step is coming from.  I heard that

2    mentioned earlier.

3    Q.   The question for you is does DX 46 -- strike that.  We will

4    start over.

5         The question is DX 46, the Mardiguian patent, does not

6    describe pre-heating a solution to which sodium hydroxide is in

7    or pre-heating sodium hydroxide in the depolymerization step,

8    does it?

9    A.   I disagree with that.

10   Q.   Does the word *pre-heating* appear in DX 46?

11   A.   I don't have in mind where it would appear in Mardiguian.

12   However, typically if I'm doing chemistry and I want a sodium

13   hydroxide solution at 62 degrees, heating that solution to

14   62 degrees, I don't refer to that as preceding.  I would heat it

15   to 62 degrees and start my reaction at that point because that's

16   where I want to start it.

17        So I disagree with the idea that Mardiguian teaches or

18   doesn't teach pre-heating because Mardiguian is teaching how to

19   do the reaction.  And I think to say that starting with a

20   solution at 62 degrees is somehow pre-heating is stretching the

21   limits of what one of ordinary skill would use as an

22   interpretation of that.

23   Q.   Where does DX 46 say to start with a solution at

24   62 degrees?

25   A.   I will attempt to find the example to which we're

1  referring.

2          THE COURT:  Counsel, you can -- -- you can feel free

3  to interrupt and say look on page so and so at line so and so,

4  so he doesn't have to be alone looking for it.

5          MS. DAVIES:  Well, I would submit to you the DX 46

6  nowhere says *pre-heating* or heating to 62 degrees.  I don't

7  think he can find it there.

8          THE COURT:  That's why I said to Mr. Weir, if he can

9  find it faster than the witness, then let's point it out.  If

10 not, then it's not there.

11         MR. WEIR:  Page 22, Claim 3, line 15 through 17 --

12 Example 3, sorry.

13         THE COURT:  Line 15 through 17?

14         MR. WEIR:  Yes.

15         THE WITNESS:  Okay.  Quote -- line 15 from page 22,

16 *two grams of the above ester are treated for two hours with*

17 *stirring with 50 milliliters of 1/10th normal aqueous solution*

18 *of sodium hydroxide at 60 degrees,* end quote.

19         I don't see anything here that indicates pre-heating.

20 It indicates that this is -- where the depolymerization reaction

21 is done, namely, at 60 degrees.  And I would never start a

22 depolymerization reaction -- if I knew I wanted to go to

23 60 degrees, I wouldn't start it at room temperature because then

24 one wouldn't know how quickly to ramp the temperature up to

25 60 degrees.

```
 1    BY MS. DAVIES:

 2    Q.    I believe you said 62 degrees when you were talking

 3    earlier.

 4    A.    You'll have to take me to where that is, Ms. Davies,

 5    because I saw something which said 62 degrees --

 6    Q.    Yes.  Perhaps --

 7    A.    And this part is 60 degrees.

 8    Q.    Perhaps you could refer to DX 37.  I believe it's in your

 9    notebook.  DX 37 is the '618 patent.  If you could please refer

10    in '617 -- '618, excuse me, to column 7 at the bottom there.

11    You see at line 56 it's talking did the depolymerization step

12    that the Aventis '618 patent is teaching?

13    A.    Yes.  I see that.

14    Q.    And you see the last line there it starts *to this solution,*

15    *heated to 62 degrees C, sodium hydroxide was added,* period?

16    A.    Yes.  I see that.

17    Q.    Perhaps that's where you were thinking 62 degrees came

18    from, the teachings in the Aventis patent?

19    A.    I may have been thinking that is where it case from because

20    I believe that was in one of the opening statements.  However, I

21    don't see any pre-heating in -- in this statement from the '618

22    either.

23    Q.    Okay.

24    A.    One starting at 62 degrees to carry out the

25    depolymerization and according to this one, maintaining the
```

```
 1    temperature at that for an hour thirty minutes.
 2    Q.    And your testimony is someone would just know that that
 3    would require pre-heating?
 4    A.    I've been doing synthetic chemistry for 51 years, and I'm
 5    not used to the term pre-heating.  When it says do a reaction at
 6    50 degrees, I don't refer to heating the solution up to
 7    52 degrees as pre-heating.  I take it just for what it says.
 8    It's going to be at 50 degrees, I do it at 50 degrees or
 9    62 degrees.
10    Q.    I believe your testimony earlier was you would take DX 46
11    at face value, and if you follow the teachings in Example 2, for
12    example, all the way through, you will get an enoxaparin; is
13    that correct?
14    A.    So I'm taking Mardiguian Example 2 and I'm following this
15    all the way through.
16              THE COURT:  What's the page you're looking at, please?
17              MS. DAVIES:  Page 21 and 22, your Honor.
18              THE COURT:  Thank you.  Okay.
19              THE WITNESS:  Yes.  Yes.  If I take Example 2 and run
20    Example 2 as its written here, my opinion is that I will get a
21    low molecular weight heparin.
22     BY MS. DAVIES:
23    Q.    And I believe you testified you will get a low molecular
24    weight heparin that would fall within the scope of the '618
25    claims; correct?
```

```
 1   A.   I don't recall testifying to falling within the '618.  I
 2   recall testifying that if one mixes and matches Example 2 and
 3   Example 3 with the right starting product, one will get a
 4   heparin -- a low molecular weight heparin that's within the
 5   claims of the '618.  I don't recall saying that specifically
 6   just for Example 2.
 7   Q.   Dr. Atwood, your deposition testimony is included in the
 8   binder that you have.  If you could look at that and turn to
 9   page 157, starting at line 23.  And going along to 158, line 3.
10   A.   This is -- Exhibit 130, right?
11   Q.   157, line 23.  Oh, yes, 157, line 23.  Your deposition
12   testimony.
13   A.   Okay.
14            THE COURT:  What's the number of the paper, please?
15            THE WITNESS:  I think that's 130, your Honor.  I'm
16   looking at 157.  Page 157, were you directing me specifically
17   to --
18    BY MS. DAVIES:
19   Q.   Yes, sir.  Line 23.  I would like you to read that through
20   158, line 6, please.  If you could read it out loud.
21   A.   Excuse me just a moment.  I want to get some context to
22   this.  Okay.  Starting at line 23 of page 157 of Exhibit 130.
23   Q.   Correct.
24   A.   (Reading):
25            Q. Do you have a view one way or another with regard
```

1    *to whether reproducing Exhibit 2 from the Mardiguian patent all*

2    *the way through would result in a low molecular weight heparin*

3    *within the claims of the '618 patent?*

4         *A. So the question is do I have a view on whether or*

5    *not, not whether it was actually done?*

6         *Q. Yes.*

7         *A. In my opinion, it would.*

8         Yes.  I haven't seen it done, but my opinion at that

9    time and as I think about it today, I have -- I have reason to

10   believe that it would fall within those limits.

11   Q.   If you follow Example 2 straight through?

12   A.   Yes.  But as I say here, I don't know that anyone has

13   actually done that.

14        THE COURT:  Ms. Davies, let me ask you how much longer

15   you have.  This is not rushing you.  This is so I can be

16   appropriate with the break.  I was asking you how long you're

17   going to be?

18        MS. DAVIES:  I do not believe I will be more than a

19   few -- a couple more minutes.  Less than five.

20        THE COURT:  Okay.

21        Mr. Weir, how long do you think the redirect is?

22        MR. WEIR:  15.

23        THE COURT:  All right.  Would you prefer to have the

24   lunch break now and then pick it up afterwards?  Let's do that.

25   So that --

 1                   MS. DAVIES:  Yes.

 2                   THE COURT:  Then Ms. Davies can do her final

 3      organization.

 4                   Let me ask -- let me confer with the reporter as to

 5      the timing of this.

 6                   Counsel, what would be a reasonable time for the

 7      luncheon recess?  Would half an hour be too short?  Don't worry.

 8      If you need 45 minutes, it's okay for right now.

 9                   MR. WEIR:  I think maybe 45 minutes.

10                   THE COURT:  Let's do that.  Let's recess until 20

11      after 1:00.  All right 1:30.  1:30.  And you guys can take a

12      look at your time estimates.  I think we are a bit ahead, aren't

13      we?  That's helpful.  See you folks at 1:30.

14                        (A.M. session ended at 12:35 p.m.)

*CERTIFICATE OF OFFICIAL REPORTER*

*COUNTY OF LOS ANGELES )*
                      *)*
*STATE OF CALIFORNIA   )*

*I, Pamela A. Batalo, Federal Official Realtime Court Reporter, Registered Professional Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 18, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.*

*Date:  July 7, 2014*

*/s/ Pamela A. Batalo*
_____
*Pamela A. Batalo, CSR No. 3593, FCRR, RMR*
*Federal Official Court Reporter*

'

'01 [3] - 34:14, 34:15, 35:11
'03 [3] - 26:7, 40:24, 41:6
'04 [4] - 26:13, 41:9, 41:19, 41:25
'05 [3] - 26:25, 28:15
'08 [2] - 42:4, 42:10
'09 [1] - 40:20
'144 [77] - 13:14, 14:8, 14:12, 15:8, 21:21, 21:25, 22:12, 22:17, 23:4, 23:10, 23:17, 23:24, 23:25, 24:1, 24:3, 24:21, 25:1, 25:7, 25:13, 26:2, 26:4, 26:19, 26:21, 27:4, 27:8, 27:10, 27:22, 27:25, 28:16, 29:6, 29:8, 29:10, 29:20, 29:21, 29:24, 30:3, 30:10, 30:11, 30:14, 30:17, 31:2, 32:15, 33:2, 33:7, 34:4, 34:7, 34:16, 34:19, 34:20, 34:23, 35:2, 35:5, 35:14, 35:19, 35:23, 36:5, 36:15, 37:9, 38:9, 38:11, 39:9, 39:14, 39:16, 39:21, 40:7, 40:8, 40:11, 41:1, 43:12, 44:16, 44:19, 45:13, 45:15, 45:19, 45:24, 106:17
'617 [1] - 109:10
'618 [89] - 9:24, 13:16, 13:19, 13:21, 13:22, 21:16, 21:19, 22:13, 22:16, 23:2, 23:8, 23:16, 23:20, 23:23, 23:25, 24:7, 24:21, 25:25, 26:4, 26:5, 26:7, 26:9, 26:14, 26:20, 27:2, 27:10, 27:22, 28:1, 28:4, 28:17, 31:10, 34:6, 34:10, 34:16, 34:18, 34:20, 34:22, 34:25, 35:1, 35:6, 35:12, 35:15, 35:16, 35:18, 35:24, 36:4, 36:12, 36:20, 36:23, 37:9, 38:15, 39:1, 39:6, 39:15, 39:16, 39:18, 39:19, 39:20, 39:24, 40:7, 40:11, 40:25, 42:23, 43:1, 43:4,

43:9, 43:11, 44:9, 44:10, 44:19, 45:14, 45:17, 45:20, 45:23, 47:8, 47:14, 109:9, 109:10, 109:12, 109:21, 110:24, 111:1, 111:5, 112:3
'89 [1] - 25:3

/

/s [1] - 114:20

0

0046-0019 [1] - 54:14
09-00023-MJG(Opx [1] - 1:11

1

1 [43] - 1:18, 2:6, 6:15, 7:8, 36:3, 54:20, 70:21, 70:25, 72:6, 73:1, 73:6, 76:21, 77:15, 77:16, 77:17, 77:19, 78:8, 88:3, 88:4, 88:11, 92:10, 95:21, 97:14, 97:22, 97:23, 98:7, 98:8, 98:10, 98:22, 99:18, 99:21, 100:11, 100:12, 100:17, 101:1, 101:4, 101:6, 102:7, 105:8, 105:9
1.3 [1] - 7:15
1.5 [1] - 36:10
1/10th [1] - 108:17
10 [28] - 8:7, 11:3, 11:6, 12:8, 54:20, 72:16, 72:24, 73:20, 73:21, 77:15, 77:16, 77:19, 78:1, 78:3, 78:4, 78:7, 78:10, 78:22, 79:12, 80:11, 81:3, 81:13, 81:24, 90:3, 92:11, 92:17, 97:22, 103:15
10,000 [1] - 105:12
100 [2] - 84:2, 84:23
1050 [1] - 2:23
11 [7] - 8:7, 13:14, 54:16, 54:18, 56:16, 57:19, 99:11
11,400 [14] - 88:13, 88:22, 89:8, 89:9, 89:10, 89:13, 89:20, 90:23, 93:11, 94:21, 99:14, 99:23, 105:10
1100 [1] - 2:13

111 [1] - 30:3
12 [10] - 13:14, 14:5, 14:7, 54:16, 54:20, 70:19, 70:20, 71:8, 71:11, 71:21
12:35 [1] - 113:14
12TH [1] - 2:6
13 [3] - 63:20, 63:23, 64:3
130 [3] - 111:10, 111:15, 111:22
14 [16] - 15:5, 35:18, 63:9, 63:18, 63:19, 63:23, 64:2, 64:8, 67:5, 91:22, 96:20, 97:3, 97:4, 97:5, 97:6
142 [1] - 21:23
144 [1] - 35:12
147 [5] - 26:17, 27:9, 27:14, 27:20, 28:5
15 [14] - 21:23, 54:20, 64:17, 65:24, 69:25, 77:15, 77:18, 77:20, 78:12, 78:22, 108:11, 108:13, 108:15, 112:22
157 [6] - 111:9, 111:11, 111:16, 111:22
158 [2] - 111:9, 111:20
16 [1] - 64:16
16,000 [1] - 106:5
16th [1] - 72:13
17 [11] - 6:19, 9:21, 10:2, 10:3, 23:5, 63:5, 63:9, 64:16, 67:5, 108:11, 108:13
18 [2] - 32:25, 114:11
180 [13] - 24:25, 25:6, 25:17, 27:7, 97:25, 98:5, 98:14, 98:15, 101:2, 102:21, 103:19, 103:20, 104:15
1801 [1] - 2:18
181-I [1] - 1:24
19 [13] - 54:13, 54:15, 54:18, 56:16, 56:17, 56:18, 57:19, 58:4, 73:19, 73:21, 99:7, 105:25, 106:1
1981 [1] - 8:15
1984 [1] - 25:1
1985 [1] - 14:7
1989 [2] - 14:11, 84:2
1995 [1] - 26:7
19th [1] - 79:4
1:00 [1] - 113:11
1:30 [3] - 113:11,

113:13
1st [1] - 38:14

2

2 [30] - 10:6, 10:7, 10:9, 10:23, 10:25, 11:2, 11:4, 11:6, 11:10, 11:11, 26:16, 72:6, 76:22, 76:25, 77:5, 77:9, 98:22, 101:4, 104:10, 105:24, 106:3, 110:11, 110:14, 110:19, 110:20, 111:2, 111:6, 112:1, 112:11
2,000 [2] - 7:12, 105:11
20 [28] - 7:11, 7:12, 10:19, 32:25, 54:22, 54:23, 56:16, 57:19, 65:4, 65:6, 65:10, 71:21, 71:24, 72:1, 74:2, 74:9, 74:11, 74:16, 79:8, 79:15, 79:23, 80:1, 81:20, 81:24, 99:7, 99:8, 113:10
200 [2] - 83:21, 83:22
2000 [2] - 38:15, 38:21
2000s [1] - 9:1
2001 [6] - 34:9, 34:11, 36:22, 37:16, 37:19
2002 [3] - 24:10, 37:17, 42:23
2003 [2] - 5:16, 44:12
20036-5306 [1] - 2:24
2004 [3] - 26:18, 43:16, 43:25
2008 [1] - 44:2
2014 [4] - 1:20, 3:1, 4:1, 114:17
21 [1] - 110:17
2100 [1] - 2:13
213 [1] - 1:25
22 [3] - 108:11, 108:15, 110:17
23 [10] - 21:23, 54:24, 71:12, 86:6, 90:3, 111:9, 111:11, 111:19, 111:22
23rd [2] - 72:17, 72:24
24 [5] - 64:7, 64:8, 71:12, 91:23, 96:21
25 [6] - 83:21, 84:3, 98:9, 99:7, 99:8, 100:21
25-year [1] - 84:3
255 [1] - 1:23

26 [1] - 63:6
28 [1] - 96:21

3

3 [35] - 6:15, 6:18, 6:23, 6:24, 6:25, 7:5, 10:5, 10:6, 10:7, 10:9, 10:25, 11:2, 11:11, 11:12, 22:18, 23:2, 23:12, 26:16, 54:20, 70:25, 77:3, 77:7, 77:10, 78:14, 78:15, 78:16, 104:10, 105:24, 106:3, 108:11, 108:12, 111:3, 111:9
30 [9] - 36:3, 36:11, 52:19, 73:8, 79:10, 79:16, 79:17, 84:3, 89:2
301 [4] - 75:2, 75:4, 76:18, 76:19
33 [1] - 63:6
34 [1] - 63:9
35 [1] - 27:19
35.5 [1] - 86:5
3500 [1] - 7:15
3593 [1] - 114:21
36 [1] - 84:19
37 [2] - 109:8, 109:9

4

4 [10] - 6:16, 6:23, 6:25, 7:5, 13:4, 15:8, 24:25, 89:7, 99:11
40 [6] - 84:16, 84:17, 84:23, 86:19, 101:8
40,144 [5] - 6:12, 6:14, 8:24, 13:24, 53:17
40-milligram [1] - 6:16
42 [1] - 101:9
45 [5] - 4:20, 6:17, 80:18, 113:8, 113:9
46 [13] - 53:12, 53:14, 54:13, 63:18, 106:2, 106:18, 106:22, 107:3, 107:5, 107:10, 107:23, 108:5, 110:10

5

5 [9] - 7:12, 77:15, 77:18, 77:20, 78:1, 78:12, 78:18, 78:19, 78:21
5.85 [1] - 73:7
50 [4] - 108:17, 110:6,

110:8
**51** [2] - 3:6, 110:4
**52** [1] - 110:7
**55** [2] - 98:9, 100:22
**5500** [1] - 7:16
**56** [1] - 109:11
**58.5** [11] - 72:19, 73:2, 73:3, 86:3, 86:8, 86:14, 89:13, 89:25, 90:5, 90:6

**6**

**6** [28] - 6:9, 6:11, 6:23, 6:24, 7:4, 8:24, 21:16, 22:16, 22:18, 23:1, 23:2, 23:12, 23:20, 24:6, 26:9, 29:22, 30:5, 39:13, 39:14, 41:21, 42:2, 42:23, 44:10, 72:7, 72:16, 72:24, 73:8, 111:20
**6.1** [1] - 7:15
**60** [16] - 7:13, 49:8, 51:23, 65:4, 65:6, 65:10, 79:14, 79:23, 81:20, 81:24, 108:18, 108:21, 108:23, 108:25, 109:7
**62** [19] - 36:1, 36:4, 36:7, 36:11, 36:12, 107:13, 107:14, 107:15, 107:20, 107:24, 108:6, 109:2, 109:5, 109:15, 109:17, 109:24, 110:9
**687-0446** [1] - 1:25

**7**

**7** [12] - 1:20, 3:1, 4:1, 64:18, 64:25, 98:18, 98:20, 101:2, 101:13, 109:10, 114:17
**70** [1] - 81:24
**700** [2] - 52:10, 85:5
**73** [1] - 21:23
**75** [1] - 6:16
**75201-6912** [1] - 2:14
**753** [1] - 114:10

**8**

**8** [14] - 65:24, 98:21, 99:4, 99:12, 100:11, 100:24, 101:1,

101:3, 101:17, 101:19, 101:20, 101:22, 102:6
**8,000** [1] - 7:13
**80** [2] - 72:1, 84:22
**80202-2642** [1] - 2:19
**83** [1] - 3:6
**86** [1] - 7:13

**9**

**9** [17] - 7:11, 11:1, 11:3, 11:10, 11:11, 11:14, 25:16, 65:24, 70:1, 73:19, 73:21, 77:5, 77:9, 77:25, 78:15, 78:17, 99:11
**9(c** [1] - 98:21
**9.5** [1] - 35:18
**90** [1] - 84:2
**90012** [1] - 1:24
**92614** [1] - 2:7
**9:01** [1] - 4:2

**A**

**A-T-W-O-O-D** [1] - 50:14
**a.m** [1] - 4:2
**A.M** [2] - 1:18, 113:14
**able** [3] - 31:9, 31:15, 46:19
**above-entitled** [1] - 114:13
**absence** [1] - 104:22
**absolute** [1] - 17:24
**absolutely** [4] - 19:19, 31:19, 33:23, 68:2
**abstract** [1] - 90:16
**academic** [1] - 80:3
**accept** [3] - 14:18, 48:2, 49:15
**acceptable** [1] - 10:3
**accepted** [1] - 29:25
**according** [11] - 7:1, 7:18, 23:3, 64:9, 71:1, 71:4, 71:19, 88:6, 91:24, 96:25, 109:25
**accuracy** [3] - 43:2, 44:10, 99:25
**acid** [17] - 66:10, 66:12, 66:15, 66:18, 66:20, 67:11, 68:8, 68:12, 68:19, 68:20, 68:21, 68:23, 68:24, 68:25, 69:1
**acids** [1] - 69:2
**acknowledge** [2] - 32:19, 45:11

