JAN P. WEIR, Cal. Bar No. 106652
  jan.weir@klgates.com
JOSEPH J. MELLEMA, Cal. Bar No. 248118
  joseph.mellema@klgates.com
TAYLOR C. FOSS, Cal. Bar No. 253486
  taylor.foss@klgates.com
JENNIFER A. MAURI, Cal. Bar No. 276522
  jennifer.mauri@klgates.com
JAMES W. MATTHEWS, Mass. Bar No. 56050
  james.matthews@klgates.com
KATY E. KOSKI, Mass. Bar No. 650613
  katy.koski@klgates.com
JASON L. DRORI, Mass. Bar No. 665865
  jason.drori@klgates.com

K&L GATES LLP
1 Park Place
Twelfth Floor
Irvine, CA  92614
Telephone: (949) 253-0900
Fax: (949) 623-4499

Attorneys for Relator
AMPHASTAR PHARMACEUTICALS, INC.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| The UNITED STATES, the DISTRICT OF COLUMBIA, the states of CALIFORNIA, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MASSACHUSETTS, MICHIGAN, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WISCONSIN, *ex rel.* AMPHASTAR PHARMACEUTICALS, INC.<br><br>        Plaintiffs/Relator<br><br>        vs.<br><br>AVENTIS PHARMA S.A., AVENTIS PHARMACEUTICALS, INC., SANOFI-AVENTIS S.A., and DOES 1-10<br><br>        Defendants. | No. EDCV 09-00023 MJG (OPx)<br><br>Judge:  Honorable Marvin J. Garbis<br><br>**RELATOR AMPHASTAR PHARMACEUTICALS, INC.'S POST-EVIDENTIARY HEARING BRIEF**<br><br>**[PUBLIC VERSION]**<br><br>**FILED UNDER SEAL**<br><br>**Hearing:**<br>Date:  October 10, 2014<br>Time:  10:00 AM<br>Place:  Courtroom 5C<br>        United States Courthouse<br>        101 W. Lombard Street<br>        Baltimore, MD |

RELATOR'S POST-EVIDENTIARY HEARING BRIEF - FILED UNDER SEAL

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................. 1

II.   THE ESTABLISHED FACTS ............................................................................. 3

A.    As Part of Amphastar's Preparations to Enter the Enoxaparin Market, It Began Conducting Experiments on Enoxaparin ............................. 3

1.    The Prior Art EP '144 Patent Discloses Multiple Examples of LMWH Synthesis ............................................................. 4

2.    Amphastar's Enoxaparin Synthesis Experiments ...................... 7

3.    Amphastar's Experiments Further Showed That Enoxaparin Is Not Sensitive to "Specified" Reaction Conditions, As Aventis Falsely Claimed to the FDA ....................................... 9

4.    Amphastar's *In Vivo* Rat Study Further Confirms and Corroborates That Amphastar Is an Original Source ............... 10

5.    Amphastar's Discovery of Aventis's Fraud Formed the Basis of the ANDA Litigation ................................................. 12

III.  APPLICABLE LEGAL STANDARDS ............................................................ 14

A.    The Requirement of Direct and Independent Knowledge ................. 14

IV.   AMPHASTAR IS AN ORIGINAL SOURCE .................................................. 16

A.    Amphastar's Experiments Constitute Sufficient Direct and Independent Knowledge of the Falsity Upon Which Amphastar's Allegations are Based ...................................................... 16

1.    Amphastar's EP '144 Patent Experiments Yielded Enoxaparin .................................................................... 17

2.    Aventis's Own Experiments Further Confirm That Amphastar Reproduced the LMWHs that Were the Basis for the False Half-Life Comparison in Example 6 .................. 19

3.    Amphastar ANDA Certification and ANDA Litigation Pleadings Consistently Relate to Amphastar's Experiments .... 21

B.    Amphastar Played a Role in Any Alleged Public Disclosure ............ 22

V.    AVENTIS'S SELF-CONTRADICTING ARGUMENTS AND RANK SPECULATION DO NOT COMPEL A CONTRARY CONCLUSION .... 24

A.    The EP '144 Patent Is Admitted Prior Art ........................................ 25

1.    Aventis Previously Admitted that the EP '144 Patent is Prior Art .......................................................................... 25

RELATOR'S POST-EVIDENTIARY HEARING BRIEF - FILED UNDER SEAL

       2.      Aventis Misrepresented the EPO Decision ............................ 26

       3.      Aventis Now Contradicts the Arguments It Made to the EPO ...................................................................................... 28

    B.    Aventis's Arguments Regarding the Teachings of the EP '144 Patent Lack Merit ...................................................................................... 29

       1.      The EP '144 Patent Discloses Pre-Heating ............................ 29

       2.      There is No Requirement for the Molecular Weight of Starting Heparin Exists in the EP '144 Patent ...................................... 31

       3.      Pre-Synthesis Purification Does Not Affect the End Result .... 33

       4.      Post-Synthesis Purification Does Not Affect the End Result .. 34

       5.      Measuring the Degree of Esterification is a Common Scientific Practice ................................................................................ 35

    C.    Aventis's Argument That Amphastar "Admitted It Was Not an Original Source" Is Unfounded and Speculative ................................. 35

    D.    Aventis's Argument Regarding Teva's Alleged Discovery Are Unsupported ...................................................................................... 36

VI.    CONCLUSION .......................................................................................... 37

RELATOR'S POST-EVIDENTIARY HEARING BRIEF - FILED UNDER SEAL

TABLE OF AUTHORITIES

Page(s)

**Cases**

*United States ex rel. Aflatooni v. Kitsap Physicians Servs.*,
  163 F.3d 516 (9th Cir. 1998) .................................................................. 14, 15

*Aventis Pharma S.A. v. Amphastar Pharm., Inc.*,
  390 F. Supp. 2d 936 (C.D. Cal. 2005) ......................................................... 3

*Aventis Pharma S.A. v. Amphastar Pharm., Inc.*,
  525 F.3d. 1334 (Fed. Cir. 2008) ............................................................... 14

*Aventis Pharma S.A. v. Amphastar Pharms., Inc.*,
  176 Fed. Appx. 117 (Fed. Cir. 2006) ........................................................ 13

*Aventis Pharma S.A. v. Amphastar Pharms., Inc.*,
  475 F. Supp. 2d 970 (C.D. Cal. 2007) .................................................. 13, 19

*Daubert v. Merrell Dow Pharms.*,
  509 U.S. 579 (1993) ................................................................................ 12

*United States ex rel. Devlin v. California*,
  84 F.3d 358 (9th Cir. 1996) ...................................................................... 15

*Gonzalez v. Planned Parenthood of L.A.*,
  392 Fed. Appx. 524 (9th Cir. 2010) .......................................................... 15

*(Id.) Commil USA, LLC v. Cisco Systems, Inc.*,
  720 F. 3d 1361 (Fed. Cir. 2013) .........................................................*passim*

*Meyer v. Horizon Health Corp.*,
  565 F.3d 1195 (9th Cir. 2009) .................................................................. 15

*Peters v. Active Mfg.*,
  129 U.S. 530 (1889) ................................................................................ 22

*Rasmusson v. SmithKline Beecham Corp.*,
  413 F.3d 1318 (Fed. Cir. 2005) ................................................................ 28

*United States ex rel. Springfield Terminal Railway v. Quinn*,
  14 F.3d 645 (D.C. Cir. 1994) .............................................................. 14, 25

*Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*,
   602 F.3d 1325 (Fed. Cir. 2010) ........................................................................28

**Statutes**

21 U.S.C. § 355(j)(2)(B)(ii). (Exh. 28.) .................................................... 12, 21

31 U.S.C. § 3729(b) ..............................................................................22, 35

31 U.S.C. § 3730(e)(4)(b) ..................................................................3, 14, 16

31 U.S.C. § 3731(d) ....................................................................................14

**Other Authorities**

FED. R. CIV. P. 37(b)(2)(A)(ii) .....................................................................29

FED. R. CIV. P. 37(c)(1)(C) & 37(b)(2)(A)(i)-(vi) .......................................25

Rule 26(f) ....................................................................................................36

## I.   INTRODUCTION

This False Claims Act case arises from false representations made by Defendants ("Aventis") to the United States Patent and Trademark Office ("PTO") and the Food and Drug Administration ("FDA").  In particular, Aventis fraudulently obtained United States Patent No. 5,389,618 (the "'618 patent") by making affirmative misrepresentations to the PTO regarding allegedly superior half-life properties of the invention claimed in the '618 patent.  (Exh. 37 at 9:33-66.)  Further, Aventis falsely reported to the FDA that the manufacturing process for enoxaparin was sensitive to "specified" reaction conditions such as time, temperature, and concentration.  (Exh. 8, pp. 0011-12.)  Amphastar discovered these frauds through its direct and independent research.

Amphastar presented live testimony, corroborated by contemporaneous documentation, that between December 2001 and March 2003 Amphastar conducted numerous experiments reproducing a low molecular weight heparin ("LMWH") according to the teachings of the prior art European Patent No. 40,144 (the "EP '144 patent").  Aventis fraudulently used Example 6 to obtain allowance of the '618 patent's claims based upon the false contention that  compositions falling within the scope of the '618 patent's claims had superior half-life properties over the LMWH "prepared according to the process described" the EP '144 patent.  (Exh. 37 at 9:55-58; Dkt. No. 254-1, Undisputed Fact Nos. 11, 12, 15-20.)[1] Amphastar's experiments however established that one can make a LMWH as claimed in Claim 1 of the '618 patent by following the process disclosed in the EP '144 patent's Example  9 (namely, the esterification and depolymerization steps of Examples 2 and 3, respectively).  This resulted in a LMWH having the molecular weight properties of Claim 1 of the '618 patent.  In other words, from its laboratory

---

[1]        The reference to Dkt. No. 254-1 and to "Undisputed Fact" is to the list of undisputed facts found by the ANDA courts listed in Relator's Memorandum In Support Of Motion For Issue Preclusion Relating To Facts Established During The ANDA Litigation.  (Dkt. No. 254-1.)  The number indicates the corresponding number of the related fact listed in Relator's memorandum.  The Court ruled that it would deem such facts as established for purposes of the original source inquiry.

RELATOR'S POST-EVIDENTIARY HEARING BRIEF - FILED UNDER SEAL

1   experiments alone, Amphastar concluded that the half-life study reported in

2   Example 6 of the '618 patent could not be true.  Ultimately in the ANDA litigation,

3   the court found Aventis's '618 patent unenforceable due to fraud on the PTO,

4   confirming Amphastar's conclusion.

5       Other evidence following Amphastar's lab experiments only further

6   supported and corroborated this conclusion.  Amphastar established at the hearing

7   (as corroborated by Aventis's interrogatory responses from the original ANDA

8   lawsuit),  specific details of Aventis's synthesis of the particular prior art LMWH

9   that was "prepared according to the process described in European Patent EP

10  40,144" and which was used in the false half-life comparison in Example 6

11  subparagraph (3) of the '618 patent.  It was this specific LMWH that Aventis

12  synthesized that formed the bases of Aventis's misrepresentations to the PTO.  The

13  evidence summarized in Table I below demonstrates that the procedure Amphastar

14  used in its experiments was essentially the same as the procedure used by Aventis

15  itself to synthesize the compound, which the '618 patent described as being

16  "prepared according to the process described in European Patent EP 40,144."

17  (Exh. 37 at 9:55-56.)  This evidence further confirms that Amphastar had

18  uncovered Aventis's fraud on the PTO.

19  **Table 1:  Comparison of Amphastar's Method to EP '144 Method and
    Aventis's Method For Synthesizing the LMWH of Example 6 Paragraph (3)**

20

| Source | Esterification Step | | | | | Depolymerization Step | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Solvent | Chloride | Ratio: benzethonium heparinate to benzyl chloride | Temp. (C) | Time (hrs.) | Base | Ratio: ester to base | Temp. (C) | Time (hrs.) |
| Mardiguian EP 40144 patent Examples 2/3 and 9 | DMF | Benzyl chloride | 1 : 1 | RT | 60 | NaOH | 10 | 60 | 2 |
| Amphastar 031703 EX.2-3 | DMF | Benzyl chloride | 1 : 1 | RT | 60 | NaOH | 10 | 60 | 2 |
| The product in Example 6 of the '618 patent prepared according to the process described in EP 40,144 | | | | | | | | | |

21

22

23

24

25

26  Accordingly, Amphastar's experiments reconstructed the conditions in

27  Example 6 of the '618 patent as closely as possible without having Aventis's actual

28

-2-

1   data.  From those results, Amphastar concluded, based upon its experiments, that

2   the half-life study reported in Example 6 of the '618 patent was false.  A

3   subsequent *in vivo* rat study conducted by Amphastar further confirmed and

4   corroborated that Amphastar's enoxaparin had the same (*i.e.*, equivalent)

5   pharmacokinetic characteristics, including no difference in half-life when

6   compared to Lovenox®, Aventis's brand-name enoxaparin covered by the '618

7   patent.  Amphastar's experiments also established that the synthesis of enoxaparin

8   is not sensitive to "specified" reaction conditions, including time, temperature, and

9   base concentration, contrary to Aventis's representations to the FDA.  Thus,

10  through its experiments, Amphastar has established that it had sufficient direct and

11  independent knowledge to qualify it as an "original source" under Section

12  3730(e)(4)(B).

