1
2
3
4
5
6
7
8            UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| AMPHASTAR PHARMACEUTICALS INC., | Case No. 5:09-cv-00023-SHK |
| Plaintiff, | |
| v. | OPINION AND ORDER |
| AVENTIS PHARMA SA, et al., | |
| Defendants. | |

Presently before the Court is the Application for Attorney Fees ("Application" or "App.") filed by Defendants Aventis Pharma S.A., Aventis Pharmaceuticals, Inc., and Sanofi-Aventis S.A. (collectively "Defendants"), against Plaintiff Amphastar Pharmaceuticals, Inc. ("Plaintiff"). Electronic Case Filing Number ("ECF No.") 559, Fee Application. Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of the undersigned United States Magistrate Judge. See ECF No. 607, Statement of Consent to Proceed before a United States Magistrate Judge ("Consent Statement"). For the reasons discussed below, the Court partially GRANTS the amount sought in Defendants' Application.

/ / /

1

# I.    BACKGROUND

2    The procedural history of this case, which the parties are familiar with, is

3    lengthy.  As such, the Court discusses only the procedural history relevant to the

4    Application.

5    On July 14, 2017, Defendants applied for attorney fees and expenses under 31

6    U.S.C. 3730(d)(4)[1] ("Previous Fee Application").  ECF No. 519, Previous Fee

7    Application.  On November 20, 2017, the previously assigned United States

8    District Judge granted Defendant' Previous Fee Application ("Order Granting

9    Previous Fee Application"), found that Plaintiff's "claim was clearly frivolous[,]"

10    and ordered "Plaintiff-Relator, Amphastar Pharmaceuticals Inc. [to] pay

11    Defendants their reasonable attorneys' fees and expenses from the date the

12    Complaint was unsealed[2] to the final disposition of this case."  ECF No. 541, Order

13    Granting Previous Fee Application at 2, 22.  The previously assigned judge also

14    found "that the instant case is one of the exceptional cases where the plaintiff's

15    arguments were 'wholly without merit,' and clearly had no reasonable chance of

16    success."  Id. at 15.  The Court explained that:

17    In denying Aventis' motions to dismiss at the pleading stage, the Court

18    relied on Amphastar's representations that it had direct and

19    independent knowledge sufficient to qualify as an original source.

20

21

---

[1] The Court observes that Defendants originally applied for attorneys' fees and costs on July 27,

22    2015, after the previously assigned United States District Judge, on July 13, 2015, dismissed the case for "lack of jurisdiction, with costs pursuant to 28 U.S.C. § 1919" but "retain[ed]

23    jurisdiction to address matters, including the imposition of sanctions, in regard to the conduct of Plaintiff's counsel."  See ECF No. 379, Judgment Order; ECF No. 385, Application to the Clerk

24    to Tax Costs against Plaintiff; ECF No. 386, Request for Attorneys' Fees.  Defendants stated

25    that they filed their Request for Attorneys' Fees at that time "to ensure that the issue of Defendants' entitlement to attorneys' fees [wa]s properly preserved."  ECF No. 386, Request

26    for Attorneys' Fees at 2 (citing Local Rule ("L.R.") 54-10).

27    [2] The Court observes that "[o]n October 28, 2011, the Complaint was unsealed, and Amphastar elected to proceed with the case on its own pursuant to 31 U.S.C. § 3730(c)(3)."  ECF No. 541,

28    Order Granting Previous Fee Application at 9.

> However, it became clear at the evidentiary hearing that not only was there no factual support for Amphastar's contentions, but also that Amphastar knew, or should have known, that it was not an "original source" when it decided to proceed with the case.

Id. The Court further noted that:

> [T]he manner in which Amphastar and its counsel proceeded provides further indication of the absence of any reasonable basis for its contention that it was an "original source." As reflected in the Superseding Decision Re: Jurisdiction [ECF No. 380], the behavior of Amphastar's counsel in regard to the hearing was questionable. He knew, but did not disclose, that hearing exhibits were incomplete copies of original documents and that he had complete original documents of which incomplete copies were in evidence. Moreover, his arguments to the Court were so specious as to manifest a lack of proper professional concern for integrity.

Id. at 17. The Court added that it did "not find Amphastar's claim frivolous because it did not prevail, but rather because, as the facts became known to the Court, it became clear that Amphastar had no reasonable foundation on which to bring the suit." Id. at 20. The Court also added that "after the Government declined to proceed, prior to Amphastar's decision to pursue the suit, Amphastar knew or should have known that the Court would not have jurisdiction. Deciding to pursue a lawsuit without a credible foundation from the onset for doing so is clearly frivolous." Id.

The Court concluded that:

> Upon reviewing the entire course of the litigation, the Court notes multiple discovery issues, improper conduct, incredible testimony, and a baseless claim with no supporting evidence. As a result, both Aventis and the Court have devoted countless hours and resources to bring this

litigation to resolution.  These findings lend weight to an award of attorneys' fees, even though an award is not mandatory upon a finding of frivolousness.

Id. at 22.

The Court noted that it would, "by separate Order, refer the matter to a magistrate Judge to conduct such proceedings as may be necessary to provide a report and recommendation [("R&R")] regarding the amount of the award to be made." Id. at 23.  On November 21, 2017, the United States District Judge referred the matter to the undersigned United States Magistrate Judge to provide an R&R "regarding the amount of the award to be made."[3]  ECF No. 543, Notice of Referral of Matter to the Magistrate Judge at 1.

On August 7, 2018, Defendants filed their Application and submitted the declarations of Tracey B. Davies ("Davies Declaration" or "Davies Decl."), Daniel L. Dovdavany ("Dovdavany Declaration" or "Dovdavany Decl."), Gerald G. Knapton ("Knapton Declaration" or "Knapton Decl."), and Mark A. Perry ("Perry Declaration" or "Perry Decl.") in support of their Application.  ECF No. 559-1, Application; ECF No. 559-2, Davies Decl.; ECF No. 559-3, Dovdavany Decl.; ECF Nos. 559-4 through 559-6, Knapton Decl.; ECF No. 559-7 Perry Decl.

On November 26, 2018, Plaintiff opposed Defendants' Application ("Opposition" or "Opp'n") and submitted the declarations of James P. Schratz ("Schratz Declaration" or "Schratz Decl.") and Lee K. Fink ("Fink Declaration" or "Fink Decl.") in Support of Plaintiff's Opposition.  ECF No. 568, Opp'n; ECF Nos. 568-2 through 568-29, Schratz Decl.; ECF Nos. 568-31 through 568-40, Fink Decl.; ECF No. 569, Fink Decl.  On December 21, 2018, Plaintiff filed the Supplemental Declaration of James P. Schratz ("Supplemental Schratz

---

[3] As discussed above, Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of the undersigned United States Magistrate Judge.  See ECF No. 607, Consent Statement.  As such, the Court issues this Order, rather than an R&R as directed by the previously assigned United States District Judge.

4

Declaration" or "Supp. Schratz Decl.") in support of Plaintiff's Opposition.  ECF No. 576, Supp. Schratz Decl.

On January 8, 2019, Defendants objected to the Schratz and Knapton Declarations ("Objection to Schratz Declaration" or "Obj. to Schratz Decl." and "Objection to Knapton Declaration" or "Obj. to Knapton Decl.") and also filed a Reply in Support of their Application ("Reply"), along with a Supplemental declaration by Mark A. Perry ("Supplemental Perry Declaration" or "Supp. Perry Decl.") and a declaration by David A. Schnitzer ("Schnitzer Declaration" or "Schnitzer Decl.") in support of their Application.  ECF No. 580, Reply; ECF No. 581, Obj. to Schratz Decl.; ECF No. 582, Obj. to Knapton Decl.; ECF No. 583, Supp. Perry Decl.; ECF No. 584, Schnitzer Decl.

On January 24, 2019, Plaintiff filed a Sur-Reply to Defendants' Application ("Sur-Reply").  ECF No. 594, Sur-Reply.

On May 8, 2019, the Court heard oral arguments on Defendants' Application, ECF No. 622, Transcript of Hearing, and on May 20, 2019, Defendants filed their billing records ("Billing Records"), ECF No. 619, Billing Records.

On May 21, 2019, the parties filed a Joint Stipulation and Application for Order Re Non-Fee Expenses ("Expense Stipulation" or "Expense Stip."), which the Court granted the same day ("Order Granting Expense Stip." or "Order Granting the Expense Stipulation").  EFC No. 620, Expense Stip.; ECF No. 621, Order Granting Expense Stip.  In the Court's Order Granting the Expense Stipulation, the Court observed that the parties "filed a joint stipulation stating that $672,086.85 is a reasonable amount of Aventis's non-fee expenses from the unsealing of the complaint through April 30, 2018, in addition to the taxable costs previously paid by Amphastar and that this amount is adequately supported by documentation provided during discovery."  ECF No. 21, Order Granting Expense Stip. at 2.  The Court "accept[ed] the Parties' stipulation" and stated that it would

"incorporate this amount in its forthcoming order on the amount of fees and expenses to be paid by Amphastar to Aventis." Id. On December 4, 2019, Defendants submitted Supplemental Authorities in Support of their Application ("Supplemental Authorities" or "Supp. Auth."), ECF No. 624, Supp. Auth, which Plaintiff objected to on December 10, 2019 ("Objection to Supplemental Authorities" or "Obj. to Supp. Auth."), ECF No. 625, Obj. to Supp. Auth.

The matter stands fully briefed and ready for decision.

## II.    LEGAL STANDARDS

"'Generally, litigants in the United States pay their own attorneys' fees, regardless of the outcome of the proceedings.'" Camacho v. Bridgeport Fin., Inc., 523 F.3d 973, 978 (9th Cir. 2008) (quoting Staton v. Boeing Co., 327 F.3d 938, 965 (9th Cir. 2003)). "However, in order to encourage private enforcement of the law . . . Congress has legislated that in certain cases prevailing parties may recover their attorneys' fees from the opposing side. When a statute provides for such fees, it is termed a fee shifting statute." Id. (internal quotation marks and alterations omitted). The False Claims Act ("FCA") is such a statute and provides that:

> if the Government does not proceed with the action and the person bringing the action conducts the action, the court may award to the defendant its reasonable attorneys' fees and expenses if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment.

31 U.S.C. § 3730(d)(4).

To calculate the amount of fees that is reasonable, the Court must apply a "lodestar" method, multiplying "the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." Camacho, 523 F.3d at 978 (citation and internal quotation marks omitted). "In determining the appropriate lodestar amount, the district court may exclude from the fee request

any hours that are 'excessive, redundant, or otherwise unnecessary.'" Welch v. Metro. Life Ins. Co., 480 F.3d 942, 946 (9th Cir. 2007) (quoting Hensley v. Eckerhart, 461 U.S. 424, 434 (1983)). "In rare and exceptional cases, the district court may adjust the lodestar upward or downward using a multiplier based on facts not subsumed in the initial lodestar calculation." Id. (citing Van Gerwen v. Mut. Life Co., 214 F.3d 1041, 1045 (9th Cir. 2000)). "The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked." Id. at 948 (citing Gates v. Deukmejian, 987 F.2d 1392, 1397 (9th Cir.1992)).

"Generally, when determining a reasonable hourly rate, the relevant community is the forum in which the district court sits." Camacho, 523 F.3d at 979 (citation omitted). "Rates outside the forum may be used if local counsel was unavailable, either because they are unwilling or unable to perform because they lack the degree of experience, expertise, or specialization required to handle properly the case." Id. (citation and internal quotation marks and alteration omitted). "[T]he established standard when determining a reasonable hourly rate is the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." Id. (citation and internal quotation marks omitted).

"'To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.'" Id. at 980 (quoting Blum v. Stetson, 465 U.S. 886, 895 n.11 (1984)). The Ninth Circuit has found that "[a]ffidavits of the plaintiffs' attorney[s] and other attorneys regarding prevailing fees in the community, and rate determinations in other cases . . . are satisfactory evidence of the prevailing market rate." Id. (citation and internal quotation marks omitted).

"However, declarations filed by the fee applicant do not conclusively establish the prevailing market rate." Id. Rather, "[t]he party opposing the fee application has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the . . . facts asserted by the prevailing party in its submitted affidavits." Id. (citation and internal quotation marks omitted).

## III.    DISCUSSION

### A.    Defendants' Application

Defendants seek "$13,757,998 in fees actually paid to Gibson, Dunn, & Crutcher LLP [("Gibson")] for 23,788 hours of work at an average rate of $578 per hour[,]" a $4,950,796 fee "adjustment to account for the time-value of money[,]" and $1,000,166 in expenses[4] incurred from the unsealing of the complaint through April 30, 2018.  ECF No. 559, App. at 1-2.

### B.    Plaintiff's Opposition To Defendants' Application

Plaintiff concedes that it is "required to pay the 'reasonable' attorneys' fees that Aventis incurred in this matter[,]" ECF No. 568, Opp'n at 10 (quotation omitted), but argues that Defendants' fee award should be reduced due to "Gibson's numerous improper billing practices [that] are forbidden by established case law, and, . . . by its retainer agreement with Aventis." Id. at 11.  Specifically, Plaintiff argues that Gibson's "improper billing practices" include: (1) "block billing fees"; (2) "geometrically increasing the hours on the matter by using 88 different lawyers and paralegals"; (3) "unreasonably billing for the 88 timekeepers by engaging in duplicative work and excessive conferencing"; (4) "engaging in

---

[4] As discussed above, the parties have agreed, and the Court has ordered that $672,086.85 is a reasonable award amount for Defendants' non-fee expenses.  See EFC No. 620, Expense Stip.; ECF No. 621, Order Granting Expense Stip.  As such, the Court omits arguments relating to Defendants' non-fee expenses from this Order.

1    unnecessary and posh travel to attend inter-office meetings";[5] and (5) "charging

2    unreasonably high hourly rates."  Id.

3         Plaintiff also argues that: (1) "the lodestar rates Gibson charged are

4    excessive and should be reduced"; (2) "under the [Outside Counsel Retention

5    Agreement ("OCRA")], Aventis should be awarded no more than

6    $1,438,200.58"; and (3) "Aventis should not be awarded any enhancement in

7    addition to its reasonable and necessary fees."  Id. at 28, 32, 41 (capitalization

8    normalized).  The Court addresses each of these issues in turn below.

9         **C.    <u>Analysis</u>**

10        As an initial matter, it is undisputed that Plaintiff is required to pay

11   Defendants' reasonable attorneys' fees and non-fee expenses in this matter after

12   the Court found that Plaintiff's claim was "clearly frivolous[,]" "Amphastar had

13   no reasonable foundation on which to bring the suit[,]" and Plaintiff's counsels'

14   "arguments to the Court were so specious as to manifest a lack of proper

15   professional concern for integrity."  <u>See</u> ECF No. 541, Order Granting Previous

16   Fee App. at 2, 17, 20, 22; ECF No. 568, Opp'n at 10; 31 U.S.C. § 3730(d)(4).  As

17   an initial matter, the Court finds that Defendants have met their burden of

18   documenting the hours expended in the litigation by submitting Gibson's Billing

19   Records and the various declarations in support of their Application.  However, for

20   the reasons discussed below, a reduction to Defendants' requested fee award is

21   nevertheless necessary.