**act** [2] - 42:5, 47:10
**action** [4] - 27:6, 27:11, 30:9, 71:2
**actions** [7] - 24:16, 24:18, 31:25, 44:14, 44:22, 44:23, 48:10
**activity** [1] - 99:16, 99:25
**actual** [2] - 14:16, 24:6
**add** [2] - 20:21, 35:9, 35:25, 36:2, 36:8, 47:12, 58:9, 58:12, 58:14, 58:18, 70:8
**added** [7] - 34:18, 34:21, 35:13, 35:16, 36:1, 72:8, 109:15
**adding** [2] - 73:12, 106:23
**addition** [2] - 12:22, 15:5
**additional** [1] - 28:4
**additions** [1] - 11:18
**address** [4] - 5:9, 23:21, 50:19, 78:23
**addressed** [1] - 17:8
**admissions** [2] - 40:21, 40:22
**admit** [3] - 46:1, 46:2, 46:15
**admits** [2] - 24:6, 46:22
**admitted** [7] - 13:25, 24:4, 40:12, 47:16, 47:19, 47:22, 47:24
**admittedly** [1] - 44:25
**affairs** [1] - 28:7, 46:6
**affect** [2] - 47:2, 50:23
**affected** [2] - 65:1, 72:1
**afterwards** [1] - 112:24
**age** [1] - 44:5
**agenda** [1] - 47:10
**ago** [4] - 8:4, 75:7, 75:21, 99:24
**agree** [18] - 15:14, 21:12, 24:24, 28:18, 87:19, 90:16, 92:21, 93:3, 93:7, 93:9, 93:15, 93:18, 93:24, 96:15, 100:24, 101:25, 105:18, 106:21
**agreed** [2] - 14:11, 90:14
**agreement** [2] - 90:12, 103:7
**ahead** [10] - 21:6, 22:10, 22:23, 34:3, 39:4, 40:5, 57:1,

72:5, 105:21, 113:12
**aiming** [1] - 77:4
**air** [1] - 4:5
**al** [1] - 1:12
**allegation** [1] - 8:3
**allegations** [4] - 18:1, 23:22, 26:24, 27:12
**allege** [1] - 16:22
**alleged** [1] - 19:15
**allow** [2] - 74:6, 88:6
**allowing** [1] - 73:10
**allows** [2] - 54:2, 55:21
**almost** [2] - 17:23, 59:7
**alone** [1] - 108:4
**alpha** [1] - 98:9
**amended** [1] - 18:7
**amount** [9] - 58:17, 59:4, 59:5, 72:20, 72:21, 79:10, 80:17, 84:14
**Amphastar** [48] - 1:7, 4:11, 5:9, 5:12, 5:15, 5:17, 9:1, 9:15, 9:17, 11:9, 11:15, 11:18, 12:16, 14:14, 16:21, 16:23, 17:1, 18:9, 18:12, 21:13, 21:15, 21:18, 23:7, 24:1, 24:2, 24:4, 24:6, 24:11, 24:13, 25:11, 26:1, 26:24, 28:20, 32:14, 41:14, 41:19, 41:25, 42:11, 44:23, 45:3, 45:14, 45:22, 46:19, 46:22, 47:9, 50:16, 87:16, 104:11
**Amphastar's** [22] - 5:14, 6:2, 7:20, 8:18, 17:1, 21:19, 23:15, 26:14, 27:1, 27:11, 27:18, 28:6, 28:9, 42:10, 42:16, 43:6, 43:7, 45:7, 45:23, 46:6, 48:9, 48:13
**AND** [1] - 2:13
**ANDA** [24] - 5:15, 5:17, 5:21, 5:22, 6:9, 9:5, 9:6, 13:7, 14:1, 14:17, 16:21, 16:22, 34:12, 37:19, 39:7, 40:12, 41:11, 41:14, 41:19, 43:10, 43:16, 43:20, 47:17
**ANGELES** [1] - 114:3
**Angeles** [3] - 1:19, 1:24, 4:1
**answer** [4] - 17:15, 40:11, 41:6, 45:25

**answered** [1] - 21:14
**answers** [1] - 83:12
**anticipate** [2] - 26:21, 45:20
**anticipation** [3] - 26:20, 29:15, 45:19
**anticoagulant** [2] - 99:16, 99:24
**anyway** [2] - 33:24, 90:22
**apart** [1] - 12:8
**apologize** [1] - 100:16
**appear** [5] - 4:25, 26:19, 107:10, 107:11
**APPEARANCES** [1] - 2:1
**appeared** [1] - 15:1
**applicable** [1] - 80:9
**application** [2] - 19:16, 79:19
**applies** [1] - 51:12
**apply** [3] - 49:25, 65:8, 82:20
**approach** [2] - 13:10, 50:10
**appropriate** [5] - 37:23, 65:11, 67:1, 75:1, 112:16
**approved** [1] - 11:19
**aqueous** [1] - 108:17
**area** [1] - 33:4
**areas** [2] - 11:8, 52:14
**argue** [1] - 105:3
**argued** [1] - 6:21
**arguing** [3] - 14:8, 18:20, 33:15
**argument** [8] - 13:18, 14:6, 14:13, 15:1, 15:18, 16:3, 19:2, 103:9
**arguments** [3] - 18:6, 45:7, 49:24
**arms** [1] - 60:15
**array** [1] - 60:22
**Arrhenius** [4] - 79:5, 80:1, 80:15
**art** [27] - 6:1, 6:12, 13:16, 13:17, 13:22, 13:24, 13:25, 14:1, 14:3, 14:6, 14:13, 14:20, 21:25, 22:12, 27:21, 29:15, 33:7, 33:8, 33:9, 33:10, 33:14, 33:20, 44:17, 94:15, 97:16, 100:2, 100:13
**article** [7] - 29:10, 29:15, 29:25, 30:2, 30:11, 33:19, 33:20

**articles** [1] - 52:9
**asserted** [1] - 5:12
**assume** [7] - 19:2, 20:22, 51:12, 82:14, 104:22, 105:8, 105:9
**assuming** [1] - 104:15
**atom** [7] - 66:11, 66:14, 66:20, 67:23, 68:11, 68:12, 68:15
**attached** [3] - 60:3, 67:11, 76:15
**attacks** [1] - 18:20
**attempt** [2] - 20:7, 107:25
**attention** [6] - 48:12, 54:16, 64:18, 70:22, 92:18, 104:9
**Attorney** [1] - 44:2
**attorney's** [3] - 40:14, 40:23, 42:10
**attorneys** [1] - 94:6
**ATWOOD** [1] - 3:5
**Atwood** [26] - 37:13, 37:21, 49:5, 49:7, 50:8, 50:14, 51:18, 51:19, 51:23, 53:7, 75:20, 83:2, 83:10, 88:3, 88:17, 91:15, 92:10, 95:1, 96:10, 97:14, 99:18, 105:4, 105:25, 111:7
**August** [3] - 25:1, 41:6, 41:19
**authority** [1] - 28:9
**Aventis** [26] - 1:12, 4:16, 5:15, 5:18, 8:5, 8:7, 8:8, 14:18, 18:21, 19:21, 21:10, 22:13, 26:8, 26:13, 41:3, 41:17, 41:22, 42:11, 43:21, 43:24, 44:12, 46:14, 47:20, 109:12, 109:18
**AVENTIS** [3] - 2:10, 2:11, 2:14
**Aventis's** [3] - 46:3, 46:7, 46:20
**AVENUE** [2] - 2:13, 2:23
**average** [7] - 7:15, 88:12, 89:8, 90:22, 94:20, 99:22
**Avogadro** [1] - 72:14
**Avogadro's** [1] - 72:12
**avoid** [3] - 18:24, 29:4, 49:21
**aware** [1] - 27:10
**axle** [2] - 30:9, 31:23

**B**

**background** [1] - 8:25
**bad** [1] - 81:21
**bag** [1] - 62:13
**balance** [2] - 58:17, 61:24
**balanced** [1] - 80:5
**balances** [1] - 57:7
**base** [13] - 8:12, 14:6, 71:2, 71:9, 71:25, 72:4, 72:6, 73:1, 85:24, 86:2, 86:12, 86:17
**based** [16] - 7:24, 8:20, 14:14, 32:21, 41:11, 41:16, 41:23, 43:17, 43:21, 46:14, 46:25, 47:17, 67:24, 83:11, 89:22, 104:22
**bases** [2] - 14:25, 69:2
**basic** [5] - 12:15, 54:2, 54:5, 54:6, 89:23
**basis** [8] - 8:2, 33:18, 43:14, 43:15, 46:6, 71:12, 72:22, 72:23
**Batalo** [4] - 1:22, 114:7, 114:20, 114:21
**bath** [1] - 36:7
**bears** [1] - 98:17
**became** [2] - 11:17, 11:19
**become** [1] - 17:23
**began** [1] - 9:3
**begin** [1] - 4:7
**beginning** [8] - 13:12, 63:20, 63:23, 64:6, 64:18, 64:23, 69:6, 70:21
**begins** [2] - 6:25, 64:3
**behavior** [1] - 22:14
**beneficial** [1] - 57:4
**benzene** [1] - 67:9
**benzethonium** [53] - 54:19, 54:25, 56:1, 56:2, 56:5, 56:7, 56:8, 56:14, 56:20, 56:21, 56:24, 57:14, 57:17, 57:18, 57:20, 57:23, 57:24, 58:8, 58:12, 58:15, 58:23, 59:3, 59:5, 59:8, 59:10, 59:18, 59:19, 59:24, 60:11, 60:21, 60:24, 60:25, 61:5, 61:9, 61:22, 61:25, 62:6, 62:11, 62:21, 63:25, 64:24, 65:20, 65:25, 69:22, 69:24,

70:5, 70:7, 70:15, 74:18, 99:10
**benzyl** [13] - 8:9, 10:2, 10:3, 67:7, 67:8, 67:9, 68:15, 69:18, 70:8, 70:11, 70:12, 70:16, 106:23
**beside** [1] - 37:22
**best** [2] - 23:19, 44:21
**beta** [1] - 8:8
**better** [2] - 22:17, 36:24
**BETTY** [1] - 2:10
**Betty** [1] - 4:16
**between** [10] - 5:15, 7:13, 45:1, 63:15, 69:2, 71:25, 72:6, 72:23, 78:24, 79:1
**beyond** [1] - 9:6
**big** [3] - 6:21, 85:11, 85:13
**bill** [2] - 4:15, 21:9
**bind** [1] - 57:10
**binder** [4] - 51:17, 52:23, 53:12, 111:8
**binding** [7] - 14:18, 14:20, 16:10, 44:15, 56:24, 59:20, 61:17
**binds** [1] - 56:8
**bioavailability** [1] - 28:2
**biology** [1] - 89:3
**bit** [13] - 12:24, 13:6, 15:23, 22:22, 57:2, 60:8, 62:13, 70:3, 85:4, 97:20, 106:8, 113:12
**block** [5] - 39:2, 77:25, 78:1, 78:2, 78:3
**blocks** [1] - 77:14
**blown** [1] - 28:8
**blue** [5] - 37:11, 77:21, 77:22, 78:9, 78:11
**blush** [1] - 77:24
**board** [5] - 5:21, 20:9, 40:16, 92:16, 98:18
**body** [1] - 68:22
**bonded** [1] - 67:10
**books** [3] - 38:6, 42:21, 43:4
**bottom** [6] - 11:4, 39:2, 54:13, 61:3, 62:23, 109:10
**bound** [8] - 12:7, 55:14, 58:19, 58:24, 59:14, 59:18, 61:2, 61:5
**bovine** [4] - 11:11, 11:13, 64:11, 91:25
**box** [1] - 13:23

**break** [3] - 82:15, 112:16, 112:24
**breaks** [2] - 54:11, 84:18
**brief** [10] - 13:4, 13:12, 14:23, 15:17, 25:2, 33:16, 82:10, 82:13, 102:24
**briefly** [3] - 8:25, 13:3, 55:11
**bring** [3] - 7:17, 16:2, 23:18
**broken** [3] - 26:22, 45:21, 54:1
**brought** [1] - 15:24
**BS** [1] - 51:24
**Building** [1] - 1:23
**bunch** [2] - 37:5, 38:22
**burlington** [1] - 17:19
**button** [1] - 5:5
**BY** [19] - 3:6, 3:6, 58:7, 62:4, 63:2, 67:3, 68:4, 69:14, 70:13, 73:15, 76:17, 83:9, 88:16, 94:23, 100:19, 101:14, 109:1, 110:22, 111:18

**C**

**CA** [1] - 2:7
**calculation** [2] - 86:13, 86:14
**CALIFORNIA** [3] - 1:2, 2:18, 114:4
**California** [4] - 1:19, 1:24, 4:1, 114:10
**Campbell** [1] - 28:7
**cannot** [5] - 17:6, 26:1, 46:1, 47:4, 49:22
**carbon** [8] - 66:23, 66:24, 67:24, 68:10, 68:17, 68:18, 70:9
**carbon-based** [1] - 67:24
**carbon-containing** [1] - 70:9
**carbons** [1] - 67:10
**care** [1] - 16:14
**careful** [1] - 33:5
**carries** [1] - 55:23
**carry** [8] - 55:12, 55:19, 65:8, 74:3, 74:15, 76:25, 77:1, 109:24
**carrying** [3] - 58:3, 79:8, 79:24

**case** [31] - 5:20, 6:5, 10:25, 12:4, 12:6, 12:23, 12:25, 13:2, 13:10, 14:2, 14:16, 14:19, 14:22, 15:6, 17:19, 17:20, 17:21, 17:22, 17:23, 18:14, 20:8, 37:20, 37:23, 54:9, 55:17, 74:17, 87:1, 87:15, 90:18, 91:9, 109:19
**Case** [1] - 1:10
**cases** [4] - 6:16, 18:17, 23:6, 83:23
**catching** [1] - 100:15
**cattle** [7] - 11:11, 64:12, 87:6, 92:1, 99:12, 104:21, 105:1
**centigrade** [8] - 36:1, 36:4, 36:7, 79:12, 80:11, 80:24, 81:13
**CENTRAL** [1] - 1:2
**Central** [1] - 114:9
**central** [3] - 5:23, 14:3, 15:17
**centrifugation** [3] - 63:3, 63:11, 64:2
**centrifuge** [2] - 62:18
**centrifuging** [2] - 63:7, 63:10
**century** [1] - 79:4
**Century** [1] - 72:13
**certain** [6] - 16:9, 19:13, 31:25, 43:1, 48:10, 66:18
**certainly** [5] - 18:17, 35:24, 44:20, 82:18, 83:18
**CERTIFICATE** [1] - 114:1
**certify** [1] - 114:10
**chains** [1] - 7:11
**chair** [1] - 52:3
**challenged** [1] - 14:7
**challenging** [1] - 8:6
**chance** [1] - 100:5
**changed** [3] - 46:9, 46:14, 60:23
**changes** [2] - 38:8, 46:4
**changing** [1] - 58:4
**Chao** [6] - 24:14, 28:6, 32:23, 41:17, 47:12, 47:24
**characteristics** [3] - 25:20, 28:2, 99:13
**characterized** [1] - 16:8
**charge** [9] - 55:3, 55:4, 55:13, 55:19,

59:14, 59:18, 60:16, 61:13
**charged** [20] - 55:23, 56:8, 56:9, 56:24, 56:25, 57:5, 57:8, 57:13, 57:15, 57:16, 57:24, 57:25, 59:17, 59:21, 59:22, 60:2, 60:4, 60:5
**charges** [1] - 55:13
**charging** [1] - 17:22
**chart** [8] - 22:21, 32:18, 32:24, 36:21, 38:13, 40:16, 76:10, 77:4
**chemical** [7] - 8:11, 20:17, 68:20, 78:23, 80:9, 80:10, 80:11
**chemically** [1] - 22:24
**chemicals** [2] - 76:24, 77:1
**chemist** [5] - 52:17, 73:10, 79:4, 85:14
**chemistry** [20] - 51:24, 51:25, 52:4, 52:8, 53:7, 54:2, 58:10, 58:16, 63:13, 68:2, 69:5, 69:7, 69:9, 69:10, 69:12, 79:20, 84:12, 89:3, 107:12, 110:4
**chemists** [4] - 70:3, 72:12, 79:18, 80:4
**chloral** [1] - 10:3
**chloride** [27] - 56:5, 56:7, 57:14, 57:15, 57:17, 57:18, 57:21, 58:6, 58:8, 58:12, 59:3, 59:5, 59:9, 59:11, 60:11, 60:19, 62:20, 64:1, 65:2, 65:20, 70:9, 85:22, 86:6, 86:9, 86:16, 89:12
**chlorides** [1] - 86:7
**chlorine** [1] - 86:5
**choice** [1] - 47:9
**choose** [2] - 49:16, 66:2
**chop** [1] - 71:17
**chosen** [1] - 65:25
**chunk** [2] - 85:11, 85:13
**circuit** [2] - 17:19, 17:25
**cite** [2] - 22:17, 67:1
**cited** [3] - 17:20, 17:21, 46:8
**citizen** [1] - 46:7
**citizen's** [2] - 8:5,

46:21
**citric** [1] - 68:24
**claim** [22] - 7:7, 7:8, 7:11, 26:10, 40:19, 41:7, 41:9, 41:11, 41:20, 42:6, 43:14, 43:15, 43:17, 44:3, 47:17, 100:5, 100:13, 101:17, 105:11, 105:14, 108:11
**Claim** [19] - 7:8, 88:11, 95:21, 97:22, 97:23, 98:7, 98:8, 98:10, 99:21, 100:11, 100:12, 100:17, 101:1, 101:6, 102:7, 105:8, 105:9
**claimed** [12] - 5:25, 6:13, 12:21, 13:15, 17:3, 25:9, 28:1, 38:16, 45:13, 94:14, 97:16, 100:2
**claiming** [3] - 40:19, 100:17, 100:21
**claims** [21] - 5:12, 9:23, 11:23, 14:9, 24:5, 26:14, 27:1, 27:13, 40:15, 42:5, 42:22, 44:24, 45:14, 47:10, 98:8, 98:22, 101:4, 104:11, 110:25, 111:5, 112:3
**clarification** [1] - 20:22
**clarify** [4] - 32:11, 57:2, 91:10, 98:7
**clear** [10] - 31:23, 47:8, 48:7, 59:2, 59:4, 64:14, 74:25, 75:25, 76:4, 92:25
**clearer** [1] - 60:8
**CLERK** [4] - 48:25, 50:9, 50:12, 82:24
**clerk** [2] - 20:5, 20:10
**clock** [2] - 26:22, 45:21
**closely** [1] - 38:6
**closer** [1] - 38:13
**cloth** [1] - 103:5
**CO** [1] - 2:19
**Code** [1] - 114:11
**Codex** [1] - 99:24
**collected** [2] - 63:7, 63:10
**colors** [1] - 76:10
**columbia** [1] - 52:4
**column** [6] - 76:20, 77:12, 77:21, 77:22, 109:10

**combination** [9] - 10:5, 11:10, 26:15, 27:3, 62:1, 94:16, 97:17, 100:3, 100:14
**combine** [1] - 11:2
**combined** [2] - 33:11
**comfortable** [2] - 4:6, 79:9
**coming** [6] - 17:17, 18:4, 94:5, 103:2, 107:1
**comment** [1] - 102:13
**commenting** [1] - 91:6
**committed** [1] - 42:12
**companies** [2] - 52:20, 84:19
**company** [1] - 9:3
**compares** [1] - 6:11
**compel** [1] - 15:3
**compelled** [1] - 104:4
**compensated** [1] - 31:17
**competitor** [1] - 14:7
**complaint** [1] - 18:7
**Complaint** [1] - 5:13
**completely** [6] - 25:18, 56:4, 56:6, 59:12, 61:20, 79:11
**completion** [1] - 79:14
**complex** [2] - 25:17, 68:3
**complicated** [1] - 69:12
**composed** [3] - 55:2, 55:12, 66:23
**composition** [17] - 7:22, 21:19, 22:13, 23:8, 23:16, 23:25, 24:22, 25:25, 28:17, 31:11, 34:12, 39:6, 39:19, 39:20, 40:10, 45:23
**compositional** [2] - 45:1, 45:4
**compositions** [3] - 23:10, 69:20, 87:1
**compound** [3] - 56:5, 58:23, 59:8
**compounds** [2] - 55:17, 89:12
**computer** [1] - 4:13
**concede** [1] - 19:21
**concentration** [7] - 8:12, 8:20, 72:3, 72:5, 72:7, 72:10, 72:25
**concentrations** [1] - 77:1
**concern** [1] - 13:9
**concerned** [2] - 103:8,