## II.   THE ESTABLISHED FACTS

### A.   As Part of Amphastar's Preparations to Enter the Enoxaparin Market, It Began Conducting Experiments on Enoxaparin

In 2000, Amphastar began preparations to develop a generic version of

enoxaparin in the United States.  (Tr. 7/8/14 (PM) at 79:7-10 (Zhang).)  Amphastar

reviewed the Orange Book entry for enoxaparin.[2]  (*Id*. at 79:13-80:8; *see* Exh.

111.)  At the time, the Orange Book listed the Aventis-owned '618 patent as

covering enoxaparin.  (*Id*.)  Dr. Zhang reviewed the '618 patent, noting that the

'618 patent disclosed the EP '144 patent as prior art.  (*Id*.)  Dr. Zhang then

acquired a copy of the EP '144 patent— a French document[3]—and its English

---

[2]   The Orange Book is the colloquial name for *Approved Drug Products with Therapeutic Equivalence Evaluations*, a publication from the FDA which lists, by drug, any patents that the manufacturer contends cover the drug.  (Exh. 111.)

[3]   On May 8, 1981, Aventis filed European Patent Application No. 81/400728.2 (the "European Patent Application") based upon French Patent Application No. 80/10791 (the "French '791 application").  *Aventis Pharma S.A. v. Amphastar Pharm., Inc.*, 390 F. Supp. 2d 936, 939 (C.D. Cal. 2005) ("*Timlin Order*").  The European Patent Application was subsequently published on November 18, 1981 as the EP '144 patent.  *Id*.

-3-

translation found in Irish Patent 51283 (the "Irish Patent").[4]  (Tr. 7/8/14 (PM) at 84:21-85:13; *see* Exh. 6.)[5]  Dr. Zhang concluded that Amphastar might be able to manufacture a generic enoxaparin following the teachings of the prior art EP '144 patent.  (Tr. 7/8/14 (PM) at 84:21-85:13.)  Dr. Zhang's rational for this course was to attempt to replicate a prior art reference for Amphastar's synthesis of enoxaparin, given that a product produced in this manner could not be found to infringe the '618 patent.  Dr. Zhang assigned the project to Jeffery Ding who, in turn, assigned the synthesis experiments to Robert Fei.  (Tr. 7/8/14 (PM) at 85:22-86:13; Tr. 7/7/14 (PM) at 22:13-21 (Fei).)  From 2000 to 2003, Fei conducted a number of experiments following the teachings of the EP '144 patent, some of which resulted in a LMWH that not only fell within the molecular weight properties claimed in the '618 patent, ███████████████████████████████████ ███████████████████████████████████████████████.  (*See* Tr. 7/7/14 (PM) at 23:24-24:6, 25:1-18 (Fei).)  *See infra* Table III.

### 1.    The Prior Art EP '144 Patent Discloses Multiple Examples of LMWH Synthesis

The EP '144 patent discloses LMWH synthesis.  (Exh. 6, p. 2:1-6:  "The present invention relates to mixtures of sulphated polysaccharides of weight mean molecular weight less than that of heparin . . . ."; *see also* Tr. 7/7/14 (AM) at 53:23-54:3 (Atwood).)  According to the EP '144 patent's disclosure, the LMWHs taught by the EP '144 patent have the following advantages over heparin:

> The mixtures of sulphated polysaccharides according to the invention . . . can be used, as anti-coagulant and anti-thrombotic agents, for the prevention and treatment of thrombosis.  . . .  They can be advantageously substituted for heparin for such application.  In fact, when administered subcutaneously, they show a longer-lasting action than heparin, which enables the frequency of the injections to be reduced.  Further they provoke less secondary effects (hemorrhagic effects than heparin.)

---

[4]    The Irish Patent 51283—an English language version of the EP '144 patent—will also be referred to collectively with EP 41044 herein as the "EP '144 patent."

[5]    Exhibits 6 and 46 are duplicate exhibits of the Irish Patent 51283.

RELATOR'S POST-EVIDENTIARY HEARING BRIEF - FILED UNDER SEAL

(Exh. 6, p. 18:12-25.)  The process disclosed in the EP '144 patent starts with natural heparin.  (*Id.* at 14:24-28; *see* Tr. 7/7/14 (PM) at 55:7-15 (Atwood).)  The EP '144 patent states:

> The heparin esters used as starting substances in the processes according to the invention may be derived from heparin of any origin (for example bovine lung heparin, heparin from pig mucous membranes or heparin from cattle intestines).

(Exh. 6 p. 14:24-28; Tr. 7/7/14 (PM) at 64:6-16 (Atwood).)  The EP '144 patent further provides:

> The commercial heparins, which are mixtures of polysaccharides whose weight mean molecular weight is greater than 10,000 daltons and of which the spread of molecular weight is from about 4,000 to about 45,000 daltons, show the following activities in vitro . . . ."

(Exh. 6, p. 3:5-9; Tr. 7/7/14 (PM) at 5:24-6:9 (Atwood).)  The heparin is first salified by the addition of benzethonium chloride to heparin (sodium salt) in water to yield a "neutral benzethonium salt of heparin."  (Exh. 6, p. 19:11-12 & 20-21; Tr. 7/7/14 (PM) at 54:13-24, 57:14-58:6 (Atwood); Tr. 7/8/14 (PM) at 87:18-89:12 (Zhang).)  As established during the hearing, (and without any dispute), the word "neutral" in the phrase "neutral benzethonium salt of heparin" teaches to one skilled in the art that all of the sodium ions that naturally occur in heparin sodium are replaced with the benzethonium ion from benzethonium chloride.  (Tr. 7/7/14 (AM) at 54:25-55:6, 55:16-58:6 (Atwood); Tr. 7/8/14 (PM) at 87:18-89:12 (Zhang).)  Further, it is undisputed that one skilled in the art could calculate the amount of benzethonium chloride that would be necessary to replace all of the sodium ions in a given amount of heparin sodium.  (Tr. 7/7/14 (AM) at 58:8-62:2 (Atwood); Tr. 7/8/14 (PM) at 87:18-89:12 (Zhang).)  Amphastar followed the teaching in the EP '144 patent of a "neutral benzethonium salt of heparin" to calculate the amounts of benzethonium chloride to add to the heparin sodium in the salification step.  (Tr. 7/7/14 (PM) at 25:3-27:7, 27:22-28:3 (Fei); Tr. 7/8/14 (PM) at 87:18-89:12 (Zhang).)

RELATOR'S POST-EVIDENTIARY HEARING BRIEF - FILED UNDER SEAL

1    The resulting benzethonium heparinate is esterified using benzyl chloride in
2    the presence of an "inert" solvent such as dimethylformamide or methylene
3    chloride to yield the benzyl ester of heparin.  (Exh. 6, p. 14:29-15:11; Tr. 7/7/14
4    (AM) at 63:18-64:5 (Atwood).)  The EP '144 patent further provides that the
5    esterification reaction can take place "at a temperature of from -20°C to +60°C."
6    (Exh. 6, p. 15:10-11; Tr. 7/7/14 (AM) at 64:17-65:12 (Atwood).)

7    The benzyl ester of heparin is then depolymerized by the addition of a water-
8    soluble base such as sodium hydroxide in the presence of water.  (Exh. 6, p. 12:1-
9    28; Tr. 7/7/14 (AM) at 70:18-71:20 (Atwood).)  The EP '144 patent further
10   provides that the depolymerization step can take place "at a temperature of 20°C to
11   80°C."  (Exh. 6, p. 12:21.)  The preferred molar base concentrations range between
12   0.1 and 0.6.  (Exh. 6, p. 12:22-23; Tr. 7/7/14 (AM) at 71:21-73:13 (Atwood).)

13   The EP '144 patent concludes with 20 examples that are described as
14   follows:  "The invention is illustrated by the following **non-limiting** Examples."
15   (Exh. 6, p. 19:9-10, emphasis added; Tr. 7/7/14 (AM) at 73:16-74:10 (Atwood);
16   Tr. 7/8/14 (PM) at 89:25-90:12 (Zhang).)  The EP '144 patent's examples consist
17   of a limited number of esterification procedures interchanged with a limited
18   number of depolymerization procedures, as demonstrated by Table II below.  (Exh.
19   301; *see* Tr. 7/7/14 (AM) at 74:11-78:22 (Atwood); Tr. 7/8/14 (PM) at 90:13-91:3,
20   92:21-25 (Zhang).)

**Table II:  Comparison of Steps in Examples of EP '144 Patent**

| Example No. of IP 51283 | Saltifying Type of Salt | Esterification Reagent Name | Ratio | Solvent Name | Ratio | Reaction Control Temp, C | Time, hrs | Depolymerization Base Name | Concent. | Solvent Name | Ratio | Reaction Control Temp, C | Time, hrs | Examples w/ Mixed Processes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Exampel-2 | Neutral | Benzyl | 1 | DMF | 20 | RT | 60 | NaOH | 0.4N | Water | 25 | 20-25 | 2 | |
| Example-3 | Neutral | Benzyl | 1 | CH₂Cl₂ | 25 | RT | 24 | NaOH | 0.1N | Water | 25 | 60 | 2 | Ex-9=Ex-2+Ex-3 |
| Example-9 | Neutral | Benzyl | 1 | DMF | 20 | RT | 60 | NaOH | 0.1N | Water | 25 | 60 | 2 | |
| Exampel-1 | Neutral | 4-C-B | 1 | DMF | 20 | RT | 60 | NaOH | 0.4N | Water | 25 | 25 | 2 | |
| Example-5 | Neutral | 4-C-B | 1 | CH₂Cl₂ | 25 | RT | 24 | NaOH | 0.1N | Water | 25 | 60 | 2 | Ex-10=Ex-1+Ex-5 |
| Example-15 | Neutral | Use the ester obtained from Exampl-10 | | | | | | NaOH | 0.1N | Water | 25 | 60 | 2 | Ex-10=Ex-1+Ex-15 |
| Example-10 | Neutral | 4-C-B | 1 | DMF | 20 | RT | 60 | NaOH | 0.1N | Water | 25 | 60 | 2 | |
| Example-8 | Neutral | 4-C-B | 1 | CH₂Cl₂ | 25 | RT | 24 | Diaza | 1:0.3 | CH₂Cl₂ | 20 | 40 | 4 | Ex-5=Ex-8+Ex-10 |
| Example-10 | Neutral | 4-C-B | 1 | DMF | 20 | RT | 60 | NaOH | 0.1N | Water | 25 | 60 | 2 | Ex-5=Ex-8+Ex-10 |
| Example-15 | Neutral | Use the ester obtained from Exampl-10 | | | | | | NaOH | 0.1N | Water | 25 | 60 | 2 | Ex-5=Ex-16+Ex-10 |
| Example-16 | Neutral | 4-C-B | 1 | CH₂Cl₂ | 25 | RT | 24 | Diaza | 1:01 | Formamide | 20 | 60 | 5 | Ex-5=Ex-16+Ex-15 |
| Example-5 | Neutral | 4-C-B | 1 | CH₂Cl₂ | 25 | RT | 24 | NaOH | 0.1N | Water | 25 | 60 | 2 | |

1

2      As shown in Table II, Example 9 combines the esterification step of Example

3   2 and the depolymerization step of Example 3.  (Tr. 7/7/14 (AM) at 77:4-10

4   (Atwood).)[6]  Though Example 9 uses bovine heparin, the EP '144 patent teaches

5   "[t]he heparin esters **used as starting substances in the processes according to**

6   **the invention** may be derived from heparin of **any origin** (for example bovine

7   lung heparin, **heparin from pig mucous membranes** or heparin from cattle

8   intestines)" and thus, the patent also teaches the use of porcine heparin in the

9   process disclosed in Example 9.  (Exh. 6, p. 14:24-28, emphasis added; Tr. 7/7/14

10  (PM) at 64:6-16 (Atwood).)  Examples 2 and 3 independently also teach the use of

11  porcine heparin in the same steps used in Example 9.  (Exh. 6, p. 19:11-14.)

12          **2.      Amphastar's Enoxaparin Synthesis Experiments**

13      Between December 2001 and March 2003, Amphastar conducted numerous

14  experiments following the teachings of the EP '144 patent that resulted in a

15  LMWH that fell within the molecular weight distribution ranges provided by

16  Claim 1 of the '618 patent.  *See* Table III below.

17

18

19

20

21

22

23  ────────────

[6]      The esterification steps in Example 2 and Example 3 are very similar.  Both Examples 2
24  and 3 use the same 1-to-1 ratio of the reactants benzyl chloride and benzethonium heparinate.
    (Exh. 6 at 21:11-12 vs. 22:4-5.)  The slight difference in the amount of solvent between
25  Examples 3 and 2 has no effect on the resulting enoxaparin, as evidenced by Amphastar's
    synthesis of a LMWH falling within the molecular weight distribution ranges of the '618 patent
26  following both procedures.  (*Compare* Exh. 22, pp. 0004-6 *with* Exh. 24, pp. 0004, 0015 *and*
    Exh. 35, p. 0018, demonstrating examples using the respective esterification steps of Examples 2
27  and 3 still falling within the claimed ranges.)  Once the reactants are dissolved any additional
    solvent is not necessary.  Further, the EP '144 patent teaches that the solvents are non-reactive
    "inert" solvents, so it does not matter for synthesis purposes which is used.  (Exh. 6 at 15:7-11;
28  Tr. 7/7/14 (AM) at 65:13-66:4 (Atwood); Tr. 7/8/14 (PM) at 111:1-23 (Zhang).)  Thus, the
    esterification steps of Examples 2 and 3 are the same as a practical matter.