22        As a secondary matter, the parties have agreed, and the Court has

23   consequently ordered, that in addition to the taxable costs previously paid by

24   Plaintiff, $672,086.85 is a reasonable award for non-fee expenses incurred by

25   Defendants from the time from when the Complaint was unsealed, through April

26   30, 2018.  EFC No. 620, Expense Stip.; ECF No. 621, Order Granting Expense

27   _____

28   [5] The Court omits discussion of this contention in this Order because Plaintiff's arguments
     related to Defendants' request for expenses, which, as discussed above, is a settled issue here.

1   Stip.  As such, **the Court awards Defendants $672,086.85 for non-fee expenses**
2   pursuant to the parties Expense Stipulation and the Court's Order Granting the
3   Expense Stipulation.  See EFC No. 620, Expense Stip.; ECF No. 621, Order
4   Granting Expense Stip.

5   Therefore, the sole issue before the Court is to determine the reasonable
6   amount of attorneys' fees to be awarded to Defendants in this case.  To determine
7   Defendants' fee award, the Court applies the lodestar method to Defendants' fee
8   request and begins by determining the number of hours that Defendants reasonably
9   expended on this litigation.

10   **1.   Reasonable Number Of Hours**

11   Defendants assert that "Aventis prevailed in a hard-fought, multi-billion-
12   dollar case, and it reasonably took 23,788 billed hours to do so" for the following
13   reasons.  ECF No. 580, Reply at 11.  First, Defendants assert that the case included
14   "over six years of high-stakes, intense litigation involving a complex scientific
15   subject matter, a confusing and disjointed evidentiary record (created and
16   obfuscated by Amphastar), multiple experts on both sides, extensive document
17   review and discovery work, and considerable travel."  ECF No. 559, App. at 10.

18   Second, Defendants assert that "Aventis *actually paid* [Gibson] $13,757,998
19   in fees and $1,000,166 in expenses through April 30, 2018, for a total of
20   $19,851,546 after an enhancement for the delay in payment."  ECF No. 580, Reply
21   at 9 (emphasis in original).  Defendants adds that "the fees paid by Aventis in this
22   case were approximately 16% less than [Gibson's] standard rates as a result of
23   various negotiated discounts, the firm's exercise of billing judgment, and Aventis's
24   close scrutiny of its monthly invoices."  ECF No. 559, App. at 10.

25   Third, Defendants assert that "Aventis's fee application was supported by
26   substantial evidence regarding hours, rates, and expenses[,]" such as spreadsheets
27   provided to Plaintiff "containing the approximately 8,400 underlying time entries,
28   including associated rate information."  ECF No. 580, Reply at 9.  Defendants add

that its billing statements "were authenticated and explained by sworn declarations from two [Gibson] partners and the Aventis in-house attorney responsible for supervising the litigation." Id.  Defendants also add that "Mr. Dovdavany, the in-house attorney who supervised the case for Aventis, carefully reviewed every invoice and approved all claimed hours for payment without any expectation of seeking reimbursement." Id. at 11. (citing ECF No. 559-3, Dovdavany Decl. at ¶¶ 6, 12, 20, 21, 34).  Defendants further assert that "Aventis was regularly and continuously involved in supervising the litigation, as reflected in the approximately 1142 time entries which include either the terms 'client' or 'Dovdavany[,]'" which "is more than one out of every seven entries." Id. (citing ECF No. 559-3, Dovdavany Decl. at ¶ 4; Schnitzer Decl. at ¶ 11).

As discussed above, Plaintiff asserts that the number of hours Defendants billed in this case is unreasonable because Defendants: (1) block billed their hours; (2) increased their hours by using 88 different lawyers and paralegals; and (3) engaged in duplicative work and excessive conferencing.  ECF No. 568, Opp'n at 10.  The Court addresses each argument in turn.

### a.    Block Billing

#### (i)    Parties' Arguments

Plaintiff argues that "an across-the-board reduction must be applied because Gibson's bills are almost entirely block-billed[,]" id. at 19, and because:

(1) "Amphastar should not be required to pay fees billed in violation of the . . . [OCRA] between Aventis and Gibson [that] included billing guidelines that explicitly forbade block-billing," ECF No. 594, Sur-Reply at 9;

(2) "[A]ccording to the Declaration of Mr. Schratz, nearly three-quarters of the time billed by Gibson—and 80% of the time billed by its core team—was block billed[,]" ECF No. 568, Opp'n at 21-22 (citing Schratz Decl. at ¶¶ 108, 110);

11

(3) "Gibson's expert has stated that across-the-board cuts of up to 40% are appropriate when fee entries are block billed[,]" id. at 20 (citing Schratz Decl. at ¶ 87 n.6.);

(4) "Courts widely recognize that block billing leads to a lack of cost control and an inability to accurately assess claimed fees, even in cases where a 'sophisticated client' reviews and pays the bills[,]" id. at 21, 22 (citing Banas v. Volcano Corp., 47 F. Supp. 3d 957, 968 (N.D. Cal. 2014); Thermolife Int'l, LLC v. Myogenix Corp., No. 13-CV-651 JLS (MDD), 2018 WL 325025, *7 (S.D. Cal. Jan. 8, 2018); MKB Constructors v. Am. Zurich Ins. Co., 83 F. Supp. 3d 1078, 1086 (W.D. Wash. 2015); Gunderson v. Mauna Kea Props., Inc., No. 08–00533 KSC, 2011 WL 9754085, *9 (D. Haw. May 9, 2011), aff'd, 567 F. App'x 538, 540 (9th Cir. 2014);

(5) The California State Bar suggests a "deduction of between 10% and 30% of the block-billed entries."  ECF No. 594, Sur-Reply at 14-15 (citing ECF No. 568-16, The State Bar of California Committee on Mandatory Fee Arbitration, Arbitration Advisory 03–01 (2003) ("California Bar Fee Report"));

(6) The cases Defendants cite in support of not reducing fees are not analogous to this case, id. at 22; and

(7) Defendants' "attempt to conflate block billing with a lack of detail is a sleight of hand designed to distract the Court" and should be found unpersuasive because the Court could "apply[] *separate* deductions to the lodestar for block billing and vague entries."  Id. at 14 (citing Good Morning to You Prods. Corp. v. Warner/Chappell Music, No. CV 13-4460-GHK (MRWx), 2016 WL 6156076, *10 (C.D. Cal. Aug. 16, 2016) (emphasis in original)).

Defendants respond that "each [Gibson] entry reflects, in detail, the work done by a single timekeeper on a single calendar day" and because "each entry was subjected to contemporaneous review by both [Gibson] and Aventis[,]" Plaintiff's

12

request for "a 30% across-the-board reduction for [Gibson's] hours for 'block billing,' amounting to a deduction of 6,422.66 hours . . . is inappropriate under Ninth Circuit precedent[ a]nd it is not supported by the record." ECF No. 580, Reply at 15 (citations omitted).

Defendants add that "[a] 30% reduction for block billing is 'at the very high end' of the amount allowed under Ninth Circuit law" and that "[a] maximal reduction is not warranted here, because the entries in question provided sufficient detail for an involved and paying client at the time the work was performed," and because "Amphastar has not actually pointed to any entry it says includes non-compensable work, unacceptably vague descriptions, or is inflated by 30% (or any other amount)." Id. (quoting Good Morning to You Prods. Corp., 2016 WL 6156076, at *10 (C.D. Cal. Aug. 16, 2016)).

Defendants also add that Plaintiff's "expert testified that actual non-billable work accounts for 'less than $20,000' (0.15%) of claimed fees" and "[g]iven that Mr. Schratz also testified that he reviewed each time entry 'either two o[r] three times,' the Court can be confident that there are no specific time entries that are objectionable, unreasonable, or unrecoverable—because Amphastar surely would have cited them." Id. at 17 (citation omitted).

Defendants argue that "[f]or all of the above reasons, no block billing reduction is warranted at all" and "[s]hould the Court elect to apply such a reduction, it should be limited to no more than 10% in light of the specificity of the entries, the review (and payment) by a sophisticated client, and the small number of entries that contain a large number of separate tasks." Id. at 20.

(ii)    <b>Legal Standard</b>

"'Block billing' is a 'time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks.'" Roadrunner Transp. Servs., Inc. v. Tarwater, No. 8:10-cv-1534 AG (MLGx), 2013 WL 12170492, at *2 (C.D. Cal.

13

Dec. 9, 2013), aff'd, 642 F. App'x 759 (9th Cir. 2016) (quoting <u>Welch</u>, 480 F.3d at 945 n.2).  The Ninth Circuit "does not quarrel with the district court's authority to reduce hours that are billed in block format" because "block billing makes it more difficult to determine how much time was spent on particular activities."  <u>Welch</u>, 480 F.3d at 948 (quoting <u>Role Models Am., Inc. v. Brownlee</u>, 353 F.3d 962, 971 (D.C. Cir. 2004) (reducing requested hours because fee applicant's "practice of block billing 'lump[ed] together multiple tasks, making it impossible to evaluate their reasonableness'"); <u>Hensley</u>, 461 U.S. at 437 (holding that the fee "applicant should 'maintain billing time records in a manner that will enable a reviewing court to identify distinct claims'"); <u>Fischer v. SJB–P.D. Inc.</u>, 214 F.3d 1115, 1121 (9th Cir. 2000) (holding that "a district court may reduce hours to offset 'poorly documented' billing")).

However, "just putting multiple tasks into one billing entry doesn't necessarily raise the concerns of block billing.  A concern in block billing is that a court may not understand precisely where time was spent, and thus may not be able to assess the reasonableness of the time spent."  <u>Roadrunner Transp. Servs., Inc.</u>, 2013 WL 12170492, at *2.  Thus, "[a]ttorneys do not have to make one billing entry per task for a court to see where time was spent[,]" and "entries for less than one hour often contain multiple tasks."  <u>Id.</u>

"[I]n cases where a voluminous fee application is filed in exercising its billing judgment the district court is not required to set forth an hour-by-hour analysis of the fee request."  <u>Gates</u>, 987 F.2d at 1399 (citations omitted).  "Rather, . . . when faced with a massive fee application the district court has the authority to make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure as a practical means of trimming the fat from a fee application."  <u>Id.</u> (citations and internal quotation marks omitted).

Nevertheless, a court making a block billing reduction "must 'explain how or why . . . the reduction . . . fairly balance[s] those hours that were actually billed in

block format.'"  Ryan v. Editions Ltd. W., Inc., 786 F.3d 754, 766 (9th Cir. 2015) (quoting Welch, 480 F.3d 942, 948) (alterations original)).  Moreover, it is reversible error when a district court "select[s] the specific percentages [of deductions] arbitrarily."  Gonzalez v. City of Maywood, 729 F.3d 1196, 1205 (9th Cir. 2013).

### (iii)   A 20% Reduction Is Warranted For The Block Billed Entries

Here, as an initial matter, the Court rejects Plaintiff's first argument that "Amphastar should not be required to pay fees billed in violation of the . . . [OCRA]" because the OCRA "included billing guidelines that explicitly forbade block-billing."  ECF No. 594, Sur-Reply at 9; see also ECF No. 568, Opp'n at 32-36.  Plaintiff argues that "[a]n attorney in a fee shifting case cannot make the opposing party pay more in attorneys' fees than it agreed to pay itself."  ECF No. 568, Opp'n at 34 (citing Hensley, 461 U.S. at 434; Copeland v. Marshall, 641 F.2d 880 (D.C. Cir. 1980); Image Tech. Serv., Inc. v. Eastman Kodak Co., 136 F.3d 1354, 1358 (9th Cir. 1998); In re Chang Sup Han, No. 2:11–BK–30025 RK, Adv. No. 2:11–AP–02632 RK, 2015 WL 5610886 (Bankr. C.D. Cal. Sept. 22, 2015)).  Contrary to Plaintiff's assertion, in this case, Gibson is not seeking more in attorneys' fees than Defendants agreed to pay.  Rather, Gibson seeks less.[6]  And, after Gibson's successful handling of this case, Defendants, who are sophisticated clients that oversaw each step of this litigation, agreed to pay Gibson more than the amount Gibson seeks here after negotiating discounts with Gibson.  Thus, the Court is not persuaded that reductions in Defendants fee award are necessary as a result of Gibson's' purported deviations from the terms of the OCRA.

---

[6] The Court notes that Defendants seek less than even Plaintiff's expert acknowledges Gibson was paid by Defendants.  Compare ECF No. 559, App. at 1-2 (Gibson seeks "$13,757,998 in fees actually paid to [Gibson] for 23,788 hours of work") with ECF No. 568-2 Schratz Decl. (Mr. Schratz observing that Gibson was paid $13,826,028.47 for 23,929.64 hours billed).

However, the Court finds that a reduction in the amount of hours Gibson claimed is nevertheless necessary because Defendants routinely lumped together multiple tasks in the narrative portions of their billing entries or failed to provide an adequate description of the work performed in other entries, making it impossible for the Court to determine whether Defendants spent the appropriate amount of time on each task throughout this multi-year litigation.

For example, at the outset of the litigation, on November 11, 2011, Michael Sukenik billed 7.8 hours with the following billing entry: "Exchange emails with S. Royall & M. Drake regarding research on false claims act and antitrust issues; review email summaries regarding issues; conduct legal research regarding FCA and antitrust claims, particularity pleading requirements, and standing for FCA claims; draft email memoranda summarizing findings."  ECF No. 619-1, Billing Records at 2.  It is unclear to the Court how many of the 7.8 hours Mr. Sukenik spent on November 11, 2011, for example, reviewing emails versus drafting memoranda.  While spending the lion's share of the billed time on the former would be inappropriate, spending more time on the latter would be reasonable. However, because Mr. Sukenik provided no indication of how much time he spent on each discrete task contained in this billing entry, the Court cannot determine whether this billing entry is reasonable.