105:16
**conclude** [1] - 47:13
**concluded** [1] - 38:8
**concludes** [1] - 10:19
**conclusion** [9] - 43:2, 44:8, 46:6, 47:11, 47:12, 88:5, 103:9
**Conclusions** [1] - 28:10
**conclusions** [1] - 43:5
**condition** [2] - 78:6, 78:7
**conditioning** [1] - 4:5
**conditions** [12] - 8:21, 25:21, 76:24, 77:1, 77:5, 77:6, 77:14, 77:17, 77:18, 78:4, 78:9, 78:11
**conduct** [24] - 16:22, 17:23, 18:2, 18:5, 18:10, 27:13, 40:19, 41:5, 41:8, 41:10, 41:16, 41:20, 42:1, 42:6, 43:13, 43:17, 43:20, 44:1, 44:3, 45:7, 47:17, 47:23, 52:5
**conducted** [3] - 9:5, 9:19, 12:17
**confer** [2] - 82:16, 113:4
**Conference** [1] - 114:15
**conference** [1] - 15:23
**confirm** [3] - 44:20, 44:22, 44:24
**confirmed** [4] - 24:15, 24:18, 28:12, 44:13
**confirming** [1] - 47:15
**conformance** [1] - 114:14
**confused** [3] - 86:15, 86:20, 89:24
**confusing** [2] - 86:3, 86:15
**CONNECTICUT** [1] - 2:23
**consider** [4] - 17:17, 48:13, 84:23, 91:7
**considerably** [1] - 81:6
**considered** [3] - 28:13, 45:6, 81:5
**considering** [3] - 88:7, 88:17, 91:5
**considers** [1] - 27:1
**consistently** [2] - 17:2, 18:12
**consult** [1] - 84:12
**consulting** [4] - 52:20,

84:14, 84:18, 84:19
**containing** [2] - 57:12, 70:9
**contemporaneous** [3] - 12:11, 47:14, 48:3
**contemporaneously** [1] - 11:25
**contend** [3] - 16:17, 28:25, 48:9
**contended** [1] - 14:25
**contending** [3] - 18:22, 38:25, 48:13
**contention** [7] - 6:2, 11:8, 14:3, 14:24, 16:21, 18:18, 19:9
**context** [2] - 52:17, 111:21
**continuously** [1] - 73:12
**contrary** [1] - 44:13
**contributes** [2] - 25:22, 85:1
**control** [4] - 35:17, 36:24, 41:16, 47:20
**controlled** [1] - 34:19
**controlling** [1] - 13:7
**convenient** [2] - 72:20, 72:21
**conversations** [1] - 13:8
**copies** [4] - 12:4, 20:5, 51:17
**copy** [6] - 19:25, 20:3, 51:19, 51:20, 52:23
**corporate** [3] - 49:16, 51:8, 51:10
**correct** [40] - 19:3, 19:19, 20:18, 29:12, 29:16, 29:18, 30:11, 31:10, 32:4, 37:6, 40:1, 50:2, 51:14, 52:24, 52:25, 53:19, 54:22, 59:25, 70:17, 84:9, 84:10, 85:2, 85:6, 85:7, 85:9, 85:10, 85:12, 85:21, 91:10, 96:11, 96:22, 98:12, 99:17, 100:20, 106:10, 106:11, 110:13, 110:25, 111:23, 114:12
**correctly** [3] - 63:14, 68:16, 92:20
**counsel** [25] - 4:8, 4:11, 4:16, 12:5, 15:16, 16:3, 16:8, 17:6, 18:1, 18:21, 19:2, 19:21, 20:1, 21:6, 22:20, 26:1,

27:3, 42:9, 51:20,
67:14, 94:4, 94:9,
103:5, 108:2, 113:6
**count** [1] - 72:11
**counterbalanced** [1] -
55:14
**COUNTY** [1] - 114:3
**couple** [4] - 8:4, 75:7,
82:8, 112:19
**course** [13] - 4:6,
15:19, 19:24, 20:10,
26:5, 37:24, 53:8,
80:7, 86:9, 87:24,
89:22, 92:5
**Court** [26] - 5:9, 9:14,
13:13, 15:20, 16:6,
17:16, 17:25, 20:5,
20:10, 21:9, 21:13,
22:9, 26:23, 41:10,
44:13, 47:6, 47:8,
48:2, 48:25, 54:17,
54:25, 68:7, 70:22,
114:7, 114:9, 114:21
**COURT** [157] - 1:1,
4:4, 4:14, 4:18, 5:3,
13:1, 18:16, 19:5,
19:8, 19:20, 19:24,
20:15, 20:20, 21:1,
21:5, 22:1, 22:4,
22:7, 22:10, 22:20,
28:21, 28:23, 29:24,
30:6, 31:4, 31:8,
31:12, 31:22, 32:5,
32:9, 32:16, 33:4,
33:19, 33:24, 34:2,
38:12, 38:19, 38:24,
39:4, 39:8, 39:11,
39:22, 40:3, 48:6,
48:17, 48:21, 48:22,
49:2, 49:6, 49:15,
49:19, 49:21, 50:2,
50:4, 50:11, 50:19,
50:25, 51:7, 51:11,
51:15, 53:8, 56:10,
56:18, 57:1, 57:3,
58:19, 59:13, 59:24,
60:3, 60:13, 61:4,
61:8, 61:21, 62:1,
66:6, 66:24, 67:13,
68:20, 69:1, 69:4,
69:13, 72:10, 73:14,
75:11, 75:23, 76:9,
76:14, 80:3, 80:8,
80:19, 80:22, 81:2,
81:4, 81:10, 81:16,
81:23, 82:2, 82:4,
82:10, 82:13, 82:17,
82:19, 83:1, 83:4,
88:15, 88:18, 88:20,
89:4, 89:10, 89:15,

89:18, 89:22, 90:3,
90:5, 90:8, 90:11,
90:20, 90:22, 90:25,
92:8, 92:11, 93:6,
93:15, 93:20, 93:22,
94:1, 94:4, 94:25,
95:5, 95:9, 95:12,
95:14, 95:17, 100:8,
100:10, 101:5,
101:11, 101:19,
102:20, 103:3,
103:17, 103:20,
103:23, 104:3,
104:13, 106:1,
108:2, 108:8,
108:13, 110:16,
110:18, 111:14,
112:14, 112:20,
112:23, 113:2,
113:10
**court** [17] - 5:22, 13:7,
14:17, 24:17, 38:2,
40:13, 40:22, 41:11,
41:14, 41:19, 43:16,
43:20, 48:10, 48:18,
82:24, 84:1, 84:3
**courtesy** [1] - 82:11
**courtroom** [3] - 4:5,
49:23, 50:16
**courts** [2] - 5:22, 16:9
**covered** [4] - 26:6,
27:25, 87:5, 102:7
**cow** [1] - 104:23
**create** [1] - 44:6
**creates** [1] - 8:10
**critical** [1] - 34:21
**criticize** [1] - 18:1
**cross** [5] - 12:14,
82:20, 92:12, 93:1,
93:2
**CROSS** [2] - 3:6, 83:8
**cross-examination** [2]
- 12:14, 82:20
**CROSS-
EXAMINATION** [2] -
3:6, 83:8
**cross-examine** [1] -
93:2
**cross-examined** [1] -
93:1
**cross-examiner** [1] -
92:12
**CRUTCHER** [3] - 2:12,
2:17, 2:22
**crystal** [3] - 85:18,
85:20, 86:3
**crystallographer** [1] -
37:24
**crystallography** [3] -
85:12, 85:13, 85:15

**crystals** [1] - 37:25
**CSR** [2] - 1:22, 114:21
**Cunningham** [1] -
4:17
**CUNNINGHAM** [1] -
2:16
**cup** [2] - 59:2, 72:20
**cups** [1] - 60:22
**curators'** [1] - 52:3
**curiosity** [1] - 67:17
**curious** [1] - 86:1
**current** [3] - 22:12,
43:6, 52:2
**curriculum** [1] - 52:24
**cut** [2] - 13:23, 32:1
**cuts** [1] - 79:13
**CV** [1] - 1:11

# D

**DALLAS** [1] - 2:14
**dalton** [10] - 20:23,
88:21, 88:23, 88:24,
88:25, 89:15, 89:22,
90:9, 90:13, 90:17
**daltons** [13] - 7:16,
88:13, 89:8, 89:14,
89:20, 90:6, 90:23,
93:11, 94:21, 99:23,
105:10, 105:12,
106:5
**data** [3] - 11:20, 12:19
**Date** [1] - 114:17
**date** [3] - 5:14, 26:11,
35:10
**dates** [2] - 41:12,
47:18
**dating** [1] - 48:1
**David** [3] - 94:19,
96:18, 96:23
**DAVIES** [42] - 2:11,
3:6, 75:5, 75:13,
75:19, 82:8, 82:12,
83:3, 83:7, 83:9,
88:16, 88:19, 90:16,
90:21, 91:4, 94:10,
94:11, 94:23, 95:11,
95:13, 96:6, 100:9,
100:11, 100:19,
101:7, 101:10,
101:14, 101:20,
103:16, 103:19,
103:22, 104:1,
104:4, 105:22,
106:2, 108:5, 109:1,
110:17, 110:22,
111:18, 112:18,
113:1
**Davies** [21] - 4:16,
32:20, 37:6, 82:5,

82:17, 83:11, 90:12,
91:2, 92:12, 95:12,
96:1, 96:3, 99:4,
101:5, 102:4,
103:15, 105:20,
106:25, 109:4,
112:14, 113:2
**DAWSON** [46] - 2:9,
4:15, 19:4, 19:7,
19:23, 20:4, 20:24,
21:3, 21:7, 21:9,
22:3, 22:6, 22:8,
22:11, 22:24, 28:22,
29:17, 30:2, 30:16,
31:6, 31:10, 31:20,
32:4, 32:7, 32:13,
32:17, 33:13, 33:23,
34:1, 34:4, 38:16,
38:23, 39:3, 39:5,
39:9, 39:13, 40:1,
40:6, 48:16, 49:11,
49:18, 49:20, 49:25,
50:3, 50:15, 51:14
**Dawson** [9] - 4:15,
21:9, 22:1, 28:21,
33:4, 34:3, 38:12,
39:22, 51:12
**Dawson's** [1] - 50:25
**Dayco** [1] - 17:20
**days** [5] - 8:4, 79:25,
80:2, 84:13, 84:20
**DC** [1] - 2:24
**deal** [3] - 16:4, 16:15,
23:20
**debate** [1] - 90:19
**DeBrie** [6] - 5:19,
5:23, 6:6, 6:8, 7:19,
13:25
**deceive** [3] - 17:12,
17:13, 18:8
**December** [5] - 26:12,
37:16, 42:4, 42:10,
44:2
**decided** [1] - 9:1
**decides** [1] - 45:4
**decision** [4] - 14:14,
17:8, 91:7, 102:21
**declarations** [1] - 28:5
**defendant** [2] - 4:15,
49:11
**Defendants** [1] - 1:13
**defendants** [2] -
13:10, 15:13
**DEFENDANTS** [1] -
2:9
**defendants'** [10] -
21:23, 24:25, 25:5,
25:17, 26:17, 27:7,
27:9, 27:14, 27:20
**DEFENSE** [1] - 3:15

**defense** [7] - 21:8,
38:1, 43:20, 97:25,
98:5, 98:14, 103:19
**defined** [1] - 45:14
**defines** [1] - 7:9
**definition** [3] - 7:18,
20:23, 88:21
**degree** [9] - 18:24,
34:19, 35:7, 35:15,
35:17, 35:20, 51:24,
106:19
**degrees** [51] - 36:1,
36:4, 36:7, 36:11,
36:12, 51:23, 53:4,
65:4, 65:6, 72:1,
72:2, 79:8, 79:10,
79:12, 79:15, 79:16,
79:23, 80:11, 80:24,
80:25, 81:3, 81:6,
81:7, 81:13, 98:9,
107:13, 107:14,
107:15, 107:20,
107:24, 108:6,
108:18, 108:21,
108:23, 108:25,
109:2, 109:5, 109:7,
109:15, 109:17,
109:24, 110:6,
110:7, 110:8, 110:9
**delay** [1] - 5:3
**demonstrate** [2] -
11:21, 24:18
**DENVER** [1] - 2:19
**department** [2] - 52:3,
84:12
**depicted** [3] - 28:5,
37:4, 37:11
**depolymerization** [34]
- 10:13, 10:24, 11:2,
34:22, 36:10, 47:2,
54:10, 70:19, 70:24,
71:14, 71:23, 73:18,
74:20, 74:22, 76:23,
77:2, 77:6, 77:17,
77:20, 78:5, 78:10,
78:11, 78:13, 78:16,
78:20, 78:21, 85:25,
106:10, 106:24,
107:7, 108:20,
108:22, 109:11,
109:25
**depolymerize** [1] -
71:17
**deposition** [9] - 21:23,
46:5, 83:18, 83:25,
84:2, 84:15, 84:22,
111:7, 111:11
**derived** [3] - 64:10,
91:24, 96:25
**describe** [12] - 10:12,

14:8, 30:14, 35:5, 35:23, 55:11, 106:13, 106:14, 106:17, 106:18, 106:22, 107:6
**described** [21] - 10:11, 13:24, 21:20, 21:21, 23:4, 23:10, 23:17, 23:24, 24:1, 24:3, 24:21, 26:2, 27:21, 28:16, 32:14, 33:2, 34:21, 35:2, 38:8, 54:17, 58:4
**describes** [2] - 6:12, 86:23
**describing** [1] - 56:3
**description** [1] - 13:22
**designate** [1] - 51:9
**designation** [1] - 98:18
**desired** [1] - 106:19
**destroy** [1] - 9:10
**detailed** [2] - 25:10, 32:20
**details** [1] - 104:6
**determine** [1] - 58:8
**determined** [1] - 26:18
**determining** [1] - 26:4
**developed** [3] - 41:12, 43:18, 47:17
**development** [2] - 8:15, 52:21
**differ** [2] - 97:12, 97:13
**difference** [9] - 6:21, 11:3, 29:5, 45:5, 59:14, 63:14, 63:16, 72:23, 81:5
**differences** [2] - 29:4, 45:1
**different** [15] - 10:24, 22:16, 29:14, 36:20, 46:23, 55:2, 74:19, 74:23, 88:1, 88:2, 92:6, 92:25, 94:5, 94:6, 104:23
**digging** [1] - 51:19
**DIK** [2] - 46:15, 46:17
**diligent** [1] - 16:7
**dimethylformamide** [4] - 65:2, 70:1, 70:2, 70:4
**Ding** [7] - 24:14, 41:17, 42:24, 43:23, 46:25, 47:11, 47:24
**DIRECT** [2] - 3:6, 51:21
**direct** [11] - 17:9, 21:15, 21:17, 23:13, 43:8, 46:16, 54:16,

64:17, 75:3, 82:21, 104:9
**directing** [1] - 111:16
**direction** [1] - 94:6
**directly** [3] - 36:12, 52:18, 91:12
**disagree** [17] - 45:8, 87:20, 93:7, 93:17, 94:8, 94:24, 96:11, 96:12, 97:14, 97:19, 100:7, 101:25, 102:5, 102:9, 104:18, 107:9, 107:17
**disagreeing** [2] - 93:12, 102:2
**disagreement** [3] - 30:18, 93:16, 103:7
**disagrees** [5] - 44:23, 45:3, 45:15, 45:22
**disassociated** [1] - 61:20
**disclose** [2] - 33:21, 53:24
**disclosed** [6] - 26:9, 64:20, 88:11, 99:21, 101:22, 105:7
**discloses** [6] - 13:15, 25:8, 25:10, 38:21, 53:25, 54:4
**disclosing** [1] - 70:23
**disclosure** [7] - 25:4, 27:8, 33:9, 33:10, 43:14, 44:18, 47:24
**disclosures** [4] - 26:14, 40:18, 86:22
**discovered** [3] - 42:11, 47:25, 79:4
**discovery** [7] - 14:24, 15:6, 17:7, 17:10, 41:22, 43:22, 102:23
**discuss** [2] - 64:23, 85:8
**discussed** [4] - 4:19, 8:8, 17:5, 55:8
**discussion** [5] - 8:4, 13:5, 29:9, 30:1, 96:3
**discussions** [1] - 5:13
**dispute** [2] - 103:11, 105:6
**disputed** [3] - 88:9, 96:8, 96:13
**disputes** [1] - 13:11
**dissolve** [4] - 55:17, 57:12, 69:24, 70:5
**dissolves** [1] - 56:4
**dissolving** [1] - 85:23
**distinct** [1] - 8:10
**distribution** [1] - 7:23

**DISTRICT** [3] - 1:1, 1:2, 1:5
**District** [2] - 114:9
**district** [2] - 14:17, 16:9
**divide** [1] - 11:7
**division** [1] - 14:19
**Division** [3] - 14:11, 88:8, 91:8
**DMF** [3] - 70:3, 70:4, 70:8
**doctoral** [1] - 52:6
**Document** [1] - 104:15
**document** [13] - 16:6, 44:8, 47:14, 102:15, 102:16, 102:19, 102:20, 102:22, 103:3, 103:4, 103:17, 104:5
**documents** [9] - 15:6, 15:12, 15:14, 15:24, 16:5, 16:25, 27:14, 28:12, 97:21
**done** [14] - 12:1, 12:19, 24:1, 26:1, 31:4, 74:7, 81:19, 81:24, 84:4, 108:21, 112:5, 112:8, 112:13
**dose** [1] - 6:16
**doubt** [1] - 37:24
**down** [9] - 37:5, 42:18, 54:1, 54:11, 56:10, 71:11, 77:11, 84:18, 92:22
**Dr** [35] - 21:22, 22:11, 23:7, 24:5, 24:14, 30:24, 34:13, 37:13, 37:21, 38:1, 40:15, 42:17, 44:7, 46:12, 46:25, 48:3, 49:5, 49:7, 51:9, 51:18, 51:19, 51:23, 53:7, 75:20, 83:2, 83:10, 88:17, 91:15, 95:1, 96:10, 105:4, 105:25, 111:7
**dressed** [1] - 17:5
**drug** [4] - 8:10, 9:2, 10:4, 52:21
**drum** [1] - 62:22
**due** [3] - 4:6, 43:13, 49:7
**duly** [1] - 31:17
**DUNN** [3] - 2:12, 2:17, 2:22
**duration** [2] - 8:12, 8:20
**during** [12] - 15:6, 15:19, 26:12, 34:14,

40:21, 41:22, 42:7, 42:10, 43:21, 44:4, 47:25, 51:2
**DX** [12] - 101:2, 106:2, 106:18, 106:22, 107:3, 107:5, 107:10, 107:23, 108:5, 109:8, 109:9, 110:10

## E

**e-mail** [2] - 44:5, 44:7
**early** [4] - 9:1, 19:22, 32:24, 38:16
**easiest** [1] - 9:18
**easily** [1] - 55:18
**East** [1] - 1:23
**easy** [1] - 55:18
**eat** [1] - 68:21
**ED** [1] - 1:11
**Edgar** [1] - 38:1
**edited** [1] - 52:15
**editor** [1] - 52:12
**effect** [1] - 26:21
**effectively** [2] - 9:10, 11:10
**efficient** [1] - 67:20
**either** [7] - 43:5, 43:13, 62:24, 76:15, 86:15, 87:14, 109:22
**element** [1] - 7:11
**elimination** [1] - 8:8
**embraced** [1] - 49:9
**eminence** [1] - 49:8
**employed** [1] - 52:18
**employees** [3] - 42:1, 43:25, 47:22
**employment** [4] - 52:2, 52:5, 52:18, 53:1
**enable** [1] - 14:10
**end** [24] - 7:8, 10:20, 15:13, 19:22, 34:11, 34:15, 37:18, 42:18, 55:20, 60:17, 63:7, 63:10, 64:12, 65:4, 66:3, 67:8, 70:14, 70:15, 71:3, 71:13, 73:24, 92:2, 108:18
**ended** [1] - 113:14
**English** [1] - 53:17
**enoxaparin** [17] - 8:9, 8:15, 8:19, 8:22, 9:2, 10:1, 11:12, 11:20, 11:23, 12:2, 43:10, 47:1, 85:20, 87:12, 87:13, 98:11, 110:12
**enter** [1] - 27:6
**entire** [2] - 15:12,

15:18
**entirely** [3] - 41:21, 43:21
**entitled** [2] - 49:16, 114:13
**entity** [4] - 57:6, 66:10, 66:21, 68:16
**entries** [1] - 77:21
**EP** [69] - 6:12, 6:14, 6:18, 13:14, 13:24, 14:7, 15:8, 21:21, 21:25, 22:12, 22:17, 23:4, 23:10, 23:17, 23:24, 23:25, 24:1, 24:3, 24:21, 25:1, 25:7, 25:13, 26:2, 26:4, 26:19, 26:21, 27:4, 27:8, 27:10, 27:22, 27:25, 28:16, 29:20, 29:21, 30:3, 30:17, 31:2, 32:15, 33:2, 34:4, 34:7, 34:16, 34:20, 34:22, 35:2, 35:5, 35:14, 35:23, 36:5, 36:15, 37:9, 38:9, 38:10, 39:9, 39:14, 39:16, 39:20, 40:8, 40:10, 41:1, 43:12, 44:16, 44:19, 45:13, 45:15, 45:18, 45:24, 102:21, 106:17
**EPO** [14] - 44:11, 14:14, 14:19, 16:1, 24:23, 25:7, 27:8, 28:18, 30:13, 30:21, 31:21, 36:16, 44:16, 45:10
**equal** [2] - 84:13, 90:17
**equals** [1] - 77:9
**equation** [1] - 80:15
**equitable** [1] - 41:16
**equivalent** [1] - 30:10
**errors** [2] - 21:16, 24:6
**especially** [2] - 13:24, 27:21
**essence** [2] - 19:8, 19:17
**essential** [2] - 14:21, 16:4
**essentially** [7] - 9:24, 28:1, 28:2, 54:23, 57:22, 60:23, 79:7
**establish** [4] - 6:4, 12:20, 25:14, 27:8
**established** [1] - 5:17
**ester** [26] - 10:2, 10:3, 63:24, 64:5, 64:23, 65:9, 65:12, 66:7,