RELATOR'S POST-EVIDENTIARY HEARING BRIEF - FILED UNDER SEAL

**Table III:  The EP '144 Patent's Method Resulted in a LMWH Falling within the Scope of '618 Patent**

| Year | No. | Lot No. | 40,144 Ref. | Esterification conditions | | | | Depolymerization conditions | | | | Exh. | p. | Test Results | | | | Exh. |
| | | | | Solvent | Chloride | Temp. (C) | Time (hrs) | Base | Conc. (N) | Temp. (C) | Time (hrs) | | | Avg. (Mw) | <2000 | 2000-8000 | >8000 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2001 | 1 | 111501-1A | Ex. 3, 9 | CH₂Cl₂ | Benzyl | 35 | 40 | NaOH | 0.089 | 60 | 0.67 | 22 | 4, 5 | 4779 | 16.0 | 71.2 | 12.8 | 22 |
| | 2 | 111501-1B | Ex. 3, 9 | CH₂Cl₂ | Benzyl | 35 | 40 | NaOH | 0.089 | 60 | 1.25 | 22 | 4, 5 | 4799 | 15.8 | 71.4 | 12.9 | 22 |
| | 3 | 111501-1C | Ex. 3, 9 | CH₂Cl₂ | Benzyl | 35 | 40 | NaOH | 0.089 | 60 | 1 | 22 | 4, 5 | 4792 | 15.1 | 72.3 | 12.7 | 22 |
| | 4 | 121301-4&6 | Ex. 2, 3, 9 | DMF | Benzyl | 60 | 3 or 4 | NaOH | 0.211 | 60 | 1 | 22 | 21, 23 | 4552 | 16.4 | 73.3 | 10.3 | 22 |
| 2002 | 5 | 012802-C | Ex. 2, 3, 9 | DMF | Benzyl | 35 | 25 | NaOH | 0.083 | 60 | 1 | 112 | 30 | 4258 | 17.0 | 73.6 | 9.4 | 230 |
| | 6 | 012802-E | Ex. 2, 3, 9 | DMF | Benzyl | 35 | 25 | NaOH | 0.083 | 60 | 1 | 112 | 30 | 4353 | 15.8 | 74.2 | 10.0 | 230 |
| | 7 | 50-T1 031802 | Ex. 2, 3, 9 | DMF | Benzyl | 35 | 25 | NaOH | 0.083 | 60 | 1 | 112 | 36, 38, 40, 40B | 4124 | 16.5 | 76.6 | 6.9 | 230 |
| | 8 | 50-T2 031802 | Ex. 2, 3, 9 | DMF | Benzyl | 35 | 25 | NaOH | 0.083 | 60 | 1 | 112 | 36, 38, 40, 40B | 4156 | 15.1 | 78.0 | 6.9 | 230 |
| | 9 | 040402-1 | Ex. 2, 3, 9 | DMF | Benzyl | 35 | 25 | NaOH | 0.083 | 60 | 1 | 112 | 50 | 4367 | 16.0 | 71.0 | 13.0 | 230 |
| | 10 | 040402-2 | Ex. 2, 3, 9 | DMF | Benzyl | 35 | 25 | NaOH | 0.083 | 60 | 1 | 112 | 50 | 4697 | 14.4 | 73.3 | 12.3 | 230 |
| | 11 | T-503A 051502 | Ex. 2, 3, 9 | DMF | Benzyl | 35 | 25 | NaOH | 0.083 | 60 | 1 | 112 | 43, 44, 62 | 4233 | 20.5 | 69.8 | 9.6 | 230 |
| | 12 | T-503C 051502 | Ex. 2, 3, 9 | DMF | Benzyl | 35 | 25 | NaOH | 0.083 | 60 | 1 | 112 | 43, 44, 62 | 4119 | 18.9 | 71.7 | 9.3 | 230 |
| | 13 | 052002 #5 (T-50-3) | Ex. 2, 3, 9 | DMF | Benzyl | 35 | 25 | NaOH | 1 | 60 | 1 | 112 | 63, 67, 103 | 4145 | 18.5 | 73.0 | 8.5 | 26 |
| | 14 | | | | | | | | | | | | | | | | | |
| 2003 | 15 | 031703 EX.2-3 | Ex. 2, 3, 9 | DMF | Benzyl | RT | 60 | NaOH | 0.1 | 60 | 2 | 24 | 4, 15 | 4958 | 12.3 | 74.0 | 13.7 | 35 |
| | | | | | | | | | | '618 patent specification | | | | 3500-5500 | 9-20% | 60-86% | 5-20% | |

As the above table and related notebooks show, from December 2001 to March 2003, Amphastar conducted experiments following Example 9 (or the esterification step from Example 2 and the depolymerization step from Example 3) of the EP '144 patent, which consistently resulted in a LMWH falling within the molecular weight ranges claimed in Claim 1 of the '618 patent.[7][8]  (*See* Exhs. 22, 112, and 24, as referenced in Table III above.)[9]

On March 17, 2003, Amphastar conducted a further experiment using the exact reaction parameters of Example 9 or 2/3 of the EP '144 patent.  (Exh. 6 at

---

[7]    Using the reference numbers in the second column in Table III, Fei testified regarding experiments 1 through 3 at Tr. 7/7/14 (PM) at 43:3-49:8 (Fei), experiments 11 through 13 at Tr. 7/7/14 (PM) at 55:20-60:4; experiment 14 at Tr. 7/8/14 (AM) at 73:12-76:23, and experiment 15 at Tr. 7/7/14 (PM) at 60:10-68:18.

[8]    Defendants obtained testimony regarding a similar summary chart, ASTAR 05123, during their examination of Fei.  (*See* Tr. 7/8/14 (AM) at 85:5-13 (Fei).)  Amphastar produced ASTAR 05123 in the underlying ANDA litigation; the document contains the synthesis parameters and molecular weight testing results for 24 batches of enoxaparin produced by Amphastar.  (*See* ASTAR 05123.)

[9]    Also, as can be seen in Table III (and as background information), in October 2001, Amphastar followed Example 3 of the EP '144 patent and obtained a LMWH that fell within the scope of Claim 1 of the '618 patent.  However, due to toxicity concerns with dichloromethane, the solvent used in Example 3, Amphastar decided to use the "inert" solvent of Example 2, dimethylformamide, or DMF.  (Tr. 7/7/2014 (PM) at 40:21-42:12 (Fei); Tr. 7/8/14 (PM) at 109:10-110:22 (Zhang).)

-8-

21:10-22:22, 26:1-20; Tr. 7/7/14 (PM) at 67:22-24 (Fei).)  Amphastar treated a 1:1 ratio of neutral benzethonium salt of heparin with benzyl chloride in DMF at room temperature for 60 hours, as specified in Examples 9 and 2.  (Exh. 6 at 28:2-5; Tr. 7/7/2014 (PM) at 66:3-6 (Fei).)  After precipitation, Amphastar depolymerized the heparin ester in 0.1N NaOH at 60°C for two hours, as specified in Examples 9 and 3.  (Exh. 6 at 28:12-14; Tr. 7/7/2014 (PM) at 67:2-4 (Fei).)  The resulting LMWH had a molecular weight distribution that fell within the scope of Claim 1 of the '618 patent.  (Exh. 35, p. 0019; Tr. 7/8/2014 (PM) at 63:4-64:24 (Chao); *see also* No. 15 in Table III above.)

Based upon its experiments, Amphastar concluded that one can obtain a LMWH that falls within the scope of Claim 1 of the '618 patent.  (Tr. 7/9/14 (AM) at 12:24-20:4 (Zhang); *see* Exhs. 300 and 20.)  Further, since the '618 patent represented that LMWHs having the molecular weight properties of Claim 1 had superior half-lives, Amphastar correctly concluded that the half-life comparison in Example 6 of the '618 patent could not be true.  (Tr. 7/9/14 (AM) at 20:8-24:25 (Zhang), Tr. 7/9/14 (PM) at 4:7-6:5 (Zhang).)

**3.    Amphastar's Experiments Further Showed That Enoxaparin Is Not Sensitive to "Specified" Reaction Conditions, As Aventis Falsely Claimed to the FDA**

[10]

RELATOR'S POST-EVIDENTIARY HEARING BRIEF - FILED UNDER SEAL

As reflected in Table III above, Amphastar also experimented with different reaction conditions and found that enoxaparin was not sensitive to specified reaction conditions—contrary to Aventis's false representations to the FDA.  For example, as shown in Table III above, Fei used different times and temperatures for the esterification step and still, the resulting LMWH fell within the molecular weight ranges of Claim 1 of the '618 patent.  Further, on November 13-15, 2001, Fei performed the depolymerization step with varied reaction times for three (3) samples of the same batch, where—one sample was collected at 40 minutes (Batch 111501-1A), one at 75 minutes (Batch 111501-1B), and one at 120 minutes (Batch 111501-1C).  (Exh. 22, pp. 6-7.)

Fei also performed experiments testing different temperatures for the depolymerization step.  In December 2001, Fei performed experiments wherein he varied the temperature of the depolymerization step from 50˚C to 60˚C on two separate batches (Batch 121901-4 and Batch 121901-6).  (Exh. 112, p. 0020.)  The resulting LMWH still fell within the ranges claimed in the '618 patent.  In April 2002, Fei performed experiments at a decreased temperature of 58˚C, "to see the difference."  (Exh. 112, p. 0075.)  Fei prepared four samples at this temperature, and all four samples fell within the ranges claimed in the '618 patent.  (Exh. 230 at 53-54.)  On November 16-19, 2001, Fei tested the depolymerization step at 62°C, and the resulting LMWH still fell within the '618 patent's claimed ranges.  (Exh. 22, pp. 0008-9.)

### 4. Amphastar's *In Vivo* Rat Study Further Confirms and Corroborates That Amphastar Is an Original Source

In March 2004, Amphastar conducted a "Parallel *In Vivo* Profile Study of Lovenox® and Amphastar Enoxaparin Using a Sprague-Dawley Rat Model." (Exh. 9; Tr. 7/9/14 (AM) at 25:19-26:1 (Zhang).)  The study compared the enoxaparin sodium injection developed by Amphastar following the teachings of the EP '144 patent to Lovenox, the drug covered by the '618 patent (according to

-10-

1   Aventis's Orange Book listing).  (Exh. 9, p. 0005; Tr. 7/9/14 (AM) at 26:20-27:2

2   (Zhang).)

3

4

5        The study consisted of a standard pharmacokinetic bioequivalence analysis

6   in which rats were divided into two groups, injected subcutaneously with same

7   dose of either drug, and blood samples drawn at various intervals to measure the

8   amount of drug in the system via its anti-factor Xa and the anti-factor IIa activities.

9   (Exh. 9 at 7-9; Tr. 7/9/14 (AM) at 29:2-30:21 (Zhang); Tr. 7/10/14 (PM) at 52:25-

10  53:8 (Shebuski); *see* Tr. 7/10/14 (PM) at 82:2-10 (Azadi).)  Aventis's expert, Dr.

11  Shebuski, agreed that this was a standard procedure which would be used to

12  determine half-life.  (Tr. 7/10/14 (PM) at 53:9-15 (Shebuski).)  The results are

13  reproduced graphically in Figure I below.  (Exh. 9 at 67; Tr. 7/9/14 (AM) at 31:18-

14  33:14 (Zhang).)



-11-

RELATOR'S POST-EVIDENTIARY HEARING BRIEF - FILED UNDER SEAL

Amphastar also calculated half-life as part of its study.  (*See* Exh. 53 at 24.)

Amphastar's study showed that the half-life between Lovenox and Amphastar's

enoxaparin were the "very same," *i.e.*, equivalent.  (Tr. 7/9/14 (AM) at 40:20-22

(Zhang).)[11]

### 5. Amphastar's Discovery of Aventis's Fraud Formed the Basis of the ANDA Litigation

Believing that the EP '144 patent disclosed the same LMWH claimed in the

'618 patent, Amphastar filed its Abbreviated New Drug Application, seeking

approval to manufacture and sell a generic enoxaparin on March 4, 2003.  (Tr.

7/9/14 (AM) at 24:1-5:11 (Zhang).)  Along with its ANDA application, on June 19,

2003, Amphastar provided notice pursuant to 21 U.S.C. § 355(j)(2)(B)(ii).  (Exh.