Grouping disparate tasks were commonly done through much of Defendants' 683 page billing records.[7]  Moreover, in addition to narratives that

_____

[7] See, e.g.:

- ECF No. 619-1, Billing Records at 4 (On November 15, 2011, Olivia Adendorff billed 10.7 hours to "Further research jurisdictional requirements of FCA actions, including whether discovery can constitute public disclosure; telephone call with team to discuss background and progress; draft memo summarizing results");

- Id. (On November 15, 2011, Sean Royall billed 9.7 hours to "Further review of record from patent case and related contacts with team; reviewed research findings regarding stay of discovery and leave to amend issues; coordinated with M. Drake regarding case strategy, document preservation, and related issues; supervised legal research on FCA-antitrust overlap and intent issues and coordinated with M. Sukenik regarding same;

reviewed prior orders and decisions from patent and antitrust cases, outlined observations relating to key factual and legal issues, and follow-up with team regarding related analysis of collateral estoppel, FCA, antitrust, and intent issues; coordinated with O. Jennings regarding research and analysis relating to public disclosure and original source issues; conferences with J. Zelenay and T. Hatch regarding sui and FCA-related questions; reviewed and edited updated legal hold notice and related contacts with M. Drake; call to J. Weir and related e-mail exchanges; reviewed findings regarding background research on magistrate.");

- Id. at 6 (On November 17, 2011, Michael Sukenik billed 8.5 hours to "Participate in meeting and conference call with S. Royall, O. Jenning, & J. Zeleny pertaining to ongoing research projects; conduct legal research and draft memorandum summarizing findings on pleading, FCA, and antitrust issues.");

- Id. at 494 (On June 24, 2014, Tracey Davies billed 15 hours to "Continue work in preparation for original source pre-hearing conference and hearing; conference with Gibson Dunn team regarding same; review and consider draft petition for interlocutory appeal; confer with O. Adendorff and A. Johnson regarding same; review and revise same.");

- Id. at 496 (On June 25, 2014, Tracey Davies billed 13 hours to "Continue attendance to various issues in preparation for hearing on original source; coordinate team efforts regarding bench memoranda, witness preparation and strategy; overall themes and presentation; coordinating efforts in preparation for pre-hearing conference; review and consider draft Reply in support of petition for interlocutory appeal; confer with A. Johnson and O. Adendorff regarding same.");

- Id. at 497 (On June 26, 2014, Tracey Davies billed 11.5 hours to "Continue attendance to various issues in preparation for hearing on original source; coordinate team efforts regarding bench memoranda, witness preparation and strategy; overall themes and presentation; coordinating efforts in preparation for pre-hearing conference; review and consider draft Reply in support of petition for interlocutory appeal; confer with A. Johnson and O. Adendorff regarding same; prepare for and participate in weekly status call with D. Dovdavany, N, Poulos and GDC team.");

- Id. at 502 (On June 30, 2014, Tracey Davies billed 15 hours to "Continue attendance to various issues in preparation for hearing on original source; coordinate team efforts regarding bench memoranda, witness preparation and strategy; overall themes and presentation; review and consider order of Court regarding our proposals for hearing and resetting of prehearing conference for July 2; conference with GDC team members regarding same.");

- Id. at 503 (On June 30, 2014, Betty Yang billed 14 hours to "Draft and edit cross-examination outline for Y. Zhang; prepare trial graphics for original source hearing; meet with W. Dawson, T. Davies, S. Payne, R. Cunningham, and A. Brody regarding original source hearing strategy.");

- Id. at 504 (On July 1, 2014, Betty Yang billed 17.5 hours to "Prepare graphics for opening; meet with M. Perry, W. Dawson, T. Davies, S. Payne, and A. Brody to discuss opening

group multiple tasks together under the same time entry, Defendants' Billing Records also contain billing entries that are vague and do not provide enough detail for the Court to discern the work that was actually performed.  <u>See</u> State Bar of California Committee on Mandatory Fee Arbitration, Arbitration Advisory 2016-02 (2016) ("Updated California Bar Fee Report") at 10, http://www.calbar.ca.gov /Portals/0/documents/mfa/2016/2016-02_Bill-Padding_r.pdf (last accessed November 12, 2020) ("generalized time entries such as 'research issues', 'review file', 'attention to file', 'discovery', 'prepare for trial', 'trial prep', and other similar general statements are not specific enough to let the client know what was done" and "[i]f a lawyer uses such non-specific task descriptions, it may be appropriate . . . to place on the lawyer the burden of clarifying what was actually done to assess whether the generalized time entries are actually compensable and appropriate.")

/ / /

---

strategy and theme; meet with W. Dawson to discuss opening themes and graphics; meeting with T. Davies to prepare for Fei cross exam; prepare deposition designations for original source hearing.");

- <u>Id.</u> at 506 (On July 2, 2014, Betty Yang billed 18.3 hours to "Prepare graphics for opening; participate in teleconference with M. Perry, T. Davies, S. Payne, and D. Dovdavany to discuss opening; meet with W. Dawson to discuss opening themes and graphics; meeting with W. Dawson to prepare for Y. Zhang cross examination; meeting with T. Davies to prepare for R. Fei cross examination; meeting with R. Cunningham to prepare for Y. Zeng cross examination; prepare deposition designations for original source hearing.");

- <u>Id.</u> at 507 (On July 3, 2014, Betty Yang billed 17.5 hours to "Prepare graphics for opening; meet with K. Edgar and T. Davies to prepare for K. Edgar direct examination; meet with W. Dawson, M. Perry, T. Davies and team to discuss opening; meet with T. Davies to prepare for cross examination of R. Fei.");

- <u>Id.</u> at 571 (On October 9, 2014, Betty Yang billed 20.8 hours to "Meet with T. Davies and J. McKenney re closing arguments; analyze documents to prepare for same; prepare graphics for same."); and

- <u>Id.</u> (On October 9, 2014, Tracey B. Davies billed 16.25 hours to "continue preparation for hearing on closing argument and related issues; confer with GDC team regarding same; confer with D. Dovdavany regarding same.").

For example, on July 3, 2014, and July 6, 2014, Tracey Davies billed two 19-hour entries for "Continued work in preparation for Original Source hearing." ECF No. 619-1, Billing Records at 507, 510. The Court cannot say with confidence that nineteen hours is the appropriate amount of time to spend, twice within a four-day period, performing the generic task of "work" to prepare for a hearing.

Accordingly, the Court finds that a reduction is warranted here because the Court cannot discern how much time Defendants spent on each discrete task throughout this multi-year litigation and, in some instances, cannot even discern what specific work tasks were actually performed. See Welch, 480 F.3d at 948; Updated California Bar Fee Report at 9-10. Thus, the Court turns next to how much of a reduction is warranted here.

As discussed above, the parties champion reductions ranging from zero to forty percent, and cite to case law, the OCRA between Gibson and Defendants, the California Bar Fee Report, and arguments that the attorneys involved in the instant case proffered in previous cases. While the parties raise compelling points in support of the amount to be withheld, if any, the Court finds that a twenty percent reduction to only Defendants' block-billed entries is appropriate in this case for the following reasons.

First, the cases cited by Plaintiff suggest that a ten to twenty percent across-the board reduction is appropriate for block billing. See Banas, 47 F. Supp. 3d at 968 (reducing fee award by twenty percent for block billing); Thermolife Int'l, LLC, 2018 WL 325025 at *7 (ten percent reduction for block billing); MKB Constructors, 83 F. Supp. 3d at 1086 (twenty percent reduction for block billing); Gunderson, 2011 WL 9754085 at *9 (twenty percent reduction for block billing). Although Plaintiff cites arguments made by Defendants' counsel in other unrelated cases that reductions as high as forty percent are appropriate when block billing is present, the Court finds that the reductions actually imposed in aforementioned cases, rather than the arguments made by attorneys in support of reductions, are

more persuasive.  Thus, the Court observes a ten-to-twenty-percent reduction in fees is one benchmark that could be applied in this case.

Second, the Updated California Bar Fee Report states that "block billing 'hides accountability and may increase time by 10% to 30%'" and suggests a ten to thirty percent reduction for block billed fees is appropriate.[8]  Updated California Bar Fee Report at 10 (quoting the California Bar Fee Report at 7).  Moreover, as discussed below, other courts in the Ninth Circuit have relied on the California Bar Fee Report when determining the amount to be withheld when block billing occurs.  Thus, the Court observes that a ten-to-thirty-percent reduction in fees could be applied in this case pursuant to the California Bar Fee Report and the Updated California Bar Fee Report.

Based on the foregoing, the Court finds that a twenty percent reduction is appropriate here because the instances of block billing and vague time entries were significant throughout Defendants' 683 pages of billing records, such that more than the lowest curative reduction amount of ten percent is warranted here.

However, the Court finds that a reduction at the highest end discussed in the cited sources—thirty percent—would be too great a reduction in this case because Gibson's bills were scrutinized by a sophisticated client throughout the litigation, some discounts were already negotiated by that sophisticated client, and, most notably, that sophisticated client actually paid Gibson more than Gibson seeks here after all reductions and discounts were made.  See ECF No. 619-1, Billing Records; see also id. at 503-17 (entries from July 1, 2014, to July 11, 2014, indicate that all

---

[8] The Updated California Bar Fee Report, which "[r]eplaces and [s]upersedes Arbitration Advisory 2003-01[,]" states that "discretion" for the amount to reduce block billed fees "is not limited to the 10% to 30% range."  See State Bar of California Committee on Mandatory Fee Arbitration, Arbitration Advisory 2016-02 (2016) at 10, http://www.calbar.ca.gov/Portals/0/documents/mfa/2016/ 2016-02_BillPadding_r.pdf (last accessed November 12, 2020).  However, while the 2016 version of this advisory does not limit reductions for block billing to the ten-to-thirty-percent range, the Court is unaware of any case in the Ninth Circuit where more than a thirty percent reduction has been made pursuant to the California Bar Fee Report or the Updated California Bar Fee Report.

entries are part of "$900K Fixed Fee[,]" which indicates that discounts were taken); <u>see also</u> ECF No. 568-2, Schratz Decl. at ¶ 60 (Plaintiff's expert, Mr. Schratz, acknowledged that Gibson's base hours were 24,056.99; billed hours were 23,929.64; billed amounts were $16,430,279.92; billed amount after discounts was $13,850,955.56; paid amount was $13,826,028.47; and that Mr. Schratz "presume[d] that some amount of the 'base hours' were 'written down' by either Gibson or Aventis in order to obtain the number of 'billed hours[,]'" which further indicates that discounts were taken here).

Moreover, the Court observes that in <u>Welch</u>, the Ninth Circuit "d[id] not quarrel with the district court's authority to reduce hours that [we]re billed in block format[,]" after observing that the district court "adopted the 20 percent as within the [California Bar] Fee Report's 'middle range.'" <u>See</u> <u>Welch</u>, 480 F.3d 942 at 948-49. Thus, like the district Court did in <u>Welch</u>, this Court too adopts the middle range of the California Bar Fee Report and the Updated California Bar Fee Report and finds that a twenty percent reduction is warranted here.

The Court notes, however, that the Ninth Circuit found in <u>Welch</u> that "the district court clearly erred in applying a 20 percent reduction to all of [the claimant's] requested hours" because "barely more than half of all hours submitted by [the claimant's] counsel were block billed." <u>Id.</u>; <u>see also</u>, <u>Ryan v. Editions Ltd. West, Inc.</u>, 786 F.3d 754, 766 (9th Cir. 2015) (finding that "it was within the district court's discretion to reduce the requested fee amount to account for the potential inflation of hours that may result from block billing[,]" but "vacat[ing] the district court's across-the-board twenty-percent reduction" for "failing to account for the fact that many of the entries in [the claimant's] billing log were not billed in block format" and remanding the case so that "the district court may reduce the requested fee amount to account for block billing and improperly claimed interest," with instructions that the district court "must explain how or why . . . the reduction . . . fairly balances those hours that were

actually billed in block format and how it determined the percentage of reduction to apply" (citing Welch, 480 F.3d at 948; Sorenson v. Mink, 239 F.3d 1140, 1146 (9th Cir. 2001) (internal quotation marks and alterations omitted)).

Consequently, based on Welch and its progeny, the Court finds that a twenty percent reduction to only Defendants' block-billed time is appropriate here. As such, the Court turns next to how many of Defendants' entries were block billed.

To determine the amount of billing entries that Defendants block billed, the Court did not count each of the several thousand billing entries manually,[9] or rely on Plaintiff's expert's count of the semicolons in Defendants' billing records, which even Plaintiff's expert, Mr. Schratz, concedes "is not an exact" "type of analysis" and may overstate the count of block billed entries. See ECF No. 568-2 (Schratz Decl. at ¶ 104) (Mr. Schratz stating in his Declaration that "[a]dmittedly, this type of analysis of block billing is not an exact science. It may inadvertently separate an individual task into multiple tasks, thus overstating the count of blocked entries"). Rather, the Court has sampled five pages of Defendants' billing entries at 100 page intervals[10] throughout the Billing Records and has found that 29 out of 57—or 50.88 %—of the entries on those pages listed multiple tasks per entry, which made it impossible for the Court to determine whether the time spent on

---

[9] See Gates, 987 F.2d 1392, 1399 (the Court "is not required to set forth an hour-by-hour analysis of the fee request" "in cases where a voluminous fee application is filed").

[10] The Court omits from its analysis the entries at page 505 of Defendants' Billing Records because there is a comment beside each of the billing entries on that page—and all entries from July 1, 2014, to July 11, 2014 as well—indicating that those billing entries are already part of a "$900K Fixed Fee." ECF No. 619, Billing records at 503-17. There also appears to be a discount applied to the billed rates for these entries, and the Knapton Declaration supports this conclusion. See ECF No. 559-4, Knapton Decl. at 6, n.4 (stating that a sixteen percent discount on fees—from the $16,336,371.42 Gibson billed, to the $13,751,251.91 Defendants paid—has already been made in this case). Thus, because these entries are part of a fixed fee agreement between Gibson and Defendants, and indicate that discounts have already been applied to the fees charged, the Court omits these entries from its sample data set as these entries appear to be outliers from a particularly busy time in the litigation.

each discrete task associated with those entries was reasonable.  See ECF No. 619, Billing Records at:

- 5 (five[11] out of six billing entries listed multiple tasks per entry);

- 105 (six[12] out of eight billing entries listed multiple tasks per entry);

- 205 (seven out of nine billing entries listed multiple tasks per entry);

- 305 (four out of seven billing entries listed multiple tasks per entry);

- 405 (seven[13] out of nine billing entries listed multiple tasks per entry); and

- 605 (zero[14] out of eighteen billing entries listed multiple tasks per entry or, if multiple tasks were entered, the biller indicated how much time was spent on each discrete task).

---

[11] The Court does not include the entry from Michael Sukenik for 0.4 hours to "Speak with S. Royall regarding outstanding research projects; exchange emails with J. Zelenay regarding FCA & antitrust issues"; ECF No. 619, Billing Records at 5; because Mr. Sukenik performed both tasks in no more than twenty-four minutes, which appears to be a reasonable amount of time for these two tasks.  See Roadrunner Transp. Servs., Inc., 2013 WL 12170492, at *2.

[12] The Court does not include the entry from Steven Tave for 0.5 hours to "Review and analyze Amphastar's opposition to motion to dismiss; begin formulating reply to same"; ECF No. 619, Billing Records at 105; because these two tasks appear to be so closely related that listing the amount of time spent on each task is not necessary for the Court to determine whether the entry was reasonable.  Moreover, Mr. Tave performed both tasks in 0.5 hours.  Thus, the Court finds that this entry was reasonable.  See Roadrunner Transp. Servs., Inc., 2013 WL 12170492, at *2.

[13] The Court does not include the entry from Claire Davies for 1.0 hours to "Work with L. Gee to prepare and identify exhibits for Campbell deposition outline; analyze revised original source timeline to identify any additional exhibits identified in same"; ECF No. 619, Billing Records at 405; because these two tasks appear to be closely related that listing the amount of time on each task is not necessary for the Court to determine whether the entry was reasonable.  Moreover, Ms. Davies performed both tasks in 1.0 hour.  Thus, the Court finds that this entry was reasonable.  See Roadrunner Transp. Servs., Inc., 2013 WL 12170492, at *2.