66:19, 67:6, 67:21, 68:5, 68:7, 68:18, 69:18, 70:10, 70:12, 70:16, 71:3, 71:6, 71:7, 71:16, 71:25, 72:9, 106:23, 108:16
**esterification** [26] - 10:13, 10:23, 34:20, 35:15, 35:17, 35:20, 35:21, 54:8, 70:15, 73:17, 74:19, 74:21, 76:23, 76:25, 77:5, 77:12, 77:16, 77:19, 78:4, 78:6, 78:8, 79:22, 81:19, 106:10, 106:19
**esters** [7] - 8:9, 64:7, 64:9, 69:6, 69:7, 91:23, 96:24
**estimates** [1] - 113:12
**et** [1] - 1:12
**etc** [9] - 19:13, 20:23, 29:6, 48:10, 49:24, 81:7, 93:23, 104:24, 105:8
**European** [26] - 6:12, 15:7, 15:10, 22:17, 23:4, 24:23, 25:6, 25:25, 31:13, 87:11, 88:7, 91:6, 91:8, 92:18, 97:21, 98:17, 99:17, 101:16, 101:22, 102:3, 102:9, 103:4, 103:10, 103:16, 105:18, 106:12
**evidence** [35] - 5:9, 8:23, 9:17, 17:13, 17:17, 18:3, 18:7, 20:7, 20:13, 23:18, 23:21, 23:23, 24:2, 24:9, 24:19, 24:20, 25:24, 28:19, 30:25, 32:19, 34:17, 34:24, 35:4, 36:13, 36:21, 38:10, 40:11, 41:15, 41:21, 42:15, 43:21, 48:5, 75:24, 76:6, 76:7
**evidences** [1] - 16:23
**exact** [7] - 67:1, 84:17, 87:24, 94:16, 97:17, 100:3, 100:14
**exactly** [23] - 9:13, 12:11, 16:6, 16:11, 16:12, 16:16, 18:22, 19:5, 29:18, 32:13, 38:17, 56:22, 61:23, 62:3, 67:25, 69:3, 82:1, 88:12, 89:5,

94:20, 95:24, 99:22, 102:6
**exaggeration** [1] - 83:22
**EXAMINATION** [4] - 3:6, 3:6, 51:21, 83:8
**examination** [3] - 12:14, 82:20
**examine** [1] - 93:2
**examined** [1] - 93:1
**examiner** [3] - 27:17, 28:12, 92:12
**examiner's** [1] - 27:16
**Example** [75] - 6:9, 6:11, 6:23, 6:24, 6:25, 7:4, 8:24, 9:21, 10:2, 10:3, 10:5, 10:7, 11:1, 11:2, 11:10, 11:11, 21:16, 22:16, 22:18, 23:1, 23:2, 23:12, 23:20, 24:6, 26:9, 29:22, 30:5, 39:13, 39:14, 41:21, 42:2, 42:23, 44:10, 63:5, 63:9, 76:21, 76:25, 77:3, 77:5, 77:7, 77:9, 77:10, 77:25, 78:3, 78:4, 78:7, 78:10, 78:13, 78:16, 78:17, 78:22, 99:4, 99:12, 100:11, 100:24, 101:1, 101:3, 101:19, 101:20, 101:22, 102:6, 105:24, 108:12, 110:11, 110:14, 110:19, 110:20, 111:2, 111:3, 111:6, 112:11
**example** [52] - 6:9, 6:25, 7:10, 9:21, 10:10, 10:19, 16:1, 24:12, 25:10, 27:13, 27:17, 60:15, 64:11, 65:2, 65:19, 66:25, 70:8, 70:9, 71:2, 72:18, 74:21, 74:23, 76:18, 77:5, 77:15, 77:16, 77:17, 77:18, 77:19, 77:20, 78:1, 78:12, 78:18, 78:19, 78:21, 78:22, 79:22, 91:25, 93:10, 96:20, 97:3, 97:5, 98:21, 105:10, 105:15, 107:25, 110:12
**Examples** [5] - 10:9, 10:25, 54:20, 104:10, 106:3

**examples** [26] - 6:15, 6:23, 9:15, 10:6, 10:10, 10:20, 10:24, 11:11, 26:16, 27:4, 62:16, 73:24, 74:2, 74:4, 74:6, 74:9, 74:10, 74:11, 74:17, 77:8, 77:12, 78:14, 87:22, 91:13, 99:11
**except** [4] - 49:23, 51:7, 81:4, 92:20
**excluded** [4] - 49:14, 49:22, 51:1
**excuse** [4] - 99:2, 106:17, 109:10, 111:21
**exhibit** [10] - 19:24, 24:25, 75:6, 75:8, 75:10, 75:14, 75:16, 75:17, 75:21, 98:1
**Exhibit** [27] - 21:23, 24:25, 25:6, 25:17, 26:17, 27:7, 27:9, 27:14, 27:20, 53:12, 53:14, 54:13, 63:18, 75:4, 76:18, 76:19, 88:4, 97:14, 97:25, 98:5, 98:14, 99:18, 102:21, 103:19, 111:10, 111:22, 112:1
**exhibited** [1] - 5:25
**exhibits** [4] - 16:14, 28:11, 51:18, 75:6
**EXHIBITS** [3] - 3:9, 3:11, 3:15
**existed** [1] - 30:7
**existing** [1] - 67:23
**expect** [3] - 12:25, 79:15, 80:11
**expedite** [1] - 104:2
**experience** [1] - 36:17
**experienced** [1] - 95:1
**experiment** [3] - 9:18, 9:20, 81:20
**experimental** [1] - 9:25
**experimentation** [6] - 6:3, 8:18, 9:13, 17:1, 46:14, 94:2
**experimentations** [1] - 5:14
**experiments** [57] - 7:21, 9:4, 9:5, 9:7, 9:8, 9:16, 9:18, 12:10, 12:12, 12:15, 12:18, 12:19, 17:2, 18:13, 19:13, 19:14, 20:14, 21:16, 21:18, 21:19, 23:13, 23:15,

24:5, 24:8, 24:12, 30:24, 30:25, 32:22, 32:25, 34:13, 37:15, 37:21, 40:14, 40:20, 41:2, 41:4, 41:7, 41:13, 41:18, 41:24, 42:8, 42:20, 42:25, 43:3, 43:7, 43:19, 43:22, 44:11, 45:23, 46:20, 47:7, 47:13, 47:18, 47:20
**expert** [28] - 12:22, 20:25, 21:1, 27:12, 27:17, 27:18, 31:15, 33:17, 37:23, 38:1, 38:3, 45:7, 50:21, 53:7, 75:12, 75:15, 75:18, 75:20, 76:15, 83:16, 83:21, 84:7, 84:16, 102:17, 102:25, 103:1
**expert's** [1] - 23:12
**expertise** [1] - 85:4
**experts** [4] - 37:12, 49:12, 50:1, 50:24
**explain** [9] - 54:17, 54:25, 63:20, 64:20, 65:14, 68:5, 68:6, 70:22, 72:4
**explained** [1] - 63:21
**explore** [1] - 105:14
**exposing** [1] - 61:15
**express** [2] - 33:25, 89:12
**expressed** [4] - 13:8, 19:6, 61:24, 86:7
**expresses** [1] - 21:22
**expressly** [1] - 26:25
**extent** [1] - 20:20
**extraction** [1] - 25:21
**extremely** [1] - 16:7

**F**

**face** [1] - 110:11
**fact** [26] - 15:2, 18:9, 24:6, 27:5, 29:12, 30:11, 31:23, 35:15, 36:14, 39:9, 39:17, 47:7, 49:12, 49:13, 49:25, 50:16, 50:22, 50:23, 50:25, 51:5, 51:13, 71:11, 78:7, 85:11, 91:7, 94:19
**Fact** [1] - 28:10
**fact-finder** [1] - 47:7
**factor** [1] - 72:24
**factors** [2] - 8:13, 8:20
**facts** [8] - 15:4, 18:6, 33:15, 41:11, 41:15,

43:17, 47:17, 47:19
**factual** [1] - 33:18
**factually** [1] - 31:25
**fail** [1] - 44:6
**failed** [7] - 9:20, 33:2, 33:3, 36:18
**failing** [4] - 34:8
**faithful** [2] - 26:19, 45:18
**fall** [2] - 110:24, 112:10
**falling** [2] - 12:8, 111:1
**falls** [1] - 11:22
**false** [9] - 5:18, 19:15, 19:16, 19:17, 27:24, 42:5, 46:9, 47:10
**far** [3] - 9:11, 19:6, 105:16
**fashion** [1] - 62:25
**fast** [1] - 33:4
**faster** [1] - 108:9
**FCA** [3] - 5:12, 17:11, 104:19
**FCRR** [2] - 1:22, 114:21
**FDA** [12] - 8:5, 11:18, 11:19, 19:17, 23:21, 40:23, 40:24, 43:9, 43:14, 46:1, 46:8, 46:10
**fear** [1] - 84:25
**federal** [2] - 17:19, 17:25
**Federal** [3] - 1:23, 114:7, 114:21
**Fei** [16] - 12:2, 24:13, 28:5, 28:6, 32:21, 32:22, 37:16, 38:8, 41:17, 43:3, 43:22, 46:24, 47:11, 47:21, 47:23, 50:18
**Fei's** [3] - 12:11, 30:24, 38:7
**fell** [3] - 7:22, 9:23, 12:21
**fellow** [1] - 42:18
**fellows** [1] - 52:7
**few** [3] - 65:3, 84:4, 112:19
**field** [1] - 103:2
**fifth** [1] - 24:15
**file** [5] - 18:7, 27:15, 44:6, 44:7, 51:19
**filed** [4] - 8:5, 40:22, 41:6, 102:17
**filing** [5] - 5:15, 9:5, 34:12, 37:19, 39:7
**fill** [2] - 61:22, 72:20
**filter** [4] - 62:9, 62:10,

62:12, 62:14
**filtration** [2] - 63:11, 64:2
**final** [2] - 103:24, 113:2
**finally** [1] - 7:15
**finder** [1] - 47:7
**Findings** [1] - 28:10
**findings** [5] - 13:7, 13:11, 14:17, 14:19, 16:9
**fine** [16] - 5:4, 5:6, 19:20, 32:12, 51:11, 62:13, 67:14, 73:14, 81:13, 81:16, 82:21, 94:1, 95:2, 95:5, 95:24, 104:18
**finger** [3] - 60:18, 68:9, 68:10
**fingers** [3] - 76:13, 76:14
**finish** [1] - 12:13
**finished** [1] - 82:21
**first** [37] - 4:7, 5:1, 7:11, 9:18, 10:12, 14:2, 17:4, 20:16, 21:11, 22:18, 23:19, 23:23, 24:20, 29:12, 32:25, 38:10, 40:19, 41:10, 46:2, 52:23, 56:15, 58:4, 67:13, 69:7, 69:17, 69:19, 77:24, 77:25, 83:15, 83:16, 84:14, 93:3, 96:7, 102:12, 102:17, 102:23, 104:4
**fit** [2] - 58:1, 59:22
**five** [3] - 23:19, 112:19
**FLOOR** [1] - 2:6
**focus** [9] - 16:16, 28:24, 42:8, 70:21, 70:25, 77:22, 78:3, 94:4, 96:19
**focused** [1] - 5:13
**focuses** [1] - 6:5
**focusing** [2] - 33:15, 77:25
**fog** [1] - 96:4
**folks** [1] - 113:13
**follow** [14] - 32:2, 34:7, 36:15, 54:2, 56:10, 87:8, 100:11, 101:16, 101:17, 101:22, 103:12, 106:3, 110:11, 112:11
**followed** [4] - 32:6, 74:22, 77:20, 87:16
**following** [9] - 21:20,

23:9, 23:16, 45:24, 73:23, 99:13, 104:11, 105:24, 110:14
**follows** [2] - 8:14, 105:13
**foot** [1] - 22:21
**footnote** [2] - 8:14, 45:1
**FOR** [3] - 2:2, 2:9, 3:1
**foregoing** [1] - 114:11
**forget** [1] - 92:17
**form** [10] - 12:9, 37:25, 57:19, 59:7, 61:3, 69:6, 70:10, 79:7, 85:18, 85:20
**formal** [1] - 30:9
**format** [1] - 114:14
**formation** [1] - 54:7
**formed** [5] - 34:13, 37:17, 37:18, 63:7, 63:10
**forms** [1] - 43:5
**formulations** [1] - 52:22
**forth** [2] - 15:21, 54:21
**forward** [1] - 34:11
**Foss** [1] - 4:12
**FOSS** [1] - 2:3
**foundation** [1] - 102:18
**founded** [1] - 52:14
**four** [11] - 6:17, 6:19, 10:16, 23:5, 52:7, 52:15, 60:10, 80:2, 84:11, 84:18
**fourth** [2] - 24:9, 42:15
**fraction** [4] - 94:16, 97:17, 100:3, 100:14
**frame** [1] - 33:1
**framing** [1] - 5:8
**frankly** [1] - 51:1
**fraud** [2] - 14:4, 47:25
**frauds** [1] - 42:12
**free** [2] - 61:17, 108:2
**French** [2] - 15:13, 53:17
**full** [4] - 50:12, 72:21, 84:24
**fully** [2] - 45:6, 49:9
**function** [4] - 66:10, 66:11, 67:12, 68:22
**functionality** [2] - 68:8, 68:19
**functions** [1] - 66:12
**fundamental** [1] - 14:19
**furthermore** [1] - 30:23
**fuss** [1] - 103:10

## G

**gaining** [1] - 85:16
**game** [1] - 42:19
**GARBIS** [1] - 1:4
**GATES** [1] - 2:5
**gather** [2] - 18:6, 51:2
**general** [2] - 80:13, 102:5
**generally** [5] - 9:17, 33:1, 34:6, 53:23, 55:2
**generate** [3] - 9:22, 17:3, 56:1
**generated** [1] - 12:20
**generic** [3] - 9:1, 10:4, 40:25
**GIBSON** [3] - 2:12, 2:17, 2:22
**given** [6] - 51:20, 75:9, 79:21, 87:13, 97:12, 98:18
**Goolgasian** [1] - 27:18
**government** [10] - 24:16, 24:18, 42:5, 44:2, 44:14, 44:22, 44:23, 47:24, 48:10, 81:14
**governments** [1] - 14:15
**grad** [1] - 52:7
**gram** [3] - 89:15, 90:13, 90:17
**grams** [20] - 11:3, 11:4, 72:19, 73:3, 73:7, 73:8, 86:7, 86:8, 86:14, 86:19, 89:9, 89:10, 89:13, 89:20, 89:25, 90:5, 108:16
**granted** [1] - 25:8
**graphic** [1] - 20:12
**graphics** [2] - 20:5, 20:6
**gray** [1] - 38:21
**great** [1] - 9:8
**greater** [4] - 6:13, 7:13, 9:9
**grounds** [1] - 15:9
**group** [6] - 52:6, 66:15, 67:11, 68:12, 68:15, 68:18
**Guernsey** [1] - 104:24
**guess** [6] - 4:7, 20:20, 48:18, 60:4, 67:22, 75:9
**guy** [1] - 31:17
**guys** [1] - 113:11

## H

**habit** [1] - 17:22
**half** [26] - 5:24, 6:1, 6:6, 6:14, 6:17, 6:18, 6:19, 7:6, 7:19, 8:1, 22:15, 22:21, 22:25, 23:4, 23:5, 23:11, 27:24, 29:23, 36:11, 39:15, 79:11, 79:14, 80:12, 80:17, 113:7
**half-life** [16] - 5:24, 6:1, 6:6, 6:14, 6:17, 6:19, 7:6, 7:19, 8:1, 22:15, 22:25, 23:4, 23:11, 27:24, 29:23, 39:15
**hand** [4] - 76:20, 77:9, 98:2, 104:20
**handed** [1] - 51:16
**handle** [1] - 16:15
**hands** [2] - 52:8, 68:9
**happy** [2] - 4:21, 82:5
**hard** [1] - 51:17
**head** [1] - 18:23
**hear** [5] - 10:1, 18:16, 48:12, 51:6, 88:19
**heard** [3] - 24:13, 26:16, 107:1
**hearing** [8] - 13:4, 13:6, 15:19, 15:23, 17:4, 21:14, 23:19, 102:24
**hearings** [1] - 24:17
**heat** [7] - 36:1, 36:6, 36:8, 80:6, 81:21, 107:14
**heated** [2] - 35:25, 109:15
**heating** [19] - 34:21, 35:24, 36:2, 106:22, 107:1, 107:6, 107:7, 107:10, 107:13, 107:18, 107:20, 108:6, 108:19, 109:21, 110:3, 110:5, 110:6, 110:7
**held** [1] - 114:13
**help** [5] - 28:23, 57:3, 75:25, 94:19, 104:2
**helpful** [8] - 20:16, 29:3, 37:13, 40:4, 76:3, 76:10, 105:20, 113:13
**helps** [1] - 32:11
**heparin** [167] - 9:23, 11:11, 11:12, 11:13, 11:14, 11:22, 12:21, 14:9, 25:11, 25:12, 25:13, 25:17, 25:19,

35:6, 35:8, 35:11, 35:12, 36:23, 37:25, 38:4, 54:9, 54:11, 54:19, 54:21, 55:10, 55:11, 55:12, 55:15, 55:16, 55:18, 55:23, 56:2, 56:3, 56:7, 56:9, 56:20, 56:21, 56:23, 57:5, 57:7, 57:9, 57:10, 57:12, 57:18, 57:20, 57:24, 57:25, 58:11, 58:13, 58:23, 59:1, 59:8, 59:10, 59:17, 60:5, 60:6, 60:7, 60:11, 60:14, 60:25, 61:6, 61:11, 61:18, 61:19, 62:11, 62:21, 63:24, 63:25, 64:4, 64:5, 64:7, 64:8, 64:10, 64:11, 64:12, 64:15, 64:16, 64:23, 64:24, 65:9, 65:12, 65:20, 65:25, 66:10, 66:15, 66:19, 67:12, 68:8, 68:13, 69:17, 69:23, 69:24, 70:6, 70:7, 70:12, 70:16, 71:3, 71:5, 71:6, 71:15, 72:9, 74:18, 85:8, 86:24, 86:25, 87:5, 87:8, 87:13, 87:23, 87:25, 88:2, 88:11, 88:12, 91:23, 91:25, 92:1, 92:5, 92:6, 93:10, 94:15, 94:20, 96:9, 96:14, 96:16, 96:24, 96:25, 97:8, 97:9, 97:11, 97:17, 98:8, 99:10, 99:12, 99:21, 99:22, 100:3, 100:14, 100:18, 101:18, 101:24, 104:17, 104:18, 104:21, 104:23, 105:1, 105:7, 106:4, 106:23, 110:21, 110:24, 111:4, 112:2
**heparinate** [4] - 54:19, 62:7, 70:15, 99:10
**heparins** [11] - 45:2, 54:1, 54:3, 54:5, 54:12, 55:8, 71:20, 85:9, 85:18, 87:3, 88:10
**hereby** [1] - 114:10
**high** [4] - 62:22, 80:6, 81:21, 106:9
**higher** [2] - 81:7, 90:10

**highlighted** [3] - 56:12, 77:12, 77:13
**highlights** [1] - 102:4
**highly** [1] - 25:19
**history** [1] - 53:2
**hold** [1] - 51:23
**Honor** [82] - 4:10, 4:15, 4:17, 4:24, 5:8, 7:7, 7:17, 13:5, 16:10, 16:11, 16:15, 17:4, 17:7, 19:4, 19:7, 19:23, 20:4, 20:19, 20:24, 21:3, 21:7, 22:3, 22:6, 28:22, 29:17, 30:16, 31:20, 32:7, 32:13, 35:19, 48:5, 48:16, 49:4, 49:11, 49:18, 49:20, 50:3, 50:10, 50:15, 51:14, 51:16, 53:6, 54:14, 56:15, 60:9, 61:23, 62:19, 63:6, 63:23, 64:22, 66:22, 67:9, 68:2, 69:25, 71:11, 72:12, 74:25, 75:5, 75:14, 75:19, 76:20, 77:23, 81:9, 81:18, 82:3, 82:14, 83:3, 83:7, 88:14, 89:6, 91:22, 93:9, 93:25, 94:11, 94:22, 95:4, 100:16, 102:12, 103:22, 104:1, 110:17, 111:15
**honor** [1] - 4:21
**HONORABLE** [1] - 1:4
**hope** [3] - 4:25, 32:10, 51:17
**hopefully** [3] - 15:20, 37:14, 104:11
**hopes** [1] - 18:19
**horizontal** [1] - 78:5
**hour** [4] - 36:3, 36:11, 110:1, 113:7
**hours** [12] - 6:17, 6:18, 6:19, 23:5, 36:10, 84:16, 84:17, 84:18, 84:19, 84:23, 108:16
**humor** [1] - 53:9
**hundred** [1] - 81:13
**hydrochloric** [3] - 66:12, 68:21, 68:24
**hydrogen** [9] - 66:11, 66:14, 66:20, 66:23, 67:23, 68:11, 68:12, 68:14, 68:19
**hydroxide** [22] - 36:1, 36:9, 36:10, 71:10, 71:13, 72:8, 72:18,