28.)  Amphastar stated:

> Claims 1 to 3, 5, 7, 12 to 21, 23 24 and 27 to 32 are also anticipated by Irish Patent (IP) 51283. . . .  IP 51283 inherently discloses a heterogeneous mixture of sulfated polysaccharides having the mean average molecular weight ranges as recited in claim 1, 31 and 32. . . .  IP 51283 discloses methods of preparing low molecular weight heparin mixtures by the action of an inorganic or organic base on heparin esters resulting from the partial or total esterification of the carboxylic acid groups of heparin.
>
> ***
>
> In addition, the Product does not infringe any claim of the '618 patent.  As discussed above IP 51283 teaches the production of a low molecular weight heterogeneous mixture of heparin through the depolymerization of a benzyl ester derivative of heparin.  The process utilized by Amphastar follows the teachings of IP 51283 and therefore neither the process employed by Amphastar nor the resulting produce, process or anticipated use can infringe any claim of the '618 patent.

---

[11]     Dr. Shebuski's testimony that he would have designed the study differently is irrelevant and entitled to no weight.  Dr. Azadi noted that the weight differences in the rats are so small that it would be "virtually impossible to give an accurate . . . concentration of the drug."  (Tr. 7/10/14 (PM) at 80:1-3 (Azadi).)  Dr. Shebuski himself admitted that the weight differences in the rats would make an "extremely small" difference in the amount of drug given to the rat—a difference on the magnitude of "one-thousandth of a gram."  (Tr. 7/10/14 (PM) at 60:2-19 (Shebuski).)  Further, Dr. Shebuski did not claim that the tail clip method used by Amphastar is scientifically unacceptable; rather, he testified he would use two other methods, each of which are unacceptable by industry standards.  (Tr. 7/10/14 (PM) at 35:9-25 (Shebuski); *see* Exh. 304).  Lastly, Dr. Shebuski's testimony that he would use a different method than the USP standard method for determining Anti-Xa activity was not only contrary to the USP industry standard, but contrary to the method described in Aventis's '618 patent. (Tr. 7/10/14 (PM) at 57:13-15, 58:10-13 (Shebuski); *see* Exh. 37, p. 7:7-14.)  Dr. Shebuski's testimony was so inconsistent and contrary to industry standards that it should be given no weight.  *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 594 (1993).

RELATOR'S POST-EVIDENTIARY HEARING BRIEF - FILED UNDER SEAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(*Id*. at 3-4.)  Thus, consistent with the conclusion Amphastar drew based upon its experiments, Amphastar alleged that the claims of the '618 patent were invalid and that Amphastar's method followed the teachings of the EP '144 patent.

On August 4, 2003, Aventis sued Amphastar for allegedly infringing the '618 patent.  Amphastar answered on August 25, 2003, alleging that "Amphastar practices the teachings of prior art IP 51283 and FP 40144 in the manufacture of its enoxaparin sodium and, therefore, Amphastar's manufacture, use, sale and offer for sale of its enoxaparin sodium cannot infringe any claim of the '618 patent." (*See* Exh. 28, ¶¶ 23, 24 & 26.)  On December 15, 2003 Amphastar filed its Joint Report of Parties' Planning Meeting in the ANDA litigation.  (Exh. 12.) Consistent with the conclusions it had drawn based upon its experiments, Amphastar stated that it planned on taking discovery on whether Aventis "submitted false information [to the PTO] during that prosecution [of the '618 patent]."  (*Id*.)[12]

On May 21, 2004, Amphastar publicly filed an Amended Answer adding inequitable conduct as a defense.  (Exh. 13, p. 0005.)  On August 31, 2004, Amphastar moved for summary judgment on the grounds that the '618 patent was unenforceable due to inequitable conduct.  (Exh. 151.)  On June 15, 2005, Judge Timlin granted Amphastar's motion for summary judgment, finding the '618 patent unenforceable due to inequitable conduct.  *Timlin Order* at 952.  On April 10, 2006, the Federal Circuit affirmed Judge Timlin's finding of materiality, but remanded for live testimony on the issue of specific intent to deceive.  *Aventis Pharma S.A. v. Amphastar Pharms., Inc.,* 176 Fed. Appx. 117, 121-123 (Fed. Cir. 2006) ("*Fed. Cir. I*").  On February 8, 2007, Judge Pfaelzer issued a decision finding the '618 patent unenforceable due to inequitable conduct.  *Aventis Pharma S.A. v. Amphastar Pharms., Inc*., 475 F. Supp. 2d 970, 994 (C.D. Cal. 2007)

---

[12]     Though submitted as a joint statement, as discussed in Section IV.D below, Teva focused on the alleged failure to disclose a prior art reference.

-13-

1   ("*Pfaelzer Order*").  The Federal Circuit affirmed Judge Pfaelzer's decision on

2   May 14, 2008.  *Aventis Pharma S.A. v. Amphastar Pharm., Inc.*, 525 F.3d. 1334

3   (Fed. Cir. 2008) ("*Fed. Cir. II*").

4   **III.   APPLICABLE LEGAL STANDARDS**

5           The jurisdictional issue before the Court depends on whether Amphastar is

6   an "original source" for the FCA claims at issue.  Amphastar bears the burden of

7   establishing it is an original source by a preponderance of the evidence.  31 U.S.C.

8   § 3731(d); U*nited States ex rel. Aflatooni v. Kitsap Physicians Servs.*, 163 F.3d

9   516, 525 (9th Cir. 1998).  The FCA statute defines an original source as "an

10  individual who has direct and independent knowledge of the information on which

11  the allegations are based and has voluntarily provided the information to the

12  Government before filing an action under this section which is based on the

13  information."  31 U.S.C. § 3730(e)(4)(b).

14          This Court previously held that Amphastar provided sufficient information

15  to the governments prior to filing suit.  (Order, Dkt. No. 245 at 13.)  This Court

16  also previously held that Amphastar had a hand in the alleged public disclosures.

17  (Order, Dkt. No. 78 at 24; Order, Dkt. No. 245 at 6, n.6: "In any event, there is no

18  doubt that Amphastar 'had a hand' in the public disclosure in the instant case.").

19  During the hearing, however, Aventis re-raised the issue of whether Amphastar

20  had a hand in any alleged public disclosure; thus, this Court directed Amphastar to

21  address that issue again.  (Tr. 7/9/14 (PM) at 74:22-76:4.)

22          **A.   The Requirement of Direct and Independent Knowledge**

23          The evidentiary hearing sought to answer whether Amphastar had "direct

24  and independent knowledge" as required by Section 3730(E)(4)(B).  "Direct and

25  independent knowledge" is information observed or discovered through one's own

26  labor.  (Dkt. No. 78 at 20 (citing *United States ex rel. Devlin v. California*, 84 F.3d

27  358, 360-361 (9th Cir. 1996)).)  *See United States ex rel. Springfield Terminal*

28  *Railway v. Quinn*, 14 F.3d 645, 656-57 (D.C. Cir. 1994).  Independent knowledge

-14-

RELATOR'S POST-EVIDENTIARY HEARING BRIEF - FILED UNDER SEAL

arises when the relator had evidence on which the allegations were based before the public disclosure of any allegations.  (Dkt. No. 78 at 20 (quoting *Meyer v. Horizon Health Corp*., 565 F.3d 1195, 1202 (9th Cir. 2009) ("A relator has independent knowledge when he knows about the allegations before that information is publicly disclosed.")).)  *See United States ex rel. Aflatooni*, 163 F.3d at 525 ("The fact that the relators had evidence of the fraud prior to the public disclosure of the allegations established that their knowledge was 'independent.'") (*citing Devlin*, 84 F.3d at 361).  This Court previously held that "[t]here is no doubt that Amphastar had independent knowledge." (Dkt. No. 78 at 20.)  Since the alleged public disclosures were Amphastar's ANDA litigation filings, Amphastar necessarily had "independent knowledge." *Gonzalez v. Planned Parenthood of L.A.*, 392 Fed. Appx. 524, 526 (9th Cir. 2010) (holding plaintiffs' knowledge to be independent of disclosure in a state court complaint because plaintiff acquired information before filing complaint).

"Direct knowledge" is firsthand knowledge of the alleged fraud obtained through the Relator's own labor, unmediated by anything else.  (Dkt. No. 78 at 20.) *Meyer*, 565 F.3d at 1202 (citing *United States v. Alcan Electrical and Engineering, Inc*., 197 F.3d 1014, 1020 (9th Cir. 1999)); *see* U*nited States ex rel. Devlin,* 84 F.3d at 360-61.  Amphastar does **not** bear the burden of proving that it had direct and independent knowledge of **all** the material facts or all elements of the false claims.  (Dkt. No. 78 at 22-23 (citing *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 656-57 (D.C. Cir. 1994); *Minnesota Ass'n of Nurse Anesthetists v. Allina Health System Corp*., 276 F.3d 1032, 1050 (8th Cir. 2002) ("[T]o qualify as an original source, **a relator does not have to have personal knowledge of all elements of a cause of action**.") (emphasis added); *United States ex rel. Dhawan v. N.Y. Med. Coll*., 252 F.3d 118, 121 (2d Cir. 2001) (holding relator must be **source of "core information"** upon which the complaint is based) (emphasis added)).)

-15-

## IV.   AMPHASTAR IS AN ORIGINAL SOURCE

This Court previously addressed the issue of original source in its November 14, 2012, ruling on Aventis's motion to dismiss.  (Dkt. No. 78 at 20.)  The Court held:

> Amphastar presents a version of the pertinent facts that, if accepted, would suffice to establish that it had direct and independent knowledge sufficient to be an original source . . . . [T]he Court accepts the following version of the facts for purposes of the instant motion:
>
> Amphastar's independent research was more than simply using expertise to understand the significance of information acquired through public sources. Nor did it merely assemble existing information. Rather, Amphastar conducted scientific experiments, researched the manufacturing process, and determined that enoxaparin could be manufactured by a process different than disclosed in the Lovenox patent. Amphastar discovered that an Aventis patent example was false based on reproducing the study itself. Through these efforts, Amphastar uncovered the fraud on the PTO. Thus, Amphastar had direct, first-hand, independent knowledge of the alleged fraud and provided additional facts about the alleged fraud that were not available previously. The fact that Amphastar gained additional knowledge through the discovery process in prior civil proceedings does not preclude it being an original source of the publicly disclosed information.

(*Id*. at 21-22.)  The live testimony of the persons involved in Amphastar's experiments referenced in the Court's Order and the contemporaneous documentation of those experiments establish by more than a preponderance of the evidence that Amphastar had direct and independent knowledge of the true state of facts such that Amphastar is a proper "original source" under 31 U.S.C. § 3730(e)(4)(b).

### A.   Amphastar's Experiments Constitute Sufficient Direct and Independent Knowledge of the Falsity Upon Which Amphastar's Allegations Are Based

The evidence presented during the hearing establishes that Amphastar discovered its knowledge of the falsity of Aventis's representations to the PTO and FDA through its own labor and investigation.  Dr. Zhang testified he obtained and reviewed the '618 patent as a part of his investigation into the possibility of developing a generic enoxaparin.  (Tr. 7/8/14 (PM) at 81:2-85:9 (Zhang).)  Dr.

-16-

Zhang read the statements in the '618 patent regarding the EP '144 patent, which led him to obtain and study the English language version of the EP '144 patent, the IP 51283 patent.  (*Id.* at 84:21-85:17.)  Specifically, the '618 patent distinguished the EP '144 patent by representing that the compositions claimed in the '618 patent had superior half-life properties.

> In particular, the processes described in the prior art, and especially in EP 40,144, do not permit the production of mixtures possessing the requisite pharmacological properties for improved therapeutic applications, namely, a sufficiently long plasma half-life, a fairly high absorption rate, a high bioavailability or, alternatively, a low clearance.

(Exh. 37 at 1:54-60.)  Dr. Zhang testified that he read Example 6 of the '618 patent that pertained to the half-life study and provided in applicable part:

> This example illustrates the increase in stability, in vivo, of the mixtures of the invention, expressed by their plasma half-life. . . .
>
> > (1)   From the mixtures produced in Examples 3 and 4: 40 mg dose: in 75% of the case, the half-life was longer than 4 hours, and was even longer than 4 1/2 hours in approximately 45% of the cases;
> >
> > * * *
> >
> > (3)   When the product was prepared according to the process described in European Patent EP 40,144, the half-life was longer than 4 1/2 hours in 17% of the cases.

(Exh. 37 at 9:33-58; *see also* Tr. 7/9/14 (AM) at 19:22-24:25 (Zhang).)  Despite Aventis's affirmative representations in the '618 patent that the EP '144 patent did not disclose the same LMWHs, Dr. Zhang decided to test the representations in the '618 patent to see if one could obtain enoxaparin following the teachings of the EP '144 patent.  (Tr. 7/8/14 (PM) at 85:1-17 (Zhang).)