[14] The Court observes that several entries on this page contained multiple tasks per entry.  See ECF No. 619, Billing Records at 605.  However, the entries included details about the amount of time that was spent on each discrete task associated with that entry, or the tasks were so closely related that the Court was able to discern that the amount of time billed for that entry was appropriate.  See e.g., the billing entries from:

Accordingly, because the Court finds that, pursuant to the Court's aforementioned sample, roughly half of Defendants' billing entries were block billed or too vague to determine whether the amount of time spent on each discrete task was reasonable, the Court applies a twenty percent reduction to half of Defendants' Billing Record, resulting in a **net reduction of 10.176% of Defendants' total bill as a result of block billing**.[15]  The Court turns next to whether additional reductions are necessary for other reasons.

### b.    Overstaffing, Transient Billers, And Difference Between Time Each Party Spent On The Case

### (i)    Parties' Arguments

Plaintiff argues first, generally, that "Gibson's invoices reflect unnecessary duplication of effort, excessive internal conferencing, and non-compensable time spent training junior associates, all of which requires significant reductions."  ECF No. 568, Opp'n at 24 (citations omitted).  Plaintiff adds that "an across-the-board cut of 10% should be applied for overstaffing and transient billers, and an additional 10% cut should be applied for excessive intra-office conferences."  Id. at 25 (citation omitted).

---

- Richard Cunningham for 5.1 hours to "Conference with D. Schnitzer to prepare factual overview / affidavit re sanctions issues (0.4); continue drafting factual outline of Amphastar's misconduct to support sanctions issue briefing (4.7)[,]" id.;

- David Schnitzer's entry for 0.4 hours to "Teleconference with T. Davies, R. Cunningham to prepare for costs hearing (0.3); review and revise hearing preparation materials (0.1)[,]" id.; and

- Richard Cunningham's billing entry for 4.6 hours to "Assist T. Davies in preparations for hearing with Court re Sanofi's Bill of Cost application; related contacts with T. Davies and D. Schnitzer," which contain such closely related tasks that notations for the exact amount of time spent on each discrete task was not necessary for the Court to determine whether the entry was reasonable.  Id.

[15] The reduction of 10.176% is calculated based upon the conclusion that 50.88% entries were block billed and determining that those entries should be reduced by 20% (50.88% * 20% = 10.176%).

24

1     With respect to overstaffing and transient billers, Plaintiff argues that

2  "Gibson staffed this case with 88 timekeepers, the equivalent of an entire regional

3  law firm" and that "Gibson's hours are also inflated because of numerous

4  timekeepers with limited and transient roles[,] . . . known as 'transient billers,'

5  needlessly inflate[d] the hours billed without meaningfully contributing to the

6  case." Id.  Plaintiff argues that because "Gibson staffed this case with numerous

7  timekeepers who had limited and transient roles, inflating both the total number of

8  timekeepers and the hours billed[, t]he fees Aventis claims should be reduced

9  accordingly." Id. at 26 (internal citation omitted).

10    Defendants respond first, generally, that their "actual hours are reasonable"

11 because "Mr. Perry, the Aventis relationship partner at Gibson [], has filed a sworn

12 declaration that these hours were reasonably incurred" and because "Mr.

13 Dovdavany, the in-house attorney who supervised the case for Aventis, carefully

14 reviewed every invoice and approved all claimed hours for payment without any

15 expectation of seeking reimbursement." ECF No. 580, Reply at 11 (capitalization

16 normalized, citations omitted).  Defendants add that "Aventis was regularly and

17 continuously involved in supervising the litigation, as reflected in the

18 approximately 1142 time entries which include either the terms 'client' or

19 'Dovdavany.' (That is more than one out of every seven entries.)[.]" Id. (citations

20 omitted).  Defendants then addressed each of Plaintiff's individual arguments.

21    With respect to Plaintiff's "transient biller" reduction request, Defendants

22 argue that Plaintiff "asks the Court to 'disallow the time spent by transient billers,

23 totaling 10% of the hours billed[,]'" which "is a reduction of 2,379 hours[,]" but

24 Plaintiff's "expert identifies only 263.35 hours billed by timekeepers he calls

25 'transient.'" Id. at 13 (quoting ECF No. 568, Opp'n at 19; citing id. at 16-17;

26 Schratz Decl. at ¶¶ 71-85).  Defendants assert that Plaintiff identified only fifty-

27 four individuals it identified as "transient billers" and "[o]f those, [Plaintiff's] own

28 analysis shows that 19 had no time actually billed to Aventis, and the others billed a

total of . . . 263.35 hours." Id. at 14 (citing Schratz Decl. at 28–31).  Defendant

adds that "Schratz discusses only one specific example of an identified transient

biller: 11 hours by an appellate partner serving as a moot court judge in preparation

for the Ninth Circuit oral argument" and "neither Amphastar nor its expert cite

any other specific examples of work by these 54 individuals that they contend

should have been done by a so-called 'core' timekeeper." Id. (citing Schratz Decl.

at 31).  Defendants assert that "at least 60% of the hours in question were by non-

attorneys such as paralegals and e-discovery specialists" and "[t]heir tasks

frequently are one-offs, undermining any argument that there was some

inefficiency in a 'non-core' staff person performing them." Id. (citing Schnitzer

Decl. at ¶ 4).

Defendants also argue that they "staffed the case reasonably and

appropriately" considering that "['e]leven timekeepers accounted for 70% of the

billed hours, and 22 for 96%." Id. (citing Knapton Decl. at 4).[16]  Defendants adds

that "[o]f the remaining 66 who recorded any time to the case, no time was actually

billed to Aventis for 19, and 43 were paralegals or other non-attorneys." Id.

Defendants assert that "[t]hat is a notable efficiency considering the duration of

the case and the many subject areas and types of practice involved at various

junctures" and, consequently, argue that no general reduction for 'overstaffing' is

needed." Id. (citing Auto. Prods. PLC v. Tilton Eng'g, Inc., 855 F. Supp. 1101,

1103 (C.D. Cal. 1994) for the proposition that that court "reject[ed] reduction

where 8 of 25 attorneys accounted for 97% of the time").  Defendants, therefore,

assert that "there is no basis for any reduction" and "[e]ven if [Plaintiff's] criticism

---

[16] The Court observes that Defendants incorrectly cite the data in the Knapton Declaration.  A
review of the Knapton Declaration reveals that "[t]he time by the core team of 11 attorneys is
70% of all time.  The top **23** timekeepers comprise 96% of the total time."  ECF No. 559-4,
Knapton Decl. at 7 (emphasis added).  Thus, Defendants appear to have undercounted their core
group of timekeepers by one person.

of "transient" billers were correct (it isn't), it could result in a reduction at most of 263.35 hours (or about 1% of the total)." Id. at 13-14.

Plaintiff replies that Defendants "misconstrue[] Amphastar's objection to Aventis's transient billers and the associated need to reduce the lodestar hours." ECF No. 594, Sur-Reply at 20. Plaintiff asserts that "[t]his incorrect contention stems from the fact that Mr. Schratz specifically examined the time entries for the 54 timekeepers who billed the fewest hours on the matter . . . to test Mr. Knapton's claim that the transient billers brought special expertise to the case." Id. at 21 (citing ECF No. 580, Reply at 6, ¶ 81).[17] Plaintiff adds that Defendants "mistake[] Mr. Schratz's use of a subset of timekeepers to test a hypothesis (a common practice in the scientific method) with a determination that these 54 timekeepers were the only transient billers." Id.

Plaintiff argues that "[i]n its moving papers, Aventis acknowledged that its core team of 11 lawyers billed 70% of the time on this matter[,]" therefore, "77 transient billers billed 30% of the 23,787 hours to this case, or 7,136 hours." Id. at 21 (citing Knapton Decl. at 14). Plaintiff adds that "concern about overbilling is presumably why Aventis required that Gibson assign a core team of attorneys and not add timekeepers to the matter without Aventis's consent." Id. (citation omitted). Plaintiff also adds that "the record shows that there is a gaping difference, of greater than 30%, between the hours billed by the attorneys for Aventis as compared to the attorneys for Amphastar in the exact same case." Id. at 26. Plaintiff concludes that "[t]he Court should therefore deduct 10% from Gibson's claimed hours to account for over-staffing and transient billing, as recommended by Mr. Schratz." Id. at 22.

---

[17] The Court notes that there is not a ¶ 81 at page 6 of Defendants' Reply. Thus, the Court is unsure which document Plaintiff is citing.

27

1    **(ii)    One Percent Reduction Is Warranted.**

2    Here, the Court is not persuaded by Plaintiff's argument that a ten percent

3    reduction in Gibson's claimed hours for overstaffing and transient billing.

4    Nevertheless, despite the risk of becoming a green-eyeshade accountant, the Court

5    finds that a one percent reduction is warranted here.  See <u>Fox v. Vice</u>, 563 U.S.

6    826, 838 (2011) ("trial courts need not, and indeed should not, become green-

7    eyeshade accountants.  The essential goal . . . is to do rough justice, not to achieve

8    auditing perfection.  So trial courts may take into account their overall sense of a

9    suit, and may use estimates in calculating and allocating an attorney's time.").

10    With respect to Plaintiff's first argument—that "Aventis acknowledged that

11    its core team of 11 lawyers billed 70% of the time on this matter[,]" therefore, "**77**

12    **transient billers** billed 30% of the 23,787 hours to this case, or 7,136 hours"—the

13    Court is not persuaded by Plaintiff's characterization of all remaining seventy-

14    seven timekeepers in this case as "transient billers" whose work on this case

15    demands a ten percent reduction in Gibson's bill.  ECF No. 594, Sur-Reply at 21

16    (emphasis added).

17    While it is undisputed that eleven of the eighty-eight lawyers in this case

18    billed seventy percent of the time on this matter, <u>see</u> ECF No. 568-2, Schratz Decl.

19    at ¶¶ 78-79, ECF No. 559-4, Knapton Decl. at ¶ 12, the evidence does not support

20    Plaintiff's contention that the remaining seventy-seven timekeepers in this case

21    were all "transient billers" who were equally responsible for the remaining "30% of

22    the 23,787 hours to this case, or 7,136 hours."  ECF No. 594, Sur-Reply at 21.

23    Rather, Plaintiff's own expert, Mr. Schratz, indicated that as many as seventeen of

24    the remaining seventy-seven timekeepers had their time completely written off,

25    while fifty-four billed "less than a total of $13,500.00 in fees on the case."  <u>See</u>

26    ECF No. 568-2, Schratz Decl. at ¶ 82 (declaring that "we looked at the billing

27    entries of the transient billers: of the 88 timekeepers in this case, 54 of them billed

28    less than a total of $13,500.00 in fees on the case, with 43 of those timekeepers

28

billing 9 hours or less, and 17 of those timekeepers having their time completely
written off" and "[s]everal timekeepers billed less than one hour for the entire
case.").

Indeed, a review of Mr. Schratz's "table show[ing] the transient
timekeepers, their titles, and the total hours and fees they billed" indicates that
seventeen timekeepers, some of whom billed as many as 21.5 hours in this case
already had their time written off completely.  Id.  Moreover, the fifty-four
"transient billers," as Plaintiff describes them, who appear on Mr. Schratz's
aforementioned table of "transient timekeepers," as Mr. Schratz describes them,
had their 337.57 "total base hours" reduced by twenty-two percent to 263.35 "total
billed hours," for a total bill of $107,059.20.  Id. (capitalization normalized).  Thus,
Mr. Schratz's table indicates that fifty-four people billed a total of 263.35 hours, or
1.1 percent of the total time spent on this case for a total of $107,059.20, which
represents only 0.778% of Gibson's instant fee request.

It is unclear to the Court why Mr. Schratz's table of "transient timekeepers"
listed only fifty-four people, when Plaintiff represents to the Court that "77 [people
were] transient billers [who] billed 30% of the 23,787 hours to this case, or 7,136
hours."  Id.; ECF No. 594, Sur-Reply at 21.  However, the Court suspects that the
answer to the discrepancy lies in Mr. Knapton's declaration, where Mr. Knapton
indicated that "[t]he time by the core team of 11 attorneys is 70% of all time.  The
top 23 timekeepers comprise 96% of the total time."  ECF No. 559-4, Knapton
Decl. at 7 (emphasis added).  Thus, pursuant to the Schratz and Knapton
Declarations:

- eleven of eighty-eight people billed seventy percent of the 23,788 hours
  Gibson billed,[18] or 1,513.78 hours per person;[19]

---

[18] See ECF No. 568-2, Schratz Decl. at ¶¶ 78-79; ECF No. 559-4, Knapton Decl. at ¶ 12.

[19] 23,788*0.7=16,651.6 hours; 16,651.6 hours / 11 people = 1,513.78 hours per person.

- twelve of eighty-eight people billed twenty-six percent of the 23,788 hours Gibson billed,[20] or 515.41 hours per person;[21]
- the remaining sixty-five of eighty-eight people in this case billed four percent of the 23,788 hours Gibson billed,[22] or 951.52 hours total;[23]
- pursuant to Mr. Schratz's declaration, fifty-four of those sixty-five remaining people billed 263.35 hours, or 1.1 percent of the 23,788 hours Gibson billed, or 4.88 hours per person[24] (after a twenty-two percent discount was applied as discussed above);
- which means that eleven remaining timekeepers ("Outliers")—who were not accounted for in the top twenty-three timekeepers billing ninety-six percent of the time from Mr. Knapton's declaration, or the bottom fifty-four timekeepers billing 1.1% of the time from Mr. Schratz's declaration— billed the remaining 2.9 percent of the 23,788 hours Gibson billed in this case,[25] or 62.71 hours per person.[26]

Therefore, because the aforementioned declarations submitted by both parties reveal that some of the seventy-seven billers who were outside of the top eleven billers in this case billed, for example, an average of 515.41 hours per person, and because Plaintiff submits no authority to support a conclusion that people billing over 500 hours in a case are transient billers, the Court rejects Plaintiff's

---

[20] Eleven people billing seventy percent of the time plus twelve people billing twenty-six percent of the time equals twenty-three people billing ninety-six percent of the time, as stated in Mr. Knapton's declaration.  See ECF No. 559-4, Knapton Decl. at 7.

[21] 23,788*0.26=6,184.88 hours / 12 people = 515.41 hours per person.

[22] Eighty-eight timekeepers minus the aforementioned twenty-three timekeepers equals sixty-five timekeepers.

[23] 23,788*0.04=951.52 hours total.

[24] 263.35 hours / 54 people = 4.88 hours per person.

[25] 96% + 1.1% +2.9% = 100%.

[26] 23,788*0.029=689.85 hours; 689.85 hours / 11 people = 62.71 hours per person.

assertion that all seventy-seven of the people who were outside the top eleven billers in this case were transient billers whose work in this matter supports a ten percent across-the-board reduction of Gibson's billed time.