72:19, 73:2, 73:4, 73:7, 73:9, 86:2, 86:16, 86:19, 106:23, 107:6, 107:7, 107:13, 108:18, 109:15
**hyphen** [1] - 68:6
**hypothesis** [12] - 24:10, 24:15, 24:17, 34:14, 37:17, 42:16, 42:17, 44:12, 44:20, 44:22, 44:24, 48:2

**I**

**i.e** [1] - 14:10
**idea** [3] - 61:25, 73:10, 107:17
**identified** [1] - 25:13
**identifies** [2] - 25:11, 25:13
**identify** [2] - 4:8, 14:24
**Illinois** [1] - 52:1
**illustrated** [2] - 56:19, 73:23
**illustrates** [2] - 6:25, 44:21
**illustration** [1] - 75:25
**illustrative** [1] - 9:15
**imagine** [1] - 18:17
**immediately** [2] - 59:7, 94:17
**impact** [1] - 46:23
**importance** [2] - 85:24, 87:7
**important** [7] - 15:22, 29:20, 29:21, 30:20, 38:20, 38:25, 48:18
**importantly** [1] - 17:11
**impossible** [2] - 22:19, 22:24
**improved** [1] - 6:1
**improvement** [1] - 76:12
**impurities** [1] - 35:7
**INC** [1] - 2:13
**Inc** [1] - 1:7
**incidentally** [1] - 25:11
**include** [3] - 75:5, 75:10, 94:18
**included** [5] - 27:12, 75:8, 75:12, 75:13, 111:7
**includes** [5] - 18:7, 28:5, 53:1, 97:18, 99:11
**including** [2] - 12:14, 22:15

**income** [1] - 85:2
**inconsistent** [1] - 41:22
**incorporated** [1] - 7:4
**increase** [3] - 11:5, 79:9, 79:12
**indeed** [1] - 100:21
**indefiniteness** [2] - 26:15, 27:2
**independent** [10] - 17:9, 19:1, 19:10, 19:12, 21:15, 21:17, 23:13, 43:8, 46:16, 76:6
**INDEX** [2] - 3:1, 3:3
**indicates** [2] - 108:19, 108:20
**indulge** [2] - 9:14, 15:21
**industries** [1] - 17:20
**industry** [2] - 52:16, 52:19
**inequitable** [22] - 16:22, 17:23, 18:2, 18:5, 18:9, 18:10, 27:13, 40:19, 41:5, 41:8, 41:9, 41:20, 42:1, 42:6, 43:13, 43:17, 43:20, 44:1, 44:3, 45:7, 47:16, 47:23
**inert** [5] - 65:1, 65:14, 65:16, 65:21
**inevitable** [2] - 26:20, 45:19
**information** [18] - 5:18, 15:10, 16:23, 17:9, 19:14, 24:7, 25:14, 34:16, 42:6, 42:21, 42:24, 44:3, 46:10, 46:11, 46:13, 54:23, 85:16
**infringe** [4] - 39:24, 40:2, 40:25, 43:10
**infringed** [1] - 39:1
**infringement** [3] - 38:18, 41:7
**infringing** [3] - 38:15, 38:17, 39:12
**initial** [4] - 8:15, 59:10, 64:14, 65:19
**initials** [1] - 27:16
**inorganic** [1] - 71:2, 71:9, 85:14
**insert** [1] - 65:24
**insoluble** [1] - 69:23
**inspection** [2] - 12:5, 12:6
**instead** [6] - 29:9, 66:18, 67:16, 68:18,

68:24, 73:12
**instructed** [1] - 16:10
**instruction** [1] - 50:17
**insufficiency** [2] - 25:4, 27:8, 44:18
**insufficiently** [1] - 13:14
**insult** [1] - 67:20
**intent** [3] - 17:12, 17:13, 18:8
**interact** [1] - 55:19
**interesting** [2] - 10:9, 67:19
**interpretation** [1] - 107:22
**interrogatory** [1] - 43:24
**interrupt** [5] - 20:15, 32:10, 38:12, 50:15, 108:3
**intestines** [4] - 54:21, 64:12, 92:2, 99:12
**intuitively** [1] - 80:19
**invalid** [6] - 26:15, 27:2, 33:10, 43:11
**invalidate** [3] - 26:4, 43:12, 44:19
**invalidated** [1] - 26:21
**invalidity** [4] - 27:12, 28:9, 41:1, 45:7
**invention** [29] - 5:25, 6:11, 6:13, 7:2, 7:4, 7:7, 7:9, 7:18, 7:25, 13:15, 14:11, 17:3, 25:15, 25:23, 33:12, 56:19, 64:10, 71:1, 71:4, 71:19, 73:23, 74:3, 74:4, 74:5, 74:7, 74:9, 74:16, 91:24, 96:25
**inventor** [2] - 21:24, 31:5
**invoke** [1] - 49:12
**involved** [3] - 30:12, 42:8, 83:23
**involves** [3] - 54:6, 62:19, 78:24
**involving** [1] - 15:8
**ion** [34] - 56:8, 56:24, 56:25, 57:5, 57:7, 57:8, 57:15, 57:16, 57:21, 57:24, 57:25, 58:5, 58:13, 58:14, 58:15, 59:17, 59:21, 59:23, 60:2, 60:11, 60:12, 60:14, 60:15, 60:17, 60:19, 60:21, 61:16, 61:17, 61:18
**ionic** [2] - 55:17, 56:5
**ionically** [1] - 55:14

**ions** [25] - 55:3, 55:5, 55:12, 55:14, 55:18, 55:21, 55:24, 57:6, 57:9, 57:12, 57:13, 57:17, 58:5, 58:19, 58:22, 58:23, 58:24, 59:14, 59:22, 61:1, 61:12, 61:19
**Irish** [1] - 53:15
**irrelevant** [1] - 29:8
**IRVINE** [1] - 2:7
**isolate** [1] - 62:6
**issuance** [1] - 25:1
**issuances** [1] - 40:18
**issue** [24] - 5:8, 5:10, 5:11, 5:20, 5:23, 6:5, 6:9, 14:16, 15:11, 17:5, 18:14, 20:14, 23:15, 23:20, 24:8, 32:1, 32:2, 37:20, 39:23, 40:3, 45:16, 45:22, 47:7, 87:1
**issued** [2] - 26:7, 29:13
**issuing** [1] - 26:4
**items** [1] - 76:19
**itself** [4] - 62:15, 65:16, 65:21, 80:15

**J**

**Jan** [1] - 4:10
**JAN** [1] - 2:2
**January** [1] - 26:25
**Jennifer** [1] - 4:12
**JERRY** [1] - 3:5
**Jerry** [3] - 49:5, 50:8, 50:14
**job** [1] - 69:11
**John** [1] - 27:18
**JOSEPH** [1] - 2:4
**Joseph** [1] - 4:12
**journals** [2] - 52:11, 52:14
**JUDGE** [1] - 1:5
**judge** [4] - 15:3, 44:25, 63:20, 64:20
**Judge** [1] - 45:12
**Judicial** [1] - 114:14
**July** [3] - 1:20, 4:1, 114:17
**JULY** [1] - 3:1
**June** [6] - 26:25, 28:15, 38:14, 38:21, 41:3, 41:9

**K**

**K&L** [1] - 2:5
**kat** [1] - 56:8

keep [2] - 19:11, 37:15
keeping [1] - 38:6
kelvin [4] - 80:25, 81:3, 81:6, 81:7
key [10] - 6:5, 6:9, 7:3, 8:10, 9:16, 12:18, 21:21, 25:3, 30:12, 45:11
kilodaltons [1] - 89:2
kind [1] - 10:19
kinds [1] - 55:2
knocks [1] - 61:9
knowledge [2] - 17:14, 19:13, 21:15, 21:17, 23:14, 26:10, 42:1, 43:8, 43:25, 46:17, 47:23
known [2] - 25:19, 93:22
knows [2] - 7:7, 13:5
knuckle [1] - 68:9

## L

lab [5] - 36:6, 37:22, 42:20, 43:1, 63:13
labeled [1] - 75:1
laboratory [3] - 35:4, 52:5, 85:17
lack [2] - 25:5, 44:18
lacked [1] - 16:23
laid [1] - 102:18
lane [1] - 42:18
language [7] - 7:3, 8:10, 16:17, 17:22, 22:19, 23:1, 23:4
large [21] - 10:20, 55:12, 57:6, 57:8, 57:15, 57:24, 57:25, 58:5, 59:21, 60:1, 60:14, 60:15, 62:21, 68:16, 71:17, 72:16, 89:1, 90:23
largely [1] - 66:23
larger [3] - 59:22, 59:24, 90:10
largest [1] - 60:10
last [14] - 17:18, 22:1, 23:20, 44:9, 46:19, 50:13, 52:19, 75:7, 75:22, 83:21, 92:21, 94:9, 102:13, 109:14
lastly [3] - 16:20, 44:5, 78:23
late [2] - 75:7, 75:21
law [1] - 45:3
Law [1] - 28:10
lawyer [1] - 92:19
leading [3] - 13:6, 55:5, 65:9

leads [4] - 87:4, 87:13, 98:22, 101:3
leaps [1] - 38:20
learned [1] - 24:6
least [11] - 24:10, 30:13, 38:2, 38:7, 38:14, 38:24, 41:23, 43:22, 89:20, 104:22, 105:9
leave [1] - 47:6
leaves [1] - 43:6
left [8] - 20:12, 26:6, 27:16, 47:8, 50:17, 57:21, 57:22, 103:2
legal [4] - 30:9, 31:25, 33:13, 33:14
legitimate [1] - 38:5
less [2] - 7:12, 112:19
lesser [1] - 39:15
letter [4] - 41:3, 42:4, 42:9, 47:24
letters [2] - 40:13
level [1] - 106:9
levels [2] - 69:2, 70:4
license [3] - 83:5, 92:13, 92:14
life [16] - 5:24, 6:1, 6:6, 6:14, 6:17, 6:19, 7:6, 7:19, 8:1, 22:15, 22:25, 23:4, 23:11, 27:24, 29:23, 39:15
lift [2] - 35:18, 61:16
lifted [3] - 34:25, 35:3, 55:21
light [1] - 50:17
liken [1] - 10:15
limited [2] - 8:19, 74:4
limiting [3] - 73:24, 74:3, 74:8
limits [5] - 9:8, 9:11, 99:25, 107:21, 112:10
line [45] - 5:1, 34:15, 37:9, 40:17, 54:18, 54:22, 54:23, 56:15, 56:16, 57:19, 63:6, 63:9, 63:20, 63:23, 64:3, 64:6, 64:8, 64:18, 64:25, 67:5, 70:1, 70:21, 71:8, 71:11, 71:12, 71:21, 71:24, 89:7, 91:23, 97:23, 99:20, 102:13, 108:3, 108:11, 108:13, 108:15, 109:11, 109:14, 111:9, 111:11, 111:19, 111:20, 111:22
lines [12] - 13:14,

21:23, 22:18, 54:16, 54:24, 64:16, 65:24, 70:25, 73:19, 73:21, 96:20, 99:7
linkage [2] - 68:6, 68:7
linked [2] - 79:3, 79:4
liquid [6] - 62:18, 62:24, 62:25, 63:1, 63:12, 63:17
list [7] - 53:1, 75:6, 75:8, 75:10, 75:14, 75:21, 98:1
listed [2] - 76:19, 76:22
liter [4] - 73:1, 73:4, 73:7, 73:9
literally [1] - 104:17
litigated [1] - 14:1
litigation [31] - 5:15, 5:17, 5:22, 6:10, 9:5, 9:6, 11:9, 13:18, 14:1, 14:17, 15:11, 16:21, 24:7, 27:1, 41:12, 42:7, 42:11, 43:6, 43:18, 44:4, 47:10, 47:16, 47:18, 47:19, 47:22, 47:25, 84:20
live [1] - 44:5
LLP [4] - 2:5, 2:12, 2:17, 2:22
LMWH [2] - 45:13, 45:14
LMWHs [1] - 45:2
logical [1] - 8:1
look [19] - 10:25, 11:3, 16:6, 22:4, 31:14, 32:1, 67:4, 71:21, 94:12, 98:2, 98:5, 98:21, 100:5, 100:6, 105:25, 108:3, 111:8, 113:12
looking [7] - 5:6, 38:13, 56:11, 63:6, 67:1, 67:5, 71:11, 88:22, 91:16, 91:18, 91:19, 91:22, 92:16, 98:10, 108:4, 110:16, 111:16
looks [1] - 68:7
loosely [1] - 61:6
LOS [1] - 114:3
Los [3] - 1:19, 1:24, 4:1
lose [1] - 66:7
loud [2] - 64:6, 111:20
Lovenox® [1] - 40:25
low [20] - 9:22, 11:21, 12:20, 14:9, 45:2, 53:25, 54:3, 54:5,

54:11, 55:7, 71:5, 71:19, 85:8, 98:10, 98:11, 100:18, 110:21, 110:23, 111:4, 112:2
lower [1] - 81:6
lunch [1] - 112:24
luncheon [1] - 113:7
lung [2] - 64:11, 91:25

## M

machine [1] - 31:14
magazine [2] - 33:19, 33:20
magistrate [1] - 15:3
magnetic [1] - 85:15
maiden [1] - 38:3
mail [2] - 44:5, 44:7
main [1] - 5:2
maintained [2] - 17:2, 36:3
maintaining [1] - 109:25
major [1] - 17:23
managed [1] - 96:4
manufacture [1] - 8:9
manufacturing [5] - 8:16, 11:18, 46:3, 46:9, 46:12
map [1] - 69:19
March [1] - 40:24
Mardiguian [72] - 6:1, 7:21, 9:4, 9:22, 10:10, 10:14, 10:19, 11:14, 13:17, 17:3, 21:24, 31:6, 50:22, 53:15, 53:23, 53:25, 54:4, 55:8, 55:25, 62:16, 63:3, 63:5, 63:11, 63:24, 64:3, 64:21, 64:22, 65:11, 67:5, 69:10, 70:23, 71:18, 71:22, 74:1, 74:8, 74:11, 78:14, 79:21, 81:18, 81:20, 86:23, 86:24, 87:4, 87:5, 87:9, 87:16, 88:5, 91:12, 91:14, 92:3, 93:13, 97:24, 99:1, 99:5, 99:7, 101:7, 101:24, 102:7, 104:10, 105:23, 106:3, 106:13, 106:14, 106:18, 107:5, 107:11, 107:17, 107:18, 110:14, 112:1
Mardiguian's [1] -

74:16
mark [1] - 75:16
marked [3] - 12:5, 75:15, 103:20
MARKED [2] - 3:11, 3:15
marketed [1] - 22:12
MARVIN [1] - 1:4
matched [1] - 10:24
matches [4] - 10:22, 55:5, 74:17, 111:2
material [16] - 38:8, 55:7, 58:17, 62:19, 70:10, 70:11, 73:13, 87:18, 88:10, 91:11, 91:15, 96:10, 96:17, 98:10, 98:12, 102:6
materials [2] - 59:10, 70:5
math [1] - 80:15
mathematics [1] - 51:24
matrix [1] - 10:15
matter [3] - 58:10, 81:24, 114:13
matters [2] - 49:23, 52:20
Mauri [1] - 4:12
MCKINLEY [1] - 2:13
mean [19] - 16:12, 20:20, 30:12, 64:13, 65:6, 65:7, 68:21, 73:25, 74:1, 81:23, 90:6, 93:1, 95:22, 95:23, 97:23, 101:19, 103:10, 104:16, 105:3
meaning [2] - 64:14, 65:8
means [3] - 57:10, 74:3, 77:13
measured [1] - 59:5
medium [3] - 65:17, 65:22, 72:6
meet [2] - 83:13, 83:14
meets [1] - 18:22
Mellema [1] - 4:12
MELLEMA [1] - 2:4
membranes [2] - 64:11, 92:1
memo [1] - 44:7
memorandum [1] - 28:9
memos [1] - 44:6
mention [12] - 40:25, 41:1, 41:2, 41:4, 41:7, 41:8, 41:13, 41:17, 41:18, 63:3
mentioned [10] - 65:3, 65:13, 70:18, 83:15,

83:17, 83:18, 86:2, 102:22, 103:1, 107:2
**mentions** [1] - 63:5
**merely** [1] - 48:11
**merits** [1] - 49:10
**mesh** [1] - 62:13
**met** [1] - 83:10
**methanol** [2] - 35:9, 35:13
**method** [6] - 9:25, 11:17, 53:25, 54:1, 63:4, 74:22
**methods** [6] - 39:21, 63:12, 63:13, 63:15, 63:17, 74:24
**methylene** [1] - 65:2
**microphone** [1] - 83:5
**might** [8] - 33:11, 33:21, 72:4, 80:6, 80:16, 80:17, 81:5, 89:1
**milliliter** [1] - 86:14
**milliliters** [1] - 108:17
**mind** [4] - 17:7, 17:14, 37:15, 107:11
**mine** [1] - 5:1
**minus** [5] - 65:4, 65:5, 65:10, 79:23, 81:19
**minute** [4] - 42:9, 88:18, 94:25, 99:24
**minutes** [11] - 4:20, 36:4, 36:11, 49:8, 79:15, 79:17, 82:8, 110:1, 112:19, 113:8, 113:9
**mischaracterized** [1] - 96:1
**mischaracterizes** [2] - 95:7, 95:14
**misleading** [1] - 27:25
**mismatch** [2] - 57:8, 57:10, 57:16
**mispronunciation** [1] - 12:1
**misrepresentations** [1] - 14:4
**miss** [1] - 56:22
**missing** [1] - 101:1
**Missouri** [3] - 51:25, 52:4, 84:12
**misstatement** [1] - 47:4
**misunderstanding** [1] - 49:21
**mix** [5] - 10:18, 10:22, 56:6, 57:18, 74:24
**mixed** [2] - 76:21, 77:8
**mixes** [2] - 74:17, 111:2
**mixture** [17] - 25:9,

25:10, 62:10, 62:20, 71:1, 71:4, 71:19, 94:15, 95:21, 95:22, 95:25, 97:15, 99:21, 100:2, 100:12, 100:13, 105:8
**mixtures** [7] - 6:11, 6:15, 7:1, 27:23, 45:13, 45:14, 88:11
**modification** [1] - 54:9
**modified** [1] - 67:23
**moiety** [1] - 64:4
**molar** [9] - 72:5, 72:10, 72:23, 72:25, 73:4, 73:6, 73:10, 86:13, 86:14
**mole** [21] - 72:15, 72:17, 72:18, 72:23, 73:1, 73:2, 73:3, 86:6, 86:19, 89:4, 89:13, 89:15, 89:20, 89:22, 89:25, 90:6, 90:13, 90:17, 90:22
**molecular** [68] - 7:9, 7:12, 7:15, 7:22, 9:22, 11:22, 12:17, 12:20, 14:9, 22:13, 45:2, 46:24, 47:2, 54:1, 54:3, 54:5, 54:12, 55:7, 71:5, 71:19, 72:15, 85:8, 86:2, 86:7, 87:1, 87:8, 87:11, 87:12, 87:18, 87:20, 87:21, 87:22, 87:25, 88:2, 88:6, 88:12, 88:24, 88:25, 89:8, 89:9, 89:11, 89:19, 90:10, 90:22, 91:11, 91:15, 91:18, 92:4, 92:6, 93:11, 94:18, 94:20, 97:8, 97:10, 97:11, 97:13, 97:19, 98:10, 98:11, 99:14, 99:22, 100:18, 104:9, 106:5, 110:21, 110:23, 111:4, 112:2
**molecule** [18] - 25:18, 54:9, 58:20, 59:13, 59:15, 59:16, 59:20, 66:16, 66:24, 67:22, 67:23, 67:24, 71:7, 71:15, 71:17, 72:22, 72:23
**molecules** [9] - 54:11, 57:6, 61:11, 61:15, 72:11, 72:13, 72:15, 72:17, 90:1
**moles** [1] - 73:8
**moment** [1] - 111:21