### 1.   Amphastar's EP '144 Patent Experiments Yielded Enoxaparin

Following the EP '144 patent, Amphastar synthesized LMWHs that fell within the molecular weight distribution ranges claimed by the '618 patent. Amphastar obtained a copy of the EP '144 patent (and its English version, namely, IP 51283.) (Tr. 7/8/14 (PM) at 85:1-9 (Zhang); Tr. 7/7/14 (PM) at 22:13-21 (Fei);

-17-

1  Dkt. No. 298 at 6, Depo Tr. 4/24/2014 at 31:23-32:8 (Ding).)  The EP '144 patent

2  teaches a synthesis process in which heparin from any source is salified, esterified

3  and depolymerized to yield a LMWH.  (Exh. 6, p. 14:24-28; Tr. 7/7/14 (AM) at

4  64:6-16 (Atwood); Exh. 6, p. 19:11-12 & 20-21; Tr. 7/7/14 (AM) at 54:4-24

5  (Atwood); Tr. 7/8/14 (PM) at 98:6-22 (Zhang); Exh. 6 at 14:29-15:11; Tr. 7/7/14

6  (AM) pp. 63:18-64:5 (Atwood); Exh. 6, p. 12:1-28; Tr. 7/7/14 (AM) at 70:18-

7  71:20 (Atwood).)  The EP '144 patent teaches that the reactions can take place

8  within certain disclosed temperature ranges.  (Exh. 6, p. 15:10-11; Tr. 7/7/14 (AM)

9  at 64:17-65:12 (Atwood); Exh. 6, p. 12:21.)  The EP '144 patent also provides

10  "non-limiting" examples which teach specific combinations of reaction conditions.

11  (Exh. 6, p. 19:9-10, emphasis added; Tr. 7/7/14 (AM) at 73:16-74:10 (Atwood);

12  Tr. 7/8/14 (PM) at 90:6-12 (Zhang).)   Example 9 of the EP '144 patent teaches an

13  esterification step using a 1:1 ratio of benzethonium heparinate to benzyl chloride

14  dissolved in an inert solvent, DMF, at room temperature, and then a

15  depolymerization step using sodium hydroxide at a concentration of 0.1 N at 60°C

16  for 2 hours.  (Exh. 6, p. 28:1-20.)  Amphastar conducted experiments following the

17  method taught in Example 9 using porcine heparin.  Table III above.  Each of these

18  experiments resulted in a LMWH that fell within the scope of Claim 1 of the '618

19  patent.  (*Id*.)

20      Based upon these experiments, Amphastar concluded that the half-life study

21  reported in Example 6 of the '618 patent could not be true.  (Tr. 7/9/14 (AM) at

22  19:22-24:25 (Zhang), Tr. 7/9/14 (PM) at 4:7-6:5 (Zhang).)  Since the fundamental

23  premise for the patentability of the '618 patent was that a composition with the

24  **specific molecular weight distribution** claimed in the patent claims **exhibited**

25  **longer half-life** and was therefore patentable, it follows that a composition—such

26  as Amphastar's enoxaparin—having the claimed molecular weight properties, must

27  have the same half-life properties.  (Exh. 37 at 1:54-60, 9:33-58; *see also* Tr.

28

-18-

7/9/14 (AM) at 19:22-24:25 (Zhang).) [13]  Therefore, Amphastar's experiments further demonstrated that the compositions taught by the EP '144 patent have the same molecular weight properties and thus, must have the same half-life. (*Compare* data summarized in Table III *with* Exh. 37 at 10:8-26.)  Thus, Dr. Zhang correctly concluded that the representations in Example 6 of the '618 patent— claiming improved half-life—could not be true.  Dr. Zhang's conclusion was ultimately proved to be correct since an examination of the studies that formed the basis for the false half-life study in Example 6 showed there was, in fact, no difference in half-life.  (Undisputed Fact Nos. 52, 61-63, 75 & 76.)

### 2. Aventis's Own Experiments Further Confirm That Amphastar Reproduced the LMWHs That Were the Basis for the False Half-Life Comparison in Example 6

Aventis's own experiments confirm that Amphastar reproduced the LMWH's that were the subject of the false half-life comparison of Example 6 of the '618 patent, further demonstrating the reliability of Amphastar's experiments and the conclusions Amphastar drew from those experiments.  Subparagraph 3 of Example 6 of the Aventis's '618 patent compares the claimed invention to a substance "made by the process described in Mardiguian 40144." (Exh. 37.)  The patent does not specifically state how those compositions were made.  (Tr. 7/9/14 (PM) at 36:1-7 (Azadi).)  Nor does subparagraph 3 identify the study from which the half-life data was obtained.  (Exh. 37 at 9:55-58.)

As part of its investigation, Amphastar served interrogatories and document production requests on Aventis during the ANDA litigation.  Amphastar's Interrogatory No. 1 sought an identification of each change to Aventis's

---

[13]     Throughout the prosecution of the '618 patent, the central question was whether the Debrie and Mardiguian LMWH products were compositionally different.  *Pfaelzer Order*, 475 F. Supp. 2d at 982.  The keystone of Aventis's strategy for overcoming the Patent Examiner's rejections was to distinguish the Debrie LMWH based on its purportedly superior pharmacokinetic properties—particularly, its longer plasma half-life.  *Id*. at 973.  Throughout the prosecution, Aventis affirmatively represented that Example 6 "clearly demonstrate[d]" a significantly longer plasma half-life for the Debrie LMWH compared to the Mardiguian LMWH. *Id*. at 974.  Further, "[d]osage was the fulcrum on which Aventis's entire case for patentability turned." *Id*. at 993.

-19-

1  enoxaparin manufacturing process from 1980 (the time of Mardiguian) to the filing

2  of the '618 patent.  After several motions to compel, Aventis finally provided the

3  requested information.  (Exh. 105.)  Amphastar also served Interrogatory No. 6,

4  which requested the identity of the manufacturing method used to manufacture a

5  given batch of enoxaparin.  (Exh. 104.)

6       The non-public *Fouquet* study (Exh. 102) is the source of the study

7  underlying subparagraph 3 of Example 6 of the '618 patent.   (Undisputed Fact

8  Nos. 44, 45, & 46.)  ████████████████████████████████████

9  ████████████████████████████████████████████

10 ███████████████████████████████████████████

11 ██████████████████████████████████████████

12 ████████████████████████████████████████████

13 ███████████████████████████████████████████

14       ███████████████████████████████

15       ███████████████████████████████

16       ███████████████████████████████

17       ███████████████████████████████

18       ███████████████████████████████

19       ████████████████████████████████████

20       ███████████████████████████████

21       ███████████████████████████████

22       ███████████████████████████████

23       ██████████████████████

24 █████████████

25       ███████████████████████████████████

26 ████████████████████████████████████████████

27 ████████████████████████████████████████████

28 ████████████████████████████████████████████

RELATOR'S POST-EVIDENTIARY HEARING BRIEF - FILED UNDER SEAL

1 ███████████████████████████████████████████████████████████

2 ███████████████████████████  ████████████████████████████████

3 ██████████████████████████          Amphastar's *in vivo* rat study

4 subsequently confirmed and corroborated Amphastar's conclusions.

### 3. Amphastar ANDA Certification and ANDA Litigation Pleadings Consistently Relate to Amphastar's Experiments

On June 19, 2003, Amphastar provided notice to Aventis pursuant to 21

U.S.C. § 355(j)(2)(B)(ii) that the '618 patent was invalid or unenforceable in view

of the EP '144 patent. (Exh. 28.) In its certification letter, Amphastar stated that

IP51283 anticipated the claims of the '618 patent. (*Id.*) Amphastar further stated

that its generic enoxaparin "product" did not infringe any claim of the '618 patent

because Amphastar's process follows the teachings of IP 51283. (*Id.*) *Commil*

*USA, LLC v. Cisco Systems, Inc.*, 720 F. 3d 1361, 1368 (Fed. Cir. 2013) ("It is

axiomatic that one cannot infringe an invalid patent.") (citing *Prima Tek II, L.L.C.*

*v. Polypap, S.A.R.L.,* 412 F.3d 1284, 1291 (Fed. Cir. 2005); *Richdel, Inc. v.*

*Sunspool Corp.*, 714 F.2d 1573, 1580 (Fed. Cir. 1983) ("The claim being invalid

---

[14] ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████ Amphastar's experiments

confirmed this. For example, Batch 111501, using dichloromethane as the solvent in the

esterification step, produced enoxaparin falling within the claimed ranges of the '618 patent. (*See*

Exh. 22, pp. 0005-7.) ███████████████████████████████████████████

████████████ Amphastar experimented with variations of the time and temperature for its

esterification step. Within batches 0605706 and 0605405, Amphastar varied the time of

esterification from 24 to 25 hours. (Exh. 24, pp. 0024-25.) All the variations of 0605706 and

0605405 fell within the claimed ranges of the '618 patent. Amphastar further varied time and

temperature by performing esterification at 60 degrees (the maximum taught by the Mardiguian

patent), varying the time in sub-batches at 1 hour, 2 hours, 2.5 hours, 3 hours, 4.5 hours, 6 hours,

7 hours, 8.25, and 26.5 hours. (Exh. 22, p. 0022, showing results for the 3 hour batch and 6 hour

batch both falling within the '618 claimed ranges). Amphastar's experiments using different

times and temperatures resulted in LMWHs that fell within the scope of Claim 1 of the '618

patent. ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

RELATOR'S POST-EVIDENTIARY HEARING BRIEF - FILED UNDER SEAL

there is nothing to be infringed.")); s*ee also Peters v. Active Mfg.*, 129 U.S. 530 (1889) ("That which infringes, if later, would anticipate, if earlier."). On August 25, 2003, Amphastar answered Aventis's patent infringement complaint raising the same allegations. (*See* Exh. 28 at ¶¶ 23, 24 & 26.) [15] Further, on December 15, 2003 Amphastar filed its Joint Report of Parties' Planning Meeting stating that it planned on taking discovery on whether Aventis "submitted false information [to the PTO] during that prosecution [of the '618 patent]." (Exh. 12.)

These allegations corroborate the fact of Amphastar's experiments and the conclusions that Amphastar drew from them. Amphastar's experiments showed that one could obtain the LMWHs claimed in the '618 patent by following the teachings of the EP '144 patent. Thus, Amphastar's experiments established that the EP '144 patent anticipated the claims of the '618 patent.

Amphastar's ANDA certification and ANDA litigation pleadings are consistent with Amphastar's experiments and its conclusions. Though Amphastar did not have evidence of Aventis's specific intent to deceive at the time, the allegation that the EP '144 patent anticipates the claims of the '618 patent is related to an inequitable conduct allegation, as it provides the material prior art element of the defense. An FCA claim does not require proof of a specific intent to deceive. 31 U.S.C. § 3729(b). Amphastar's experiments showed that one obtains the same composition claimed in the '618 patent following the teachings of the EP '144 patent and thus the claims of the '618 patent are anticipated and Aventis's representations regarding the EP '144 patent could not be correct.

**B.     Amphastar Played a Role in Any Alleged Public Disclosure**

Though Amphastar previously established this element, as confirmed by the Court, Amphastar will address this element again.

---

[15]     On August 4, 2003, Aventis sued Amphastar in this district in light of Amphastar's ANDA to manufacture and sell a generic version of the drug enoxaparin in the United States. Amphastar filed its Answer on August 25, 2003.

RELATOR'S POST-EVIDENTIARY HEARING BRIEF - FILED UNDER SEAL

On November 14, 2012, this Court issued a ruling on Aventis's motion to dismiss Amphastar's *qui tam* complaint.  (*See* Dkt. Nos. 78 & 43-1.)  Citing Aventis's contentions, the Court identified the following documents as containing the allegedly public disclosures:

> Aventis contends that the disclosures in the First Suit (in Amphastar's May 21, 2004 antitrust counterclaim, its December 31, 2008 amended counterclaim, its May 13, 2004 response to Aventis's citizen petition) and generally to other FDA submissions, public court filings, and judicial decisions predating the instant complaint were "public disclosures."

(Dkt. No. 78 at 13.)  The reference to "judicial decisions" includes the *Timlin Order* granting Amphastar's motion for summary judgment, the *Fed. Cir. I* decision affirming in part and reversing in part, and the *Pfaelzer Order* on remand.  (Dkt. No. 78 at 3; *see also* Dkt. No. 43-1 at 6.)  The Court found that there was a public disclosure based "primarily on the inequitable conduct lawsuit commencing in 2004 with a counterclaim by Amphastar against Aventis."  (Dkt. No. 78 at 36, n.18.)[16]

Each of these documents was either a pleading filed by Amphastar, or was the result of a pleading filed by Amphastar; thus, it is undeniable that Amphastar played a direct role in any alleged public disclosure.  Amphastar publicly filed its May 21, 2004 Answer and Counterclaim in the ANDA litigation.  Amphastar publicly filed its May 13, 2004 response to Aventis's citizen petition with the FDA.  Judge Timlin issued his summary judgment decision based upon a motion filed by Amphastar.  The related Federal Circuit appeal also filed its decision as a result of Amphastar's motion for summary judgment.  Further, Judge Pfaelzer issued her subsequent decision on remand from the Federal Circuit from an appeal by Amphastar arising out of a motion for summary judgment filed by Amphastar.

---

[16]    As the Court noted in its decision, Amphastar disputed that there was a sufficient public disclosure.  (Dkt. No. 78 at 14.)  Amphastar reserves its right to appeal the Court's ruling and makes the arguments herein based only upon accepting the Court's prior ruling as law of the case.