Nevertheless, the Court finds that a **<u>one percent reduction in Gibson's bill is warranted</u>** in this case to compensate for most of the hours billed by the fifty-four individuals discussed in Mr. Schratz's declaration, who billed 1.1% of the time in this matter at an average of only 4.88 hours per person.  The Court finds a reduction in hours is warranted here due to the low average number of hours worked by these fifty-four individuals over the course of the roughly decade-long litigation.  See <u>Roadrunner Transp. Servs., Inc.</u>, 2013 WL 12170492, at *2 (reducing "the amount billed by the roughly 10 timekeepers who spent less than 20 hours each on th[e] case.").  The Court does not reduce the entire 1.1% billed by these individuals, however, because: (1) as discussed above, Defendants already negotiated a twenty-two percent reduction in hours for these timekeepers; and (2) seventeen of these timekeepers, some of whom billed as many as 21.5 hours in this case—more than the twenty hour threshold contemplated in <u>Roadrunner</u>—already had had their time completely written off by Defendants.  See <u>id.</u>; <u>see also</u> ECF No. 568-2, Schratz Decl. at ¶82.

The Court also makes no deduction for the hours billed by the eleven Outliers who billed the remaining 2.9 percent of the 23,788 hours in this case, or 62.71 hours per person, because this number of hours far exceeds the twenty hour threshold contemplated in <u>Roadrunner</u> and the Court finds that these hours spent were not "transient" as Plaintiff argues.  See <u>Roadrunner Transp. Servs., Inc.</u>, 2013 WL 12170492, at *2.  Moreover, the Court observes that Mr. Knapton opined, which Mr. Schratz acknowledged, that the billers Plaintiff defines as "transient" were "'doing specialized work that was appropriate for them, and [he] didn't really see them as transient billers.'"  ECF No. 568-2, Schratz Decl. at ¶ 81 n.4 (citation omitted).

Turning to Plaintiff's second argument—that a reduction is appropriate here
pursuant to the terms of the OCRA, which Plaintiff argues Gibson violated because
Gibson could "not add timekeepers to the matter without Aventis's consent" but
did so anyway—the Court is unpersuaded.  ECF No. 594, Sur-Reply at 21.  As
discussed immediately above and in the previous section, Defendants not only
agreed to pay Gibson the amount Gibson seeks here, Defendants paid Gibson more.
Further, Defendants are sophisticated clients who already negotiated discounts to
the bill.  Specifically, Defendants have already negotiated a discount from the
$16,430,279.92 that Gibson billed, to the $13,826,028.47 that Defendants paid,
which is more than the $13,757,998 that Gibson seeks here.  See ECF No. 559,
App. at 1-2; see also ECF No. 568-2, Schratz Decl. at ¶ 60 (Plaintiff's expert, Mr.
Schratz, acknowledged that Gibson's billed amounts" were $16,430,279.92;
Gibson's "billed amount less invoice-level discounts and writeoffs [sic]" was
$13,850,955.56; and the "paid amount" was $13,826,028.47) (capitalization
normalized).

Accordingly, even assuming that Plaintiff—a non-party to the OCRA—has
standing to enforce the terms of the OCRA that only Gibson and Defendants are
party to, which the Court reserves judgment on, the Court finds that further
reductions pursuant to the OCRA are not warranted here because Defendants have
already negotiated over $2.6 million in discounts from the amount Gibson billed to
the amount Gibson was paid.[27]

Turning to Plaintiff's third argument—that a reduction is warranted because
there was a thirty percent deviation between Plaintiff's and Defendants' billed time
in this case—the Court is unpersuaded.  In light the previously made findings in
this case, the Court cannot conclude that Defendants spent considerably more time
defending this matter than would otherwise have been appropriate.  As such, the

---

[27] The $16,430,279.92 that Gibson billed minus the $13,826,028.47 that Defendants paid equals
$2,604,251.45, or roughly $2.6 million.

fact that Plaintiff spent less time than Defendants on this case does not warrant a
further reduction in Defendants' fee request.  See Holt v. Kormann, No. 8:11-cv-
1047 (DOC) (MLGx), 2012 WL 5829864, *6 (C.D. Cal. Nov. 15, 2012) ("Courts
'should defer to the winning lawyer's professional judgment as to how much time
he was required to spend on the case.'") (quoting Moreno v. City of Sacramento,
534 F.3d 1106, 1112 (9th Cir. 2008)).

### c. Excessive Conferencing And Excessive Hours
### (i) Parties' Arguments

As discussed above, Plaintiff argues that "an additional 10% cut should be
applied for excessive intra-office conferences."  ECF No. 568, Opp'n at 25
(citations omitted).  Plaintiff argues that "Gibson billed for an excessive and
unreasonable number of intra-office conferences and communications[,]"
including "entries for roughly 749 intra-firm communications, amounting to 694.6
hours."  Id. (citation omitted).  Plaintiff argues that "[t]his is plainly excessive, and
the Court should reduce Aventis's fee request to account for this inordinate
number of intra-firm conferences and communications."  Id.

Plaintiff also argues that "Gibson's fee request is replete with billers who
billed an excessive number of hours each day on a case and '[a]bsent extraordinary
circumstances, such billing indicates excessive hours and a reduction should be
applied.'"  Id. at 27 (citations omitted).  Plaintiff argues that "Gibson's fee records
also show excessive time for multiple attorneys attending depositions, excessive
time on motions, and on pro hac vice applications" and adds that "[a]ll these
demonstrate that a reduction of Gibson's hours when calculating the lodestar is
appropriate."  Id. (citing Schratz Decl. at ¶¶ 127-31, 134, 137).  Plaintiff also adds
that "the jurisdictional issue on which the case was decided does not warrant
Gibson's unreasonably high hours" because "this case was decided after a four-day
bench trial regarding a limited factual question" regarding "whether Amphastar
conducted certain experiments."  Id. (capitalization normalized and citation

33

omitted).  Moreover, Plaintiff asserts "[t]hat the case was accompanied by two 12(b)(6) motions, one summary judgment motion, five discovery motions, and appeals is typical of federal litigation and does not justify the enormous expenditure of time and money that Aventis claims."  Id.

Defendants respond that Plaintiff's requested reduction for alleged excessive conferencing "overreaches on several legal, methodological, and arithmetical grounds."  ECF No. 580, Reply at 20.  First, Defendants argue that Plaintiff did "not point[] to any particular meeting, conference, or telephone call that was abusive or excessive" and therefore, has not met "the rebuttal burden of providing evidence that claimed hours were duplicative or inefficient."  Id. (citations, internal quotation marks, and alterations omitted).

Second, Defendants argue that Plaintiff provides no explanation for the discrepancy between the "roughly 749 intra-firm conferences, amounting to 694.6 hours" Plaintiff argues Gibson's billing records include, and that proposed reduction of 1,498 hours Plaintiff seek here.  Id.

Third, Defendants argue that "the proposed reduction is based on [Plaintiff's] expert's definition of 'intra-office communications[,]'" however, neither Plaintiff's expert's "declaration nor the attached exhibits provide a list of the keywords he used to identify such entries, and the exhibits proffered as including examples contain entries he agrees do not actually reflect intra-office conferencing."  Id. (citations omitted).  Defendants add that "[w]hat is clear is that the definition applied by [Plaintiff] is very broad, encompassing not only actual meetings and phone calls, but emails, drafting of memos, . . . possibly implementing comments from and drafting documents for a colleague[,] . . . correspondence with outside entities, and telephone calls with the client."  Id. at 21 (citations omitted).

Fourth, Defendants argue that "[c]ourts have rejected imposing arbitrary levels of allowed conferencing (such as the 4% offered by Schratz here), particularly in complex matters."  Id. (citing Nadarajah v. Holder, 569 F.3d 906, 925 (9th Cir.

2009); Cruz v. Starbucks Corp., No. C-10-01868 JCS, 2013 WL 2447862, at *8 (N.D. Cal. June 5, 2013)).

Defendants conclude that "[g]iven the absence of any specific objections to particular internal conferences, the Court should not apply any reduction on this basis[]" and "[s]hould the Court find any reduction on this ground is necessary, it should be limited to no more than 694.6 hours because that is the only amount Amphastar specifically identified . . . ." Id.

In Plaintiff's Sur-Reply, Plaintiff argues that Defendants "incorrectly contends that 694 hours represents the total amount of internal conferencing for all timekeepers." ECF No. 568, Opp'n at 25 (citations omitted); ECF No. 594, Sur-Reply at 23. Plaintiff argues for the first time in its Sur-Reply that "Mr. Schratz identified 694 hours of internal conferencing in the single-entry items amongst Gibson's core team[,]" which is "20.7% of the 3,361 hours billed by the core timekeepers in their single-billed (i.e. non-block-billed) entries constituted internal conferencing." ECF No. 594, Sur-Reply at 22-23 (citing ECF No. 568-2, Schratz Decl. at ¶¶ 117-19). Plaintiff argues that "that number does not take into account the block-billed entries by the core time-keepers (which is more than 70% of their recorded time), or any entries by the non-core billers." Id. at 23. Plaintiff argues that "[b]ecause of Gibson's pervasive use of block billing, Mr. Schratz isolated this number as a representative sample, so that he could extrapolate the total amount of time dedicated to internal conferencing" and "[b]y that calculation, Gibson spent approximately 4,757 hours engaged in internal conferencing." Id. (citing ECF No. 568-2, Schratz Decl. at ¶ 120).

Plaintiff adds that "[w]hile not fully explained in Amphastar's Opposition, Mr. Schratz's declaration thoroughly explains his analysis." Id. at 24 n.9 (citing ECF No. 568-2, Schratz Decl. at ¶¶ 118-23). Plaintiff also adds that "even a cursory review of Exhibit 19 to Mr. Schratz's declaration reveals that Mr. Schratz's methodology correctly identified a large number of conferences and other internal

35

1   communications[]" because "the entries in Exhibit 19 refer to 'discuss,'

2   'communications,' 'coordination,' 'teleconference,' and e-mail exchanges.'" Id.

3   at 24 n.10.  Plaintiff further adds that "Mr. Schratz conceded that his calculation

4   was not exact, but also observed that calculating the actual number of hours spent

5   on internal conferencing was impossible because of Gibson's nearly universal block

6   billing" and "by recommending an across-the-board deduction of only 10%, Mr.

7   Schratz's conclusion allows this Court to make an appropriate reasonableness

8   determination while still allowing a significant amount of fees for internal

9   conferencing." Id. at 24-25.

10         Finally, Plaintiff argues that Mr. Schratz explained that "between 2% and 4%

11  of time is typically spent on internal conferencing" and because Defendants' billed

12  more than four percent of their time to internal conferencing, "the Court [should]

13  apply a 10% reduction to the lodestar hours for internal conferencing." Id. at 23

14  (citing ECF No. 568-2, Schratz Decl. at ¶ 121).

15                    **(ii)    No Reduction Is Warranted For Internal**

16                              **Conferencing.**

17         Here, the Court is unmoved by Plaintiff's arguments in support of a ten

18  percent reduction to Defendants' fee request due to excessive conferencing for

19  several reasons.  First, it is unclear to the Court how Plaintiff's expert determined

20  what work constituted intra-office communications.  An inspection of Mr.

21  Schratz's Declaration reveals that Mr. Schratz's entire analysis on Defendants'

22  alleged excessive conferencing is contained in eleven paragraphs of his Declaration

23  that reference three exhibits. See ECF No. 568-2, Schratz Decl. at ¶¶ 113-23

24  (referencing ECF No. 568-3, Exhibit 1; ECF No. 568-23, Exhibit 19; ECF No. 568-

25  24, Exhibit 20).  However, neither the Declaration, nor the three exhibits cited in

26  the Declaration list the search terms or methodology Mr. Schratz used to create his

27  list of billing entries he opined constituted intra-office communications, and an

28  inspection of the three exhibits cited by Mr. Schratz reveals that some billing

36

entries cited in the exhibits contain tasks that do not appear to be intra-office communications.  See, e.g., ECF No. 568-24, Ex. 20 at 3 (entry by Betty Jo Page for 0.30 hours to "Search for pleadings filed in U.S. District Court case for M. Sukenik[,]" which the Court finds does not appear to be an intra-office communication).  Moreover, it appears that none of the time associated with the aforementioned entry was even billed to Defendants.  See id. (billing entry by Betty Jo Page lists the "Base Hrs" as 0.30 hours and the "Billed Hrs" as "-", indicating that Defendant was not billed for this time).

Second, even if the Court were to accept that all the billing entries Mr. Schratz opined as having contained intra-office communications—even though Mr. Schratz did not explain his methodology or the search terms he used to compile his list and not all the entries on his list appear to contain intra-office communications—a review of Mr. Schratz's sample calculations reveals that Mr. Schratz overstates the amount of time Defendants spent on intra-office communications.  Specifically, Mr. Schratz appears to consider the entire amount of time billed in his sampled billing entries as intra-office communications, when there are often multiple tasks performed in the entries he cites that are clearly not intra-office communications.

For example, Mr. Schratz explained in his Declaration that:

The 11 core timekeepers billed 1,818 non-block-billed billing entries, totaling 3,361.4 billed hours.  Based on this review of these 1,818 non-block-billed billing entries, I found that 749 billing entries contained some form of intra-office conferencing.  These entries total 694.6 billed hours.  These entries are set forth in Exhibit 19.  In sum, this means that 20.7 percent (694.6/3,361.4) of Gibson's core timekeepers' non-block-billed time was devoted to some type of intra-office conferencing.

ECF No. 568-2, Schratz. Decl. at ¶¶ 118-19 (emphasis added).

As this passage illustrates, Mr. Schratz opines the "total 694.6 billed hours" listed in Exhibit 19 prove that "20.7 percent (694.6/3,361.4) of Gibson's core timekeepers' non-block-billed time was devoted to some type of intra-office conferencing." Id.  This conclusion is problematic because many billing entries appear to contain, at most, only small amounts of intra-office communications.

For example, on the first page of the billing entries contained in Exhibit 19, three entries by Sean M. Royall, from November 25, 2011, appeared to contain only small amounts of intra-office communications.  Those entries stated:

- 3.60 hours to "Continue[] work on draft motion to dismiss, distributed current version of draft to team, and reviewed updated regulatory timeline distributed by M. Drake";
- 1.20 hours for "Further edits to portions of motion to dismiss brief and related contacts with team"; and
- 10.10 hours to "Edit and draft motion to dismiss, review of underlying litigation and regulatory materials and cited case law, and related contacts with M. Sukenik and O. Jennings."

ECF No. 568-23, Ex. 19 at 2.  With no explanation by Mr. Schratz of why these entries were included in Mr. Schratz's calculations, the Court can only assume that Mr. Schratz believes that, for example, the aforementioned entry by Mr. Royall of 10.10 hours supports a conclusion that a ten percent reduction in Gibson's bills is appropriate because Mr. Royall spent 10.10 hours on intra-office communications. The Court disagrees.