**Monday** [2] - 1:20, 4:1
**monitor** [3] - 5:1, 5:2, 5:4
**months** [1] - 32:25
**morning** [5] - 4:4, 4:10, 26:16, 37:5, 53:16
**most** [2] - 43:3, 48:18
**motion** [5] - 15:3, 16:9, 41:11, 41:15, 41:20
**move** [6] - 22:20, 53:7, 80:1, 82:2, 102:13, 104:11
**moved** [1] - 9:21
**moving** [2] - 33:4, 69:5
**MR** [88] - 3:6, 4:10, 4:15, 4:24, 5:7, 13:2, 19:4, 19:7, 19:19, 19:23, 20:4, 20:19, 20:24, 21:3, 21:7, 21:9, 22:3, 22:6, 22:8, 22:11, 22:24, 28:22, 29:17, 30:2, 30:16, 31:6, 31:10, 31:20, 32:4, 32:7, 32:13, 32:17, 33:13, 33:23, 34:1, 34:4, 38:16, 38:23, 39:3, 39:5, 39:9, 39:13, 40:1, 40:6, 48:16, 49:4, 49:11, 49:18, 49:20, 49:25, 50:3, 50:6, 50:10, 50:15, 50:21, 51:5, 51:9, 51:14, 51:16, 51:22, 53:6, 53:11, 58:7, 62:4, 63:2, 67:3, 68:4, 69:14, 70:13, 73:15, 75:12, 75:15, 76:8, 76:11, 76:17, 82:3, 82:14, 82:18, 88:14, 94:22, 95:7, 95:16, 102:12, 102:21, 108:11, 108:14, 112:22, 113:9
**MS** [41] - 3:6, 75:5, 75:13, 75:19, 82:8, 82:12, 83:3, 83:7, 83:9, 88:16, 88:19, 90:16, 90:21, 91:4, 92:10, 94:11, 94:23, 95:11, 95:13, 96:6, 100:9, 100:11, 100:19, 101:7, 101:10, 101:14, 101:20, 103:16, 103:19, 103:22,

104:1, 104:4, 105:22, 106:2, 108:5, 109:1, 110:17, 110:22, 111:18, 112:18, 113:1
**mucosa** [2] - 87:6, 92:1
**mucous** [1] - 64:11
**must** [10] - 22:15, 23:11, 25:9, 58:12, 58:14, 58:18, 94:15, 97:16, 100:3, 100:13

---

# N

**name** [4] - 31:5, 50:13, 83:10
**name's** [1] - 31:4
**named** [1] - 72:13
**namely** [1] - 108:21
**names** [1] - 70:2
**NaOH** [1] - 36:9
**neat** [1] - 37:11
**necessarily** [1] - 83:24
**necessary** [1] - 23:13
**need** [8] - 17:7, 17:8, 20:21, 21:18, 97:20, 101:23, 106:4, 113:8
**needs** [1] - 76:2
**negative** [15] - 55:4, 55:5, 55:13, 55:20, 57:12, 58:22, 58:23, 59:17, 60:16, 61:1, 61:13, 61:16, 61:24, 66:3
**negatively** [11] - 55:23, 56:9, 56:24, 57:5, 57:8, 57:16, 57:25, 59:17, 59:22, 60:4, 60:5
**negatively-charged** [10] - 55:23, 56:24, 57:5, 57:8, 57:16, 57:25, 59:17, 59:22, 60:4, 60:5
**neutral** [20] - 54:18, 54:25, 55:1, 55:4, 55:6, 55:25, 56:1, 56:14, 56:20, 56:21, 57:20, 57:23, 58:9, 58:20, 59:19, 61:25, 62:11, 70:5, 76:22, 99:9
**never** [11] - 13:18, 15:1, 15:4, 25:12, 38:1, 38:17, 39:17, 46:9, 52:18, 108:21
**new** [1] - 41:15
**newly** [1] - 43:17

**newly-pled** [1] - 43:17
**next** [7] - 6:8, 11:24, 13:20, 39:2, 75:3, 77:14, 100:1
**nice** [6] - 48:21, 48:22, 69:11, 83:13, 83:14
**nicely** [2] - 58:1, 59:22
**night** [3] - 18:24, 75:7, 75:22
**nobody** [2] - 82:15, 104:18
**non** [10] - 14:13, 25:23, 36:16, 36:25, 38:18, 45:10, 45:12, 73:24, 74:3, 74:8
**non-infringement** [1] - 38:18
**non-limiting** [3] - 73:24, 74:3, 74:8
**non-prior** [1] - 14:13
**non-reproducibility** [3] - 25:23, 45:10, 45:12
**non-reproducible** [1] - 36:16
**none** [5] - 31:14, 41:25, 43:25, 47:22, 85:8
**nonetheless** [1] - 25:14
**normal** [4] - 71:6, 71:15, 84:19, 108:17
**normally** [1] - 55:17
**note** [1] - 97:25
**notebook** [7] - 12:7, 12:8, 35:10, 36:6, 98:3, 98:6, 109:9
**notebooks** [13] - 12:1, 12:3, 12:7, 35:4, 37:2, 37:3, 37:4, 37:10, 37:11, 37:22, 38:7, 42:20, 43:1
**noted** [2] - 25:2, 44:25
**notes** [2] - 12:11, 28:8
**nothing** [1] - 50:6
**notice** [1] - 36:21
**noticed** [4] - 14:22, 14:23
**noting** [1] - 101:16
**November** [3] - 26:18, 41:25, 43:25
**nowhere** [1] - 108:6
**nuclear** [1] - 85:15
**number** [20] - 10:21, 10:24, 13:8, 28:24, 55:4, 55:5, 60:4, 72:13, 75:17, 75:24, 76:20, 80:25, 83:23, 88:22, 90:1, 90:5, 90:23, 103:13,

103:17, 111:14
**nutshell** [2] - 19:11, 19:12
**NW** [1] - 2:23

# O

**oath** [1] - 83:2
**object** [2] - 75:9, 102:13
**objected** [1] - 15:9
**objection** [3] - 75:23, 88:14, 88:15
**objections** [2] - 15:14, 15:20
**observation** [1] - 39:23
**observe** [1] - 74:14
**observed** [2] - 74:15, 74:16
**obtain** [4] - 94:15, 97:17, 100:3, 100:13
**obtained** [7] - 19:14, 25:9, 35:8, 41:21, 42:6, 43:21, 44:3
**obtaining** [4] - 94:14, 97:15, 100:2, 100:12
**obvious** [3] - 33:12, 33:22, 38:14
**obviously** [1] - 15:20
**occasional** [2] - 26:19, 45:19
**occurred** [1] - 42:7
**occurs** [2] - 65:18, 65:22
**October** [5] - 34:9, 34:14, 35:11, 36:22, 37:16
**odds** [2] - 24:10, 42:16
**OF** [6] - 1:2, 1:17, 3:3, 114:1, 114:3, 114:4
**offensive** [1] - 105:17
**offer** [1] - 12:22
**offered** [3] - 15:25, 16:13, 16:16
**office** [5] - 5:18, 26:3, 40:14, 40:23, 42:10
**Office** [24] - 5:25, 13:19, 15:7, 24:23, 25:7, 25:25, 28:3, 31:13, 42:13, 88:8, 91:6, 92:19, 97:21, 98:17, 99:17, 101:16, 101:23, 102:3, 102:9, 102:10, 103:4, 103:10, 103:16, 105:18
**Official** [3] - 1:22,

114:7, 114:21
**OFFICIAL** [1] - 114:1
**old** [2] - 12:8
**one** [81] - 10:11, 11:6, 11:8, 18:18, 20:12, 22:22, 28:3, 28:24, 29:3, 29:5, 32:2, 36:10, 36:11, 36:14, 42:8, 43:13, 44:25, 45:4, 45:12, 46:2, 46:8, 46:18, 48:7, 50:15, 54:2, 54:6, 55:3, 55:4, 56:4, 58:3, 58:24, 59:6, 59:25, 60:10, 62:9, 62:15, 65:7, 65:8, 66:1, 69:24, 69:25, 72:17, 72:18, 73:2, 73:3, 73:4, 73:7, 73:9, 74:3, 74:6, 74:21, 74:22, 74:23, 75:24, 81:20, 81:21, 86:23, 87:3, 87:19, 87:23, 88:25, 89:1, 89:15, 90:13, 90:17, 93:13, 95:17, 102:5, 107:21, 108:24, 109:20, 109:24, 109:25, 111:2, 111:3, 111:25
**one's** [1] - 73:11
**one-liter** [2] - 73:7, 73:9
**one-molar** [1] - 73:4
**ones** [2] - 37:10, 38:7
**oOo** [1] - 4:3
**opening** [10] - 4:21, 4:23, 13:4, 14:23, 21:8, 46:8, 51:2, 102:16, 102:22, 109:20
**operate** [1] - 82:22
**opinion** [6] - 13:16, 47:15, 88:7, 88:17, 103:14, 105:19, 110:20, 112:7, 112:8
**opinions** [4] - 45:13, 53:10, 87:9, 87:10
**opponent's** [1] - 20:11
**oppose** [1] - 19:18
**opposing** [1] - 51:20
**opposite** [1] - 42:2
**Opposition** [3] - 14:11, 88:8, 91:8
**opposition** [2] - 15:7, 98:17
**optical** [3] - 98:8, 99:15, 100:21
**order** [7] - 5:19, 48:25, 58:9, 61:12, 82:24,

95:20, 102:6
**ordinary** [2] - 65:7, 107:21
**organic** [15] - 52:21, 66:2, 66:16, 66:20, 66:21, 66:22, 68:16, 69:9, 70:5, 70:9, 70:11, 71:2, 71:9, 85:14
**organization** [1] - 113:3
**organize** [2] - 82:6, 82:9
**organizing** [1] - 82:11
**origin** [8] - 64:10, 64:16, 87:6, 91:25, 92:5, 92:6, 97:1, 97:7
**original** [17] - 5:12, 6:4, 12:7, 12:9, 14:25, 15:18, 16:24, 19:12, 26:10, 37:4, 39:19, 46:2, 46:3, 46:16, 47:4, 54:11
**originally** [3] - 16:22, 18:10, 18:11
**originals** [2] - 12:3, 12:5
**originated** [1] - 17:22
**ourself** [1] - 30:8
**ourselves** [2] - 6:4, 43:7
**overall** [2] - 55:6, 68:12
**overly** [2] - 89:24, 103:8
**overrule** [1] - 75:23
**own** [5] - 30:25, 36:17, 52:8, 74:16, 75:17
**oxygen** [5] - 68:10, 68:11, 68:15, 68:17, 68:18

# P

**p.m** [1] - 113:14
**packs** [1] - 62:23
**page** [51] - 8:7, 13:4, 14:7, 21:23, 54:13, 54:15, 54:18, 56:11, 56:16, 56:17, 56:18, 57:19, 58:4, 63:6, 63:9, 63:18, 63:19, 63:23, 64:2, 64:8, 64:17, 65:24, 67:5, 69:25, 70:19, 70:20, 71:8, 71:11, 71:21, 73:19, 73:21, 91:22, 92:8, 97:4, 97:5, 97:6, 98:16, 99:3,

99:7, 101:6, 101:8, 105:25, 108:3, 108:11, 108:15, 110:16, 110:17, 111:9, 111:16, 111:22, 114:13
**PAGE** [1] - 3:4
**pages** [1] - 103:12
**Pamela** [4] - 1:22, 114:7, 114:20, 114:21
**paper** [3] - 62:10, 62:12, 111:14
**papers** [4] - 52:10, 85:5, 85:8, 85:11
**paragraph** [6] - 22:18, 23:2, 23:12, 25:16, 27:19, 103:15
**parameters** [6] - 94:16, 94:17, 97:18, 100:4, 100:14, 100:25
**PARK** [1] - 2:6
**part** [15] - 25:5, 25:6, 27:13, 27:14, 27:20, 32:24, 41:23, 43:22, 48:12, 52:5, 60:7, 65:13, 68:12, 101:2, 109:7
**participant** [1] - 65:17
**particular** [9] - 6:14, 8:6, 13:23, 32:22, 71:13, 73:19, 75:16, 87:21, 93:14
**particularly** [4] - 67:6, 67:7, 74:25, 106:25
**parts** [1] - 28:4
**party** [2] - 14:14, 14:18
**pass** [1] - 62:12
**passing** [1] - 18:24
**past** [1] - 16:8
**pasta** [2] - 62:14, 62:15
**patent** [109] - 5:18, 5:19, 5:24, 6:1, 6:7, 6:8, 6:12, 6:19, 7:8, 7:19, 7:24, 8:2, 8:5, 8:24, 9:4, 9:22, 9:24, 10:10, 10:15, 10:20, 10:21, 11:15, 13:16, 13:17, 13:19, 13:21, 13:22, 13:25, 14:12, 15:8, 15:10, 17:23, 19:17, 21:16, 21:25, 22:12, 22:16, 22:17, 23:2, 23:4, 24:7, 25:1, 25:8, 26:3, 26:5, 26:7, 26:9, 27:22, 28:1, 28:13,

29:6, 29:8, 29:10, 29:11, 29:13, 30:3, 33:9, 33:10, 33:17, 34:20, 34:22, 35:6, 35:12, 35:15, 35:22, 36:10, 40:25, 41:7, 42:23, 43:1, 43:4, 43:9, 45:14, 45:17, 47:14, 50:22, 53:15, 53:18, 53:23, 53:25, 54:3, 55:8, 55:25, 56:11, 74:5, 74:12, 78:14, 87:9, 88:9, 96:8, 96:13, 97:16, 97:24, 99:1, 101:6, 101:7, 101:24, 105:1, 106:12, 106:14, 106:18, 107:5, 109:9, 109:12, 109:18, 112:1, 112:3
**Patent** [24] - 5:25, 13:19, 15:7, 24:23, 25:7, 25:25, 28:3, 31:13, 42:13, 88:8, 91:6, 92:18, 97:21, 98:17, 99:17, 101:16, 101:23, 102:3, 102:9, 102:10, 103:4, 103:10, 103:16, 105:18
**patent's** [1] - 14:9
**patentability** [2] - 5:19, 5:23
**patentable** [1] - 6:22
**paying** [2] - 48:12, 92:17
**PAYNE** [1] - 2:21
**peer** [2] - 52:11, 52:12
**peer-reviewed** [2] - 52:11, 52:12
**people** [2] - 43:5, 47:13
**per** [11] - 73:1, 86:14, 86:19, 89:13, 89:15, 89:20, 89:25, 90:5, 90:13, 90:17
**perceives** [1] - 18:19
**percent** [8] - 6:16, 6:17, 6:20, 7:11, 7:13, 23:5, 81:13
**percentages** [1] - 35:21
**perfect** [2] - 67:14, 83:5
**perfectly** [4] - 67:14, 82:5, 93:4, 95:23
**performed** [2] - 47:2, 63:14

perhaps [7] - 44:21, 57:2, 60:8, 103:11, 109:6, 109:8, 109:17
period [7] - 26:25, 34:14, 37:6, 37:7, 40:21, 84:3, 109:15
permit [1] - 27:22
person [6] - 48:18, 49:22, 94:15, 97:16, 100:2, 100:13
pertinent [1] - 80:8
petition [2] - 46:7, 46:21
Pfaelzer [2] - 44:25, 45:12
pH [1] - 69:2
Ph.D [1] - 51:25
Pharma [1] - 1:12
PHARMA [1] - 2:10
pharmaceutical [5] - 38:22, 52:16, 52:19, 52:20, 84:19
pharmaceuticals [1] - 4:11
PHARMACEUTICALS [1] - 2:12
Pharmaceuticals [1] - 1:7
Pharmacopeia [1] - 87:11
phase [1] - 36:6
phrase [2] - 21:21, 65:14
phrased [1] - 96:13
phrasing [1] - 80:23
physical [1] - 63:17
pick [1] - 112:24
piece [3] - 33:21, 62:10, 76:7
pig [5] - 54:21, 64:11, 87:6, 92:1, 104:25
pigs [1] - 104:21
place [2] - 61:22, 66:15
placed [1] - 13:13
places [2] - 40:13, 63:6
plague [1] - 17:24
Plaintiff [1] - 1:8
PLAINTIFF [1] - 2:2
plaintiff's [2] - 4:23, 25:2
PLAINTIFFS' [1] - 3:11
plasma [2] - 5:24, 27:23
plays [1] - 90:17
PLAZA [1] - 2:6
plead [3] - 18:9, 18:10, 30:18

pleadings [3] - 16:20, 16:25, 30:17
pled [1] - 43:17
plus [9] - 65:4, 65:6, 65:10, 77:9, 79:23, 98:9, 100:21, 100:22
point [38] - 16:11, 24:20, 24:22, 28:14, 28:16, 30:8, 30:13, 30:19, 33:6, 33:14, 34:11, 37:22, 39:8, 39:10, 39:11, 44:9, 50:25, 51:4, 78:6, 81:8, 81:17, 86:11, 93:7, 93:10, 93:21, 94:14, 97:15, 97:22, 100:1, 100:12, 104:1, 104:8, 105:2, 105:16, 105:22, 107:15, 108:9
pointed [2] - 84:22, 102:4
pointer [2] - 68:9, 68:10
points [1] - 28:9
polydispersity [1] - 7:14
polysaccharide [1] - 7:11
polysaccharides [1] - 38:4
porcine [3] - 11:12, 11:13
porous [1] - 62:10
portion [1] - 48:8
position [3] - 31:19, 43:6, 66:18
positions [1] - 48:9
positive [14] - 55:3, 55:5, 55:20, 58:22, 61:1, 61:13, 61:14, 61:16, 61:21, 61:24, 62:17, 62:20, 66:3
positively [9] - 56:8, 56:25, 57:13, 57:15, 57:24, 59:21, 60:2, 61:13
positively-charge [1] - 61:13
positively-charged [7] - 56:25, 57:13, 57:15, 57:24, 59:21, 60:2
possession [2] - 41:16, 47:20
possible [1] - 29:7
possibly [1] - 17:6
post [4] - 41:12, 47:18, 47:25, 52:6
post-doctoral [1] -

52:6
poster [1] - 40:16
pour [2] - 59:6, 62:10
pouring [1] - 62:24
power [1] - 72:24
powers [1] - 4:4
practical [3] - 63:14, 63:16, 79:18
practice [3] - 13:15, 18:5, 18:6
pre [21] - 13:4, 15:23, 34:21, 35:24, 36:2, 36:6, 36:8, 102:24, 106:22, 107:1, 107:6, 107:7, 107:10, 107:18, 107:20, 108:6, 108:19, 109:21, 110:3, 110:5, 110:7
pre-2000 [1] - 37:21
pre-2003 [2] - 34:13, 37:15
pre-hearing [3] - 13:4, 15:23, 102:24
pre-heat [2] - 36:6, 36:8
pre-heating [16] - 34:21, 35:24, 36:2, 106:22, 107:1, 107:6, 107:7, 107:10, 107:18, 107:20, 108:6, 108:19, 109:21, 110:3, 110:5, 110:7
preceding [1] - 107:14
precipitant [1] - 62:5
precipitate [7] - 35:9, 35:13, 59:7, 63:7, 63:10, 69:20
precipitates [2] - 62:2, 69:23
precisely [3] - 25:22, 46:24, 59:15
predate [1] - 26:11
predates [1] - 43:18
predominant [1] - 13:13
prefer [1] - 112:23
preferably [1] - 72:6
premature [1] - 18:1
prematurely [1] - 18:6
premise [2] - 14:19, 102:5
premised [1] - 41:21
preparation [1] - 7:1
prepared [3] - 23:3, 71:1, 71:5
preparing [2] - 25:10, 53:20
present [3] - 5:9,

31:15, 51:8
presentation [1] - 48:8
presented [2] - 20:8, 48:9
president [1] - 28:6
PRESIDING [1] - 1:5
pretty [2] - 30:23, 92:25
previous [1] - 91:10
previously [1] - 38:2
primarily [3] - 42:21, 84:11, 87:10
principle [2] - 79:18, 80:19
principles [1] - 20:17
privilege [1] - 18:4
probative [2] - 18:11, 18:12
problem [4] - 10:15, 44:11, 47:14, 95:12
problems [3] - 26:9, 43:8, 47:8
procedure [2] - 34:18, 34:21
proceed [10] - 4:8, 4:18, 4:22, 21:7, 48:15, 57:1, 76:5, 76:16, 80:17, 82:5
proceeded [1] - 85:23
proceeding [9] - 5:1, 15:7, 15:10, 15:12, 15:25, 16:1, 16:22, 26:8, 37:19
proceedings [2] - 26:12, 114:12
PROCEEDINGS [1] - 1:17
process [31] - 8:8, 8:10, 8:16, 21:20, 21:21, 23:3, 23:9, 23:17, 23:24, 25:9, 27:21, 28:16, 30:14, 32:2, 32:6, 45:24, 46:9, 46:13, 46:14, 47:5, 54:4, 54:5, 54:6, 64:3, 64:4, 66:14, 85:25, 96:25, 101:16, 101:22
processes [5] - 13:23, 64:9, 76:21, 77:9, 91:24
produce [14] - 15:6, 15:14, 31:10, 31:18, 38:22, 54:3, 70:11, 86:25, 95:21, 95:23, 100:11
produced [9] - 6:15, 12:4, 21:24, 35:1, 37:5, 38:7, 58:19,