-23-

1   Thus, all of the documents that this Court's ruling held were prior public

2   disclosures either came from Amphastar or were the result of pleadings or appeals

3   filed by Amphastar.  As this Court previously concluded, Amphastar had a hand in

4   any public disclosure.  (5/12/14 Order, Dkt. No. 245; *see also* Dkt. No 78 at 24.)

5       The Court made no other findings regarding any alleged public disclosure.

6   Though Aventis vaguely has alleged there are other public disclosures, Aventis did

7   not provide any specific public disclosure of its false statements to either the PTO

8   or FDA during the evidentiary hearing, and thus, Amphastar is without the ability

9   to respond. [17]

10  **V.   AVENTIS'S SELF-CONTRADICTING ARGUMENTS AND RANK**

11       **SPECULATION DO NOT COMPEL A CONTRARY CONCLUSION**

12       As set forth above, Amphastar has met and exceeded its burden of

13  establishing subject matter jurisdiction by the preponderance of the evidence.  At

14  the hearing, Aventis surprised Amphastar with arguments and evidence not

15  previously identified in Aventis's responses to a direct Court order. [18]   Even so,

16  Aventis's surprise amounted to little more than a misreading of the EPO decision,

17  misinterpretation of the law, and repeated contradictions of itself.  Aventis cannot

18  overcome Amphastar's *prima facie* case through mistaken arguments and self-

19  contradiction.  Further, Aventis's expert testimony lacked any relevance or

20  _____

21  [17]     In its pre-evidentiary hearing brief, Aventis contended that Amphastar did not have a
    hand in an alleged public disclosure of the false statements in Example 6 of the '618 patent by
22  Aventis's alleged disclosure in its May 7, 2003 petition to re-issue the '618 patent.  (Dkt. No.
    271 at 24.)  Aventis did not specifically cite to any language which allegedly disclosed Aventis's
23  false statements.  (*Id.*)  Aventis did not address any alleged public disclosure of the false
    statements in the re-issue petition during the hearing, and thus, not only waived the argument,
24  but left Amphastar with nothing specific that it can address at this time.
    [18]     On August 9, 2013, Magistrate Judge Parada ordered Aventis, in response to
25  Amphastar's contention interrogatory and related production request, to "provide further
    responses detailing any facts, witnesses, specific discovery or testimony, specific
26  communications, documents, or other factual bases supporting their contentions that Relator is
    not an 'original source'" and to "produce any non-privileged responsive documents they identify
27  that are not in Relator's possession, custody, or control."  (Dkt. No. 138, pp. 16-17.)  Aventis did
    not say anything about the EPO decision in its many supplemental interrogatory responses.  (*See*
28  Defendants' Sixth Supplemental Objections and Responses to Relator Amphastar's First Set of
    Interrogatories to Defendants, Exh. 45, which contains the entirety of Aventis's supplemental
    interrogatory responses.)

-24-
RELATOR'S POST-EVIDENTIARY HEARING BRIEF - FILED UNDER SEAL

materiality to the issue of original source, since the issue is whether Amphastar gained direct and independent knowledge through its investigation—which the evidence conclusively established it did.  (Dkt. No. 78 at 20, *citing Devlin*, 84 F.3d 358, 360-61.)  *See United States ex rel. Springfield Terminal Railway v. Quinn*, 14 F.3d 645, 656-57 (D.C. Cir. 1994).

## A.     The EP '144 Patent Is Admitted Prior Art

Though not disclosed in its discovery responses—and though Aventis expressly refused to provide discovery on the issue[19]—Aventis contended for the first time that the EP '144 patent is not "prior art" as evidenced by a European Patent Office ("EPO") revocation.  (Tr. 7/7/14 (AM) at 33:4-17.)  Considering Aventis's failure to comply with a Court order and refusal to provide discovery to Amphastar on this issue, the court should preclude Aventis from making this argument now.  FED. R. CIV. P. 37(c)(1)(C) & 37(b)(2)(A)(i)-(vi).  Nevertheless, as detailed below, Aventis's argument is contrary to its prior admissions and the findings of the ANDA courts, misrepresents the EPO decision, and is contrary to the arguments Aventis made to the EPO.

### 1.     Aventis Previously Admitted that the EP '144 Patent Is Prior Art

Aventis has admitted in three separate circumstances that the EP '144 patent is prior art:  (1) in the '618 patent itself; (2) during the prosecution of the '618 patent; and (3) in the ANDA litigation.  As stated above, Aventis addressed the EP '144 patent in the '618 patent under the "Description of the **Prior Art**" section of the specification.  (Exh. 37 at 1:17, *emphasis added*.)  In particular, Aventis stated with respect to the EP '144 patent:

---

[19]     When Amphastar requested discovery relating to the EPO proceeding, Aventis refused to give the discovery on, among other grounds, the ground that is was irrelevant and not likely to lead to the discovery of admissible evidence. (*See* Defendants' Response to Relator Amphastar's Second Request for the Production of Documents and Things, Declaration of Joseph J. Mellema ("Mellema Decl."), Exh. 405 at 54-56) ("Defendants stand on their objections and do not agree to produce documents in response to this Request.").)

-25-

RELATOR'S POST-EVIDENTIARY HEARING BRIEF - FILED UNDER SEAL

1
2

> In particular, the process described in the **prior art**, and especially in EP 40,144, do not permit the production of mixtures possessing the requisite pharmacological properties . . . .

3

(Exh. 37 at 1:54-60, emphasis added.)  Moreover, though the Examiner repeatedly

4

rejected the claims of the '618 patent over the EP '144 patent, Aventis did not

5

argue that the EP '144 patent was not prior art.  Rather, when faced with its

6

admission that the EP '144 patent was prior art, Aventis relied on the false half-life

7

comparison.  (*See* Undisputed Fact Nos. 11-12 & 15-49.)  Aventis also did not

8

contend during the ANDA litigation that the EP '144 patent was not prior art.  (*See*

9

Undisputed Fact No. 68:  "The elements of nondisclosure and high materiality

10

have been admitted.")  Aventis is changing its position again from what it said in

11

the prosecution of the '618 patent and what it said in the ANDA litigation.

12

(*Compare* Exh. 180 (EPO Decision) dated January 13, 1989 *with* Exh. 37 ('618

13

patent) filed June 26, 1990.)

14

### 2.    Aventis Misrepresented the EPO Decision

15

During oral argument, counsel for Aventis argued that the EPO found that

16

the method disclosed in the EP '144 patent was not reproducible.  (Tr. 7/7/14 (AM)

17

at 23:23-25:  "[T]he evidence will show that doing the process described in EP

18

'144 will not reproduce the '618 composition because EP '144 is not

19

reproducible . . ."; *Id*. at 24:20-24:  "So going to the evidence on the first point,

20

that doing what was described in EP '144 will not reproduce the '618 composition

21

because it's simply not reproducible, a point on which both the European Patent

22

Office, the EPO and the PTO agree."; *Id.* at 30:19-22:  "But what our point is, is

23

it's the reason it was revoked that is important.  And that is because it's not

24

reproducible.  That has been found not just by the EPO but PTO as well.").)

25

Aventis's counsel misrepresented the EPO's decision.

26

In support of its argument, Aventis's counsel questioned Dr. Atwood

27

regarding a portion of the EPO's decision, which provides:

28

> There is no suggestion in the disputed patent that there is a <u>range</u> of heparin [*sic, should be plural* heparins] that can be used as starting

-26-

RELATOR'S POST-EVIDENTIARY HEARING BRIEF - FILED UNDER SEAL

> material.  The only heparin disclosed as producing the mixture of **Claim 1** is a specific heparin having exactly an average molecular weight= 11,400 daltons, $(\alpha)_D{}^{20} = +37°$ and for which the Codex anticoagulant activity = 128 IU/mg (within the accuracy limits of the analytical methods, of course.

(Exh. 180 at 11, ¶ 10; Tr. 7/7/14 (AM) at 14-24, bold emphasis added.)  Aventis's

counsel then misrepresented to Dr. Atwood that the reference to "Claim 1" was to

Claim 1 from the EP '144 patent.  (Tr. 7/7/14 (PM) at 7:4-14 (Atwood).)  This was

a key misrepresentation, not only because Dr. Atwood had testified that he had not

read the decision, but because it provided a false record regarding the EPO's

decision.  The reference to "Claim 1" in paragraph 10 was to an amended claim

that Aventis submitted during the opposition proceeding.  (*See* Exh. 180 at 2-4,

¶¶ 5 & 3, 6, ¶ 7; Tr. 7/7/14 (PM) at 7:15-9:15 (Atwood).)[20]

The difference between Claim 1 of the EP '144 patent and the Amended

Claim 1 being referred to by the EPO is highly material.  Claim 1 of the EP '144

patent contains a broad average molecular weight range between "2000 to 10,000

Daltons."  (Exh. 6 at 42:13; Tr. 7/7/14 (PM) at 8:22-24 (Atwood).)  Amended

Claim 1 narrowed the average molecular weight to exactly 4500 Daltons.  (Exh.

180 at 3:7; Tr. 7/7/14 (PM) at 8:5-7, 19-24 (Atwood).)  Thus, in order to overcome

the prior art, Aventis submitted narrowed claims.  (Exh. 180 at 2-4 & 6, ¶ 6: "The

Patentee requested maintaining the patent in amended form . . . .".)

The strategy of significantly narrowing the claims to a specific average

molecular weight worked for novelty purposes.  (Exh. 180 at 8 ¶ 2 ("New Claim 1

does not contravene Article 123(3) EPC because the introduction of the additional

parameters represents a limitation of protection."); Tr. 7/7/14 (PM) at 11:8-21

(Atwood).)  However, narrowing the claims introduced the issue of whether the

narrowed claims were enabled.  (Exh. 180 at 9, ¶ 4 ("Otherwise, and this is true of

the present case, the characteristics are of decisive importance for the invention,

---

[20]     Aventis specifically directed the Court to the Irish Patent claim 1 and not the EPO amended claim 1 actually at issue in the document before the witness.  (Tr. 7/7/14 (AM) at 101:5-11 (Atwood).)

RELATOR'S POST-EVIDENTIARY HEARING BRIEF - FILED UNDER SEAL

1  which means that a combination of the specific values of the eight parameters is

2  required to characterize the product obtained."); Tr. 7/7/14 (PM) at 11:22-15:11

3  (Atwood).)  Thus, the EPO's decision at paragraph 10, as evidenced by its

4  emphasis, was that the specific product claimed in amended Claim 1 was not

5  enabled because the patent did not disclose how to get the "<u>exact combination</u>" of

6  claimed parameters.  (Exh. 180 at 11, ¶ 10; *see also id.* at 12, ¶ 11, 13, ¶ 12; Tr.

7  7/7/14 (PM) at 11:22-15:11 (Atwood).)

8  Thus, Aventis's argument is plainly wrong.  The EPO <u>did not</u> find that the

9  EP '144 patent failed to provide an enabling disclosure for purposes of being used

10  as a prior art reference.  The EPO <u>did not</u> find that the EP '144 patent was not prior

11  art.  The EPO only found that the newly amended claims with their specific

12  limitations including an average molecular weight of exactly 4500 Daltons were

13  not enabled.  (Exh. 180 at 11, ¶ 10.)  "The standard for what constitutes proper

14  enablement of a prior art reference for purposes of anticipation under section 102,

15  however, differs from the enablement standard under section 112."  *Verizon Servs.*

16  *Corp. v. Cox Fibernet Va., Inc*., 602 F.3d 1325, 1336-37 (Fed. Cir. 2010) (citation

17  omitted); *Rasmusson v. SmithKline Beecham Corp*., 413 F.3d 1318, 1325 (Fed.

18  Cir. 2005) ("[S]ection 112 provides that the specification must enable one skilled

19  in the art to 'use' the invention whereas section 102 makes no such requirement as

20  to an anticipatory disclosure.") (citation omitted).

### 3.  Aventis Now Contradicts the Arguments That It Made to the EPO

21

22  Aventis is not only contradicting its admissions in the '618 patent, its

23  prosecution history, and the ANDA litigation that the EP '144 patent is prior art to

24  the '618 patent, Aventis is contradicting the representations it made to the EPO.

25  As shown in the proceeding section, Aventis submitted significantly narrowed

26  claims to the EPO during the opposition proceeding.  By narrowing its claims,

27  Aventis was able to avoid the prior art, but then encountered an enablement

28

-28-

problem.  However, the EPO proceedings did not end with the January 13, 1989 EPO decision.  On April 21, 1989, Aventis filed an appeal.  (Exh. 400; *see also* Exh. 401.)  After losing the narrowed claims on enablement grounds, Aventis retreated back to the claims having a scope similar to the originally issued claims.  (*See* Exh. 401, p. 10.)  Once Aventis removed the narrowing limitations, Aventis then argued that broader claims in the EP '144 patent were enabled by contending, just as Amphastar had in this case, that: "In this process, the esters of heparin come from commercial heparins from any source."  (*Id*. at 8; *see also* Exh. 403, p. 5.)