Similarly, Mr. Schratz lists, for example, an entry by Michael Sukenik for 7.80 hours to "[c]onduct legal research and draft memorandum summarizing findings on pleading, FCA, and antitrust issues; speak with S. Royall & O. Jennings regarding ongoing research; review emails from J. Zelenay." Id. at 4.  Although the Court cannot accurately discern exactly how much of the 7.80 hours Mr. Sukenik spent researching and writing versus speaking with people or reviewing emails, Mr.

1   Schratz appears to use this entry, and many others like it, to support a finding that

2   all the time associated with the entry was spent on intra-office communications,

3   when this clearly does not appear to be the case.

4        Moreover, Mr. Schratz appears to have based his remaining findings on the

5   premise that the above discussed findings established that twenty-percent of all

6   billing entries contained intra-office communications.  See ECF No. 568-2, Schratz

7   Decl. at ¶ 120 (stating that "[c]oncerning blocked entries, it was difficult to

8   quantify the amount of conferencing as a result of the entries being block-billed.

9   We therefore extrapolated that, since 20% of the single-task entries by core

10  timekeepers included an intra-office conference, 20% of the block-billed entries by

11  all billers also contained intra-office conferences.").

12       Thus, because Mr. Schratz's unexplained methodology appears to attribute

13  all the time in the billing entries he cites in Exhibits 19 and 20 to intra-office

14  communications, when it appears that only a fraction of the time spent in many of

15  those entries can be attributed to intra-office communications, the Court finds that

16  Mr. Schratz's opinion regarding the amount of time Defendants spent on intra-

17  office communications is overstated.

18       Third, the number of hours listed in the exhibits cited by Mr. Schratz do not

19  support the number of hours Mr. Schratz discussed in his Declaration.  For

20  example, as discussed above, Mr. Schratz stated in his Declaration that the entries

21  "set forth in Exhibit 19" "contained some form of intra-office conferencing" and

22  "total 694.6 billed hours."  See ECF No. 568-2, Schratz Decl. at ¶ 118.  Exhibit 19,

23  however, notes 869.20 as the "Grand Total" of base hours listed and 849.90 as the

24  "Grand Total" of billed hours listed.  See ECF No. 568-23, Exhibit 19 at 91.  Thus,

25  it is unclear why the total hours Mr. Schratz noted in his Declaration do not match

26  the totals listed in the exhibits he references in support of his Declaration.  To the

27  extent Mr. Schratz performed some sort of additional calculation to extrapolate a

28  subset of the entries contained in Exhibit 19 to support the total time claimed in his

Declaration, he did not state such in his Declaration. The Court, therefore, cannot find that Mr. Schratz's findings and opinions in his Declaration are supported by the Exhibits he references, which undercuts Mr. Schratz's findings and opinions in his Declaration relating to intra-office conferencing.

/ / /

Similarly confusing is Exhibit 20, a fourteen-page document that merely lists billing entries, with no explanation of why the entries were selected, and lists no total amounts of time associated with the entries. See ECF No. 568-24, Ex. 20. Mr. Schratz explains in his Declaration that "[e]xamples of intra-office conferencing are set forth in Exhibit 20 attached hereto[,]" but he does not explain why he submitted this fourteen page exhibit in addition to the ninety-one page Exhibit 19. See ECF No. 568-2, Schratz Decl. at ¶ 22. The Court is unsure of why Mr. Schratz referenced two separate exhibits with examples of intra-office communications and discussed the findings in only one—Exhibit 19—and, thus, the Court finds that Exhibit 20 does nothing to support Mr. Schratz's opinions and conclusions in his Declaration.

In sum, the exhibits cited by Mr. Schratz do not support Mr. Schratz's opinion that a ten percent reduction is warranted for intra-office communications because these exhibits list total amounts of time that do not correlate with the totals Mr. Schratz discusses in his Declaration and, reviewing the entries included in these exhibits reveals that Mr. Schratz overstated the time spent on intra-office communications by apparently including all time associated with each billing entry to intra-office communications, which overstates the amount of time Defendants spent on intra-office communications.

Finally, the Court observes that Mr. Schratz concedes "that intra-office conferencing is an important aspect of case development and preparation," but opines that "billing for conferencing should not exceed four percent of total fees." Id. at ¶¶ 114, 17, 121. Even if the Court were to adopt Mr. Schratz opinion that

four percent of total fees for intra-office communications was acceptable, which the
Court reserves judgment on, for the reasons discussed above, the Court cannot
determine how much time Defendants spent on intra-office communications.

Therefore, based on Mr. Schratz's Declaration, the Court cannot find that
any reduction is warranted for intra-office communications because Mr. Schratz'
Declaration and the exhibits he cites, fail to establish how much time Defendants
spent on this task.  To the extent it was difficult to do so because of the block
billing, that aspect has already been addressed.

Moreover, Plaintiff's "calculation[ that] Gibson spent approximately 4,757
hours engaged in internal conferencing[,]" is similarly unpersuasive and is not
cause for a reduction in Defendants' requested fee because Plaintiff's calculations
are based on Mr. Schratz's inadequately explained and confusing findings.  ECF
No. 594, Sur-Reply at 23 (citing ECF No. 568-2, Schratz Decl. at ¶ 120).

Consequently, the Court finds that Plaintiff has not met its rebuttal burden
of establishing that a reduction is warranted for excessive intra-office
communications by submitting "evidence to the district court challenging the
accuracy and reasonableness of the hours charged or the facts asserted by
[Defendants]."  Gates, 60 F.3d at 534-35.

Similarly, the Court finds that no reductions are warranted for Defendants'
alleged violations of the OCRA by engaging in excessive conferencing because,
again, Plaintiff failed to meet its rebuttal burden of establishing how much internal
conferencing Gibson billed Defendants.  Thus, the Court cannot determine that
Defendants engaged in excessive internal conferencing in violation of the OCRA.

Finally, with respect to Plaintiff's argument that a reduction is warranted for
billers who billed an excessive number of hours each day, and because the
circumstances of this case are "typical of federal litigation and do[] not justify the
enormous expenditure of time and money that Aventis claims[,]" the Court
disagrees.  ECF No. 568, Opp'n at 27.  As previously discussed , Defendants have

already negotiated over $2.6 million in discounts from the amount Gibson billed to the amount Gibson was paid and, notably, during peak times in the litigation where long days were noted in Gibson's billing logs, the parties already negotiated a fixed fee for those billing entries. See ECF No. 619-1, Billing Records at 503-17 (entries from July 1, 2014, to July 11, 2014, have a comment that states "$900K Fixed Fee" next to each billing entry). Moreover, to the extent that Defendants billing many hours in one day led to any ambiguity in narrative descriptions of the work that was performed in those days, reductions have already been made for these ambiguities in the block-billing section of this Order.

Consequently, the Court finds that no reduction is warranted here for Defendants billing long days or for the nature of this litigation being typical of other federal litigation. Holt, 2012 WL 5829864, *6; Moreno, 534 F.3d at 1112.

Accordingly, based on the foregoing, the Court finds that a total 11.176% reduction to Defendants' claimed 23,788 hours—or a reduction of 2,797.47 hours—is appropriate here. Thus, the Court finds that, after all reductions are made, **20,990.53 hours is a reasonable number of hours here**. The Court turns next to the hourly rate Defendants claim.

### 2. Hourly Rate

As discussed above, Defendants seek $578 per hour for work performed in this case. See ECF No. 559-1, Application at 25. The Court addresses the parties' specific arguments relating to the reasonable hourly rate below.

### a. Parties Arguments

Defendants assert that its $578 hourly rate is reasonable for the following reasons. First, Defendants argue that they "seek[] to recoup exactly what [Defendants'] paid, and 'evidence that an institutional client in a competitive legal market was willing to pay the rates charged without any guarantee of reimbursement is important evidence that the rate was reasonable.'" Id. at 24

1   (quoting Perfect 10, Inc. v. Giganews, Inc., No. 2:11-cv-7098, 2015 WL 1746484, at

2   *8 n.14 (C.D. Cal. Mar. 24, 2015), aff'd, 847 F.3d 657 (9th Cir. 2017)).

3        Second, Defendants assert that the relevant community for this case "is the

4   forum in which the district court sits," i.e., the Central District of California[,]"

5   which "means the entire Central District, including Los Angeles." Id. (citations

6   omitted).

7        Third, Defendants argue that the hourly rates Defendants seek are

8   reasonable for the "quality of work in the District, particularly in light of (i) the

9   enormous alleged damages and potential consequences for the industry, (ii) the

10  complex legal and factual issues, and (iii) the 'skill, experience and reputation' of

11  the firm as a whole and the specific attorneys involved in the case." Id. at 25

12  (quoting Blum, 465 U.S. at 895 n.11). Defendants assert that "[d]uring the time of

13  the litigation, associate hourly rates ranged from $342 to $700 (including all

14  discounts and write-offs), with a weighted average of $492." Id. Defendants add

15  that Partner hourly rates ranged from $695 to $1,090 (including all discounts and

16  write-offs), with a weighted average of $798." Id. Defendants assert that "[t]he

17  weighted average rate (paid fees divided by billed hours) for all timekeepers over

18  the life of the matter was approximately $578 per hour." Id.

19       Defendants assert that their expert, Mr. Knapton "compared these figures

20  to those for other large (1000+ attorney law firms) in the Los Angeles area for

21  commercial and IP litigation (the two most comparable reported categories), as

22  documented in highly regarded compilations of actual billing data[]" and "found

23  that '[w]hile the fact that a large and sophisticated client has actually paid the

24  requested rate establishes that they are the market rates, both the Real Rate Report

25  and the Legal Billing Reports provide corroboration for the rates sought by Moving

26  Parties for the legal work in this matter.'" Id. at 25-26 (quoting Knapton Decl. at

27  ¶¶ 44, 63-79). Defendants add that their "rates are the result of extensive

28  negotiation between Aventis and [Gibson], and Aventis's close scrutiny of its

invoices, which combined to result in a 16% effective discount, or $2,699,093." Id. at 26.

Fourth, Defendants argue that "Amphastar's own counsel's claimed rates are also useful evidence to suggest that the rates sought [for Gibson] are reasonable." Id. (citation and internal quotation marks omitted). Defendant cites to hourly rates sought by Plaintiff's counsel in other cases ranging up to $825 and compares those rates to Defendants' attorneys in the instant matter who were paid $749 per hour for their work for the proposition that Defendants rates are "a bargain indeed." See id. at 27.

Fifth, Defendants assert that "[c]riteria such as firm size and reputation are also highly significant" and that Gibson "is routinely ranked in the highest echelons of law firms." Id. at 27-28 (citations omitted).

Finally, Defendants assert that the rates they seek here "are also comparable to those previously awarded by courts in the Central District[,]" such as:

- A "Central District court approv[ing] [Gibson] rates of up to $900/hour for work ending in 2012, when this litigation was just beginning[,]" id. at 28 (citing U.S. ex rel. Lee v. Corinthian Colls., Inc., No. 2:07-cv-1984, 2013 WL 12114064, at *7 (C.D. Cal. June 6, 2013) (overruled on other grounds));

- "A 2017 decision approved a $1,200/hour rate for an IP partner at another firm as 'reasonable in light of th[e] partner's extensive skill and experience.'" Id. (quoting Flo & Eddie, Inc. v. Sirius XM Radio, Inc., No. 2:13-cv-5693, 2017 WL 4685536, at *8 (C.D. Cal. May 8, 2017)); and

- A "2015 decision, affirmed by the Ninth Circuit, approved rates for partners between $610 and $930, and hourly rates for associates between $360 and $690 for intellectual property work ending in 2014." Id. (citing Perfect 10, Inc., 2015 WL 1746484, at *30).

44

Plaintiff responds that the Court should "reduce Gibson's hourly blended rate to $432, the same rate as Amphastar's lawyers and a rate in line with the prevailing rates in the regions in which Gibson's lawyers worked" for the following reasons.  ECF No. 568, Opp'n at 29 (citation omitted).

First, Plaintiff argues that "Gibson's rates are significantly higher than the rates Amphastar paid to comparable counsel."  Id. (capitalization normalized). Plaintiff asserts that "[d]uring the course of the litigation, Amphastar was represented by comparable counsel[,]" "[y]et, the 'blended rate' that Amphastar's lawyers charged ($432 per hour) was approximately 25% lower than the blended rate charged by Gibson ($578 per hour)."  Id. (citations omitted).  Plaintiff argues that "the rates paid by Amphastar provide strong evidence of reasonable rates, and the blended hourly rate Aventis seeks should be reduced accordingly."  Id. at 29-30.

Second, Plaintiff argues that "Gibson's rates were not extensively negotiated."  Id. at 30 (capitalization normalized).  Plaintiff argues that contrary to Defendants' argument that their rates were the result of extensive negotiation, "[t]he 10% or 15% invoice-level discount is common in the legal marketplace, and even Aventis's own proffered expert admits that law firms regularly offer such discounts."  Id. (citations omitted).

Third, Plaintiff argues that a reduction in the hourly rate Defendants seek is appropriate here because "Gibson's lawyers hail from significantly less expensive markets than the Central District of California" and "the Ninth Circuit (along with other circuits) have held that rates other than those in the forum may be applied." Id. (capitalization normalized) (citing Gates, 987 F.2d at 1405).  Plaintiff asserts that "[t]ypically, rates other than those of the forum are allowed when local counsel is unable or unwilling to litigate the matter" and that here, "[a]lthough local counsel was unquestionably available, Aventis retained counsel from less expensive jurisdictions."  Id. (citing Gates, 987 F.2d at 1405).  Plaintiff argues that

45

"[o]f the 11 core team members that it identified, only one attorney (Anne Brody, an associate who billed time on the matter only in 2014) is located in the Central District of California." Id. (citation and internal quotation marks omitted). Plaintiff adds that "[s]ix are located in Dallas and two are from Washington, D.C.[,]" the partner who is responsible for the greatest share of fees is Tracey Davies, who is located in Austin, Texas[,]" and "[t]he non-partner lawyer who generated the largest share of fees was Richard Cunningham, who is located in Denver, Colorado." Id. at 31 (citations omitted). Plaintiff asserts that "[c]ompared to other regions, rates in the Los Angeles market are very high[]" and, specifically, "rates and compensation for attorneys in the Dallas and Denver markets, where Aventis's lawyers primarily practice, are 10 to 20% lower than lawyers in Los Angeles." Id.

Plaintiff concludes by arguing that because "the blended hourly rate for Amphastar's attorneys was 25% less than Gibson's," and because "Gibson lawyers generally practice in markets with significantly lower rates, the hourly rates for Gibson's lawyers should be reduced to a blended rate of $432 per hour, the same as Amphastar's comparable lawyers, for purposes of calculating the lodestar." Id. at 31-32.

Defendants reply that Plaintiff's assertion that "it was represented by counsel that was comparable at $432 per hour . . . is a questionable proposition on its face" because Plaintiff, in addition to using two larger firms, "also used three smaller firms: Stradling Yocca (142 lawyers), Greenberg Gross (21), and Michelman & Robinson (62) . . . and '[i]t is a fact of life that rates charged by large firms will be at the high end.'" ECF No. 580, Reply at 23 (quoting L.A. Unified Sch. Dist. v. C.M., No. 2:08-cv-424 (MMM) (JCx), 2009 WL 10672592, at *5 (C.D. Cal. Sept. 16, 2009)). Defendant adds that "[m]uch of the work on behalf of Amphastar was performed by a lawyer . . ., who it is now suing for malpractice"

1    and Plaintiff "rightly does not even suggest that his work was of Gibson Dunn

2    quality." Id. at 23-24 (citing Schnitzer Decl. at ¶ 9 and Ex. 8).