60:24, 102:23
producing [4] - 53:25, 88:11, 99:21, 105:8
product [17] - 8:10, 10:2, 10:4, 11:19, 11:21, 18:4, 21:24, 23:3, 27:25, 28:1, 30:15, 31:18, 98:22, 99:11, 100:24, 101:3, 111:3
production [1] - 27:23
Professional [1] - 114:8
professor [1] - 52:3
proffered [1] - 15:25
project [2] - 9:3, 47:11
promise [1] - 4:5
pronounce [1] - 31:5
properties [6] - 7:1, 7:6, 7:10, 7:20, 7:25, 8:1
proportionate [1] - 11:4
proposition [2] - 16:13, 33:13
protein [1] - 89:1
proton [1] - 66:11
protruding [1] - 67:11
prove [2] - 21:17, 21:18
proved [1] - 29:22
proven [2] - 23:12, 30:24
provide [6] - 15:11, 20:10, 20:16, 22:8, 87:7, 104:6
provided [4] - 12:5, 83:12, 83:16, 102:16
providing [1] - 84:6
provision [1] - 105:23
PTO [20] - 24:23, 26:3, 26:14, 26:18, 27:5, 27:10, 27:14, 27:20, 28:18, 30:21, 31:21, 36:16, 40:18, 44:19, 45:3, 45:4, 45:6, 45:8, 45:17
public [3] - 24:7, 40:18, 46:10
publication [1] - 30:1
publications [2] - 52:13, 53:1
published [7] - 29:10, 29:15, 29:25, 30:6, 52:9, 52:10, 85:5
pull [1] - 88:3
pulling [2] - 34:10, 36:19
purely [1] - 29:4
purification [5] -

34:18, 35:5, 35:11, 106:13, 106:15
**purified** [3] - 36:23, 36:25
**purity** [1] - 35:8
**purpose** [1] - 38:5
**purposes** [1] - 29:13
**pursuant** [1] - 114:10
**put** [18] - 12:16, 20:8, 28:19, 33:8, 34:12, 55:16, 55:22, 57:11, 61:8, 61:10, 62:21, 68:16, 72:20, 73:3, 75:6, 81:23, 92:24
**puts** [1] - 71:18
**putting** [2] - 15:21, 86:11

## Q

**qualified** [1] - 53:9
**quantity** [1] - 72:16
**questioning** [1] - 102:14
**questions** [4] - 68:1, 82:3, 83:11, 105:21
**quickly** [2] - 46:1, 108:24
**quite** [5] - 13:6, 34:7, 57:6, 57:7, 106:8
**quote** [27] - 13:21, 16:10, 23:9, 23:16, 54:18, 63:7, 63:8, 63:10, 64:8, 64:12, 64:25, 65:3, 65:4, 67:7, 67:8, 70:25, 71:3, 71:13, 71:25, 72:5, 73:23, 73:24, 91:23, 92:2, 108:15, 108:18
**quotes** [1] - 5:21

## R

**raised** [1] - 8:3
**ramp** [1] - 108:24
**ran** [2] - 9:4, 19:13
**range** [18] - 7:14, 65:5, 65:10, 69:2, 71:22, 79:22, 80:5, 81:12, 81:19, 85:5, 88:9, 96:9, 96:14, 98:8, 100:17, 104:17, 104:18, 105:5
**ranges** [1] - 12:21
**ranging** [1] - 35:17
**rather** [16] - 10:20, 23:9, 26:20, 34:25, 35:18, 37:9, 43:19, 43:22, 45:19, 61:2,

65:21, 68:2, 77:18, 84:24, 89:3, 92:4
**ratio** [1] - 11:5
**ratios** [1] - 11:7
**raw** [2] - 11:20, 12:19
**re** [1] - 26:4
**re-issuing** [1] - 26:4
**reach** [1] - 43:2
**reached** [1] - 34:5
**reaching** [4] - 34:10, 34:15, 37:8, 60:16
**react** [1] - 66:16
**reactants** [1] - 11:5
**reacting** [1] - 65:21
**reaction** [33] - 8:13, 8:21, 9:9, 9:10, 11:15, 46:21, 46:22, 62:19, 64:25, 65:9, 65:17, 65:18, 65:22, 71:23, 71:25, 78:25, 79:2, 79:8, 79:11, 79:13, 79:16, 79:20, 79:22, 79:24, 80:2, 80:7, 80:10, 80:12, 107:15, 107:19, 108:20, 108:22, 110:5
**reactions** [5] - 69:6, 73:16, 80:9, 86:13, 90:18
**reactive** [1] - 67:2
**read** [7] - 64:6, 65:13, 72:3, 73:21, 91:20, 111:19, 111:20
**Reading** [1] - 111:24
**reading** [6] - 64:8, 89:7, 89:21, 90:7, 91:17, 95:8
**ready** [1] - 4:17
**real** [1] - 105:6
**realize** [2] - 74:25, 77:22
**really** [8] - 11:10, 20:14, 28:23, 32:1, 32:2, 80:24, 102:2, 103:11
**Realtime** [1] - 114:7
**reason** [5] - 7:17, 29:20, 30:19, 45:11, 112:9
**reasonable** [1] - 113:6
**rebuttal** [4] - 12:25, 13:1, 15:21, 16:16
**received** [1] - 75:7
**RECEIVED** [2] - 3:11, 3:15
**recently** [4] - 17:21, 41:12, 43:18, 47:17
**recess** [5] - 48:20, 48:23, 82:13, 113:7,

113:10
**Recess** [2] - 48:24, 82:23
**recognize** [1] - 53:14
**record** [5] - 13:9, 20:2, 27:20, 50:12, 91:20
**records** [1] - 27:11
**redefine** [1] - 66:7
**redirect** [1] - 112:21
**reduced** [1] - 35:7
**refer** [11] - 13:3, 16:25, 20:1, 70:3, 98:25, 99:6, 101:2, 107:14, 109:8, 109:9, 110:6
**reference** [4] - 6:23, 6:24, 87:16, 87:17
**referenced** [1] - 29:22
**referred** [6] - 8:24, 14:23, 18:13, 24:13, 53:16, 72:12
**referring** [11] - 23:1, 66:22, 69:25, 72:7, 86:9, 90:13, 90:14, 96:20, 99:24, 100:6, 108:1
**reflects** [1] - 28:25
**regard** [9] - 16:7, 19:14, 48:9, 49:7, 61:5, 81:17, 103:6, 104:14, 111:25
**regarding** [2] - 13:11, 91:18
**regardless** [2] - 92:24, 94:8
**Registered** [1] - 114:8
**regret** [1] - 51:11
**regulations** [1] - 114:14
**regulatory** [2] - 28:7, 46:5
**reissue** [2] - 26:8, 27:1
**reissued** [6] - 27:10, 28:4, 28:13, 28:15, 44:19, 45:20
**reissuing** [1] - 45:18
**rejected** [1] - 45:6
**relate** [3] - 85:11, 85:13, 98:7
**related** [2] - 52:21, 84:20
**relating** [5] - 15:6, 41:20, 42:1, 44:1, 47:23
**relation** [2] - 18:19, 80:1
**relationship** [5] - 78:24, 79:1, 79:5, 79:6, 89:4
**relator** [2] - 4:11, 49:4

**relator's** [1] - 25:2
**relevant** [2] - 20:17, 67:16
**relies** [1] - 37:16
**relitigate** [3] - 45:5, 45:9, 45:16
**rely** [3] - 9:16, 17:10, 30:18
**relying** [7] - 9:7, 12:18, 14:13, 16:17, 31:24, 97:2, 97:3
**remainder** [1] - 59:9
**remained** [1] - 8:16
**remains** [1] - 59:11
**remedy** [1] - 76:2
**removed** [2] - 51:6, 66:12
**removing** [3] - 58:24, 62:25, 66:14
**rendered** [1] - 91:9
**rendering** [1] - 91:8
**repeated** [1] - 56:16
**repeatedly** [4] - 24:4, 24:16, 34:8, 40:12
**repetition** [2] - 98:21, 101:3
**replaced** [1] - 66:20
**replacing** [2] - 67:23, 68:14
**report** [10] - 27:17, 27:19, 27:20, 75:12, 75:13, 75:15, 75:18, 75:20, 76:15, 103:1
**reported** [3] - 6:6, 44:12, 114:12
**reporter** [2] - 48:18, 113:4
**Reporter** [4] - 1:22, 114:8, 114:21
**REPORTER** [2] - 48:21, 114:1
**REPORTER'S** [1] - 1:17
**reports** [5] - 27:12, 45:8, 91:8, 102:17, 103:1
**represent** [1] - 76:13
**representation** [3] - 46:7, 46:20, 75:20
**representative** [3] - 49:16, 51:8, 51:10
**represented** [2] - 5:24, 41:25
**reproduce** [6] - 14:9, 23:24, 24:21, 28:17, 31:9, 102:6
**reproduced** [2] - 26:1, 30:15
**reproducibility** [7] - 25:5, 25:15, 25:23,

27:9, 44:18, 45:10, 45:12
**reproducible** [14] - 21:20, 23:16, 23:25, 24:22, 30:21, 30:24, 31:2, 31:18, 35:16, 36:16, 38:11, 40:8, 45:15, 45:24
**reproducing** [1] - 112:1
**reproductions** [3] - 8:23, 26:19, 45:18
**request** [2] - 4:20, 15:15
**require** [3] - 17:11, 43:14, 110:3
**required** [1] - 75:6
**requirements** [3] - 101:17, 104:10, 105:24
**research** [5] - 9:2, 9:3, 52:6, 84:11, 85:2
**researching** [1] - 84:8
**resonance** [1] - 85:15
**respect** [7] - 12:18, 20:13, 23:23, 42:2, 44:9, 49:12, 99:20
**respond** [1] - 104:4
**response** [5] - 13:2, 15:9, 15:14, 43:24, 48:14
**restate** [1] - 91:3
**result** [12] - 8:22, 26:19, 31:9, 32:3, 32:6, 45:19, 79:15, 79:16, 95:22, 103:24, 105:10, 112:2
**resulted** [1] - 7:21
**resulting** [1] - 62:1
**results** [3] - 11:21, 36:20, 36:25
**retained** [1] - 62:11
**return** [1] - 99:6
**reveal** [2] - 20:14, 44:11
**reverted** [1] - 94:13
**review** [2] - 27:5, 95:9
**reviewed** [14] - 24:14, 27:17, 28:4, 28:8, 38:6, 42:20, 43:1, 43:4, 52:11, 52:12, 53:20, 74:11, 102:15
**reviewing** [3] - 26:24, 27:11, 28:14, 28:15, 38:10
**revocation** [2] - 26:6, 30:10
**revoke** [1] - 25:16
**revoked** [13] - 14:12,

25:3, 25:4, 25:7,
27:8, 29:6, 30:17,
30:20, 33:14, 44:16,
45:10, 45:11
**rich** [1] - 4:17
**RICHARD** [1] - 2:16
**right-hand** [2] - 76:20,
77:9
**ring** [5] - 51:16, 52:23,
53:12, 67:10
**RMR** [2] - 1:22, 114:21
**Robert** [7] - 12:2,
24:13, 28:5, 28:6,
32:20, 32:22, 50:18
**role** [1] - 46:25
**room** [4] - 9:19, 79:9,
79:25, 108:23
**Room** [1] - 1:24
**Rosa** [1] - 104:23
**rotating** [1] - 62:22
**rotation** [5] - 91:16,
99:23, 100:21
**rotations** [1] - 98:9
**roughly** [1] - 84:18
**Roybal** [1] - 1:23
**rule** [8] - 49:12, 51:11,
51:12, 80:9, 80:13,
81:12, 82:14, 82:19
**ruled** [1] - 15:3
**rules** [1] - 43:14
**ruling** [1] - 49:7
**run** [2] - 84:12, 110:19
**rushing** [1] - 112:15

**S**

**SA** [3] - 1:12, 2:10,
2:14
**salification** [9] - 54:7,
58:3, 64:15, 66:1,
70:14, 73:17, 74:18,
76:22, 106:9
**salt** [26] - 54:7, 54:19,
55:1, 55:2, 55:4,
55:6, 55:10, 55:15,
56:1, 56:2, 56:14,
56:20, 56:21, 57:20,
57:22, 57:23, 58:9,
58:21, 59:12, 59:19,
59:20, 60:25, 86:10,
99:10
**samples** [2] - 36:22,
97:12
**SANOFI** [1] - 2:14
**SANOFI-AVENTIS** [1]
- 2:14
**Santa** [1] - 104:23
**satisfied** [1] - 67:17
**saw** [1] - 109:5
**scale** [2] - 11:17,

72:24
**scale-up** [1] - 11:17
**schedule** [1] - 4:19
**scheduling** [1] - 49:23
**scientific** [3] - 32:20,
52:9, 52:10
**scientist** [3] - 12:2,
14:10, 72:13
**scientists** [1] - 12:17
**scope** [4] - 7:22, 9:23,
11:22, 110:24
**screen** [4] - 5:6,
22:21, 89:7, 100:25
**seated** [1] - 50:9
**second** [19] - 9:24,
10:13, 13:23, 24:2,
32:16, 32:17, 37:10,
46:18, 54:8, 64:4,
66:6, 69:8, 71:8,
78:1, 78:3, 93:6,
99:20, 105:7
**seconds** [2] - 49:9,
51:23
**Section** [1] - 114:10
**see** [30] - 4:19, 5:1,
5:2, 7:10, 15:8,
16:11, 22:21, 27:16,
76:14, 79:20, 81:21,
90:20, 95:3, 96:10,
98:18, 98:22, 98:24,
99:9, 101:15,
103:25, 104:13,
106:5, 106:6,
108:19, 109:11,
109:13, 109:14,
109:16, 109:21,
113:13
**seeing** [1] - 97:22
**seek** [1] - 45:8
**seeking** [1] - 77:24
**seeks** [1] - 15:9
**seem** [1] - 81:11
**segments** [1] - 71:18
**self** [1] - 44:12
**self-reported** [1] -
44:12
**semantic** [1] - 29:4
**sense** [5] - 33:9,
33:11, 68:20, 77:23,
80:20
**sensitive** [3] - 8:11,
46:21, 47:5
**sent** [1] - 46:18
**sentence** [6] - 64:6,
64:18, 65:13, 92:21,
93:3, 93:6, 93:17,
93:19, 94:9, 94:12,
95:7, 95:20, 96:7,
100:1, 105:7
**separate** [9] - 54:6,

57:12, 59:15, 59:16,
59:19, 62:17, 62:24,
106:15
**separated** [1] - 64:1
**separately** [2] - 75:15,
75:16
**separating** [2] - 63:12,
63:17
**separation** [1] - 63:3
**sequence** [1] - 76:20
**served** [1] - 52:12
**serving** [1] - 84:7
**Session** [1] - 1:18
**session** [3] - 49:1,
82:25, 113:14
**set** [6] - 8:25, 15:17,
36:24, 37:10, 42:21,
77:13
**sets** [3] - 37:22, 38:6,
43:4
**seven** [2] - 52:7, 76:19
**several** [6] - 55:13,
59:17, 59:21, 60:16,
61:15, 79:25
**shall** [2] - 4:18
**shared** [1] - 24:11
**sheet** [5] - 98:18,
98:20, 101:2, 101:13
**ships** [1] - 18:24
**shooting** [1] - 35:21
**short** [1] - 113:7
**show** [38] - 5:5, 7:20,
8:23, 9:13, 9:15,
9:17, 10:14, 10:22,
11:1, 11:20, 11:25,
12:10, 12:19, 16:20,
17:2, 20:9, 20:13,
21:19, 23:15, 23:23,
24:2, 24:5, 24:9,
25:24, 30:23, 30:25,
34:17, 34:24, 35:5,
36:13, 36:21, 38:10,
40:12, 40:14, 42:15,
45:23, 46:19, 77:4
**showed** [3] - 15:4,
47:7, 47:13
**showing** [3] - 27:16,
68:9, 78:10
**shown** [4] - 76:18,
78:5, 78:6, 78:7
**shows** [4] - 6:3, 8:18,
26:5, 32:24
**side** [14] - 13:20,
18:17, 18:18, 18:19,
18:20, 19:3, 20:5,
32:5, 48:11, 49:15,
51:7, 61:14, 77:9
**side's** [1] - 30:13
**sides** [3] - 30:18,
51:12, 61:16

**significance** [3] -
31:2, 77:11, 103:24
**significant** [1] - 95:19
**silent** [1] - 97:10
**similar** [3] - 39:6,
39:18, 54:22
**simple** [1] - 58:10
**simplest** [1] - 79:7
**simply** [4] - 24:22,
38:5, 45:22, 104:6
**single** [1] - 44:7
**sites** [2] - 59:17, 60:16
**situation** [1] - 58:16
**six** [1] - 67:10
**size** [5] - 57:16, 60:17,
60:19, 60:21, 61:12
**skill** [2] - 65:7, 107:21
**skilled** [4] - 94:15,
97:16, 100:2, 100:13
**slide** [10] - 6:8, 10:11,
11:24, 13:20, 14:5,
15:5, 17:18, 21:11,
22:2
**slides** [1] - 4:25
**slightly** [2] - 94:5
**slow** [1] - 56:10
**slowly** [3] - 20:1, 22:5,
100:16
**small** [9] - 55:14,
55:18, 57:8, 57:9,
57:15, 58:5, 61:11,
72:11, 89:12
**smaller** [2] - 54:11,
71:18
**so-called** [1] - 67:9
**sodium** [84] - 35:7,
35:8, 35:11, 35:12,
35:13, 36:1, 36:9,
36:10, 55:10, 55:11,
55:12, 55:14, 55:15,
55:16, 55:18, 55:21,
56:2, 56:3, 56:7,
57:7, 57:9, 57:10,
57:13, 57:18, 57:21,
58:6, 58:11, 58:13,
58:14, 59:1, 59:9,
59:10, 59:11, 60:7,
60:11, 60:17, 60:23,
61:4, 61:5, 61:9,
61:10, 61:12, 61:16,
61:17, 61:19, 62:20,
64:1, 65:20, 69:17,
71:10, 71:13, 71:16,
72:7, 72:18, 73:2,
73:3, 73:7, 73:9,
85:22, 86:2, 86:6,
86:7, 86:9, 86:16,
86:19, 87:12, 87:13,
89:12, 106:23,
107:6, 107:7,

107:12, 108:18,
109:15
**sole** [1] - 52:18
**solid** [17] - 59:7, 61:3,
61:17, 62:6, 62:8,
62:11, 62:18, 62:21,
62:23, 62:24, 62:25,
63:1, 63:12, 63:17,
63:25, 86:10
**solubility** [1] - 69:20
**soluble** [9] - 56:3,
56:6, 57:17, 58:2,
59:12, 61:2, 66:1,
69:17, 71:13
**solution** [46] - 35:25,
36:2, 55:22, 55:24,
57:21, 57:22, 59:1,
59:2, 59:3, 59:4,
61:3, 61:20, 62:6,
62:7, 62:9, 62:10,
62:12, 62:14, 62:20,
63:12, 64:1, 65:1,
70:8, 72:8, 72:9,
73:1, 73:4, 73:5,
73:6, 73:8, 73:9,
73:11, 73:12, 86:11,
90:18, 106:23,
107:6, 107:13,
107:20, 107:23,
108:17, 109:14,
110:6
**solvent** [10] - 65:1,
65:14, 65:15, 65:16,
65:21, 65:24, 66:1,
66:2, 66:3
**solvents** [1] - 69:24
**someday** [1] - 40:4
**someone** [1] - 110:2
**soon** [1] - 95:2
**sorry** [4] - 11:25,
88:19, 95:13, 108:12
**sort** [5] - 21:4, 68:5,
69:15, 79:8, 105:11
**source** [22] - 5:12, 6:4,
14:25, 15:18, 16:24,
17:9, 19:12, 25:21,
26:10, 39:20, 46:2,
46:3, 46:16, 47:4,
64:15, 87:5, 87:24,
87:25, 88:7, 97:11,
97:12
**southwest** [1] - 51:25
**spare** [1] - 53:9
**speaker** [1] - 51:6
**speaking** [1] - 83:5
**species** [5] - 57:20,
58:1, 60:24, 66:15,
67:9
**specific** [19] - 17:12,
17:13, 74:2, 74:6,

88:12, 91:13, 92:4, 94:18, 94:20, 97:18, 99:13, 99:22, 99:23, 101:17, 101:23, 104:9, 105:8, 105:24, 106:19
**specifically** [6] - 87:17, 91:16, 96:23, 106:14, 111:5, 111:16
**specification** [5] - 6:24, 74:5, 91:12, 91:14, 100:6
**specified** [7] - 8:11, 8:12, 8:19, 97:18, 98:22, 101:3, 101:24
**specifies** [1] - 99:13
**specify** [1] - 99:15
**speed** [1] - 62:22
**speeds** [2] - 80:10, 81:12
**spell** [1] - 50:13
**spelled** [1] - 74:5
**spelling** [2] - 69:10, 69:11
**spend** [8] - 84:6, 84:13, 84:15, 84:17, 84:22, 84:25, 85:1
**spent** [1] - 52:19
**spin** [1] - 62:22
**spite** [1] - 15:2
**spot** [1] - 68:2
**stage** [1] - 62:5
**stages** [1] - 25:8
**stand** [2] - 15:13, 82:15
**standard** [1] - 63:13
**stands** [2] - 18:21, 95:2
**start** [19] - 5:7, 21:11, 71:24, 84:24, 87:17, 87:19, 88:6, 93:13, 96:5, 96:7, 99:20, 101:21, 101:23, 107:4, 107:15, 107:16, 107:23, 108:21, 108:23
**started** [7] - 9:18, 26:8, 34:9, 36:19, 36:20, 37:8, 39:18
**starting** [44] - 25:11, 25:12, 25:13, 54:18, 54:20, 55:7, 64:2, 64:9, 74:17, 86:24, 87:4, 87:8, 87:11, 87:12, 87:18, 87:20, 87:21, 87:22, 88:10, 91:11, 91:22, 91:23, 92:6, 93:7, 93:10, 93:21, 94:14, 96:9,