### B.    Aventis's Arguments Regarding the Teachings of the EP '144 Patent Lack Merit

Aventis was well aware from the pleadings relating to its motion to dismiss and the Court's related order of Amphastar's contention that Amphastar had direct and independent knowledge by virtue of its experiments.  Aventis, however, failed to provide a full and complete disclosure of its contentions in its Court-ordered discovery responses.  As Aventis was ordered to provide a full and complete answer, it should not be permitted to make those non-disclosed arguments now.  FED. R. CIV. P. 37(b)(2)(A)(ii).  Alternatively, and without waiving its objections, or right for further redress, Amphastar will address the lack of merit to Aventis's undisclosed arguments below.

### 1.    The EP '144 Patent Discloses Pre-Heating

Aventis did not specifically disclose in its Court-ordered discovery responses its contention that the EP '144 patent does not disclose heating the depolymerization reactants prior to mixing.  (*See* Exh. 45.)  In other words, Aventis contends that depolymerization reaction taught by EP '144 requires heating to 60°C and then mixing, rather than mixing and then heating to 60°C.  Aventis only offered the conclusory opinion of its expert, Dr. Edgar, which contradicted the position Aventis and its employee expert, Dr. Viskov, took during the reissue of the '618 patent.  The EP '144 patent teaches in Examples 3 and 9

-29-

that depolymerization step is done "at 60°C." (Exh. 6 at 23:15-17, 28:12-14: "10g of the above ester are treated with 250 ml of a 0.1 N aqueous solution of sodium hydroxide at 60°C, for two hours with stirring.")  Dr. Atwood explained the meaning of "at 60°C":

> [T]ypically if I'm doing chemistry and I want a sodium hydroxide solution at 62 degrees, heating that solution to 62 degrees, I don't refer to that as preheating.  I would heat it to 62 degrees and start my reaction at that point because that's where I want to start it.
>
> ***
>
> Quote – line 15 from page 22, two grams of the above ester are treated for two hours with stirring with 50 milliliters of 1/10th normal aqueous solution of sodium hydroxide at 60 degrees, end quote.
>
> I don't see anything here that indicates pre-heating.  It indicates that this is where the depolymerization reaction is done, namely, at 60 degrees.  And I would never start a depolymerization reaction – if I knew I wanted to go to 60 degrees, I wouldn't start it at room temperature because then one wouldn't know how quickly to raise the temperature up to 60 degrees.

(Tr. 7/7/14 (AM) at 107:10-108:25 (Atwood).)  Dr. Atwood further testified:

> I've been doing synthetic chemistry for 51 years, and I'm not used to the term pre-heating.  When it says do a reaction at 50 degrees, I don't refer to heating the solution up to 52 degrees as pre-heating. I take it just for what it says.  It's going to be at 50 degrees, I do it at 50 degrees . . . .

(Tr. 7/7/14 (AM) at 110:2-9 (Atwood).)

Aventis's expert, Dr. Edgar, however, testified on direct examination that the EP '144 patent teaches to put "reagents together and combine them at room temperature and then heat them up" without citing to, or quoting, any such language in the patent. (Tr. 7/10/14 (AM) at 20:1-3 (Edgar).)  No such language exists.  In stark contrast, when Aventis's employee-expert Dr. Viskov claimed to have "faithfully reproduce[d]" examples 3 and 9 from the EP '144 patent during the prosecution of Aventis's reissue application, Dr. Viskov preheated the solutions prior to combining them in the depolymerization step. (Exh. 121 at 15, ¶

35; *see* Tr. 7/10/14 (AM) at 58:8-60:17 (Edgar).)[21]  Viskov reported in the notebook appended to his PTO declaration:

> Sodium hydroxide is loaded into the three-neck flask. Heat to 60 degrees C. The ester is added. The mixture is maintained at 60 degrees C plus or minus 5 degrees C for two hours under agitation.

(Tr. 7/10/14 (AM) at 59:20-60:17 (Edgar), *quoting* Exh. 147 at RE4314-15 (AV:VIT 013249-50); *see also* Tr. 7/10/14 (AM) 93:2-94:9.)

Accordingly, the expert Aventis used before the PTO, Dr. Viskov, practiced the depolymerization step of the EP '144 patent as heating to 60°C and then mixing, exactly the same as Amphastar's Fei and fully consistent with Dr. Atwood's interpretation.  This is just another example of Aventis contradicting itself:  telling the PTO one thing and then saying the opposite now to this Court.  The Court should assign no weight whatsoever to Dr. Edgar's testimony.

## 2. There is No Requirement for the Molecular Weight of Starting Heparin Exists in the EP '144 Patent

Aventis's expert, Dr. Edgar, claimed during the hearing that measuring the molecular weight of the heparin starting material is critical to reproducing Mardiguian's examples in the EP '144 patent.  (Tr. 7/9/14 (PM) at 111:1-3 (Edgar).)  Thus, he claimed, Amphastar could not "faithfully" reproduce the Mardiguian examples if it did not know the starting molecular weight of its heparin.  (*See* Tr. 7/9/14 (PM) at 113:16-115:2 (Edgar); Tr. 7/10/14 (AM) at 79:25-80:13 (Edgar).)

The EP '144 patent, however, does not require a particular starting molecular weight.  Rather, the EP '144 patent teaches that the starting material may be "commercial heparins which are mixtures of polysaccharides whose weight

---

[21]    Dr. Viskov varied from the methods taught in EP '144 in several other respects and thus Amphastar does not agree that Dr. Viskov faithfully followed the teaching of EP '144 in all respects.  Amphastar further object to the declarations of Dr. Viskov that are a part of the reissue prosecution history on hearsay and double hearsay grounds.  However, Dr. Viskov's declarations are relevant for the purposes of impeachment and showing that Aventis took a different position during the prosecution of its reissue application.

1   mean molecular weight is greater than 10,000 [D]altons and of which the, spread

2   of molecular weight is from about 4,000 to about 45,000 [D]altons" (Exh. 6, at 3:5-

3   9; *see* Tr. 7/7/14 (PM) at 6:5-9 (Atwood).)  The EP '144 patent also teaches that

4   the starting material can be "heparin of any origin; for example, bovine lung

5   heparin, heparin from pig mucous membranes or heparin from cattle intestines"

6   (Tr. 7/7/14 (AM) at 64:10-12 (Atwood).).  The reference to a particular starting

7   molecular weight that Aventis has latched onto comes from the examples of the EP

8   '144 patent, following the express teaching that the examples are "non-limiting."[22]

9   (Exh. 4; *see* Tr. 7/7/14 (AM) at 73:19-24 (Atwood).)  When asked to explain what

10   "non-limiting" meant, Amphastar's expert Dr. Atwood stated:

> I understand that to mean that Mardiguian is going to give us now, as it turns out, 20 examples, specific examples of how one can carry out his invention.  And by non-limiting, he means that his invention is not limited to these examples.  His invention is spelled out in the specification of the patent, but the examples are to allow one to . . . have some specific teaching of how the invention could be done.  So . . . by non-limiting, Mardiguian is telling us that his invention is not just these 20 examples, but these 20 examples will be a subset of what his teaching is.

16   (Tr. 7/7/14 (AM) at 74:1-10.)  The European Pharmacopeia did not require any

17   specific molecular weight for the starting material.  (*See* Exhs. 182 & 212; Tr.

18   7/7/14 (AM) at 87:10-14; 91:18-92:7 (Atwood); Tr. 7/9/14 (PM) at 59:25-60:23

19   (Azadi).)

20         By contrast, Aventis's expert Dr. Edgar merely opined that "non-limiting

21   doesn't mean unlimited."  (Tr. 7/10/14 (AM) at 22:5-11 (Edgar).)  Amphastar is

22   not suggesting that non-limiting means unlimited.  However, the EP '144 patent

23   does state that a "heparin of any origin" can be used, and that such heparins have a

24   starting molecular weight from "about 4,000 to about 45,000 [D]altons."  (Exh. 6

---

[22]        The direct English translation of the Mardiguian patent by the European patent office (Exh. 4) states that "[t]he following examples illustrate the invention without it being restricted thereto."  (Exh. 4 p. 0006.)  Aventis's attempts to restrict the Mardiguian patent to its examples—namely the starting molecular weight of the heparin used in those examples—is expressly rejected by the Mardiguian patent.  (*Id.*)

RELATOR'S POST-EVIDENTIARY HEARING BRIEF - FILED UNDER SEAL

1  at 3:5-9; Exh. 14 at 24-28.)  Aventis took the same position in its EPO appeal,

2  contending that one could use heparin of any origin.  (Exh. 401, p. 8.)

3       Moreover, Dr. Edgar's opinion conflicts with the '618 patent's disclosure.

4  Dr. Edgar testified that one needed to know the starting molecular weight of the

5  heparin to reproduce the compositions claimed in the '618 patent.  (Tr. 7/10/14

6  (AM) at 79:25-80:13 (Edgar).)  However, the '618 patent itself does not disclose

7  the starting molecular weight of the heparin.  (Exh. 37; Tr. 7/10/14 (AM) at 80:15-

8  81:2 (Edgar).)  Yet again Aventis contradicts itself.  Aventis claims now that one

9  must know the starting molecular weight of heparin, but—tellingly—did not

10  disclose that allegedly critical factor in the '618 patent.

11      **3.**    **Pre-Synthesis Purification Does Not Affect the End Result**

12       Aventis also argued that Amphastar's experiments with pre-synthesis

13  purification of the raw heparin followed the teachings of the '618 patent rather than

14  the EP '144 patent—another contention that Aventis did not specifically disclose in

15  its court-ordered discovery responses.  (Exh. 45.)  Heparin purification was well-

16  known in the art long before the filing of the '618 patent.[23]  Aventis's suggestion

17  that heparin purification as a concept was unique to the '618 patent is

18  disingenuous.  Purification involves the standard use of methanol precipitation to

19  remove impurities and is both well known in the art and taught by the EP '144

20  patent.  (*See* Exh. 6 at 35:1-4; Tr. 7/8/14 (PM) at 16:9-17:8 (Fei).)

21       Nevertheless, Amphastar's testing showed that purification of the starting

22  heparin prior to synthesis of the enoxaparin (*i.e.*, pre-purification) does not affect

23  the end result.  Comparing Amphastar's lots 012802-c, 012802-e (Exh. 112, p.

24  0030), and Amphastar's ANDA lot EO093002 (Exh. 113, pp. 0011, 0022)—all of

25  which do not use purified heparin—with Amphastar's 111501 batches 1A, 1B, and

26  ---

[23]    Given fair notice, Amphastar could have shown that alcohol precipitation using sodium
27  chloride (NaCl) is a standard purification method for heparin.  Amphastar submits three Chinese
publications including their certified English translations disclosing alcohol-based purification of
28  heparin, including the addition of sodium chloride (NaCl) prior to the alcohol precipitation.
(Mellema Decl., Exhs. 406-411.)

RELATOR'S POST-EVIDENTIARY HEARING BRIEF - FILED UNDER SEAL

1C (Exh. 22, pp. 4-5) and its 120701 batch (Exh. 22, p. 0020)—all of which use a purified heparin—there is effectively no difference as all of these samples fall within the claimed ranges (Exh. 22, p. 0025), contrary to Aventis's pre-purification argument.  Moreover, if done properly, there is no reason to expect that all of the heparin would not precipitate out of solution.  (Tr. 7/9/14 (AM) at 6:4-21 (Zhang).)

The pre-synthesis purification test of heparin was only one of many single factor impact tests (such as pH, time, temperature, etc.) that Amphastar conducted during its development of generic enoxaparin.  Amphastar determined that pre-synthesis purification was unnecessary and stopped purifying its starting material heparin after its experiments showed it made no difference and did not included it in its ANDA method.  (*See* Exh. 22, p. 0025; Exh. 5, pp. 0004, 0006, 0014; Tr. 7/7/14 (PM) at 50:6-53:6 (Fei); Tr. 7/10/14 (AM) at 83:20-22 (Edgar).)

### 4.  Post-Synthesis Purification Does Not Affect the End Result

Aventis also argued during the hearing that post-synthesis purification somehow affects the final LMWH.  Aventis again did not specifically disclose this contention in its Court-ordered discovery responses.  (Exh. 45.)  Post-synthesis purification is just another methanol precipitation otherwise disclosed in the EP '144 patent.  (*See, e.g.*, Exh. 6 at 22:19-21, 28:14-19.)  Example 9 includes the additional step of washing the precipitate with methanol after the initial post-depolymerization precipitation.  (*Id*.)  Whether done once or twice or more, if done properly, all of the LMWH precipitates out of solution.  (Tr. 7/9/14 (AM) at 6:4-21 (Zhang).)  No evidence even suggests that post-synthesis purification will effect the molecular weight distribution in any material way.  The purpose of purification is to remove impurities, not to affect the molecular weight of the heparin or enoxaparin itself.  (*See* Tr. 7/7/14 (PM) at 6:10-23 (Atwood) (discussing medicaments).)  Comparing Amphastar's ANDA lot which has a methanol re-precipitation after depolymerization (*e.g.*, EO093002, Exh. 113, pp. 11, 22), with Amphastar's earlier batches which do not have a methanol re-precipitation after

-34-

1   depolymerization (*e.g.*, 111501 batches 1A, 1B, and 1C, Exh. 22, pp. 0005-7),

2   there is no discernible difference.  All of these samples fall within the claimed

3   ranges—contrary to Aventis's post-purification argument.