3         Defendants also reply that, contrary to Plaintiff's assertion that Defendants'

4    expert "'admits' that 10–15% discounts are 'regularly offer[ed,]'" Gibson's expert,

5    "Mr. Knapton didn't say that on the page Amphastar cites—or anywhere. And on

6    the next page he said this was a 'substantial discount.'" Id. at 24 (citations

7    omitted).

8    / / /

9         Defendants next reply that although Plaintiff "points out that some members

10   of the core Gibson Dunn team hailed from Dallas and Denver, where some firms

11   charge lower rates[,]" Gibson "generally charges the same rates in Dallas, Denver,

12   and Los Angeles" and "[i]n any event, the measure in a fee-shifting case is what is

13   reasonable in 'the relevant legal community,' which is the 'forum in which the

14   district court sits.'" Id. (citing ECF No. 568, Opp'n at 21; quoting Prison Legal

15   News v. Schwarzenegger, 608 F.3d 446, 454 (9th Cir. 2010)). Defendant adds that

16   "[t]he recognized exception is when it is necessary to import more expensive

17   counsel[,]" that Plaintiff "cites no authority for importing lower rates based on

18   work being performed by a lawyer who resides in another market[,]" and that

19   "[t]he Ninth Circuit and its district courts have consistently 'decline[d]' to adopt

20   this approach." Id. (quoting Sierra Club v. U.S. Envtl. Prot. Agency, 339 F. App'x

21   678, 680 (9th Cir. 2009), and citing Schwarz v. Sec'y of Health & Human Servs.,

22   73 F.3d 895, 907 (9th Cir. 1995); Inst. for Wildlife Prot. v. Norton, No. C03-1251P,

23   2006 WL 1896730, at *2 (W.D. Wash. July 10, 2006)) (emphasis in original).

24        Finally, Defendants reply that Plaintiff "notes awarded rates in other FCA

25   cases in indisputably cheaper venues, for smaller firms, and/or for non-complex

26   work, including two higher than the $578 sought here[]" and that "[t]his only

27   highlights that $578 was a reasonable rate for this work in this market by this firm.

28   Id. at 25 (citations omitted).

47

1      In Plaintiff's Sur-Reply, Plaintiff "objects to the entirety of the declaration

2 submitted by Aventis's purported expert, Mr. Knapton, including his opinion

3 regarding rates[]" because Plaintiff argues, for the first time in its Sur-Reply, that

4 "Mr. Knapton's opinion was based on no serious analysis or standards, as

5 demonstrated by his unsolicited statement that he would have paid Aventis's lead

6 lawyer $10,000 per hour."  ECF No. 594, Sur-Reply at 26 (citation and internal

7 quotation marks omitted).

8 / / /

9               **b.**   **Analysis**

10      As an initial matter, the Court rejects Plaintiff's objection to Defendants'

11 expert's entire declaration on the ground that it "was based on no serious analysis

12 or standards[,]" id., for two reasons.  First, Plaintiff waited until its Sur-Reply to

13 assert this objection and, consequently, Defendants did not have an opportunity to

14 argue against Plaintiff's objection.  Moreover, Plaintiff provided no explanation for

15 why it waited until its Sur-Reply, which was filed on January 24, 2019, to object to

16 Mr. Knapton's Declaration that was filed five months earlier on August 7, 2018.

17 Thus, the Court rejects Plaintiff's objection on the basis that Plaintiff waited until

18 its Sur-Reply to bring it.  See Rai v. CVS Caremark Corp., No. CV 12-08717-JGB

19 (VBKx), 2013 WL 10178675, at *2 n.3 (C.D. Cal. Oct 11, 2013) ("The Court

20 declines to consider any arguments raised for the first time in a reply brief") (citing

21 Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir. 2007)).  Second, turning to the

22 merits of Plaintiff's objection, there are none.  Plaintiff objects to Mr. Knapton's

23 entire declaration because it "was based on no serious analysis or standards[,]"

24 ECF No. 594, Sur-Reply at 26, and, Plaintiff provides no analysis or standards to

25 support its unexplainedly late objection.  Accordingly, Plaintiff's objection is

26 overruled.  The Court next determines the relevant community.

27

28

1

### (i)    Relevant Community

2      Turning now to the merits of the parties' arguments in favor of an hourly

3 rate ranging from $432 to $578, the Court begins with the arguments relating to

4 identifying the relevant community is in this case.  The Court finds that the

5 relevant community for this case is the forum in which the district court sits, which

6 is the Central District of California, including the Los Angeles practice area, even

7 though some of Gibson's attorneys performed work on this case outside of this

8 community.  See Camacho, 523 F.3d at 979 ("the relevant community is the forum

9 in which the district court sits.") (citation omitted); see also Prison Legal News,

10 608 F.3d at 454-55 (same); Schwarz v. Sec'y of Health & Human Servs., 73 F.3d

11 895, 907 (9th Cir. 1995) (upholding district court's decision to apply the "general

12 rule" of "calculate[ing] th[e] reasonable hourly rate according to the prevailing

13 market rates in the relevant community, which typically is the community in which

14 the district court sits" and rejecting arguments that "the court should have based

15 its award on the hourly rate . . . in [a different forum], where [the fee applicant's]

16 lead counsel lives and works") (citations and internal quotation marks omitted);

17 Sierra Club v. U.S. Envtl. Prot. Agency, 339 F. App'x 678, 680 (9th Cir. 2009)

18 (unpublished)[28] (finding that "Under Ninth Circuit case law, the 'relevant legal

19 community' is the 'forum district' in which the district court sits[,]" that

20 "[a]lthough two of our sister circuits have adopted an exception to the forum rule

21 for those rare cases in which lawyers 'practice in far less expensive legal markets

22 and perform the bulk of their work on the case at home in those markets,' the

23 Ninth Circuit has not adopted this exception[,]" and that "[g]iven the objectivity

24 and efficiency concerns that motivated the forum rule, exceptions to it should not

25 be adopted lightly.") (internal citations omitted).

26

27 [28] The Court acknowledges that unpublished opinions "are not precedent, except when relevant
under the doctrine of law of the case or rules of claim preclusion or issue preclusion."  See 9th
28 Cir. Rule 36-3.

1    **(ii)** **Consistency Of Rates With Community**

2    Having determined that the relevant community in this case is the Central

3    District of California, which encompasses the Los Angeles practice area, the Court

4    turns next to whether the rates Defendants seek are consistent with prevailing

5    market rates in that community.  As discussed above, Defendants seek an hourly

6    rate of $578, and cites to the following rate information in support:

7    • "associate hourly rates ranged [that] from $342 to $700 (including all

8    discounts and write-offs), with a weighted average of $492";

9    • "[p]artner hourly rates ranged [that] from $695 to $1,090 (including all

10   discounts and write-offs), with a weighted average of $798"; and

11   • "[t]he weighted average rate (paid fees divided by billed hours) for all

12   timekeepers over the life of the matter [that] was approximately $578 per

13   hour."

14   ECF No. 559-1, App. at 25.

15   "An attorney's rate is 'reasonable' for the purpose of a fee award if it

16   comports with 'prevailing market rates in the relevant community[.]'" Perfect 10,

17   Inc., 2015 WL 1746484, at *15 (quoting Van Skike v. Dir., Office of Workers'

18   Comp. Programs, 557 F.3d 1041, 1046 (9th Cir. 2009)).  "To determine whether a

19   rate falls within the scope of 'prevailing market rates,' courts consider rates

20   charged by other 'attorneys in the relevant community engaged in equally complex

21   Federal litigation, no matter the subject matter' . . . 'for similar services by lawyers

22   of reasonably comparable skill, experience and reputation.'" Id. (quoting Prison

23   Legal News, 608 F.3d at 455).

24   Here, Defendants met their burden of establishing that their rates were in

25   line with the prevailing rates in the Central District of California for similar services

26   by lawyers of reasonably comparable skill, experience, and reputation by submitting

27   the Declarations of Mr. Knapton, Mr. Perry, and Mr. Dovdavany, and citing

28   examples of cases where similar fees were awarded.  See Camacho, 523 F.3d at 990

50

1   ("'To inform and assist the court in the exercise of its discretion, the burden is on

2   the fee applicant to produce satisfactory evidence—in addition to the attorney's

3   own affidavits—that the requested rates are in line with those prevailing in the

4   community for similar services by lawyers of reasonably comparable skill,

5   experience and reputation[]'" and "[a]ffidavits of the plaintiffs' attorney[s] and

6   other attorneys regarding prevailing fees in the community, and rate

7   determinations in other cases . . . are satisfactory evidence of the prevailing market

8   rate." (quoting Blum v. Stetson, 465 U.S. 886, 895 n.11 (1984)).

9       Specifically, first, Defendants submitted the Declaration of Mr. Knapton—a

10  non-Gibson attorney and expert on attorneys' fees—who opined that "the

11  discounted, negotiated hourly rates charged by Gibson Dunn are well within the

12  range of rates charged by law firms of similar caliber for this kind of litigation in the

13  Los Angeles area during this time."  ECF No. 559-4, Knapton Decl. at ¶¶ 1-2, 44.

14  Mr. Knapton noted that Gibson "currently has over 1,200 lawyers[,]" was

15  "awarded 'Band 1' placement for California commercial litigation by Chambers

16  USA, a well-respected source that evaluates law firms and lawyers in the United

17  States[,]" that its "peer firms in the Chambers USA list include Quinn, Emanuel;

18  Sullivan & Cromwell; Kirkland & Ellis; Latham & Watkins; Morrison & Foerster;

19  Cooley, LLP; Jones, Day, O'Melveny & Myers; and Hogan/Lovells US[,]" and

20  that "[a]ll of these firms are in the '500-lawyer to more than 1,000-lawyer' size

21  category of firms."  Id. at ¶ 56.

22      Mr. Knapton stated that "since the complaint was unsealed, the average rate

23  paid for all timekeepers is $578.81 per hour for all the time and the (after discount)

24  actual rates paid range from $1,090 for its most experienced partners to $156 for

25  clerks."  Id. at ¶ 59.  Mr. Knapton added that Gibson "was actually paid for its

26  lawyers' time at rates ranging from $350 for associates to $1,090 for senior

27  partners" and that "[t]hose rates are supported by the fact that a fee-paying client

28  negotiated and paid them at a time when there was no certainty that anyone else

1   would be reimbursing them." Id. at ¶ 60.  Mr. Knapton also highlighted the

2   impressive accolades of the "principal attorneys who led the team at various

3   points" throughout the litigation and opined that "[b]ased on his review of Gibson

4   Dunn's detailed list of time and work performed and discussions with its attorneys,

5   the firm's rates billed to, and paid by, clients of the firm are the rates that are being

6   requested, and those rates are reasonable." Id. at ¶¶ 62-63.

7        Mr. Knapton then discussed rates paid to comparable sized firms (more than

8   1,000 lawyers) in the Los Angeles area for "commercial litigation or patent

9   litigation" and noted that "[f]or that focused subset, the data shows a reasonable

10  rate for commercial litigation is at least the Third Quartile rates of $1,053.00 per

11  hour for partners and at least $640.00 per hour for associates" and that "[t]he

12  rates for 'intellectual property (other)' . . . have similar Third Quartile rates:

13  $1,071.43 for partners and $675.00 for associates." Id. at ¶ 70 (citations omitted).

14  Mr. Knapton added that "[b]y definition the Third Quartile rates are not the very

15  highest rates in the dataset but are a mid-point between the overall median and the

16  top of the dataset." Id.

17       Mr. Knapton also indicated that "Ms. Tracey Davies, whose hours correlate

18  to the largest share of fees was paid at an average rate of $761.55[,]" which "was

19  actually lower than the overall mean" "for partners doing commercial work at large

20  (1000+ attorneys) law firms in Los Angeles [which] was $962.22, and for IP it was

21  $855.00." Id. at ¶ 77.  Mr. Knapton added that "[a]s another example, in this

22  matter, the average associate rates paid for 2014 (by far the busiest year of the

23  matter) was $500.72 per hour.  That is below the mean ("average") 2014 rates for

24  associates of $519 (IP Other) and $516 (Commercial)." Id. at ¶ 78.

25       Second, Defendants submitted the Declaration of Mr. Perry—a partner at

26  Gibson—who opined that "the amounts invoiced to and paid by Aventis were

27  reasonable for the services provided in the course of this litigation.  The fees reflect

28  a discount of approximately 16% from Gibson Dunn's standard hourly rates[,]" and

"the volume of hours is a direct result of the difficulty in defending against Amphastar's persistent prosecution of what the district court found to be a 'clearly frivolous' lawsuit."  ECF No. 559-7, Perry Decl. at ¶ 7.  Mr. Perry discussed the rates charged and discounts negotiated with Defendants throughout the litigation in detail.  See generally id.

Third, Defendants submitted the Declaration of Mr. Dovdavany—Associate General Counsel for Defendants and the person responsible for overseeing the litigation on Defendants' behalf—who indicated that Defendants paid Gibson "$14,393,258, consisting of $13,757,998 in fees and $635,259 in costs and expenses[.]"  ECF No. 559-3, Dovdavany Decl. at ¶¶ 2, 4, 9.  Mr. Dovdavany opined that "based on [his] experience supervising litigation matters for Aventis, the amounts invoiced to and paid by Aventis for all of these services were reasonable for the services provided, were reasonably necessary, and were often provided at a significant discount."  Id. at ¶ 11 (emphasis added).  Mr. Dovdavany added that he "did not authorize payments with the expectation that Aventis would ultimately recoup the expenditures under the FCA's fee-shifting provision." Id. at ¶ 12.  Mr. Dovdavany discussed the amount and types of discounts that were negotiated throughout the litigation.  See id. at ¶¶ 16-18.  Mr. Dovdavany opined that "[i]n his experience, the rates Aventis paid Gibson Dunn were reasonable and justified in light of the firm's reputation, qualifications, and performance, and were in line with those charged for comparable work by peer firms."  Id. at ¶ 22.

Finally, Defendants discussed multiple cases where similar fee awards were made.  See ECF No. 559-1, Application at 28 (citing U.S. ex rel. Lee, 2013 WL 12114064, at *7 (overruled on other grounds) (finding that $900 per hour for work Gibson performed through 2012, which was near the beginning of this litigation, was "not unreasonable for experienced lawyers in the Los Angeles market"); Flo & Eddie, Inc., 2017 WL 4685536, at *8 (finding in 2017 that $1,200 per hour was "reasonable in light of this partner's extensive skill and experience"); Perfect 10,

1  Inc., 2015 WL 1746484, at *30 (approved hourly rates for partners between $610

2  and $930, and hourly rates for associates between $360 and $690 for intellectual

3  property work ending in 2014).