96:17, 96:24, 97:15, 98:8, 99:11, 100:1, 100:12, 100:24, 105:2, 105:16, 106:5, 107:19, 109:24, 111:3, 111:9, 111:22
**starts** [1] - 109:14
**state** [9] - 5:23, 17:6, 17:14, 20:2, 50:12, 51:25, 56:22, 61:17, 104:14
**STATE** [1] - 114:4
**statement** [40] - 4:23, 6:3, 8:6, 8:19, 13:20, 14:7, 21:8, 25:6, 27:24, 29:13, 30:6, 51:2, 54:22, 56:16, 71:7, 87:24, 91:5, 91:10, 91:16, 91:18, 91:19, 92:16, 93:4, 93:8, 93:9, 94:24, 96:2, 96:11, 96:16, 96:18, 96:19, 98:24, 100:7, 100:8, 100:9, 102:1, 103:5, 104:5, 104:20, 109:21
**statements** [11] - 4:21, 19:15, 19:16, 19:17, 20:21, 24:11, 42:17, 48:10, 105:2, 109:20
**States** [4] - 42:12, 114:9, 114:11, 114:15
**states** [1] - 54:23
**STATES** [2] - 1:1, 1:5
**stating** [1] - 65:23
**status** [1] - 29:7
**stay** [2] - 59:11, 95:18
**stenographically** [1] - 114:12
**step** [31] - 10:12, 10:13, 10:14, 10:23, 10:25, 11:1, 34:22, 47:2, 54:10, 58:3, 58:4, 63:21, 70:14, 70:15, 70:18, 70:19, 70:24, 71:14, 74:18, 78:13, 78:20, 78:21, 106:7, 106:13, 106:15, 106:20, 106:24, 107:1, 107:7, 109:11
**STEPHEN** [1] - 2:21
**steps** [8] - 8:16, 10:11, 10:12, 10:23, 54:6, 69:19, 106:8, 106:9
**still** [12] - 8:22, 11:5, 33:20, 52:8, 58:21, 59:20, 60:25, 61:1,

69:11, 83:2, 100:6
**stirring** [2] - 59:6, 108:17
**stomach** [1] - 66:13
**stop** [1] - 28:21
**story** [1] - 22:25
**straight** [2] - 67:21, 112:11
**STREET** [1] - 2:18
**Street** [1] - 1:23
**stretching** [1] - 107:20
**strike** [2] - 102:13, 107:3
**strongly** [2] - 56:8, 57:11
**structure** [8] - 8:2, 8:11, 22:14, 25:18, 55:22, 85:18, 85:20, 86:4
**struggled** [1] - 14:16
**students** [1] - 52:7
**studied** [2] - 97:21, 102:3
**studies** [1] - 12:17
**study** [1] - 6:6
**stuff** [4] - 31:13, 37:9, 38:21
**subject** [4] - 8:4, 15:2, 16:5, 90:18
**submissions** [1] - 28:12
**submit** [1] - 108:5
**submitted** [2] - 5:18, 11:18
**subparagraph** [2] - 6:15, 6:18
**subset** [1] - 74:10
**substance** [7] - 25:20, 29:4, 29:9, 35:1, 37:18, 54:20, 70:4
**substances** [3] - 64:9, 91:23, 96:24
**substitute** [1] - 11:13
**substituted** [1] - 67:7
**substituting** [1] - 30:2
**successful** [2] - 10:7, 10:8
**suffices** [2] - 69:4, 90:25
**sufficient** [2] - 6:3, 25:14
**sufficiently** [2] - 14:8, 27:23
**suggest** [1] - 18:3
**suggestion** [5] - 88:9, 96:8, 96:13, 96:16, 104:16
**SUITE** [1] - 2:13
**summarize** [2] - 20:7, 69:16

**summary** [3] - 20:12, 23:18, 32:24
**superior** [2] - 7:5, 7:19
**supervised** [1] - 42:25
**supervising** [1] - 46:25
**supplemental** [1] - 75:7
**support** [3] - 5:19, 16:12, 16:19
**supported** [1] - 16:18
**supporting** [1] - 47:19
**supports** [1] - 31:22
**suppose** [2] - 19:22, 80:1
**surfaced** [2] - 13:18, 102:23
**surprise** [3] - 76:1, 102:16, 102:20
**suspect** [4] - 12:13, 17:12, 80:22, 81:5
**suspension** [1] - 65:1
**swear** [1] - 50:7
**switched** [1] - 10:5
**sworn** [1] - 50:8
**synthesis** [2] - 12:3, 52:21
**synthetic** [2] - 85:14, 110:4

## T

**tab** [1] - 52:23
**table** [4] - 4:11, 4:16, 57:22, 86:10
**talks** [4] - 35:6, 105:9, 105:10, 105:23
**taught** [5] - 11:14, 34:20, 62:16, 65:11, 81:25
**TAYLOR** [1] - 2:3
**Taylor** [1] - 4:12
**teach** [2] - 84:11, 107:18
**teaches** [3] - 63:11, 87:20, 107:17
**teaching** [11] - 11:9, 74:7, 74:10, 84:8, 85:2, 87:23, 91:12, 92:3, 93:12, 107:18, 109:12
**teachings** [8] - 7:19, 7:21, 7:24, 9:4, 54:2, 87:16, 109:18, 110:11
**technical** [1] - 82:19
**telephone** [1] - 42:19
**temperature** [22] - 8:12, 8:20, 9:19, 36:3, 46:22, 47:1,

65:3, 65:5, 71:22, 72:1, 78:24, 79:2, 79:3, 79:9, 79:10, 79:13, 79:25, 80:1, 80:4, 108:23, 108:24, 110:1
**temperature-based** [1] - 8:20
**temperatures** [4] - 46:23, 65:9, 65:11, 80:5
**Temple** [1] - 1:23
**term** [5] - 33:7, 67:21, 69:1, 89:3, 110:5
**terms** [6] - 7:9, 29:15, 80:23, 81:11, 91:11, 104:17
**test** [1] - 35:20
**testified** [9] - 38:2, 73:16, 83:20, 84:15, 87:3, 87:4, 91:5, 96:11, 110:23
**testify** [2] - 16:2, 102:19
**testifying** [6] - 37:23, 49:13, 83:24, 85:1, 111:1, 111:2
**testimonies** [1] - 12:16
**testimony** [22] - 10:2, 12:22, 16:5, 32:21, 50:21, 50:22, 50:23, 53:20, 83:16, 83:17, 83:25, 84:2, 84:7, 84:17, 86:12, 86:21, 87:7, 110:2, 110:10, 111:7, 111:12
**testing** [1] - 9:8
**Teva** [1] - 18:10
**text** [1] - 44:5
**THE** [215] - 1:4, 4:4, 4:14, 4:18, 5:3, 13:1, 18:16, 19:5, 19:8, 19:20, 19:24, 20:15, 20:20, 21:1, 21:5, 22:1, 22:4, 22:7, 22:10, 22:20, 28:21, 28:23, 29:24, 30:6, 31:4, 31:8, 31:12, 31:22, 32:5, 32:9, 32:16, 33:4, 33:19, 33:24, 34:2, 38:12, 38:19, 38:24, 39:4, 39:8, 39:11, 39:22, 40:3, 48:6, 48:17, 48:21, 48:22, 48:25, 49:2, 49:6, 49:15, 49:19, 49:21, 50:2, 50:4, 50:9, 50:11, 50:12, 50:14, 50:19,

50:25, 51:7, 51:11, 51:15, 53:8, 56:10, 56:15, 56:18, 56:23, 57:1, 57:2, 57:3, 57:5, 58:19, 58:21, 59:13, 59:16, 59:24, 60:1, 60:3, 60:6, 60:13, 60:14, 61:4, 61:7, 61:8, 61:10, 61:21, 61:23, 62:1, 62:3, 66:6, 66:9, 66:24, 66:25, 67:13, 67:25, 68:20, 68:23, 69:1, 69:3, 69:4, 69:5, 69:13, 72:10, 72:11, 73:14, 75:11, 75:23, 76:9, 76:12, 76:14, 80:3, 80:4, 80:8, 80:13, 80:19, 80:21, 80:22, 81:1, 81:2, 81:3, 81:4, 81:8, 81:10, 81:15, 81:16, 81:17, 81:23, 82:1, 82:2, 82:4, 82:10, 82:13, 82:17, 82:19, 82:24, 83:1, 83:4, 88:15, 88:18, 88:20, 88:24, 89:4, 89:5, 89:10, 89:11, 89:15, 89:17, 89:18, 89:19, 89:22, 90:2, 90:3, 90:4, 90:5, 90:7, 90:8, 90:9, 90:11, 90:20, 90:22, 90:24, 90:25, 92:8, 92:11, 93:5, 93:6, 93:9, 93:15, 93:19, 93:20, 93:21, 93:22, 93:24, 94:1, 94:2, 94:4, 94:25, 95:4, 95:5, 95:9, 95:12, 95:14, 95:17, 100:8, 100:10, 100:15, 101:5, 101:9, 101:11, 101:12, 101:19, 102:20, 103:3, 103:17, 103:20, 103:23, 104:3, 104:13, 106:1, 106:2, 108:8, 108:13, 108:15, 110:16, 110:18, 110:19, 111:14, 111:15, 112:14, 112:20, 112:23, 113:2, 113:10
**theme** [5] - 13:13, 13:16, 14:3, 14:21, 15:17
**themselves** [3] - 4:8, 43:19, 47:5

**theory** [1] - 78:23
**Therasense** [1] - 17:21
**thereafter** [1] - 37:1
**thereby** [1] - 35:8
**therefore** [8] - 4:22, 7:24, 14:4, 14:20, 23:10, 58:12, 104:21, 104:25
**they've** [1] - 47:16
**thinking** [2] - 109:17, 109:19
**third** [10] - 24:4, 54:10, 70:18, 71:8, 72:21, 78:2, 93:17, 93:19, 97:23
**thirty** [1] - 110:1
**three** [13] - 9:12, 10:16, 36:22, 36:23, 51:16, 52:14, 52:23, 53:12, 54:6, 73:16, 84:14, 106:8, 106:9
**three-ring** [3] - 51:16, 52:23, 53:12
**threw** [1] - 31:12
**throughout** [2] - 12:6, 13:25
**thumb** [4] - 60:20, 68:11, 80:14, 81:12
**tight** [1] - 59:20
**tightly** [4] - 56:9, 56:24, 58:23, 61:2
**timeline** [2] - 26:5, 40:16
**timing** [2] - 81:5, 113:5
**tip** [1] - 68:10
**Title** [1] - 114:11
**today** [7] - 12:14, 12:15, 42:3, 53:21, 81:14, 83:17, 112:9
**together** [12] - 56:7, 57:11, 58:1, 58:19, 58:24, 59:6, 59:14, 59:22, 61:2, 74:24, 79:3, 80:5
**took** [5] - 9:3, 11:9, 27:11, 46:5, 80:12
**tool** [1] - 85:15
**top** [1] - 98:17
**totally** [2] - 41:22, 53:9
**touch** [2] - 5:5, 69:7
**touched** [2] - 15:23, 69:15
**Tracey** [2] - 4:16, 83:10
**TRACEY** [1] - 2:11
**track** [1] - 95:18
**trademark** [1] - 26:3
**TRANSCRIPT** [1] -

1:17
**transcript** [3] - 56:13, 114:12, 114:13
**translation** [1] - 53:17
**treat** [1] - 71:8
**treated** [1] - 108:16
**treatment** [5] - 25:21, 35:6, 65:19
**TRIAL** [1] - 1:17
**trial** [2] - 25:2
**tribunals** [1] - 31:25
**tried** [3] - 9:25, 34:5
**trouble** [1] - 66:6
**true** [10] - 8:21, 19:7, 24:19, 31:20, 92:23, 93:4, 104:6, 104:16, 105:9, 114:11
**try** [6] - 10:18, 28:23, 38:22, 75:25, 95:17, 95:18
**trying** [6] - 18:24, 33:1, 33:24, 34:7, 36:15, 95:11
**turn** [13] - 14:5, 14:22, 53:12, 54:13, 63:18, 64:17, 70:19, 73:19, 75:1, 75:4, 98:14, 105:25, 111:8
**turns** [1] - 74:2
**tutorial** [2] - 20:17, 37:14
**twice** [2] - 26:22, 45:21
**two** [34] - 7:14, 9:12, 10:11, 10:12, 12:16, 20:6, 20:8, 22:18, 23:10, 23:21, 27:3, 37:22, 38:6, 43:4, 43:5, 45:2, 52:6, 55:2, 56:6, 57:16, 58:5, 58:19, 59:9, 59:13, 62:8, 63:5, 63:15, 69:19, 74:24, 75:21, 101:10, 105:2, 108:16
**TX** [1] - 2:14
**tying** [1] - 101:1
**typical** [4] - 9:2, 18:18, 68:5, 68:8
**typically** [5] - 88:25, 89:1, 89:12, 90:9, 107:12

**U**

**U.S** [6] - 14:15, 26:3, 40:13, 40:23, 42:9, 44:2
**ultimately** [2] - 11:17, 11:19

**unchanged** [1] - 8:16
**undefined** [1] - 45:13
**undeniable** [1] - 105:2
**under** [5] - 13:21, 77:8, 82:19, 83:2, 102:7
**undergraduate** [2] - 52:7, 69:7
**underline** [1] - 96:23
**understood** [1] - 76:8
**undue** [1] - 94:2
**unenforceable** [1] - 43:13
**unique** [1] - 8:11
**unit** [2] - 88:25
**UNITED** [2] - 1:1, 1:5
**United** [4] - 42:12, 114:9, 114:11, 114:15
**units** [2] - 86:5, 86:6
**universal** [1] - 80:23
**universally** [1] - 80:9
**university** [2] - 51:25, 52:1
**University** [1] - 52:4
**unless** [1] - 19:21
**unsupported** [1] - 48:2
**untrue** [2] - 6:4, 46:22
**up** [46] - 5:21, 7:17, 9:5, 9:19, 10:18, 11:17, 13:6, 13:20, 15:4, 15:18, 15:19, 15:22, 17:5, 18:21, 20:3, 20:8, 21:11, 26:12, 28:8, 32:18, 33:15, 37:10, 37:19, 40:9, 51:16, 61:1, 71:17, 72:17, 73:8, 77:24, 80:1, 80:10, 81:3, 81:12, 82:7, 83:2, 88:3, 95:3, 96:4, 98:2, 100:15, 103:5, 104:15, 108:24, 110:6, 112:24
**uronic** [1] - 8:9
**usable** [1] - 33:22
**uses** [3] - 11:6, 11:11
**USPTO** [3] - 26:2, 31:13, 42:12
**utilizes** [1] - 8:8

**V**

**valid** [4] - 33:9, 33:20, 45:17, 45:20
**value** [1] - 110:11
**variability** [2] - 25:22, 93:22

**variable** [1] - 25:19
**variables** [2] - 10:16, 10:18
**varied** [2] - 8:21, 81:6
**various** [3] - 40:17, 44:23, 52:14
**verbatim** [1] - 16:10
**version** [2] - 9:2, 53:15
**vice** [1] - 28:6
**vice-president** [1] - 28:6
**view** [5] - 27:1, 29:1, 30:14, 111:25, 112:4
**viewed** [1] - 30:10
**vitae** [1] - 52:24
**vitro** [1] - 22:14
**vivo** [2] - 22:14, 22:15
**voyage** [1] - 38:3
**VP** [1] - 46:5
**vs** [2] - 1:10, 17:20

**W**

**wait** [2] - 88:18, 95:3
**waiver** [1] - 51:3
**waiving** [1] - 18:4
**walk** [1] - 20:1
**wants** [3] - 16:15, 19:21, 45:15
**WASHINGTON** [1] - 2:24
**water** [35] - 36:6, 55:16, 55:17, 55:19, 55:24, 56:4, 56:6, 57:11, 57:17, 58:1, 58:24, 59:2, 59:12, 61:2, 61:8, 61:11, 61:13, 61:15, 61:20, 62:2, 65:20, 65:21, 66:1, 66:4, 69:18, 69:22, 71:12, 72:1, 72:8, 72:9, 85:23
**wavelength** [1] - 94:7
**ways** [4] - 62:8, 74:15, 74:19, 74:23
**weaker** [2] - 68:23
**website** [1] - 46:10
**week** [6] - 46:19, 84:16, 84:17, 84:23, 84:24
**weeks** [2] - 75:7, 75:21
**weigh** [2] - 58:17, 73:13
**weighing** [2] - 86:10, 86:11
**weighs** [5] - 72:19, 73:2, 86:5, 86:6, 86:19

132

**weight** [73] - 7:9, 7:12, 7:15, 7:22, 9:23, 11:22, 12:17, 12:20, 14:9, 21:3, 45:2, 46:24, 47:2, 54:1, 54:3, 54:5, 54:12, 55:8, 71:5, 71:19, 72:15, 85:9, 86:3, 86:5, 86:6, 86:7, 86:24, 87:2, 87:4, 87:8, 87:11, 87:12, 87:18, 87:20, 87:21, 87:25, 88:2, 88:6, 88:12, 88:24, 88:25, 89:2, 89:8, 89:9, 89:11, 89:19, 90:10, 91:11, 91:15, 91:18, 92:4, 92:7, 93:11, 94:18, 94:20, 95:22, 95:24, 97:8, 97:10, 97:11, 97:13, 97:19, 98:10, 98:11, 99:14, 99:22, 100:18, 104:10, 106:5, 110:21, 110:24, 111:4, 112:2
**weight-starting** [1] - 87:18
**weights** [1] - 87:22
**WEIR** [44] - 2:2, 3:6, 4:10, 4:24, 5:7, 13:2, 19:19, 20:19, 49:4, 50:6, 50:10, 50:21, 51:5, 51:9, 51:16, 51:22, 53:6, 53:11, 58:7, 62:4, 63:2, 67:3, 68:4, 69:14, 70:13, 73:15, 75:12, 75:15, 76:8, 76:11, 76:17, 82:3, 82:14, 82:18, 88:14, 94:22, 95:7, 95:16, 102:12, 102:21, 108:11, 108:14, 112:22, 113:9
**Weir** [15] - 4:10, 4:22, 5:6, 19:8, 20:18, 48:8, 49:3, 50:5, 50:19, 75:11, 76:7, 95:2, 95:6, 108:8, 112:21
**Weir's** [1] - 104:5
**well-known** [1] - 25:19
**wet** [1] - 62:14
**whereas** [1] - 45:13
**whisper** [1] - 42:18
**whisper-down-the-lane** [1] - 42:18
**whole** [2] - 8:1, 103:5
**WILLIAM** [1] - 2:9

**wish** [2] - 19:10, 82:20
**WITNESS** [54] - 50:14, 56:15, 56:23, 57:2, 57:5, 58:21, 59:16, 60:1, 60:6, 60:14, 61:7, 61:10, 61:23, 62:3, 66:9, 66:25, 67:25, 68:23, 69:3, 69:5, 72:11, 76:12, 80:4, 80:13, 80:21, 81:1, 81:3, 81:8, 81:15, 81:17, 82:1, 88:24, 89:5, 89:11, 89:17, 89:19, 90:2, 90:4, 90:7, 90:9, 90:24, 93:5, 93:9, 93:19, 93:21, 93:24, 94:2, 95:4, 100:15, 101:9, 101:12, 108:15, 110:19, 111:15
**witness** [19] - 16:1, 16:5, 20:16, 31:16, 50:7, 51:13, 82:15, 82:16, 83:16, 83:21, 84:7, 91:4, 95:1, 103:6, 105:17, 105:22, 108:9
**witness's** [1] - 104:9
**WITNESSES** [2] - 3:3, 3:4
**witnesses** [10] - 24:11, 42:17, 49:12, 49:13, 49:24, 49:25, 50:16, 50:24, 50:25, 51:5
**wondering** [1] - 88:3
**word** [2] - 90:12, 107:10
**words** [4] - 29:25, 71:9, 71:17, 79:14
**worry** [1] - 113:7
**wrapped** [1] - 30:9
**wrapper** [1] - 27:15
**writing** [5] - 29:8, 31:5, 48:3, 77:8, 84:8
**written** [3] - 103:3, 103:4, 110:20
**wrote** [1] - 41:3

# Y

**Yang** [1] - 4:17
**YANG** [1] - 2:10
**year** [3] - 41:3, 69:7, 69:8
**years** [6] - 9:13, 12:8, 52:15, 52:20, 83:21, 110:4

**yellow** [4] - 39:2, 77:12, 77:13, 78:7
**yield** [2] - 9:9, 30:15
**yourself** [1] - 49:8

# Z

**Zeng** [5] - 24:14, 32:23, 42:22, 43:23, 47:11
**Zhang** [15] - 17:13, 17:14, 21:22, 22:11, 23:7, 24:5, 34:13, 40:15, 41:17, 44:7, 46:12, 47:15, 48:3, 51:9
**Zhang's** [6] - 24:9, 24:15, 42:16, 42:17, 44:12, 44:22