### 5. Measuring the Degree of Esterification is a Common Scientific Practice

6       Aventis also did not specifically disclose in Aventis's Court-ordered

7   discovery responses its argument that Amphastar copied the idea of testing for the

8   degree of esterification from the '618 patent.  (Exh. 45.)  The argument is absurd.

9   Testing for the degree of esterification is common knowledge to chemists.  (Tr.

10   7/9/14 (AM) at 77:22-78:2 (Zhang).)  Even Aventis's expert Dr. Edgar admitted

11   that testing for the degree of esterification after an esterification reaction would be

12   common chemistry practice.  (Tr. 7/10/14 (AM) at 61:22-62:25 (Edgar).)  Dr.

13   Edgar then argued that the fact that Amphastar used one of the two possible

14   methods to report the data (rather than the other) indicated that Amphastar copied

15   the method of the '618 patent.  (*Id.* at 74:1-7.)  The argument that a coin flip

16   indicates anything is absurd on its face.

### C. Aventis's Argument That Amphastar "Admitted It Was Not an Original Source" Is Unfounded and Speculative

19       Aventis asked this Court to take judicial notice of nine (9) documents from

20   the ANDA litigation, which it contends contains admissions by Amphastar that

21   Amphastar was not an original source for the FCA claims at issue in this case.

22   (*See* Notice of Submission of Documents of Which The Court Has Taken Judicial

23   Notice [sic], Exhs. 7, 13-16, 28, 33, 146, & 151.)  The documents Aventis cites

24   contain no such admission.  Further, the documents are irrelevant and immaterial

25   to the point Aventis is attempting to make.  The FCA explicitly does not require a

26   specific intent to deceive. 31 U.S.C. § 3729(b):  "Definitions.— For purposes of

27   this section— (1) the terms "knowing" and "knowingly"— . . . (B) require no

28   proof of specific intent to defraud . . . .").  Amphastar discovered the falsity

-35-

RELATOR'S POST-EVIDENTIARY HEARING BRIEF - FILED UNDER SEAL

through its experiments, and discovered Aventis's intent through discovery.

Aventis's arguments regarding Amphastar's inequitable conduct claims are

inapposite when they fail to specify to which element they are referring:

materiality or specific intent to deceive.  The ANDA litigation did not involve any

FCA claim, such that Amphastar never addressed the original source issue in any

pleading or document.  Indeed, neither the defense of patent invalidity or patent

unenforceability require an allegation that Amphastar had direct and independent

knowledge of any alleged false claim by Aventis to the governments.

### D.  Aventis's Argument Regarding Teva's Alleged Discovery Are Unsupported

Aventis cites the Court to Teva's statement in the December 15, 2003ANDA

Joint Report of Parties' Planning Meeting that Teva "believes that it is likely that,

after initial discovery concerning these prior art issues, it will be appropriate to

seek an inequitable conduct defense." (Exh. 12 at 3, emphasis added.)  Teva is

merely saying what it might do if something happens in the future.  Nevertheless,

Aventis takes Teva's statement entirely out of context.  Amphastar's and Teva's

joint statement addressed anticipated discovery and in context provided:

> Linked to the invalidity issue are issues regarding whether those substantively involved in the prosecution of the patent in suit failed to disclose prior art known to them during the patent prosecution **and/or** submitted false information during that prosecution.  For example, a prior art reference authored by A. Frydman, a Rhone-Poulenc Sante employee disclosed characteristics of a low molecular weight heparin essentially identical to the characteristics disclosed in a declaration submitted during prosecution of the patent by Andre Uzan, the Head of Research Laboratory of Rhone-Poulenc Rorer, the assignee of the patent, arguing that the alleged invention produced allegedly unexpected results. Teva believes that it is likely that, after initial discovery concerning these prior art issues, it will be appropriate to assert an inequitable conduct defense.

(Exh. 12 at 2-3, emphasis added.)  Teva's statement related to the prior art issues

relating to the alleged failure to disclose the *Frydman* article to the PTO.  (*Id*. at 3.)

This is confirmed by Teva's October 10, 2003 Supplemental Brief In Support of

Motion to Compel Prompt Rule 26(f) Conference, p. 4:19-20:  "[A] key reference

-36-

1  may have been intentionally withheld from the PTO during prosecution." Thus the

2  joint statement shows that Teva was focused on the failure to disclose a prior art

3  reference. Amphastar focused on the chemistry and its conclusion—based upon its

4  experiments—that Aventis submitted false half-life data to the PTO. Thus, rather

5  than evidencing that Amphastar is not an original source, the Joint Statement is

6  further corroboration that Amphastar was the source of the allegation that Aventis

7  made false statements relating to its claimed invention.

8  **VI.   CONCLUSION**

9        The evidence establishes by at least a preponderance of the evidence that

10  Amphastar is an original source for the FCA claims asserted in this action such that

11  the Court has subject matter jurisdiction. The fact that Amphastar independently

12  conducted experiments reproducing the prior art and found that the resulting

13  enoxaparin product—including the resulting molecular weight—fell within the

14  scope of the '618 patent claims alone establishes that Amphastar uncovered

15  Aventis's fraudulent statements to the PTO regarding Example 6. Further,

16  Amphastar's experiments showed that enoxaparin could be made under different

17  reaction conditions, contrary to Aventis's false representations to the FDA. All

18  other evidence supports and corroborates the conclusion that Amphastar is an

19  original source.

20

21                              Respectfully submitted,

22                              DATED:  August 11, 2014

23                              K&L GATES LLP

24                              By: */s/ Jan P. Weir*
                                    Jan P. Weir
25                                  Joseph J. Mellema
                                    Taylor C. Foss
26                                  Jennifer A. Mauri

27                              Attorneys for Relator
                               Amphastar Pharmaceuticals, Inc.
28

-37-

**CERTIFICATE OF SERVICE**

United States, et al., ex rel. Amphastar Pharmaceuticals, Inc.

v.

Aventis Pharma S.A. et al.

Case No. EDCV 09-0023 MJG (OPx)

I am and was at all times herein mentioned over the age of 18 years and not a party to the action in which service is made. At all times herein mentioned I have been employed in the County of Orange in the office of a member of the bar of this court at whose direction service was made. My business address is 1 Park Plaza, 12th Floor, Irvine, CA 92614.

On August 11, 2014, I caused the service of a true and correct copy of **RELATOR AMPHASTAR PHARMACEUTICALS, INC.'S POST-EVIDENTIARY HEARING BRIEF - FILED UNDER SEAL**

as follows:

[ ]   **CM/ECF:**  By electronically filing the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the attached Electronic Mail Notice List by operation of the Court's CM/ECF System.

[X]   **BY U.S. MAIL**:  In the ordinary course of business to the non-CM/ECF participants indicated on the attached Manual Notice List. I am readily familiar with the Firm's practice for the collection and processing of correspondence for mailing with the Postal Service and that the correspondence would be deposited with the same that same day in the ordinary course of business.

[X]   **BY ELECTRONIC MAIL:**  I am personally and readily familiar with the business practice of the firm for the preparation and processing of documents in portable document format (PDF) for e-mailing.  I prepared said document(s) in PDF and then caused such documents to be served by electronic mail to the below addressees.

**CM/ECF SERVICE LIST**

James L. Zelenay Jr.
jzelenay@gibsondunn.com

M. Sean Royall
sroyall@gibsondunn.com

Stephen C. Payne
spayne@gibsondunn.com

**ELECTRONIC MAIL SERVICE LIST**

Richard Nicholson
richard.nicholson@usdoj.gov

Susan Hershman
susan.hershman@usdoj.gov

**U.S. MAIL SERVICE LIST**

| | |
|---|---|
| CALIFORNIA | Emmanuel R. Salazar<br>Deputy Attorney General<br>California Department of Justice<br>Bureau of Medi-Cal Fraud and Elder Abuse<br>Office of the Attorney General<br>1425 River Park Drive, Suite 300<br>Sacramento, CA 95815 |
| DISTRICT OF COLUMBIA | Susan Kennedy, Director<br>Medicaid Fraud Control Unit of D.C.<br>Office of D.C. Inspector General<br>717 14th St., N.W., 5th Floor<br>Washington, DC 20005 |
| DELAWARE | Christina (Tina) Showalter, Director<br>Medicaid Fraud Control Unit of Delaware<br>Office of the Attorney General<br>820 N French Street, 5th Floor<br>Wilmington, DE 19801 |
| FLORIDA | James V. Varnado, Director<br>Medicaid Fraud Control Unit of Florida<br>Office of the Attorney General<br>The Capitol, PL-01<br>Tallahassee, FL 32399-1050 |
| GEORGIA | Charles Richards, Director<br>Medicaid Fraud Control Unit of Georgia<br>Office of the Attorney General<br>200 Piedmont Ave<br>S.E. West Tower 19th Floor<br>Atlanta, GA 30334 |
| HAWAII | Michael L. Parrish, Director<br>Medicaid Fraud Control Unit of Hawaii<br>Office of the Attorney General<br>333 Queen Street, 10th Floor<br>Honolulu, HI 96813 |
| ILLINOIS | Illinois State Police<br>Medicaid Fraud Control Unit<br>801 South 7th Street, Suite 500-A<br>Springfield, IL 62703 |
| INDIANA | Allen K. Pope, Director<br>Medicaid Fraud Control Unit of Indiana<br>Office of the Attorney General<br>8005 Castleway Drive<br>Indianapolis, IN 46250-1946 |

CERTIFICATE OF SERVICE

| | | |
|---|---|---|
| 1 | LOUISIANA | Fred A. Duhy, Director<br>Medicaid Fraud Control Unit of Louisiana<br>Office of the Attorney General<br>PO Box 94005<br>Baton Rouge, LA 70804-9005 |
| 3 | MASSACHUSETTS | Steven Hoffman, Director<br>Medicaid Fraud Control Unit of Massachusetts<br>Office of the Attorney General<br>One Ashburton Place<br>Boston, MA 02108 |
| 6 | MICHIGAN | David Tanay, Director<br>Medicaid Fraud Control Unit of Michigan<br>Office of the Attorney General<br>2860 Eyde Parkway<br>East Lansing, MI 48823 |
| 8 | MONTANA | Debrah Fosket, Director<br>Medicaid Fraud Control Unit of Montana<br>Division of Criminal Investigation<br>303 N Roberts Street, Room 367<br>Helena, MT 59620 |
| 11 | NEVADA | Mark N. Kemberling, Director<br>Medicaid Fraud Control Unit of Nevada<br>Office of the Attorney General<br>100 North Carson St.<br>Carson City, NV 89701-4717 |
| 13 | NEW HAMPSHIRE | Karin M. Eckel, Director<br>Medicaid Fraud Control Unit of New Hampshire<br>Office of the Attorney General<br>33 Capitol Street<br>Concord, NH 03301-6397 |
| 16 | NEW JERSEY | Nicole Rizzolo, Director<br>Medicaid Fraud Control Unit of New Jersey<br>Office of the Attorney General<br>25 Market Street<br>P.O. Box 094<br>Trenton, NJ 08625 |
| 19 | NEW MEXICO | Mr. Jody Curran, Director<br>Medicaid Fraud Control Unit of New Mexico<br>Office of the Attorney General<br>111 Lomas Blvd. N.W., Suite 300<br>Albuquerque, NM 87102 |
| 21 | NEW YORK | Monica Hickey-Martin, Director<br>Medicaid Fraud Control Unit of New York<br>Office of the Attorney General<br>120 Broadway, 13th Floor<br>New York, NY 10271 |
| 24 | OKLAHOMA | Ms. Mykel Fry, Director<br>Medicaid Fraud Control Unit of Oklahoma<br>Office of the Attorney General<br>313 NE 21st<br>Oklahoma City, OK 73105 |

-3-

CERTIFICATE OF SERVICE

| RHODE ISLAND | James F. Dube, Director<br>Medicaid Fraud Control Unit of Rhode Island<br>Office of the Attorney General<br>150 S Main Street<br>Providence, RI 02903 |
|---|---|
| TENNESSEE | Norman Tidwell, Director<br>Medicaid Fraud Control Unit of Tennessee<br>Bureau of Investigation<br>901 R.S. Gass Boulevard<br>Nashville, TN 37216-2639 |
| TEXAS | W. Rick Copeland, Director<br>Medicaid Fraud Control Unit of Texas<br>Office of the Attorney General<br>6330 Hwy 290 East, Suite 250<br>Austin, TX 78723 |
| VIRGINIA | Randall L. Clouse, Director<br>Medicaid Fraud Control Unit of Virginia<br>Office of the Attorney General<br>900 E Main Street, 5th Floor<br>Richmond, VA 23219 |
| WISCONSIN | Tom Storm, Director<br>Medicaid Fraud Control Unit of Wisconsin<br>Office of the Attorney General<br>PO Box 7857<br>Madison, WI 53707-7857 |

I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on August 11, 2014, at Irvine, California.

/s/ Terry L. Kuester
Terry L. Kuester

CERTIFICATE OF SERVICE