4         The Court finds that Defendants met their burden of establishing that their

5  hourly rates were reasonable with these declarations and cases because these

6  sources establish that Gibson's rates were in line with the prevailing rates in the

7  Central District of California for similar services by lawyers of reasonably

8  comparable skill, experience, and reputation.  Camacho, 523 F.3d at 990; see also

9  Perfect 10, Inc., 2015 WL 1746484, at *5 ("courts do not limit their analysis of a

10 prevailing market rate the specific practice area at issue in the litigation. '[T]he

11 proper scope of comparison . . . extends to all attorneys in the relevant community

12 engaged in equally complex Federal litigation, no matter the subject matter.'"

13 (quoting Prison Legal News, 608 F.3d at 455)).  Further, the Court finds that

14 Gibson's hourly rates are reasonable for the additional reason that Defendants

15 actually paid Gibson the rate Gibson seeks here, after all discounts were applied.

16 See Perfect 10, Inc., 2015 WL 1746484, at *8 n.14 ("evidence that an institutional

17 client in a competitive legal market was willing to pay the rates charged without any

18 guarantee of reimbursement is important evidence that the rate was reasonable.").

19 Finally, the Court finds Gibson's rates reasonable because of the complexity and

20 high stakes nature of this litigation and because of Gibson's reputation and

21 successful handling of this case where, as discussed above, Gibson successfully

22 navigated multiple discovery issues and its opponent's "improper conduct,

23 incredible testimony, and a baseless claim with no supporting evidence."  ECF No.

24 541, Order Granting Previous Fee Application at 22.

25        Moreover, the Court finds that Plaintiff failed to meet its rebuttal burden of

26 establishing that Defendants' hourly rate was not reasonable for the following

27 reasons.  See Camacho, 523 F.3d at 990 ("declarations filed by the fee applicant do

28 not conclusively establish the prevailing market rate[,]" rather, "[t]he party

opposing the fee application has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the . . . facts asserted by the prevailing party in its submitted affidavits." (citation and internal quotation marks omitted)).

First, the Court is unmoved by Plaintiff's argument that Gibson's hourly rate should be reduced because Plaintiff paid its "comparable counsel" only $432 per hour. ECF No. 568, Opp'n at 29. "Although the rates charged by opposing counsel may sometimes be 'useful', 'the district court has the discretion not to rely on them.'" Perfect 10, Inc., 2015 WL 1746484 at *5 (quoting Gonzalez v. City of Maywood, 729 F.3d at 1202).

Here, as Defendants correctly assert, one of the main attorneys who led Plaintiff through much of this litigation is now being sued by Plaintiff for malpractice and breach of fiduciary duty for his work on this case. See ECF No. 584, Schnitzer Decl. at ¶ 9 (declaring that the attached "Exhibit 8 is a true and correct copy of Amphastar's complaint against [prior counsel] for malpractice and breach of fiduciary duty, filed on November 22, 2017 in Orange County Superior Court"); see also ECF No. 584-8 Ex. 8 at 3 (copy of the complaint in Amphastar's malpractice suit against prior counsel, wherein Amphastar asserts that  prior counsel "represented to Amphastar that he possessed the necessary background, experience, and expertise to handle complex FCA litigation.  At no time did [prior counsel] advise or warn Amphastar that he had never handled an FCA litigation before[.]") (emphasis added).

Because Plaintiff is currently suing one of its former attorneys for malpractice—for his handling of this case—and because Plaintiff indicated in that malpractice lawsuit that the attorney it is suing had never even handled an FCA litigation before this case, the Court rejects Plaintiff's argument that its attorneys and Defendants attorneys are comparable.  As such, the Court declines to adjust Defendants' proposed rates to those of Plaintiff's counsel.

Similarly unpersuasive is Plaintiff's argument that a reduction in Gibson's claimed hourly rates is necessary because "Gibson's rates were not extensively negotiated."  ECF No. 568, Opp'n at 30.  A review of the record reveals that Defendants negotiated "a discount of approximately 16% from Gibson Dunn's standard hourly rates[,]" Gibson's rates were "often provided at a <u>significant discount</u>[,]" and evidence was provided supporting the claim that "the rates Aventis paid Gibson Dunn were reasonable and justified in light of the firm's reputation, qualifications, and performance, and were in line with those charged for comparable work by peer firms."  ECF No. 559-7, Perry Decl. at ¶ 7; ECF No. 559-4, Knapton Decl. at ¶¶ 11, 22; ECF No. 559-3, Dovdavany Decl. at ¶ 11 (emphasis added).  Moreover, the cases cited by Defendant support a conclusion that Defendants' rates were in line with the prevailing rates in the Central District of California for similar services by lawyers of reasonably comparable skill, experience, and reputation.  As such, **the Court finds that $578 was a reasonable hourly rate in this case**.

Accordingly, applying the reasonable hourly rate of $578 to the 20,990.53 hours the Court finds are reasonable in this case results in a **total fee award of $12,132,526.34**.  The Court turns next to whether an adjustment for delay in payment is warranted in this case.

### 3. Adjustment For Delay In Payment

Defendants also seek "an increase of $4.95 million" as "an adjustment to account for the lost opportunity of using money" that Defendants paid to Gibson for this litigation.  ECF No. 559-1, Application at 39.

### a. Parties' Arguments

Defendants argue that "[s]ince this lawsuit commenced more than six years ago, Aventis has been paying fees and expenses to [Gibson] and other vendors and therefore has been unable to use those funds for other corporate purposes."  <u>Id.</u>  Defendants assert that "[i]t is generally accepted that a fee award must contain an

adjustment to account for the lost opportunity of using money" and "[o]ne of the two methods approved by the Ninth Circuit to compensate for the 'time value of money lost' is 'applying the attorneys' current rates to all hours billed during the course of the litigation.'" Id. (quoting In re Wash. Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1305 (9th Cir. 1994), and citing Knapton Decl. at ¶ 94). Defendant asserts that "an increase of $4.95 million" is appropriate here to compensate for the time value of money lost as a result of this case and supports its assertions by referencing the declaration of Defendants' expert, Mr. Knapton. Id. (citing Knapton Decl. at ¶¶ 94-96). In the alternative, Defendants assert that the Court could choose to award "[i]nterest at the prime rate on Aventis's claimed fees and expenses is $1,917,310, accounting for what was spent each year and the changes in rates over time (ranging from 3.25% to 4.75%)." ECF No. 580, Reply at 27 (citing Knapton Decl. Ex. 11 at 4, Ex. 12 at 2).

Plaintiff responds that Defendants "should not be awardeed [sic] any enhancement in addition to its reasonable and necessary fees." ECF No. 568, Opp'n at 41 (capitalization normalized). Plaintiff argues that Defendants' assertion that "the fee award should be adjusted upward based on the attorneys' current rates, regardless of when the work was performed or how senior the lawyer was at the time . . . results in a massive and unsupported inflation of the fees." Id. at 42. Plaintiff adds that "while Aventis claims it should be awarded this bonus to account for the lost opportunity of using money, Aventis did not lose that opportunity" because "during the course of the litigation, Aventis frequently floated bonds at rates near—and, in some cases, at—zero percent." Id. (citations omitted).

Plaintiff adds that the cases cited by Defendants in support of an enhanced fee award are distinguishable from this case because in the cases cited by Defendants, "both cases involved attorneys who took on cases of public importance with no guarantee of ever being paid for their work" and "[t]hat is not the case here" because "Gibson did not take on a public interest matter where its

1  prospects for being paid were in doubt" and in this case, "Gibson's fees have

2  already been paid in full." Id. at 42-43 (citations omitted).  Plaintiff, therefore,

3  asserts that "Gibson suffered no opportunity cost to represent Aventis in this

4  matter, and there is no basis whatsoever to pay Gibson at its attorneys' current

5  rates." Id. at 43.

6       Plaintiff also argues that "Aventis is not entitled to any enhancement for the

7  "time value of money" because "applying current rates to Gibson's reasonable

8  hours would create a windfall" and "Aventis does not even provide the specific

9  evidence to justify applying the prime interest rate." Id. (capitalization

10 normalized).  Plaintiff adds that "Aventis falsely claims that it was unable to use

11 funds it paid to Gibson for other corporate purposes" because "[d]uring the course

12 of this litigation, . . . Aventis borrowed more than $27 billion in corporate bonds,

13 dwarfing the fees paid in this case" and "Aventis borrowed these funds at interest

14 rates approaching—and sometimes equaling—zero percent." Id. at 43-44

15 (citations and internal quotation marks omitted).  Plaintiff, therefore, argues that

16 "Aventis has not shown that it lost any opportunities to use its funds for other

17 corporate purposes" and, thus, Defendants are "not entitled to any enhancement

18 for the time value of money, let alone the $5 million bonus it requests."[29] Id. at 44.

19              **b.    Legal Standard**

20      "The district court has discretion to compensate delay in payment in one of

21 two ways: (1) by applying the attorneys' current rates to all hours billed during the

22 course of the litigation; or (2) by using the attorneys' historical rates and adding a

23 prime rate enhancement." In re Wash. Pub. Power Supply Sys. Sec. Litig., 19 F.3d

24 at 1305 (citation omitted).  The Court may not, however, use "the last rates

25 ───────────

26 [29] The Court observes that Plaintiff again raises entirely new arguments and cites new cases in its
   Sur-Reply that are not raised in response to new arguments raised by Defendants in Defendants'
27 Reply.  See ECF No. 594, Sur-Reply at 28-31.  As such, the Court declines to consider Plaintiff's
   arguments raised, and the authority cited, for the first time in Plaintiff's Sur-Reply.  See Rai,
28 2013 WL 10178675, at *2 n.3; Zamani, 491 F.3d at 997.

1   charged by attorneys who left prior to the fee petition, without a prime rate

2   enhancement," because doing so "inadequately compensate[s] the firm for the

3   delay in receiving its fees[]" and "[t]he time value of money lost by the firm is only

4   partially recouped." Id. Instead, "[f]ull compensation requires charging current

5   rates for all work done during the litigation, or by using historical rates enhanced by

6   an interest factor." Id.

7                   c.     **Adjustment For Delay In Payment Is Warranted**

8                           **Here.**

9       Here, the Court is not persuaded by Plaintiff's arguments that Defendants

10   should not be awarded an adjustment for the delay in payment. With respect to

11   Plaintiff's first argument—that the fee award should not be adjusted upward based

12   on the attorney's current rates—Plaintiff's argument fails because the Ninth

13   Circuit has expressly stated that "[f]ull compensation requires charging current

14   rates for all work done during the litigation, or by using historical rates enhanced by

15   an interest factor." In re Wash. Pub. Power Supply Sys. Sec. Litig., 19 F.3d at

16   1305. Thus, the Court declines to stray from binding precedent by adopting one of

17   Plaintiff's proposed calculations.

18       With respect to Plaintiff's second argument—that Defendants are not

19   entitled to an adjustment for the delay in payment because Defendants were able to

20   borrow money during the relevant time period, demonstrating that Defendants did

21   not lose the opportunities to use funds tied up in this litigation for other

22   purposes—the Court is not persuaded by Plaintiff's argument. Plaintiff cites no

23   binding authority for the proposition that Defendants needed to demonstrated need

24   for the funds that were tied up in this litigation in order to receive an adjustment for

25   the delay in payment. Moreover, even if Plaintiff had provided such authority,

26   Plaintiff's argument that Defendants borrowed money during the relevant time

27   period, even at low interest rates, demonstrates that Defendants indeed could have

28   used the money they spent on this litigation for continuing business operations.

1    Finally, with respect to Plaintiff's last argument—that the subject matter of
2    this case is distinguishable from the cases cited by Defendants in support of
3    receiving an adjustment for delay in payment, where, in the cases cited by
4    Defendants, matters of public interest were involved in those cases and, therefore,
5    Defendants should not receive an adjustment for a delay in payment because
6    matters of public interest were not involved in this case—the Court is
7    unpersuaded.  Here, Plaintiff brought a lawsuit and it was previously concluded
8    that previous counsel's actions warranted the awarding of fees and those actions
9    also required Defendants to devote millions of dollars to this litigation that they
10   could have used for legitimate business purposes had they not been subject to this
11   litigation.  And indeed, as Plaintiff's arguments illustrate, Defendants borrowed
12   money during the relevant time period to finance their continued operations.
13   Moreover, after all the reductions discussed above are applied, Defendants will not
14   even be returned to the status quo ante for the fees they paid Gibson.  Therefore,
15   insofar as Defendants request a delay-in-payment-adjustment here, Defendants'
16   request is **GRANTED**.

17   As discussed above, Defendants assert that the Court can award "[i]nterest
18   at the prime rate on Aventis's claimed fees and expenses is $1,917,310, accounting
19   for what was spent each year and the changes in rates over time (ranging from
20   3.25% to 4.75%)."  ECF No. 580, Reply at 27 (citing Knapton Decl. Ex. 11 at 4, Ex.
21   12 at 2).  Defendants add that "[t]he Ninth Circuit has also authorized using
22   current (2018) rates, which results in a $4.95 million enhancement to the fee
23   component (after applying the same 16% discount from rack rates that applied to
24   the historic rates), plus interest (totaling $142,586) on the expense component."
25   Id. (citing Knapton Decl. ¶¶ 94-99).

26   The Court finds that awarding Defendants interest based on the prime rate is
27   appropriate here because doing so will adequately compensate Defendants for the
28   time value of the money they had tied up in this litigation.

As such, the Court **AWARDS Defendants interest at the prime rate on Aventis's claimed fees and expenses**.  However, the exhibit cited by Defendants—the Knapton Declaration, Exhibit 11 at 4—does not list the total of $1,917,310, as Defendants assert.  Rather, page four lists no total and page three of that same exhibit lists $1,252,752 as the total.  See ECF No. 559-6, Knapton Decl., Ex. 11 at 3-4.  Nevertheless, the Court finds that any total asserted in that exhibit is now stale information, as it provides calculations through only April 30, 2018.  See id. at 3.  As such, the Court **HEREBY ORDERS Defendants to provide fresh calculations to the Court, within thirty days of this Order, demonstrating the interest amount due to Defendants through the date of the Order based on the prime rate**.

## IV.    CONCLUSION

For the reasons discussed above, IT IS HEREBY ORDERED that Defendants' Application is GRANTED in part.  Specifically, Defendants are awarded:

1)  $672,086.85 for non-fee expenses pursuant to the parties Expense Stipulation and the Court's Order Granting the Expense Stipulation; and

2)  $12,132,526.34 in attorneys' fees.

IT IS HEREBY FURTHER ORDERED that Defendants shall provide fresh calculations to the Court, within thirty days of this Order, demonstrating the interest amount due to Defendants through the date of the Order based on the prime rate.  The Court will award Defendants a delay-in-payment-adjustment by separate order after Defendants submit the aforementioned fresh calculations.

IT IS SO ORDERED.

DATED: 11/13/2020    _____

HONORABLE SHASHI H. KEWALRAMANI
United States Magistrate Judge

61